# 22-1291-cv

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

– v. –

ELON MUSK,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX

MICHAEL A. CONLEY
JEFFREY A. BERGER
JOHN R. RADY
UNITED STATES SECURITIES AND
    EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
(202) 551-5112

*Attorneys for Plaintiff-Appellee*

ALEX SPIRO
ELLYDE R. THOMPSON
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

– and –

WILLIAM A. BURCK
RACHEL G. FRANK
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000

*Attorneys for Defendant-Appellant*

i

**JOINT APPENDIX**
**TABLE OF CONTENTS**

**Page**

U.S. District Court Docket Entries ........................... A-1

Complaint, dated September 27, 2018....................... A-16

Consent Motion for Entry of Final Judgment, dated
    September 29, 2018 ................................................ A-39

Final Judgment, dated October 16, 2018 .................. A-41

Plaintiff's Motion and Memorandum of Law, in
    Support of an Order to Show Cause, dated
    February 25, 2019
    (Omitted Herein)

    Exhibit 1 to Memo -
    Tesla, Inc. Senior Executives Communications
    Policy, dated December 11, 2018 ......................... A-55

    Exhibit 2 to Memo -
    Letter from Cheryl L. Crumpton to Elon Musk,
    dated February 20, 2019 ........................................ A-57

    Exhibit 3 to Memo -
    Letter from Cheryl L. Crumpton to Tesla, Inc.,
    dated February 20, 2019 ........................................ A-59

    Exhibit 4 to Memo -
    Letter from Bradley Bondi to Cheryl L.
    Crumpton, dated February 22, 2019 ..................... A-61

    Exhibit 5 to Memo -
    Tesla Fourth-Quarter and Full-Year 2018 Update . A-65

ii

**Page**

Order Requiring Defendant To Show Cause Why
He Should Not Be Held In Contempt For
Violating The Court's Final Judgment, dated
February 26, 2019 .................................................. A-75

Defendant's Response To Order To Show Cause
Why Defendant Elon Musk Should Not Be Held
In Contempt For Violating The Court's Final
Judgment, dated March 11, 2019
(Omitted Herein)

Exhibit 6 to Response -
E-Mail from Steve Farina to Amanda MacDonald
and Eden Schiffmann, forwarding E-Mails
between Bradley Bondi and Cheryl Crumpton,
dated February 22–24, 2019 ................................. A-76

Exhibit 8 to Response -
Letter from Matthew T. Martens to Cheryl L.
Crumpton, dated March 11, 2019 ......................... A-80

Exhibit 9 to Response -
Declaration of Elon Musk, dated March 11, 2019. A-89

Exhibit 10 to Response -
Declaration of Christopher F. Noe, Ph.D., dated
March 11, 2019, with *Curriculum Vitae* ............... A-94

Plaintiff's Reply Memorandum to Defendant Elon
Musk's Response To Order To Show Cause,
dated March 18, 2019
(Omitted Herein)

Exhibit 12 to Reply Memo -
Elon Musk Tweets ................................................ A-114

iii

**Page**

Defendant's Sur-Reply In Response To Order To
Show Cause Why Defendant Elon Musk Should
Not Be Held In Contempt For Violating The
Court's Final Judgment, dated March 22, 2019
(Omitted Herein)

Exhibit 9 to Sur-Reply Memo -
E-Mail from Walker S. Newell to Steve Farina,
dated September 20, 2018......................................  A-129

Exhibit 10 to Sur-Reply Memo -
E-Mail from Bradley J. Bondi, dated
September 23, 2018 ...............................................  A-137

Order of the Honorable Alison J. Nathan, dated
April 5, 2019 ...........................................................  A-145

Transcript of Proceedings held before the
Honorable Alison J. Nathan, dated April 4, 2019 ..  A-146

Joint Submission Regarding Status of Efforts To
Resolve The SEC's Pending Motion, dated
April 18, 2019 .........................................................  A-218

Joint Submission Regarding Status of Efforts To
Resolve The SEC's Pending Motion, dated
April 25, 2019 .........................................................  A-219

Consent Motion To Amend Final Judgment As To
Defendant Elon Musk, dated April 26, 2019 ........  A-220

Exhibit 1 to Motion -
Consent of Defendant Elon Musk, dated
April 26, 2019 .........................................................  A-225

Exhibit 2 to Motion -
Proposed Order Amending Final Judgment as To
Defendant Elon Musk .............................................  A-229

iv

**Page**

Order Amending Final Judgment as To Defendant
Elon Musk, dated April 30, 2019 ........................... A-231

Letter from Alex Spiro to the Honorable Alison J.
Nathan, dated February 17, 2019 ........................... A-233

Letter from Steven Buchholz to the Honorable
Alison J. Nathan, dated February 18, 2019 ........... A-236

Letter from Alex Spiro to the Honorable Alison J.
Nathan, dated February 21, 2019 ........................... A-238

Order of the Honorable Alison J. Nathan, dated
February 24, 2022 ................................................. A-241

Defendant Elon Musk's Notice of Motion To Quash
and To Terminate Consent Decree, dated
March 8, 2022 ........................................................ A-243

Defendant Elon Musk's Motion To Quash and To
Terminate Consent Decree, dated
March 8, 2022 ........................................................ A-244

Defendant Elon Musk's Memorandum of Law In
Support Of His Motion To Quash & To Terminate
Consent Decree, dated March 8, 2022
(Omitted Herein)

Exhibit A to Memo -
*Redacted* Elon Musk Subpoena in the Matter of
Tesla, Inc. (SF-4496) (Reproduced in
Confidential Joint Appendix at pp. CA-2-CA-13). A-247

Exhibit B to Memo -
*Redacted* Tesla, Inc., Subpoena in the Matter of
Tesla, Inc. (SF-4496) (Reproduced in
Confidential Joint Appendix at pp. CA-14-CA-
25) ......................................................................... A-248

v

**Page**

Exhibit C to Memo -
Privilege Log, dated November 30, 2021 .............. A-249

Exhibit D to Memo -
*Redacted* Order Directing Private Investigation
and Designating Officers to Take Testimony in
the Matter of Tesla, Inc. (SF-4496) (Reproduced
in Confidential Joint Appendix at pp. CA-26-CA-
29) ........................................................................ A-251

Exhibit E to Memo -
Letter from Alex Spiro to Steven Buchholz, dated
May 22, 2020 ........................................................ A-252

Declaration Of Elon Musk In Support Of His
Motion To Quash and To Terminate Consent
Decree, dated March 7, 2022 ................................ A-255

Opinion and Order of the Honorable Lewis J.
Liman, dated April 27, 2022 ................................. A-258

Letter from Alex Spiro to the Honorable Lewis J.
Liman, dated May 23, 2022 .................................. A-280

Court's So-Ordered Memo Endorsement, dated
May 25, 2022 ........................................................ A-282

Notice of Appeal, dated June 15, 2022 ..................... A-284

9/21/22, 10:44 AM                                          SDNY CM/ECF NextGen Version 1.6

**Query**   **Reports**   **Utilities**   **Help**   **Log Out**

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:18-cv-08865-LJL

United States Securities and Exchange Commission v. Musk
Assigned to: Judge Lewis J. Liman
Related Case: 1:18-cv-08947-LJL
Cause: 15:78m(a) Securities Exchange Act

Date Filed: 09/27/2018
Date Terminated: 10/16/2018
Jury Demand: Plaintiff
Nature of Suit: 850 Securities/Commodities
Jurisdiction: U.S. Government Plaintiff

**Plaintiff**

**United States Securities and Exchange Commission**

represented by **Cheryl L. Crumpton**
Securities and Exchange Commission (DC)
100 F Street, N.E.
Washington, DC 20549
(202)-551-4459
Fax: 202-772-9245
Email: crumptonc@sec.gov
*TERMINATED: 06/29/2022*
*LEAD ATTORNEY*

**Jina Lee Choi**
Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2372
Email: choij@sec.gov
*TERMINATED: 06/29/2022*
*LEAD ATTORNEY*

**Adriene Mixon**
United States Securities and Exhange
Commission
444 South Flower Street
Ste 900
Los Angeles, CA 90071
202-551-4463
Email: mixona@sec.gov
*ATTORNEY TO BE NOTICED*

**Edward Barrett Atwood**
Securities and Exchange Commission ( San
Francisco )
44 Montgomery Street, 26th Floor
San Francisco, CA 94104
(415)-705-2467
Email: atwoode@sec.gov

A-1

*TERMINATED: 06/29/2022*

**Melissa Jane Armstrong**
Securities and Exchange Commission (DC)
100 F Street, N.E.
Washington, DC 20549
202-551-4724
Email: armstrongme@sec.gov
*ATTORNEY TO BE NOTICED*

**Steven D Buchholz**
U.S. Securities and Exchange Commission
44 Montgomery Street
Suite 2800
San Francisco, CA 94104
415-705-2500
Email: buchholzs@sec.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Elon Musk**                    represented by    **Alex Spiro**
Quinn Emanuel Urquhart & Sullivan (NYC)
51 Madison Avenue
New York, NY 10010
212-849-7000
Fax: 212-849-7100
Email: alexspiro@quinnemanuel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alison Lynn Plessman**
Irell & Manella LLP
1800 Avenue of The Stars, Suite 900
Los Angeles, CA 90067
(310)-203-7563
Fax: (310)-203-7199
Email: aplessman@irell.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dane Hal Butswinkas**
Williams & Connolly LLP
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5110
Fax: (202) 434-5029
Email: dbutswinkas@wc.com
*TERMINATED: 03/01/2019*
*LEAD ATTORNEY*

A-2

**John Charles Hueston**
Irell & Manella LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
(949)-760-0991
Fax: (949)-760-5289
Email: jhueston@hueston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marshall Alan Camp**
Hueston Hennigan LLP
523 West 6th Street, Suite 400
Los Angeles, CA 90014
213-788-4541
Email: mcamp@irell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Moez M. Kaba**
Hueston Hennigan LLP
523 West 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340
Fax: (888) 775-0898
Email: mkaba@hueston.com *(Inactive)*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Anthony Burck**
Quinn Emmanuel Urquhart & Sullivan, LLP
777 6th Street NW 11th floor
Washington, DC 20005
202-538-8000
Fax: 202-538-8100
Email: williamburck@quinnemanuel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda M. MacDonald**
Williams & Connolly LLP
725 Twelfth Street, Nw
Washington, DC 20005
(202) 434-5416
Fax: (202) 434-5029
Email: amacdonald@wc.com
*TERMINATED: 03/01/2019*

**Steven M.. Farina**
Williams & Connolly
725 12th Street
NW
Washington, DC 20005

A-3

(202) 434-5000
Fax: (202)-434-5029
Email: sfarina@wc.com
*TERMINATED: 03/01/2019*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/27/2018 | 1 | COMPLAINT against Elon Musk. Document filed by United States Securities and Exchange Commission.(Choi, Jina) (Entered: 09/27/2018) |
| 09/27/2018 | 2 | CIVIL COVER SHEET filed. (Choi, Jina) (Entered: 09/27/2018) |
| 09/28/2018 | | **\*\*\*NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Jina Choi. The following case opening statistical information was erroneously selected/entered: Cause of Action code 12:12; Jury Demand code n (None); County code New York; Fee Status code pd (paid);. The following correction(s) have been made to your case entry: the Cause of Action code has been modified to 15:0078; the Jury Demand code has been modified to p (Plaintiff); the County code has been modified to XX Out of State; the Fee Status code has been modified to wv (waived). (laq)** (Entered: 09/28/2018) |
| 09/28/2018 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Alison J. Nathan. Please download and review the Individual Practices of the assigned District Judge, located at http://nysd.uscourts.gov/judges/District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (laq) (Entered: 09/28/2018) |
| 09/28/2018 | | Magistrate Judge Gabriel W. Gorenstein is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: http://nysd.uscourts.gov/forms.php. (laq) (Entered: 09/28/2018) |
| 09/28/2018 | | Case Designated ECF. (laq) (Entered: 09/28/2018) |
| 09/28/2018 | 3 | MOTION for Cheryl L. Crumpton to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by United States Securities and Exchange Commission. (Attachments: # 1 Affidavit of Cheryl L. Crumpton in Support of Motion to Appear Pro Hac Vice, # 2 Exhibit 1- DC Certificate of Good Standing, # 3 Exhibit 2- Texas Certificate of Good Standing, # 4 Text of Proposed Order to Appear Pro Hac Vice)(Crumpton, Cheryl) (Entered: 09/28/2018) |
| 09/28/2018 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 3 MOTION for Cheryl L. Crumpton to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 09/28/2018) |
| 09/28/2018 | 4 | NOTICE OF INITIAL PRETRIAL CONFERENCE: Initial Conference set for 2/1/2019 at 04:00 PM in Courtroom 906, 40 Centre Street, New York, NY 10007 before Judge Alison J. Nathan. (As further set forth in this Order.) Parties ordered to submit via ECF proposed case management plan and joint letter seven days before conference. (Signed by Judge Alison J. Nathan on 9/28/2018) (cf) (Entered: 09/28/2018) |
| 09/28/2018 | 5 | MOTION for E. Barrett Atwood to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by United States |

A-4

| | | |
|---|---|---|
| | | Securities and Exchange Commission. (Attachments: # 1 Affidavit of E. Barrett Atwood, # 2 Exhibit Good Standing Certificate (CA), # 3 Exhibit Good Standing Certificate (DC), # 4 Text of Proposed Order Granting Pro Hac Vice of E. Barrett Atwood)(Atwood, Edward) (Entered: 09/28/2018) |
| 09/28/2018 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 5 MOTION for E. Barrett Atwood to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (jc)** (Entered: 09/28/2018) |
| 09/29/2018 | 6 | CONSENT MOTION for Judgment *According to the Parties' Settlement*. Document filed by United States Securities and Exchange Commission. (Attachments: # 1 Exhibit 1- Consent to Entry of Judgment, # 2 Exhibit 2- Proposed Final Judgment)(Choi, Jina) (Entered: 09/29/2018) |
| 10/02/2018 | 7 | ORDER granting 3 Motion for Cheryl L. Crumpton to Appear Pro Hac Vice (HEREBY ORDERED by Judge Alison J. Nathan)(Text Only Order) (Nathan, Alison) (Entered: 10/02/2018) |
| 10/02/2018 | 8 | ORDER granting 5 Motion for E. Barrett Atwood to Appear Pro Hac Vice (HEREBY ORDERED by Judge Alison J. Nathan)(Text Only Order) (Nathan, Alison) (Entered: 10/02/2018) |
| 10/04/2018 | 9 | ORDER: No later than October 11, 2018, the parties shall file a joint letter not to exceed ten pages double-spaced, explaining why the Court should approve the proposed consent judgment. (As further set forth in this Order.) (Signed by Judge Alison J. Nathan on 10/4/2018) (cf) (Entered: 10/04/2018) |
| 10/05/2018 | 10 | NOTICE OF APPEARANCE by Dane Hal Butswinkas on behalf of Elon Musk. (Butswinkas, Dane) (Entered: 10/05/2018) |
| 10/05/2018 | 11 | MOTION for Steven M. Farina to Appear Pro Hac Vice *on behalf of Elon Musk*. Filing fee $ 200.00, receipt number 0208-15667351. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Elon Musk. (Attachments: # 1 Affidavit Of Steven M. Farina In Support Of Motion To Appear Pro Hac Vice, # 2 Exhibit DC Certificate Of Good Standing, # 3 Text of Proposed Order To Appear Pro Hac Vice) (Farina, Steven) (Entered: 10/05/2018) |
| 10/06/2018 | 12 | MOTION for Amanda M. MacDonald to Appear Pro Hac Vice *on behalf of Elon Musk*. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Elon Musk. (Attachments: # 1 Affidavit Of Amanda M. MacDonald In Support Of Motion To Appear Pro Hac Vice, # 2 Exhibit 1 - DC Certificate of Good Standing, # 3 Exhibit 2 - Illinois Certificate of Good Standing, # 4 Text of Proposed Order To Appear Pro Hac Vice)(MacDonald, Amanda) (Entered: 10/06/2018) |
| 10/06/2018 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 11 MOTION for Steven M. Farina to Appear Pro Hac Vice *on behalf of Elon Musk*. Filing fee $ 200.00, receipt number 0208-15667351. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 10/06/2018) |
| 10/06/2018 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 12 MOTION for Amanda M. MacDonald to Appear Pro Hac Vice *on behalf of Elon Musk*. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 10/06/2018) |
| 10/11/2018 | 13 | JOINT BRIEF re: 6 CONSENT MOTION for Judgment *According to the Parties' Settlement*. . Document filed by United States Securities and Exchange Commission. |

A-5

| | | (Crumpton, Cheryl) (Entered: 10/11/2018) |
|---|---|---|
| 10/16/2018 | 14 | FINAL JUDGMENT AS TO DEFENDANT ELON MUSK: The Securities and Exchange Commission having filed a Complaint and Defendant Elon Musk having entered a general appearance; consented to the Court's jurisdiction over Defendant in this matter only and the subject matter of this action; consented to entry of this Final Judgment without admitting or denying the allegations of the Complaint (except as to jurisdiction and except as otherwise provided herein in paragraph III); waived findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment: IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 USC. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security; as set forth herein. IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay a civil penalty in the amount of $20,000,000 to the Securities and Exchange Commission pursuant to Section 21(d)(3) of the Exchange Act [15 U.S. C. § 78u(d)(3)]. Defendant shall make this payment within 14 days after entry of this Final Judgment. IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment. (Signed by Judge Alison J. Nathan on 10/16/2018) (mro) (Entered: 10/16/2018) |
| 02/05/2019 | 15 | CONSENT MOTION to Consolidate Cases 1:18-cv-8947 *for Distribution Purposes*. Document filed by United States Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order Proposed Order)(Atwood, Edward) (Entered: 02/05/2019) |
| 02/05/2019 | 16 | MEMORANDUM OF LAW in Support re: 15 CONSENT MOTION to Consolidate Cases 1:18-cv-8947 *for Distribution Purposes*. . Document filed by United States Securities and Exchange Commission. (Atwood, Edward) (Entered: 02/05/2019) |
| 02/06/2019 | 17 | ORDER TO CONSOLIDATE ACTIONS FOR DISTRIBUTION PURPOSES granting 15 Letter Motion to Consolidate Cases. IT IS HEREBY ORDERED: 1. Pursuant to Final Judgments entered in these two Securities and Exchange Commission ("SEC") enforcement actions, Defendants Elon Musk and Tesla, Inc. have paid penalties in the total amount of $40,000,000.00. These funds were paid into an interest- bearing account at the Bureau of Fiscal Services of the U.S. Treasury Department (the "Distribution Funds"). Each final judgment provides, in part, that the Distribution Funds may be distributed pursuant to the Fair Fund provisions of the Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended by the Dodd- Frank Act of 2010, 15 U.S.C. § 7246(a). 2. The Court hereby orders that the above-captioned actions are consolidated for the purposes of distribution of funds to harmed investors. (Signed by Judge Alison J. Nathan on 2/6/2019) (anc) (Entered: 02/06/2019) |
| 02/25/2019 | 18 | MOTION for Order to Show Cause *Why Defendant Elon Musk Should Not Be Held in Contempt and Memorandum of Law in Support*. Document filed by United States Securities and Exchange Commission. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Text of Proposed Order)(Crumpton, Cheryl) (Entered: 02/25/2019) |
| 02/26/2019 | 19 | ORDER REQUIRING DEFENDANT ELON TO SHOW CAUSE WHY HE SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATING THE COURT'S FINAL JUDGMENT: NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that Defendant Elon Musk shall submit to this Court by March 11, 2019, briefing to show cause, if any, why he should not be found in contempt of the Court's Final Judgment. SO ORDERED. (Show Cause Response due by 3/11/2019.)Motions terminated: 18 MOTION |

A-6

| | | |
|---|---|---|
| | | for Order to Show Cause *Why Defendant Elon Musk Should Not Be Held in Contempt and Memorandum of Law in Support*. filed by United States Securities and Exchange Commission. (Signed by Judge Alison J. Nathan on 2/26/2019) (kv) (Entered: 02/26/2019) |
| 02/28/2019 | 20 | NOTICE of Substitution of Attorney. Old Attorney: Dane H. Butswinkas, Steven M. Farina, and Amanda M. MacDonald, New Attorney: John C. Hueston, Marshall A. Camp, Alison L. Plessman, and Moez M. Kaba, Address: Hueston Hennigan LLP, 523 W. 6th Street, Suite 400, Los Angeles, California, USA 90014, (213) 788-4340. Document filed by Elon Musk. (Attachments: # 1 Affidavit Declaration of Steven M. Farina)(Farina, Steven) (Entered: 02/28/2019) |
| 03/01/2019 | 21 | STIPULATION AND NOTICE OF SUBSTITUTION OF COUNSEL: Pursuant to Rule 1.4 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, the undersigned hereby stipulate and consent to the substitution of the law firm Hueston Hennigan LLP, by and through its attorneys John C. Hueston, Marshall A. Camp, Alison L. Plessman, and Moez M. Kaba, as attorneys of record for Defendant Elon Musk in the above-captioned action in place and instead of the law firm ofWilliams & Connolly LLP, and its attorneys Dane H. Butswinkas, Steven M. Farina, and Amanda M. MacDonald. The undersigned request this Court to so-order the substitution, and as further set forth in this Order. SO ORDERED. Attorney Amanda M. MacDonald, Dane Hal Butswinkas and Steven M. Farina terminated. (Signed by Judge Alison J. Nathan on 3/1/2019) (jca) (Entered: 03/01/2019) |
| 03/01/2019 | | Attorney John Charles Hueston, Marshall Alan Camp, Alison Lynn Plessman, Moez M. Kaba for Elon Musk added. (Signed by Judge Alison J. Nathan on 3/1/2019) (jca) (Entered: 03/01/2019) |
| 03/05/2019 | 22 | NOTICE OF APPEARANCE by Moez M. Kaba on behalf of Elon Musk. (Kaba, Moez) (Entered: 03/05/2019) |
| 03/06/2019 | 23 | MOTION for Alison Plessman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16453275. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Elon Musk. (Attachments: # 1 Text of Proposed Order) (Plessman, Alison) (Entered: 03/06/2019) |
| 03/07/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 23 MOTION for Alison Plessman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16453275. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 03/07/2019) |
| 03/07/2019 | 24 | ORDER granting 23 Motion for Alison Plessman to Appear Pro Hac Vice (HEREBY ORDERED by Judge Alison J. Nathan)(Text Only Order) (Nathan, Alison) Transmission to Attorney Services/Help Desk. (Entered: 03/07/2019) |
| 03/07/2019 | 25 | MOTION for John Charles Hueston to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16456937. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Elon Musk. (Attachments: # 1 Text of Proposed Order) (Hueston, John) (Entered: 03/07/2019) |
| 03/07/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 25 MOTION for John Charles Hueston to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16456937. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 03/07/2019) |
| 03/08/2019 | 26 | ORDER granting 25 Motion for Charles Hueston to Appear Pro Hac Vice (HEREBY ORDERED by Judge Alison J. Nathan)(Text Only Order) (Nathan, Alison) Transmission |

A-7

| | | to Attorney Services/Help Desk. (Entered: 03/08/2019) |
|---|---|---|
| 03/11/2019 | 27 | RESPONSE TO ORDER TO SHOW CAUSE re: 19 Order to Show Cause,,, Terminate Motions,,. Document filed by Elon Musk. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Affidavit Declaration of Elon R. Musk, # 10 Affidavit Declaration of Christopher F. Noe) (Hueston, John) (Entered: 03/11/2019) |
| 03/12/2019 | 28 | LETTER MOTION for Leave to File Reply Memorandum addressed to Judge Alison J. Nathan from Cheryl Crumpton dated March 12, 2019. Document filed by United States Securities and Exchange Commission.(Crumpton, Cheryl) (Entered: 03/12/2019) |
| 03/12/2019 | 29 | ORDER granting 28 Letter Motion for Leave to File Document. The Government's motion for leave to file a reply memorandum is granted. The Government shall file its reply memorandum no later than March 19, 2019. No later than March 26, 2019, each party shall indicate in writing whether it is seeking an evidentiary hearing on this matter. SO ORDERED. (Signed by Judge Alison J. Nathan on 3/12/2019) (kv) (Entered: 03/12/2019) |
| 03/18/2019 | 30 | REPLY to Response to Motion re: 18 MOTION for Order to Show Cause *Why Defendant Elon Musk Should Not Be Held in Contempt and Memorandum of Law in Support.* . Document filed by United States Securities and Exchange Commission. (Attachments: # 1 Exhibit 6, # 2 Exhibit 7, # 3 Exhibit 8, # 4 Exhibit 9, # 5 Exhibit 10, # 6 Exhibit 11, # 7 Exhibit 12)(Crumpton, Cheryl) (Entered: 03/18/2019) |
| 03/18/2019 | 31 | LETTER MOTION for Leave to File Sur-Reply Memorandum addressed to Judge Alison J. Nathan from John C. Hueston dated March 18, 2019. Document filed by Elon Musk. (Hueston, John) (Entered: 03/18/2019) |
| 03/21/2019 | 32 | ORDER granting 31 Letter Motion for Leave to File Document. Defendant may file a sur-reply memorandum of no more than 8 pages by March 22, 2019. (Signed by Judge Alison J. Nathan on 3/21/2019) (cf) (Entered: 03/21/2019) |
| 03/21/2019 | | Set/Reset Deadlines: Surreplies due by 3/22/2019. (cf) (Entered: 03/21/2019) |
| 03/22/2019 | 33 | REPLY to Response to Motion re: 18 MOTION for Order to Show Cause *Why Defendant Elon Musk Should Not Be Held in Contempt and Memorandum of Law in Support. Sur-Reply in Response to Order to Show Cause Why Defendant Elon Musk Should Not Be Held In Contempt.* Document filed by Elon Musk. (Attachments: # 1 Exhibit 9, # 2 Exhibit 10, # 3 Exhibit 11)(Hueston, John) (Entered: 03/22/2019) |
| 03/25/2019 | 34 | LETTER addressed to Judge Alison J. Nathan from Cheryl Crumpton dated March 25, 2019 re: the SEC's Position on an Evidentiary Hearing. Document filed by United States Securities and Exchange Commission.(Crumpton, Cheryl) (Entered: 03/25/2019) |
| 03/25/2019 | 35 | LETTER addressed to Judge Alison J. Nathan from John C. Hueston dated March 25, 2019 re: Evidentiary Hearing. Document filed by Elon Musk.(Hueston, John) (Entered: 03/25/2019) |
| 03/26/2019 | 36 | ORDER re: 35 Letter filed by Elon Musk, 34 Letter filed by United States Securities and Exchange Commission. Accordingly, the Court will decide Plaintiff's motion without an evidentiary hearing. The Court will, however, hold oral argument, which is hereby scheduled for April 4, 2019 at 2:00 p.m. SO ORDERED. (Oral Argument set for 4/4/2019 at 02:00 PM before Judge Alison J. Nathan.) (Signed by Judge Alison J. Nathan on 3/26/2019) (kv) (Entered: 03/26/2019) |
| 04/03/2019 | 37 | MOTION for Steven Buchholz to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by United States Securities and Exchange Commission. (Attachments: # 1 Affidavit of Steven Buchholz in Support of |

A-8

| | | |
|---|---|---|
| | | Motion, # 2 California Certificate of Good Standing, # 3 Text of Proposed Order to Appear Pro Hac Vice)(Buchholz, Steven) (Entered: 04/03/2019) |
| 04/03/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 37 MOTION for Steven Buchholz to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (jc)** (Entered: 04/03/2019) |
| 04/04/2019 | 38 | ORDER granting 37 Motion for Steven Buchholz to Appear Pro Hac Vice (HEREBY ORDERED by Judge Alison J. Nathan)(Text Only Order) (Nathan, Alison) (Entered: 04/04/2019) |
| 04/05/2019 | 39 | ORDER: For the reasons stated on the record at oral argument yesterday, the parties are required to meet and confer for at least one hour in an effort to resolve the pending motion to hold Mr. Musk in contempt, as well as any modifications to the consent judgment and Tesla's Senior Executives Communications Policy. No later than April 18, 2019, the parties shall submit a joint letter indicating whether they have reached an agreement. If no agreement has been reached, the Court will issue a decision resolving the current SEC motion to hold Mr. Musk in contempt. If Mr. Musk is held in contempt, the Court will allow further briefing on sanctions. (Signed by Judge Alison J. Nathan on 4/5/2019) (rro) (Entered: 04/05/2019) |
| 04/05/2019 | | Minute Entry for proceedings held before Judge Alison J. Nathan. Oral argument held on SEC's motion for contempt. The Court reserved decision. (Court Reporter Paula Speer) (qs) (Entered: 04/05/2019) |
| 04/16/2019 | 40 | TRANSCRIPT of Proceedings re: conference held on 4/4/2019 before Judge Alison J. Nathan. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2019. Redacted Transcript Deadline set for 5/17/2019. Release of Transcript Restriction set for 7/15/2019.(McGuirk, Kelly) (Entered: 04/16/2019) |
| 04/16/2019 | 41 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 4/4/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 04/16/2019) |
| 04/18/2019 | 42 | STATUS REPORT. *Regarding Efforts to Resolve the SEC's Pending Motion* Document filed by United States Securities and Exchange Commission.(Crumpton, Cheryl) (Entered: 04/18/2019) |
| 04/18/2019 | 43 | MEMO ENDORSEMENT on re: 42 Status Report filed by United States Securities and Exchange Commission. ENDORSEMENT: SO ORDERED. (Signed by Judge Alison J. Nathan on 4/18/19) (kv) (Entered: 04/18/2019) |
| 04/25/2019 | 44 | STATUS REPORT. *Regarding Efforts to Resolve the SEC's Pending Motion* Document filed by United States Securities and Exchange Commission.(Crumpton, Cheryl) (Entered: 04/25/2019) |
| 04/26/2019 | 45 | MEMO ENDORSEMENT on re: 44 Status Report filed by United States Securities and Exchange Commission. ENDORSEMENT: SO ORDERED. (Signed by Judge Alison J. Nathan on 4/26/19) (kv) (Entered: 04/26/2019) |
| 04/26/2019 | 46 | CONSENT MOTION to Amend/Correct *Final Judgment*. Document filed by United |

A-9

|  |  | States Securities and Exchange Commission. (Attachments: # 1 Exhibit 1 (Consent of Defendant Elon Musk), # 2 Exhibit 2 (Proposed Order Amending Final Judgment)) (Crumpton, Cheryl) (Entered: 04/26/2019) |
|---|---|---|
| 04/30/2019 | 47 | ORDER AMENDING FINAL JUDGMENT AS TO DEFENDANT ELON MUSK IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that subpart (b) of paragraph IV of the Final Judgment is replaced and superseded by the following herein, IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all other provisions of the Final Judgment shall remain in effect. IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of the Final Judgment, as amended by this Order. (And as further set forth in this Order). (Signed by Judge Alison J. Nathan on 4/30/2019) (jca) (Entered: 04/30/2019) |
| 05/01/2019 | 48 | ORDER re: 47 Amended Judgment. In the consent motion to amend the Final Judgment, the parties stated that "if the Court grants this motion and enters the proposed Order, this will resolve the Commission's pending motion." Dkt. No. 46 at 4. The Court has now granted the motion and entered the proposed Order amending the Final Judgment. Dkt. No. 47. Accordingly, the SEC's contempt motion, Dkt. No. 18, is denied as moot. SO ORDERED. (Signed by Judge Alison J. Nathan on 5/1/2019) (kv) (Entered: 05/01/2019) |
| 10/03/2019 | 49 | **FILING ERROR - DEFICIENT DOCKET ENTRY** - MOTION for Adriene Mixon to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by United States Securities and Exchange Commission. (Attachments: # 1 Affidavit, # 2 Exhibit Certificate of Standing CA, # 3 Exhibit Certificate of Standing NY, # 4 Text of Proposed Order)(Mixon, Adriene) Modified on 10/3/2019 (wb). (Entered: 10/03/2019) |
| 10/03/2019 |  | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 49 MOTION for Adriene Mixon to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of California;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (wb)** (Entered: 10/03/2019) |
| 12/16/2019 | 50 | MOTION for Adriene Mixon to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by United States Securities and Exchange Commission. (Attachments: # 1 Affidavit, # 2 Exhibit Certificate of Standing NY, # 3 Exhibit Certificate of Standing CA, # 4 Text of Proposed Order)(Mixon, Adriene) (Entered: 12/16/2019) |
| 12/17/2019 |  | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 50 MOTION for Adriene Mixon to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 12/17/2019) |
| 12/18/2019 | 51 | ORDER granting 50 Motion for Adriene Mixon to Appear Pro Hac Vice (HEREBY ORDERED by Judge Alison J. Nathan)(Text Only Order) (Nathan, Alison) Transmission to Attorney Services/Help Desk. (Entered: 12/18/2019) |
| 02/24/2020 | 52 | MOTION Motion to Establish A Fair Fund and Appoint Tax Administrator . Document filed by United States Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order).(Mixon, Adriene) (Entered: 02/24/2020) |
| 02/26/2020 | 53 | ORDER ESTABLISHING A FAIR FUND, APPOINTING A TAX ADMINISTRATOR, |

| | | |
|---|---|---|
| | | AND AUTHORIZING PAYMENT OF TAX RELATED FEES, EXPENSES, AND OBLIGATIONS granting [52] Motion for to Establish A Fair Fund and Appoint Tax Administrator. IT IS HEREBY ORDERED: 1. The Motion is GRANTED. 2. A Fair Fund is hereby established pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended by the Dodd-Frank Act of 2010 [15 U.S.C. §7246(a)] for the $40,000,000.00 paid by Musk and Telsa, along with any accrued interest and earnings thereon (the "Fair Fund"). 3. Miller Kaplan Arase LLP ("Miller Kaplan") is appointed as the Tax Administrator to execute all income tax reporting requirements, including the preparation and filing of tax returns, for all funds under the Court's jurisdiction in this case. (as further set forth herein). 7. The SEC is authorized to approve and arrange payment of all future tax obligations owed by the Fair Fund and tax administrator fees and expenses owed by the Fair Fund directly from the Fair Fund without further order of this Court. All payments for taxes and the fees and expenses of the Tax Administrator shall be reported to the Court in a final accounting. (Signed by Judge Alison J. Nathan on 2/26/2020) (kv) Transmission to Finance Unit (Cashiers) for processing. (Entered: 02/26/2020) |
| 04/30/2021 | [54] | MOTION Motion to Appoint Distribution Agent . Document filed by United States Securities and Exchange Commission. (Attachments: # [1] Text of Proposed Order).(Mixon, Adriene) (Entered: 04/30/2021) |
| 05/12/2021 | [55] | ORDER APPOINTING A DISTRIBUTION AGENT AND AUTHORIZING PAYMENT OF ADMINISTRATIVE FEES AND EXPENSES granting [54] Motion for Appoint Distribution Agent. re: [54] MOTION Motion to Appoint Distribution Agent . IT IS HEREBY ORDERED that: 1. The Motion is GRANTED; 2. Rust is appointed to serve as Distribution Agent (the "Distribution Agent") for the Fair Fund to assist in overseeing the administration and the distribution of the Fair Fund in coordination with the Commission staff, pursuant to the distribution plan (the "Plan") to be approved by this Court; 3. Rust shall perform services in accordance with the pricing schedule and cost proposal submitted by the Distribution Agent to the Commission. Such services may include, but are not limited to, developing a Plan, determining the identities of injured investors and the amounts lost, establishing a claims process to evaluate and verify claims, fielding inquiries from investors and managing the ultimate distribution of the Fair Fund; 4.Rust shall coordinate with the Court-appointed Tax Administrator, Miller Kaplan Arase LLP, to ensure that the Fair Fund, a Qualified Settlement Fund ("QSF") under Section 468B(g) of the Internal Revenue Code, and regulated regulations, 26 C.F.R. §§ 1.468B-1 through 5, complies with all related legal and regulatory requirements, including but not limited to, satisfying any reporting or withholding requirements imposed on distribution from the QSF; 5. Rust shall invoice all administrative fees and expenses incurred in the administration and distribution of the Fair Fund to the Commission for review and approval by the Commission. Any unresolved objections to an invoiced amount will be referred to the Court; 6. Within forty- five (45) days of the Court's approval of the Plan, Rust will provide a status report, and thereafter, will provide additional reports and quarterly account statements within thirty (30) days after the end of every quarter. Moreover, once the Fair Fund has been transferred to an escrow account opened by Rust as Distribution Agent, Rust will include with its quarterly reports a quarterly accounting report in a format to be provided by the Commission. The status report and quarterly accounting report will inform the Court and the Commission of the activities and status of the Fair Fund during the relevant period and will specify, at a minimum (a) the location of the account(s) comprising the Fair Fund; and (b) an interim accounting of all monies in the Fair Fund as of the most recent month-end, including the value of the account(s), all monies earned or received into the account(s), funds distributed to harmed investors under the Court approved Plan, and any monies expended from the Fair Fund, including fees, expenses, and taxes incurred by, or imposed on, the Fair Fund; 7. Upon completing its duties as Distribution Agent, Rust, working with the Court-appointed Tax Administrator, Miller Kaplan Arase LLP, will prepare a final report and final accounting for filing with |

|            |       | the Court, in a format to be provided by the Commission; 8. Rust may be removed sua sponte at any time by the Court or upon motion of the Commission and replaced with a successor. In the event Rust decides to resign, it will first give written notice to the Court and to Commission staff of such intention, and the resignation, if permitted, will not be effective until the Court appoints a successor; 9. The Distribution Agent will be entitled to charge reasonable fees and related expenses incurred in the performance of its duties, in accordance with the cost proposal submitted to the Commission staff. The Commission is authorized to approve and arrange payment of the fees and expenses of the Distribution Agent directly from the Fair Fund without further order of this Court. The Distribution Agent will submit invoices of all fees and expenses incurred in connection with its duties to the Commission staff for review and, as appropriate, payment. All payments will be reflected in the final accounting referenced herein; and 10. The Court will retain exclusive jurisdiction over the distribution, including, but not limited to, claims against the Distribution Agent asserting liability for violation of any duty imposed by the Plan or other Court order. IT IS SO ORDERED. (Signed by Judge Alison J. Nathan on 5/12/2021) (kv) (Entered: 05/12/2021) |
| 12/21/2021 | 56 | ORDER: The Court on May 12, 2021, appointed Rust Consulting as distribution agent for the Fair Fund. No. 18-cv-8865, Dkt. No. 55. That order required that Rust file status reports and quarterly accounting statements within 30 days of the end of each quarter. Id. Paragraph 6. The Court has received no such reports. Rust is hereby ordered to file a status report and the most recent quarterly accounting statement by January 7, 2022. SO ORDERED. (Signed by Judge Alison J. Nathan on 12/21/2021) (vfr) (Entered: 12/21/2021) |
| 01/05/2022 | 57 | STATUS REPORT. *of Rust Consulting* Document filed by United States Securities and Exchange Commission..(Mixon, Adriene) (Entered: 01/05/2022) |
| 01/10/2022 | 58 | MEMO ENDORSEMENT on re: 57 Status Report filed by United States Securities and Exchange Commission. ENDORSEMENT: SO ORDERED. (Signed by Judge Alison J. Nathan on 1/10/2022) (vfr) (Entered: 01/10/2022) |
| 02/17/2022 | 59 | NOTICE OF APPEARANCE by William Anthony Burck on behalf of Elon Musk..(Burck, William) (Entered: 02/17/2022) |
| 02/17/2022 | 60 | NOTICE OF APPEARANCE by Alex Spiro on behalf of Elon Musk..(Spiro, Alex) (Entered: 02/17/2022) |
| 02/17/2022 | 61 | LETTER addressed to Judge Alison J. Nathan from Tesla, Inc. and Elon Musk dated February 17, 2022 re: SEC Conduct. Document filed by Elon Musk..(Spiro, Alex) (Entered: 02/17/2022) |
| 02/17/2022 | 62 | MEMO ENDORSEMENT on re: 61 Letter filed by Elon Musk. ENDORSEMENT: The Commission shall file a response to the Defendants' letter by February 24, 2022. SO ORDERED. (Signed by Judge Alison J. Nathan on 2/17/2022) (vfr) (Entered: 02/17/2022) |
| 02/18/2022 | 63 | LETTER addressed to Judge Alison J. Nathan from Steven Buchholz dated 02/18/2022 re: Docket No. 61. Document filed by United States Securities and Exchange Commission.. (Buchholz, Steven) (Entered: 02/18/2022) |
| 02/21/2022 | 64 | LETTER addressed to Judge Alison J. Nathan from Tesla, Inc. and Elon Musk dated February 21, 2022 re: Reply Re: SEC Conduct. Document filed by Elon Musk..(Spiro, Alex) (Entered: 02/21/2022) |
| 02/24/2022 | 65 | ORDER: The Court is in receipt of the Defendants Elon Musk and Tesla, Inc.'s letter dated February 17, 2022, as well as the Commission's response dated February 18, 2022, and the Defendants' further letter dated February 21, 2022. Dkt. Nos. 61, 63, 64. The Defendants' precise application to the Court is unclear. They request a conference to address "why the |

A-12

| | | |
|---|---|---|
| | | SEC has failed to distribute these funds to shareholders but has chosen to spend its energy and resources investigating Mr. Musk's and Tesla's compliance with the consent decree by issuing subpoenas unilaterally, without Court approval." Dkt. No. 61 at 1. The Court DENIES this request for a conference. To the extent that the Defendants seek to impose a deadline on the Commission's implementation of a Plan of Distribution of the Fair Fund, the Defendants may file a motion and submit briefing in support of doing so. Otherwise, the Court cannot enforce a deadline that does not currently exist. E.g., Dkt. Nos. 14, 53, 55. Further, to the extent that the Defendants have a non-frivolous basis to quash a subpoena in light of the Court's prior orders in this case, the Defendants may make a motion, supported by briefing, that requests specific relief from the Court. The Defendants also seek "on-the-record assurance that the Commission has not leaked investigative details in violation of its own rules and policies, and is otherwise acting in accordance with the law." Dkt. No. 64 at 2-3. The letter does not contain specific facts or legal authority to justify this request. Moreover, the Court doubts that the regulations invoked by the Defendants, 17 C.F.R. §§ 203.2, 203.5, are judicially enforceable against the Commission, see LaMorte v. Mansfield, 438 F.2d 448, 450-51 (2d Cir. 1971) (explaining that the regulations describe only "the discretion possessed by the agency in determining whether to disclose information," a privilege that "is the agency's, not the witness'[s]"). The request is DENIED. SO ORDERED. (Signed by Judge Alison J. Nathan on 2/24/2022) (vfr) (Entered: 02/24/2022) |
| 02/24/2022 | 66 | MOTION for Melissa J. Armstrong to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by United States Securities and Exchange Commission. (Attachments: # 1 Affidavit, # 2 Certificate of Good Standing, # 3 Text of Proposed Order).(Armstrong, Melissa) (Entered: 02/24/2022) |
| 02/25/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 66 MOTION for Melissa J. Armstrong to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 02/25/2022) |
| 02/28/2022 | 67 | ORDER granting 66 Motion for Melissa J. Armstrong to Appear Pro Hac Vice (HEREBY ORDERED by Judge Alison J. Nathan)(Text Only Order) (kwi) (Entered: 02/28/2022) |
| 03/08/2022 | 68 | MOTION to Seal *Exhibits to the Memorandum of Law*. Document filed by Elon Musk.. (Spiro, Alex) (Entered: 03/08/2022) |
| 03/08/2022 | 69 | ***SELECTED PARTIES*** LETTER addressed to Judge Alison J. Nathan from Alex Spiro dated March 8, 2022 re: Sealed Exhibits. Document filed by United States Securities and Exchange Commission, Elon Musk. (Attachments: # 1 Exhibit A to the Memorandum of Law, # 2 Exhibit B to the Memorandum of Law, # 3 Exhibit D to the Memorandum of Law)Motion or Order to File Under Seal: 68 .(Spiro, Alex) (Entered: 03/08/2022) |
| 03/08/2022 | 70 | MOTION to Quash Certain Portions of SEC Subpoena & to Terminate Consent Decree . Document filed by Elon Musk..(Spiro, Alex) (Entered: 03/08/2022) |
| 03/08/2022 | 71 | MEMORANDUM OF LAW in Support re: 70 MOTION to Quash Certain Portions of SEC Subpoena & to Terminate Consent Decree . . Document filed by Elon Musk. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E). (Spiro, Alex) (Entered: 03/08/2022) |
| 03/08/2022 | 72 | DECLARATION of Elon Musk in Support re: 70 MOTION to Quash Certain Portions of SEC Subpoena & to Terminate Consent Decree .. Document filed by Elon Musk. (Attachments: # 1 Exhibit A).(Spiro, Alex) (Entered: 03/08/2022) |
| 03/08/2022 | 73 | PROPOSED ORDER. Document filed by Elon Musk. Related Document Number: 70 .. (Spiro, Alex) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: |

A-13

| | | 03/08/2022) |
|---|---|---|
| 03/08/2022 | 74 | LETTER addressed to Judge Alison J. Nathan from Alex Spiro dated March 8, 2022 re: Request for Oral Argument. Document filed by Elon Musk..(Spiro, Alex) (Entered: 03/08/2022) |
| 03/08/2022 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 73 Proposed Order was reviewed and approved as to form. (km) (Entered: 03/08/2022) |
| 03/08/2022 | 75 | ORDER: The Commission is hereby ORDERED to file a response to Defendant's motions by March 22, 2022. Dkt. Nos. 68, 70. Defendant shall file a reply, if any, by March 29, 2022. SO ORDERED. ( Responses due by 3/22/2022, Replies due by 3/29/2022.) (Signed by Judge Alison J. Nathan on 3/8/2022) (vfr) (Entered: 03/08/2022) |
| 03/08/2022 | 76 | MOTION Motion to Approve Distribution Plan . Document filed by United States Securities and Exchange Commission. (Attachments: # 1 Exhibit Distribution Plan, # 2 Exhibit Plan of Allocation, # 3 Text of Proposed Order).(Mixon, Adriene) (Entered: 03/08/2022) |
| 03/17/2022 | 77 | ORDER: The Court is in receipt of the Commission's motion to approve the distribution plan. Dkt. No. 76. The Defendants shall file a response, if any, by March 22, 2022. SO ORDERED. (Responses due by 3/22/2022) (Signed by Judge Alison J. Nathan on 3/17/2022) (jca) (Entered: 03/17/2022) |
| 03/22/2022 | 78 | RESPONSE in Opposition to Motion re: 70 MOTION to Quash Certain Portions of SEC Subpoena & to Terminate Consent Decree . . Document filed by United States Securities and Exchange Commission..(Armstrong, Melissa) (Entered: 03/22/2022) |
| 03/25/2022 | 79 | ORDER APPROVING DISTRIBUTION PLAN granting 76 Motion to Approve Distribution Plan . IT IS HEREBY ORDERED that: 1. The Motion is GRANTED; and 2. The Distribution Plan is approved in its entirety. The Distribution Plan shall govern the administration and distribution of the Fair Fund previously established by Order entered February 26, 2020. IT IS SO ORDERED. (Signed by Judge Alison J. Nathan on 3/25/2022) (vfr) (Entered: 03/25/2022) |
| 03/29/2022 | 80 | REPLY to Response to Motion re: 70 MOTION to Quash Certain Portions of SEC Subpoena & to Terminate Consent Decree . . Document filed by Elon Musk..(Spiro, Alex) (Entered: 03/29/2022) |
| 04/12/2022 | | NOTICE OF CASE REASSIGNMENT to Judge Ronnie Abrams. Judge Alison J. Nathan is no longer assigned to the case. (laq) (Entered: 04/12/2022) |
| 04/13/2022 | | NOTICE OF CASE REASSIGNMENT to Judge Lewis J. Liman. Judge Ronnie Abrams is no longer assigned to the case. (aea) (Entered: 04/13/2022) |
| 04/27/2022 | 81 | OPINION AND ORDER re: 70 MOTION to Quash Certain Portions of SEC Subpoena & to Terminate Consent Decree filed by Elon Musk. The motion to quash the subpoena and to terminate the consent decree is DENIED. The Clerk of Court is respectfully directed to close Dkt. No. 70. SO ORDERED. (Signed by Judge Lewis J. Liman on 4/27/2022) (va) (Entered: 04/27/2022) |
| 04/29/2022 | 82 | ORDER granting 68 Motion to Seal. (HEREBY ORDERED by Judge Lewis J. Liman) (Text Only Order) (ra) (Entered: 04/29/2022) |
| 05/09/2022 | 83 | STATUS REPORT. *Progress Report of Rust Consulting* Document filed by United States Securities and Exchange Commission..(Mixon, Adriene) (Entered: 05/09/2022) |
| 05/23/2022 | 84 | LETTER addressed to Judge Lewis J. Liman from Alex Spiro dated May 23, 2022 re: Unopposed Motion to Amend. Document filed by Elon Musk..(Spiro, Alex) (Entered: |

A-14

| | | |
|---|---|---|
| | | 05/23/2022) |
| 05/25/2022 | 85 | MEMO ENDORSEMENT: on re: 84 Letter filed by Elon Musk. ENDORSEMENT: The Court's Opinion was not intended to express a finding that Musk did not preclear the communications, and it should not be interpreted as such. That issue is not before the Court, and the Court has no views on it. SO ORDERED. (Signed by Judge Lewis J. Liman on 5/25/2022) (ama) (Entered: 05/25/2022) |
| 06/15/2022 | 86 | NOTICE OF APPEAL from 81 Memorandum & Opinion,. Document filed by Elon Musk. Filing fee $ 505.00, receipt number ANYSDC-26283268. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Spiro, Alex) (Entered: 06/15/2022) |
| 06/15/2022 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 86 Notice of Appeal. (tp) (Entered: 06/15/2022) |
| 06/15/2022 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 86 Notice of Appeal filed by Elon Musk were transmitted to the U.S. Court of Appeals. (tp) (Entered: 06/15/2022) |
| 06/24/2022 | 87 | MOTION to Withdraw *Appearances of Counsel*. Document filed by United States Securities and Exchange Commission. (Attachments: # 1 Affidavit Declaration of Melissa J. Armstrong).(Armstrong, Melissa) (Entered: 06/24/2022) |
| 06/29/2022 | | ORDER granting 87 Motion to Withdraw 87 MOTION to Withdraw *Appearances of Counsel*. (HEREBY ORDERED by Judge Lewis J. Liman)(Text Only Order) (ra) Transmission to Attorney Services/Help Desk. (Entered: 06/29/2022) |
| 07/19/2022 | 88 | STATUS REPORT. *Status Report of Rust Consulting* Document filed by United States Securities and Exchange Commission..(Mixon, Adriene) (Entered: 07/19/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/21/2022 10:44:30 | | |
| **PACER Login:** | cpnycpara16 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-cv-08865-LJL |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |

A-15

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** | : |
| Plaintiff, | : |
| vs. | : **Civil Action No. 1:18-cv-8865** |
| **ELON MUSK,** | : **Jury Trial Demanded** |
| Defendant. | : |

## <u>COMPLAINT</u>

Plaintiff United States Securities and Exchange Commission (the "Commission"), alleges as follows:

### SUMMARY

1.      This case involves a series of false and misleading statements made by Elon Musk, the Chief Executive Officer of Tesla, Inc. ("Tesla"), on August 7, 2018, regarding taking Tesla, a publicly traded company, private.  Musk's statements, disseminated via Twitter, falsely indicated that, should he so choose, it was virtually certain that he could take Tesla private at a purchase price that reflected a substantial premium over Tesla stock's then-current share price, that funding for this multi-billion dollar transaction had been secured, and that the only contingency was a shareholder vote.  In truth and in fact, Musk had not even discussed, much less confirmed, key deal terms, including price, with any potential funding source.

2.      At approximately 12:48 p.m. EDT on August 7, 2018, during trading hours, Musk tweeted to his over 22 million Twitter followers, "Am considering taking Tesla private at $420.

1

A-16

Funding secured." This statement was false and misleading. Over the next three hours, Musk made a series of additional materially false and misleading statements via Twitter including:

- "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla."

- "Shareholders could either to [sic] sell at 420 or hold shares & go private."

- "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."

3.      Musk knew or was reckless in not knowing that each of these statements was false and/or misleading because he did not have an adequate basis in fact for his assertions. When he made these statements, Musk knew that he had never discussed a going-private transaction at $420 per share with any potential funding source, had done nothing to investigate whether it would be possible for all current investors to remain with Tesla as a private company via a "special purpose fund," and had not confirmed support of Tesla's investors for a potential going-private transaction. He also knew that he had not satisfied numerous additional contingencies, the resolution of which was highly uncertain, when he unequivocally declared, "Only reason why this is not certain is that it's contingent on a shareholder vote." Musk's public statements and omissions created the misleading impression that taking Tesla private was subject only to Musk choosing to do so and a shareholder vote.

4.      Investors reacted to Musk's August 7 tweets. From the time of Musk's first tweet that day until the close of trading on August 7, Tesla's stock price increased by more than 6% on significantly increased volume and closed up 10.98% from the previous day.

5.      Musk's false and misleading public statements and omissions caused significant confusion and disruption in the market for Tesla's stock and resulting harm to investors.

A-17

6.      By engaging in the conduct alleged in this Complaint, Musk violated, and unless restrained and enjoined will violate again, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. § 78j(b)*] and Rule 10b-5 [*17 C.F.R. § 240.10b-5*] thereunder.

## NATURE OF PROCEEDING AND RELIEF SOUGHT

7.      The Commission brings this action against Musk pursuant to Section 21(d) of the Exchange Act [*15 U.S.C. § 78u(a)*] to enjoin the transactions, acts, practices, and courses of business alleged in this Complaint and to seek orders of disgorgement, along with prejudgment interest, civil penalties, and an officer and director bar against Musk, and such further relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [*15 U.S.C. §§ 78u(a), 78u(e), and 78aa*].

9.      Venue in this District is proper pursuant to Section 27 of the Exchange Act [*15 U.S.C. § 78aa*].  Defendant transacts business in this District, and certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District, and were effected, directly or indirectly, by making use of the means, instruments, or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of national securities exchanges.  Musk regularly communicates via Twitter with users located in this District.  In addition, Tesla is traded on the Nasdaq Global Select Market, which is headquartered in this District, and trades in Tesla securities were handled and executed by trading personnel located in this District during the period relevant to the allegations.

A-18

## DEFENDANT

10.     **Defendant Elon Musk**, age 47, resides in Los Angeles, California.  He co-founded Tesla, Inc. in 2003 and since that time has been the Chairman of Tesla's Board of Directors and largest stockholder.  He was named Chief Executive Officer in 2008.  Musk oversees all product development, engineering, and design of Tesla's products.

## RELEVANT ENTITY

11.     **Tesla**, which designs, develops, manufactures, and sells electric vehicles and energy generation and storage systems, is incorporated in Delaware with its principal place of business in Palo Alto, California.  Tesla conducted an initial public offering in 2010, and at all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act [*15 U.S.C. § 78l(b)*] and was publicly traded on the Nasdaq Global Select Market under the ticker symbol TSLA.

## FACTUAL ALLEGATIONS

### Musk Used Twitter to Communicate with Millions of People as Tesla's Spokesperson

12.     Musk created a profile on the social media application Twitter (twitter.com/elonmusk) in 2009.  Since that time, Musk often used Twitter to communicate about Tesla's business.  Tesla's Chief Financial Officer described Musk's Twitter statements as a "strong channel of marketing" with Musk acting as a "spokesman" for Tesla.

13.     On November 5, 2013, Tesla publicly filed a Form 8-K with the Commission stating that it intended to use Musk's Twitter account as a means of announcing material information to the public about Tesla and its products and services and has encouraged investors to review the information about Tesla published by Musk via his Twitter account.

A-19

14.     In August 2018, over 22 million people, including members of the press, "followed" Musk on Twitter.  His tweets were published instantaneously to those people and were also publicly available to anyone with Internet access.

**Musk's Statements Regarding Tesla Short Sellers**

15.     In 2018, stock analysts and investors increasingly began to question whether Tesla could meet its previously announced production targets and begin to earn sufficient cash in order to sustain its operations and pay its existing debt load.  By August 2018, more than $13 billion worth of Tesla shares were being "shorted," meaning they were sold by investors who did not own them at the time of the sale.  Investors who sell stock short typically believe the price of the stock will fall and hope to buy the stock at the lower price to cover their short positions and earn a profit.  If the price of the stock rises, short sellers who then exit their short positions by purchasing the stock at the higher price will incur losses.

16.     Musk has complained that Tesla has been unfairly targeted by short sellers and predicted that short sellers would be "burned."  For example, on May 4, 2018, Musk tweeted, "Oh and uh short burn of the century comin soon.  Flamethrowers should arrive just in time." On June 17, 2018, Musk tweeted that short sellers "have about three weeks before their short position explodes."

**Preliminary Discussions Regarding Taking Tesla Private**

17.     Beginning in January 2017, Musk had three or four in-person meetings with representatives of a sovereign investment fund (the "Fund").  During these meetings, according to Musk, the lead representative of the Fund expressed a verbal desire to make a large investment in Tesla and establish a Tesla production facility in the Middle East.

5

A-20

18.     In late July 2018, Musk and representatives of the Fund had not spoken for many months.  On July 28, 2018, a representative of the Fund requested a meeting with Musk.  On the evening of July 31, Musk and his chief of staff met with three representatives of the Fund at Tesla's factory in Fremont, California for approximately 30 to 45 minutes.  Tesla's CFO joined midway through the meeting.

19.     According to Musk, at the meeting the Fund's lead representative told Musk that the Fund had recently acquired almost five percent of Tesla's common stock on the open market, expressed interest in taking Tesla private, and confirmed that he was empowered to make investment decisions for the Fund.  Musk later stated that he assumed without confirming that the lead Fund representative was proposing a "standard" going-private transaction, but the terms of any such deal were not discussed.

20.     During the July 31 meeting, the lead Fund representative again raised the prospect of establishing a production facility in the Middle East.  According to Musk, he expressed openness but made no commitment; Musk assumed that whether a Tesla production facility in the Middle East was a precondition to the Fund's willingness to take Tesla private would depend on the amount of capital the Fund was required to commit to the transaction.  Musk did not discuss his assumption with the representatives of the Fund.

21.     The July 31 meeting lacked discussion of even the most fundamental terms of a proposed going-private transaction.  For example, there was no discussion at the July 31 meeting of (1) any dollar amount or specific ownership percentage for the Fund's investment in a going-private transaction; (2) any acquisition premium to be offered to current Tesla shareholders; (3) any restrictions on foreign ownership of a significant stake in Tesla; (4) the Fund's available liquid capital; (5) whether the Fund had any past experience participating in a going-private

6

A-21

transaction; (6) any regulatory hurdles to completion of a going-private transaction; or (7) the board approval process necessary to take Tesla private.  Musk has acknowledged that the July 31 meeting was the most specific discussion of a transaction to take Tesla private between him and representatives of the Fund.

22.     According to Musk, at the close of the July 31 meeting, the lead representative of the Fund asked Musk to tell the Fund how he wanted to do a going-private transaction and represented that so long as the terms were "reasonable," the Fund would be fine with them. Musk acknowledged that no specific deal terms had been established at the meeting and that there was no discussion of what would or would not be considered reasonable.  Nothing was exchanged in writing, and there was no discussion of confidentiality.  Musk did not communicate with representatives of the Fund again about a going-private transaction until August 10, three days after his August 7 statements.

**Musk's Discussion of a Going-Private Transaction with Tesla's Board of Directors**

23.     On August 2, 2018, after market close, Musk sent an email with the subject, "Offer to Take Tesla Private at $420," to Tesla's Board of Directors, Chief Financial Officer, and General Counsel.  In the email, Musk explained his reasons for wanting to take Tesla private, including that being public "[s]ubjects Tesla to constant defamatory attacks by the short-selling community, resulting in great harm to our valuable brand."  In the email, Musk asked that the "matter be put to a shareholder vote at the earliest opportunity" and stated that the "offer expires in 30 days."

24.     According to Musk, he calculated the $420 price per share based on a 20% premium over that day's closing share price because he thought 20% was a "standard premium" in going-private transactions.  This calculation resulted in a price of $419, and Musk stated that

A-22

he rounded the price up to $420 because he had recently learned about the number's significance in marijuana culture and thought his girlfriend "would find it funny, which admittedly is not a great reason to pick a price."

25.     Prior to Musk's meeting with Fund representatives on the evening of July 31, Tesla's stock had closed at approximately $298 per share.  Accordingly, at the time of the meeting, the price per share with a 20% premium would have been approximately $358. Between the July 31 meeting and Musk's August 2 email to Tesla's board, Tesla's share price had increased over 17% following the company's August 1 earnings announcement.  Musk realized that a spike in Tesla's share price might make a going-private transaction not feasible because it would require an investor in the transaction to pay a "premium on a spike."  Musk, however, said that he assumed without confirming with the Fund or any other funding source that the 17% spike in Tesla's share price did not affect the feasibility of taking Tesla private at that time.  Musk did not discuss a $420 price per share with any potential funding source for a Tesla going-private transaction prior to sending his email to Tesla's board.

26.     According to Musk, he thought that there was "a lot of uncertainty" regarding a potential going-private transaction at the time of his August 2 email to Tesla's board, "but it was worth investigating."  He believed at the time that the likelihood of consummation of a transaction was about 50%.

27.     In response to Musk's August 2 email about taking Tesla private, Tesla's board held a telephonic meeting with Musk on the night of August 3.  During that call, Musk informed the board that the Fund was interested in funding a going-private transaction.

A-23

28.     Musk also told board members that he wanted existing investors to stay with the company.  According to Musk, at least one board member told him that it would be "really difficult for small investors" to remain shareholders in a private Tesla.

29.     During the August 3 call, Musk told the board that he wanted to contact existing shareholders to assess their interest in participating in a going-private transaction.  The board authorized Musk to contact certain investors and asked him to report back to the board on those conversations.

**Musk's August 7 Statements and the Market's Reaction**

30.     Between the July 31 meeting with representatives of the Fund and the morning of August 7, Musk (1) did not have any further substantive communications with representatives of the Fund; (2) did not discuss a going-private transaction at a share price of $420 with any potential funding source; (3) had a conversation with a private equity fund representative about the process, but did not actually contact any additional potential strategic investors to assess their interest in participating in a going-private transaction; (4) did not provide Tesla's Board of Directors with a more specific proposal to take Tesla private; (5) did not contact existing Tesla shareholders to assess their interest in remaining invested in Tesla as a private company; (6) did not formally retain any advisors to assist with a going-private transaction; (7) did not determine whether retail investors could remain invested in Tesla as a private company; (8) did not determine whether there were restrictions on illiquid holdings by Tesla's institutional investors; and (9) did not determine what regulatory approvals would be required for such a transaction or whether they could be satisfied.

31.     On August 6, Musk discussed a potential going-private transaction with a private equity fund partner with previous experience with such transactions.  During this call, Musk

A-24

mentioned that to execute the potential transaction, the number of Tesla shareholders needed to be below 300.  At the time, Tesla had over 800 institutional shareholders and many more individual shareholders.  According to the private equity fund partner, the transaction structure that Musk was contemplating was "unprecedented" in his experience.

32.     These uncertainties notwithstanding, on Tuesday, August 7, 2018, Musk published a series of statements about a transaction to take Tesla private using his personal Twitter account.  Musk did not consult with Tesla's Board of Directors, any other Tesla employees, or any outside advisors about these tweets before publishing them.

33.     At approximately 12:48 PM EDT on Tuesday, August 7, 2018, Musk, using his mobile phone, published a tweet, "Am considering taking Tesla private at $420.  Funding secured."  Musk published this tweet in the middle of the day's official market trading. Immediately after this tweet, the trading volume and price of Tesla shares spiked.

34.     Over the next few hours, Musk made additional statements about taking Tesla private.  At approximately 1:15 PM EDT, Musk responded to another Twitter user's question, "At what price?" by repeating "420."

35.     At approximately 1:23 PM EDT, about 35 minutes after Musk's initial tweet about taking Tesla private, Tesla's Chief Financial Officer sent a text message to Musk, "Elon, am sure you have thought about a broader communication on your rationale and structure to employees and potential investors.  Would it help if [Tesla's head of communications], [Tesla's General Counsel], and I draft a blog post or employee email for you?"  Musk responded, "Yeah, that would be great."  Tesla's Chief Financial Officer then replied, "Working on it.  Will send you shortly."

A-25

36.     At approximately 1:40 PM EDT, Musk tweeted, "I don't have a controlling vote now & wouldn't expect any shareholder to have one if we go private.  I won't be selling in either scenario."

37.     At approximately 2:00 PM EDT, Musk tweeted, "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla.  Already do this with Fidelity's SpaceX [a privately held company for which Musk serves as CEO] investment."  In response to this tweet another Twitter user asked, "Could we still invest once private?"  Musk responded, "Yes, but liquidity events would be limited to every 6 months or so (like SpaceX)."

38.     At approximately 2:07 PM EDT, Musk responded to a Twitter user who wrote, "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company. . . ." by tweeting, "Absolutely.  Am super appreciative of Tesla shareholders.  Will ensure their prosperity in any scenario."

39.     Nasdaq rules specify that listed companies such as Tesla must notify Nasdaq at least ten minutes prior to publicly releasing material information about corporate events like a proposed going-private action.  Musk did not notify Nasdaq prior to publishing his August 7 tweets.

40.     At approximately 2:08 PM EDT, Nasdaq halted trading in TSLA shares.

41.     At approximately 2:13 PM EDT, Musk tweeted, "Shareholders could either to [sic] at 420 or hold shares & go private."

42.     At approximately 3:07 PM EDT, Musk responded to a Twitter user's comment about a "forced buyout" by tweeting, "Def. no forced sales. Hope all shareholders remain.  Will

A-26

be way smoother & less disruptive as a private company.  Ends negative propaganda from

shorts."  Later that day, Musk "retweeted" this statement, causing it to be published again in his

Twitter feed.

43.     At approximately 3:16 PM EDT, Musk sent an email to Tesla employees.  The

content of that email, entitled "Taking Tesla Private," was published to a publicly available Tesla

blog at 3:32 PM EDT.  In the email and blog post, Musk explained his reasons for wanting to

take Tesla private, including asserting that TSLA was "the most shorted stock in the history of

the stock market" and stating that "being public means there are large numbers of people who

have incentive to attack the company."

44.     In his company-wide email and blog post, Musk reiterated that he would like to

structure a Tesla going-private transaction "so that all shareholders have a choice.  Either they

can stay investors in a private Tesla or they can be bought out at $420 per share . . . ."  Musk

added, "This proposal to go private would ultimately be finalized through a vote of our

shareholders."

45.     A few minutes after publishing the blog post, at approximately 3:36 PM EDT,

Musk tweeted a link to it in a tweet that stated, "Investor support is confirmed. Only reason why

this is not certain is that it's contingent on a shareholder vote."  Neither Musk's tweet nor the

blog post provided any further information or context about the meaning of Musk's statement,

"Investor support confirmed," or disclosed any contingencies other than a shareholder vote that

would have to be satisfied in order to take Tesla private.

46.     Approximately nine minutes later, at 3:45 PM EDT, Nasdaq lifted the trading halt

on Tesla shares.  After trading resumed, Tesla's stock price continued to rise, closing at $379.57,

up over 6% from the time Musk first tweeted about taking Tesla private earlier that day.

**Reaction to Musk's August 7 Statements**

47.     Investors, stock analysts, and journalists immediately sought clarification of Musk's August 7 statements.  At 1:00 PM EDT, approximately 12 minutes after Musk published his tweet stating, "Am considering taking Tesla private at $420.  Funding secured," Tesla's own head of Investor Relations sent a text to Musk's chief of staff asking, "Was this text legit?"

48.     At approximately 1:13 PM EDT, a Tesla investor and friend of Musk's chief of staff texted the chief of staff, "What's Elon's tweet about?  Can't make any sense of it.  Would be incredibly disappointing for shareholders that have stuck it out for so long."  A few minutes later, at approximately 1:32 PM EDT, a business reporter texted Musk's chief of staff, "Quite a tweet! (Is it a joke?)."

49.     At approximately 2:23 PM EDT, another reporter sent Musk an email with the subject, "Are you just messing around?" and wrote, "Reaching out to see what's going on with your tweets about taking the company private?  Is this just a 420 joke gone awry?  Are you serious?  It seems like you are dancing into some pretty tricky legal territory by messing about with the markets this way.  Is there an actual explanation coming?"

50.     After Tesla published Musk's email to Tesla employees on its blog, at approximately 5:09 PM EDT on August 7, an investment bank research analyst emailed Tesla's head of Investor Relations, "In the tweet, he said financing is secured but in the letter he doesn't address this.  Can you clarify?"  Tesla's head of Investor Relations responded approximately ten minutes later, "I can only say that the first Tweet clearly stated that 'financing is secured'.  Yes, there is a firm offer."

51.     At approximately 5:23 PM EDT, another research analyst emailed Tesla's head of Investor Relations and another Investor Relations employee, "Had some questions/clarifications

13

A-28

on today's news and blog post.  Can either of you speak?"  A few minutes later, Tesla's head of Investor Relations responded, "[A]part from what has been tweeted and what was written in a blog post, we can't add anything else.  I only wanted to stress that Elon's first tweet, which mentioned 'financing secured' is correct."

52.     After Tesla's head of Investor Relations received another inquiry from another investment bank research analyst at approximately 7:20 PM EDT, he asked whether the analyst had read Tesla's "official blog post on this topic."  The analyst responded, "I did.  Nothing on funding though?"  The head of Investor Relations replied, "The very first tweet simply mentioned 'Funding secured' which means there is a firm offer.  Elon did not disclose details of who the buyer is."  The analyst then asked, "Firm offer means there is a commitment letter or is this a verbal agreement?"  The head of Investor Relations responded, "I actually don't know, but I would assume that given we went full-on public with this, the offer is as firm as it gets."

**Additional Statements by Musk on August 13**

53.     Musk did not make any attempt to clarify his August 7 statements until August 13.  During the interim, Musk continued to publish statements via his Twitter account, including an apparent joke on August 10 about "Short shorts coming soon to Tesla merch[andise]."

54.     On August 12, 2018, a news outlet reported that "people with knowledge of the [F]und's plans" said that it "hasn't made any firm decisions on whether to increase its stake, or by how much, but talks are ongoing . . . ."

55.     The following day, August 13, 2018, a blog post attributed to Musk called "Update on Taking Tesla Private" was published on Tesla's public blog.  In the blog post, Musk attempted to walk back his August 7 statements, stating publicly for the first time that when he had tweeted, "Am considering taking Tesla private at $420.  Funding secured," it was based on

14

A-29

his impression that there was "no question" that a deal with Fund could be closed and that it was "just a matter of getting the process moving."

56.     Musk's August 13 post also disclosed for the first time that he was still in discussions about taking Tesla private with the Fund and a number of other investors and that no detailed proposal had been presented to the board or any board committee.  This was contrary to Musk's August 7 tweet stating, "Only reason why this is not certain is that it's contingent on a shareholder vote."

57.     Although it provided some new information about a potential transaction to take Tesla private, Musk's August 13 blog post still did not disclose that the $420 share price had not been agreed to by any potential funding source for a transaction to take Tesla private.  Similarly, in the blog post, Musk again stated that his "proposal was based on using a structure where any existing shareholder who wished to remain as a shareholder in a private Tesla could do so, with the $420 per share buyout used only for shareholders who preferred that option."  Musk did not disclose that he had still not determined whether such a structure would be possible.  After abandoning the going-private transaction, Musk admitted that his assumption that it would be possible for small shareholders to remain invested in Tesla as a private company was a "fundamental misunderstanding."

58.     At approximately 11:15 PM EDT on Friday, August 24, 2018, after the close of official Nasdaq trading, a blog post was published on Tesla's public blog announcing that Musk had abandoned the process of attempting to take Tesla private.

59.     The August 24 blog post, attributed to Musk, stated:

> Given the feedback I've received, it's apparent that most of Tesla's
> existing shareholders believe we are better off as a public
> company.  Additionally, a number of institutional shareholders
> have explained that they have internal compliance issues that limit

A-30

> how much they can invest in a private company.  There is also no
> proven path for most retail investors to own shares if we were
> private.  Although the majority of shareholders I spoke to said they
> would remain with Tesla if we went private, the sentiment, in a
> nutshell, was "please don't do this."

This was the first time that Musk publicly disclosed the obstacles to allowing current Tesla

investors to remain invested if Tesla went private and thus corrected his multiple previous

misstatements that any going-private transaction would allow all current shareholders to remain

invested.

60.    On the next trading day, August 27, 2018, Tesla stock closed at $319.27, down

over 15% from the closing price of $379.57 on August 7, the date of Musk's initial tweets about

taking Tesla private.

**Musk's August 7 Statements Were Materially False and Misleading**

61.    Musk made multiple materially false statements on August 7, and taken together,

his August 7 statements left market participants with the false and misleading impression that if

Musk chose to take Tesla private at $420 per share, the only outstanding requirement to be

satisfied was a shareholder vote.

62.    Musk's first tweet on August 7 stated, "Am considering taking Tesla private at

$420.  Funding secured."  Musk then repeated the $420 share price in at least two additional

tweets that day.  Later that day, Musk also tweeted, "Investor support is confirmed.  Only reason

why this is not certain is that it's contingent on a shareholder vote."  Musk's statements that

funding was "secured" and investor support was "confirmed" were false and misleading because,

in reality, Musk had no "secured" or "confirmed" commitment from any source to provide any

amount of funding.  In addition, he had never even discussed taking Tesla private at a price of

$420 per share with the Fund or any other potential investor.

16

A-31

63.     Musk's statement, "Only reason why this is not certain is that it's contingent on a shareholder vote," was also false and misleading.  In fact, there were numerous reasons in addition to a shareholder vote why a going-private transaction was not "certain" at that time.  Any going-private transaction would have required approval of Tesla's board or a specially-appointed committee of the board, and at that time, no formal proposal to take Tesla private had even been presented for consideration.  In fact, no deal terms had been agreed upon with any source of funding, and any large investment to fund such a transaction would likely have been predicated on terms that the parties would have to negotiate and agree upon.  For example, the Fund had indicated that its investment might be contingent on Tesla building a production facility in the Middle East, a condition that would have significantly complicated any transaction, and to which neither Musk nor Tesla had agreed.  At least one Tesla board member described such a condition as a "non-starter."

64.     Musk's August 7 statements, taken together, also created the misleading impression that certain terms of a transaction to take Tesla private had been determined when, in fact, they had not even been explored, and in some cases, proved to be impossible. On August 7, Musk repeatedly stated that all current Tesla investors would be able to remain invested in Tesla after a going-private transaction.

65.     Specifically, Musk tweeted, "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla. Already do this with Fidelity's SpaceX investment."  Musk also responded to another Twitter user who wrote, "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company. . . ." by tweeting, "Absolutely.  Am super

17

A-32

appreciative of Tesla shareholders. Will ensure their prosperity in any scenario."  Musk also

tweeted, "Shareholders could either to [sic] at 420 or hold shares & go private."  Finally, in his

August 7 blog post, Musk stated " . . . all shareholders have a choice.  Either they can stay

investors in a private Tesla or they can be bought out at $420 per share . . . ."

     66.    Musk also responded to a Twitter user who asked, "Could we still invest once

private?" by tweeting, "Yes, but liquidity events would be limited to every 6 months or so (like

SpaceX)."

     67.    At the time of these statements, Musk had not determined or even explored

whether it would be possible (1) for individual investors to invest in Tesla if it was a private

company; (2) for all current Tesla shareholders to remain invested if Tesla were to go private; (3)

to create a "special purpose fund enabling anyone to stay with Tesla"; or (4) to hold liquidity

events "every 6 months or so."  In fact, Musk later admitted, "I thought the vast majority of

existing investors would want to maintain their stake, and we would find a vehicle for small

investors to participate. That latter part was a fundamental misunderstanding that I just did not

know -- I thought there would be some way to retain small investors, but there isn't."  Musk's

statements regarding specific terms of a transaction to take Tesla private created the misleading

impression that these terms had been decided upon, when in fact, they had not even been

investigated or determined to be possible.

**Musk Knew or Was Reckless in Not Knowing that His Statements Were False and Misleading**

     68.    Musk made his false and misleading public statements about taking Tesla private

using his mobile phone in the middle of the active trading day.  He did not discuss the content of

the statements with anyone else prior to publishing them to his over 22 million Twitter followers

18

A-33

and anyone else with access to the Internet.  He also did not inform Nasdaq that he intended to make this public announcement, as Nasdaq rules required.

69.     Musk's statements were premised on a long series of baseless assumptions and were contrary to facts that Musk knew.  Between the July 31 meeting with representatives of the Fund and his August 7 misstatements, Musk knew that he (1) had not agreed upon any terms for a going-private transaction with the Fund or any other funding source; (2) had no further substantive communications with representatives of the Fund beyond their 30 to 45 minute meeting on July 31; (3) had never discussed a going-private transaction at a share price of $420 with any potential funding source; (4) had not contacted any additional potential strategic investors to assess their interest in participating in a going-private transaction; (5) had not contacted existing Tesla shareholders to assess their interest in remaining invested in Tesla as a private company; (6) had not formally retained any legal or financial advisors to assist with a going-private transaction; (7) had not determined whether retail investors could remain invested in Tesla as a private company; (8) had not determined whether there were restrictions on illiquid holdings by Tesla's institutional investors; and (9) had not determined what regulatory approvals would be required or whether they could be satisfied.

70.     In addition, Musk knew that Tesla's board had not yet voted on any proposal or authorized a shareholder vote on it, and in fact, Musk had not yet even submitted a formal proposal to Tesla's board.

71.     Musk did not disclose any of these material facts that were known to him when he made his August 7 statements.  Unlike market participants reading his tweets, Musk knew that his ostensibly "secured" funding was based on a 30 to 45 minute conversation regarding a potential investment of an unspecified amount in the context of an undefined transaction

19

structure.  Musk also knew that there were many uncertainties beyond just a shareholder vote that would have had to be resolved before any going-private transaction could have been possible.  As a result, Musk knew or was reckless in not knowing that his August 7 statements were false and misleading.

**Musk Omitted Material Facts**

72.     Musk's statements on August 7 also omitted material information.  Musk had a duty to disclose material facts necessary to make his statements not misleading.

73.     Despite receiving numerous inquiries from journalists, research analysts, and current Tesla investors indicating that they were confused by Musk's tweets and that the August 7 blog post had not remedied that confusion, Musk did not attempt to clarify the August 7 statements until the blog post, "Update on Taking Tesla Private," was issued on August 13.

74.     Moreover, the August 13 blog post still did not disclose that Musk had not secured an agreement from any potential source of funding to fund a going-private transaction at a price of $420 per share or that it was uncertain that a going-private transaction could be accomplished in a manner that allowed existing Tesla shareholders to remain invested.

**Musk's Tweets Caused Market Chaos and Harmed Tesla Investors**

75.     Immediately prior to Musk's August 7 statements via Twitter, Tesla's stock was trading at $356.67.  Musk's first tweet about taking Tesla private set off a trading frenzy, and the trading volume and price of Tesla shares immediately spiked.  Nasdaq subsequently halted Tesla trading for more than 90 minutes pending an official announcement from Tesla.  At the end of August 7, after Musk's tweets and the post on Tesla's blog, the stock closed at $379.57, up 6.42% from just prior to the first tweet.

A-35

76.     By the close of market trading on August 13, after Musk and Tesla disclosed more information about the details underlying Musk's "funding secured" statement, Tesla's stock price had declined to around pre-tweet trading levels.  By the close of trading on August 27, the first trading day after Musk announced that he was abandoning his proposal to take Tesla private, Tesla's stock had dropped to $319.44.

77.     As a result of Musk's false and misleading statements and material omissions, investors who purchased Tesla stock in the period after the false and misleading statements but before accurate information was made known to the market were harmed.

## CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

78.     Paragraphs 1 through 77 are hereby re-alleged and are incorporated herein by reference.

79.     Defendant, with scienter, in connection with the purchase or sale of securities as set forth above, directly or indirectly made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading by the use of the means or instrumentalities of interstate commerce, and of the mails, and the facilities of a national securities exchange.

80.     By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, [*15 U.S.C. § 78j(b)*], and Rule 10b-5 thereunder, [*17 C.F.R. § 240.10b-5*].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

A-36

**I.**

Finding that Defendant violated the provisions of the federal securities laws as alleged herein;

**II.**

Permanently restraining and enjoining Defendant from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*];

**III.**

Ordering Defendant to disgorge, with prejudgment interest, any ill-gotten gains received as a result of the violations alleged herein;

**IV.**

Ordering Defendant to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [*15 U.S.C. § 78u(a)(3)*];

**V.**

Ordering that Defendant be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [*15 U.S.C. § 78l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [*15 U.S.C. § 78o(a)*]; and

A-37

**VI.**

Granting such other and further relief as this Court may deem just, equitable, or necessary.

Dated: September 27, 2018                    Respectfully submitted,


*/s/ Jina L. Choi*
Jina L. Choi
Cheryl L. Crumpton*
E. Barrett Atwood*

*Application for admission *pro hac vice* forthcoming

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4459 (Crumpton)
crumptonc@sec.gov

44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 295-2467 (Atwood)
atwoodb@sec.gov

Of counsel:

Erin E. Schneider
Steven Buccholz
Walker S. Newell
Bernard B. Smith

A-38

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **vs.** | :   **No. 1:18-cv-8865-AJN-GWG** |
| | : |
| **ELON MUSK** | : |
| | : |
| **Defendant.** | : |
| | : |

**CONSENT MOTION FOR ENTRY OF FINAL JUDGMENT**

Plaintiff United States Securities and Exchange Commission (the "Commission") respectfully submits this consent motion to enter final judgment according to the parties' settlement.  In support of this motion, the Commission states the following:

1.      On September 27, 2018, the Commission filed a Complaint against Defendant Musk alleging violations of the federal securities laws.

2.      The parties have reached a settlement agreement in this case.  Attached hereto as Exhibit 1 is the executed Consent of Defendant Elon Musk, setting forth the terms of his settlement with the Commission.

3.      Attached hereto as Exhibit 2 is the proposed Final Judgment to which Defendant Musk agreed.  The proposed Final Judgment would permanently enjoin him from violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.  It would also order him to pay a penalty of $20,000,000 and to comply with the undertakings detailed in the Final Judgment.

A-39

The Commission respectfully requests that the Court enter the proposed Final Judgment attached hereto as Exhibit 2.

Dated: September 29, 2018                    Respectfully submitted,

                                             /s/ Jina L. Choi
                                             Jina L. Choi
                                             Cheryl L. Crumpton*
                                             E. Barrett Atwood*

                                             *Motion to appear *pro hac vice* pending

                                             U.S. Securities and Exchange Commission
                                             100 F Street, N.E.
                                             Washington, D.C.  20549
                                             (202) 551-4459 (Crumpton)

                                             44 Montgomery Street, Suite 2800
                                             San Francisco, CA 94104
                                             (415) 705-2467 (Atwood)

Case 22-1291, Document 25, 09/27/2022, 3389698, Page47 of 291

Case 1:18-cv-08865-AJN   Document 14   Filed 10/16/18   Page 1 of 4
Case 1:18-cv-08865-AJN   Document 6   Filed 09/29/18   Page 1 of 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __OCT 1 6 2018__

---

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

        Plaintiff,

        vs.

ELON MUSK

        Defendant.

---

:
:
:
:
:
:
:
:
:
:
:

No. 1:18-cv-8865-AJN-GWG

## CONSENT MOTION FOR ENTRY OF FINAL JUDGMENT

Plaintiff United States Securities and Exchange Commission (the "Commission") respectfully submits this consent motion to enter final judgment according to the parties' settlement. In support of this motion, the Commission states the following:

1. On September 27, 2018, the Commission filed a Complaint against Defendant Musk alleging violations of the federal securities laws.

2. The parties have reached a settlement agreement in this case. Attached hereto as Exhibit 1 is the executed Consent of Defendant Elon Musk, setting forth the terms of his settlement with the Commission.

3. Attached hereto as Exhibit 2 is the proposed Final Judgment to which Defendant Musk agreed. The proposed Final Judgment would permanently enjoin him from violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. It would also order him to pay a penalty of $20,000,000 and to comply with the undertakings detailed in the Final Judgment.

The Commission respectfully requests that the Court enter the proposed Final Judgment attached hereto as Exhibit 2.

Dated: September 29, 2018

Respectfully submitted,

*/s/ Jina L. Choi*
Jina L. Choi
Cheryl L. Crumpton*
E. Barrett Atwood*

*Motion to appear *pro hac vice* pending

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
(202) 551-4459 (Crumpton)

44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2467 (Atwood)

Case 22-1291, Document 25, 09/27/2022, 3389698, Page49 of 291

Case 1:18-cv-08865-AJN   Document 14   Filed 10/16/18   Page 3 of 14
Case 1:18-cv-08865-AJN   Document 4-1   Filed 09/29/18   Page 1 of 4

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | : | |
| Plaintiff, | : | |
| vs. | : | No. 1:18-cv-8865-AJN-GWG |
| ELON MUSK, | : | |
| Defendant. | : | |

## CONSENT OF DEFENDANT ELON MUSK

1.      Defendant Elon Musk ("Defendant") waives service of a summons and the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over Defendant in this action only and over the subject matter of this action.

2.      Without admitting or denying the allegations of the complaint (except as provided herein in paragraph 13 and except as to personal jurisdiction as to this matter only and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to the entry of the final Judgment in the form attached hereto (the "Final Judgment") and incorporated by reference herein, which, among other things:

      (a)      permanently restrains and enjoins Defendant from violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") *[15 U.S.C. § 78j(b)]* and Rule 10b-5 thereunder *[17 C.F.R. § 240.10b-5]*;

      (b)      orders Defendant to pay a civil penalty in the amount of $20,000,000 under Section 21(d)(3) of the Exchange Act *[15 U.S.C. § 78u(d)(3)]*; and

      (c)      requires Defendant to comply with the undertaking set forth in this Consent and incorporated in the Final Judgment.

3.      Defendant acknowledges that the civil penalty paid pursuant to the Final

Case 22-1291, Document 25, 09/27/2022, 3389698, Page50 of 291

Case 1:18-cv-08865-AJN   Document 14   Filed 10/16/18   Page 4 of 14
Case 1:18-cv-08865-AJN   Document 8-1   Filed 09/29/18   Page 2 of 14

Judgment may be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended.  Regardless of whether any such Fair Fund distribution is made, the civil penalty shall be treated as a penalty paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty argue that he is entitled to, nor shall he further benefit by, offset or reduction of any award of compensatory damages in any Related Investor Action by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Defendant agrees that he shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this action.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

    4.    Defendant agrees that he shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.  Defendant further agrees that he shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

    5.    Defendant undertakes to:

        (a)    resign from his role as Chairman of the Board of Directors of Tesla, Inc. ("Chairman") within forty-five (45) days of the filing of this Consent and

Case 1:18-cv-08865-AJN   Document 8-1   Filed 09/29/18   Page 3 of 7

agree not to seek reelection or to accept an appointment as Chairman for a period of three years thereafter.  Upon request by Defendant, the Commission staff may grant in its sole discretion an extension to the deadline set forth above;

(b)    comply with all mandatory procedures implemented by Tesla, Inc. (the "Company") regarding (i) the oversight of communications relating to the Company made in any format, including, but not limited to, posts on social media (*e.g.*, Twitter), the Company's website (*e.g.*, the Company's blog), press releases, and investor calls, and (ii) the pre-approval of any such written communications that contain, or reasonably could contain, information material to the Company or its shareholders; and

(c)    certify, in writing, compliance with undertaking (a) set forth above.  The certification shall identify the undertaking, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance.  The Commission staff may make reasonable requests for further evidence of compliance, and Defendant agrees to provide such evidence.  Defendant shall submit the certification and supporting material to Steven Buchholz, Assistant Regional Director, U.S. Securities and Exchange Commission, 44 Montgomery Street, 28th Floor, San Francisco, CA 94104, with a copy to the Office of Chief Counsel of the Enforcement Division, 100 F Street NE, Washington, DC 20549, no later than fourteen (14) days from the date of the completion of the undertaking.

6.    Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

7.    Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.

3

A-45

8.      Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

9.      Defendant agrees that this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

10.      Defendant will not oppose the enforcement of the Final Judgment on the ground, if any exists, of lack of compliance with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

11.      Defendant waives service of the Final Judgment and agrees that entry of the Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its terms and conditions.  Defendant further agrees to provide counsel for the Commission, within thirty days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Final Judgment.

12.      Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding.  Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein.  Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations.  Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization.  This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding.  In addition, in any

Case 22-1291, Document 25, 09/27/2022, 3389698, Page53 of 291

Case 1:18-cv-08865-AJN   Document 44   Filed 10/16/18   Page 7 of 14
Case 1:18-cv-08865-AJN   Document 6-1   Filed 09/29/18   Page 5 of 14

disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant understands that he shall not be permitted to contest the factual allegations of the complaint in this action.

13.     Defendant understands and agrees to comply with the terms of 17 C.F.R. § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that he neither admits nor denies the allegations."  As part of Defendant's agreement to comply with the terms of Section 202.5(e), Defendant:  (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Defendant does not admit the allegations of the complaint, or that this Consent contains no admission of the allegations, without also stating that Defendant does not deny the allegations; (iii) upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint; and (iv) stipulates solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code *[11 U.S.C. § 523]* that the allegations in the complaint are true, and further, that any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under the Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code *[11 U.S.C. § 523(a)(19)]*.  If Defendant breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket.  Nothing in this paragraph affects Defendant's:  (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

5

A-47

14.     Defendant hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Defendant to defend against this action.  For these purposes, Defendant agrees that Defendant is not the prevailing party in this action since the parties have reached a good faith settlement.

15.     Defendant agrees that the Commission may present the Final Judgment to the Court for signature and entry without further notice.

16.     Defendant agrees that this Court shall retain jurisdiction over this matter for the purpose of enforcing the terms of the Final Judgment.

Dated: September 28 , 2018

_____
Elon Musk

On September 28 , 2018, Elon Musk , a person known to me, personally appeared before me and acknowledged executing the foregoing Consent.



_____
Notary Public
Commission expires:

Approved as to form:

_____
Steven M. Farina
Williams & Connolly LLP
725 Twelfth Street N.W.
Washington, DC 20005

Attorney for Defendant

6

A-48

## CALIFORNIA JURAT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA        )
                           ) ss.
COUNTY OF ALAMEDA          )

Subscribed and sworn to (or affirmed) before me on this 28th day of September 2018, by **Elon Musk,** proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

WITNESS my hand and official seal.

ALESSANDRA FRANCESCA FERRIS
Notary Public – California
Santa Clara County
Commission # 2218921
My Comm. Expires Oct 20, 2021

_____ (Seal)
Notary Public
State of California

A-49

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | : |
| Plaintiff, | : |
| vs. | :    No. 1:18-cv-8865-AJN-GWG |
| ELON MUSK, | : |
| Defendant. | : |

## <u>FINAL JUDGMENT AS TO DEFENDANT ELON MUSK</u>

The Securities and Exchange Commission having filed a Complaint and Defendant Elon Musk having entered a general appearance; consented to the Court's jurisdiction over Defendant in this matter only and the subject matter of this action; consented to entry of this Final Judgment without admitting or denying the allegations of the Complaint (except as to jurisdiction and except as otherwise provided herein in paragraph III); waived findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment:

### I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") *[15 U.S.C. § 78j(b)]* and Rule 10b-5 promulgated thereunder *[17 C.F.R. § 240.10b-5]*, by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light

Case 22-1291, Document 25, 09/27/2022, 3389698, Page57 of 291

Case 1:18-cv-08865-AJN   Document 14   Filed 10/16/18   Page 11 of 14
Case 1:18-cv-08865-AJN   Document 6-2   Filed 09/29/18   Page 2 of 5

of the circumstances under which they were made, not misleading; or

(c)   to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay a civil penalty in the amount of $20,000,000 to the Securities and Exchange Commission pursuant to Section 21(d)(3) of the Exchange Act *[15 U.S.C. § 78u(d)(3)]*.  Defendant shall make this payment within 14 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Elon Musk as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action.  By making this payment,

2

Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

Defendant shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended. The Court shall retain jurisdiction over the administration of any distribution of the Fund. If the Commission staff determines that the Fund will not be distributed, the Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not argue that he is entitled to, nor shall he further benefit by offset or reduction of any award of compensatory damages in any Related Investor Action by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, solely for purposes of

3

Case 22-1291, Document 25, 09/27/2022, 3389698, Page59 of 291

Case 1:18-cv-08865-AJN Document 14 Filed 10/16/18 Page 13 of 54
Case 1:18-cv-08865-AJN Document 4-2 Filed 09/29/18 Page 4 of 54

exceptions to discharge set forth in Section 523 of the Bankruptcy Code *[11 U.S.C. § 523]* the allegations in the complaint are true and admitted by Defendant, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code *[11 U.S.C. § 523(a)(19)]*. Nothing in this paragraph (a) constitutes an admission by Defendant for any purpose other than determining the applicability of Section 523(a)(19) or (b) affects Defendant's (i) testimonial obligations; or (ii) right to take any legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings set forth therein, including, but not limited to, the undertakings to:

(a) resign from his role as Chairman of the Board of Directors of Tesla, Inc. ("Chairman") within forty-five (45) days of the filing of this Consent and agree not to seek reelection or to accept an appointment as Chairman for a period of three years thereafter. Upon request by Defendant, the Commission staff may grant in its sole discretion an extension to the deadline set forth above;

(b) comply with all mandatory procedures implemented by Tesla, Inc. (the "Company") regarding (i) the oversight of communications relating to the Company made in any format, including, but not limited to, posts on social media (*e.g.*, Twitter), the Company's website (*e.g.*, the Company's blog), press releases, and investor calls, and (ii) the pre-approval of any

4

A-53

such written communications that contain, or reasonably could contain, information material to the Company or its shareholders; and

(c)     certify, in writing, compliance with undertaking (a) set forth above.  The certification shall identify the undertaking, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance.  The Commission staff may make reasonable requests for further evidence of compliance, and Defendant agrees to provide such evidence.  Defendant shall submit the certification and supporting material to Steven Buchholz, Assistant Regional Director, U.S. Securities and Exchange Commission, 44 Montgomery Street, 28th Floor, San Francisco, CA 94104, with a copy to the Office of Chief Counsel of the Enforcement Division, 100 F Street NE, Washington, DC 20549, no later than fourteen (14) days from the date of the completion of the undertaking.

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

Dated: __10/16/18_____      _____
                                Hon. Alison J. Nathan
                                UNITED STATES DISTRICT JUDGE

5

A-54

**Tesla, Inc.**

**Senior Executives Communications Policy**

**December 11, 2018**

Policy

- An Authorized Executive may use Written Communications to disseminate information relating to Tesla, subject to this Senior Executives Communications Policy (this "**Policy**") and subject to Tesla's Disclosure Control and Procedures.

  - "**Authorized Executive**" means Tesla's Chief Executive Officer ("**CEO**"), Head of Communications (who shall receive appropriate guidance from the General Counsel) and any Tesla Vice President or higher employee designated in writing by the CEO.

  - "**Written Communication**" means the communication of information through any written format, including social media (e.g., Twitter, Facebook, Instagram, LinkedIn, blogs), press releases, and any other means that have a high likelihood of being disseminated outside of Tesla, including on an unauthorized basis by others (e.g., Tesla worldwide employee communications and written materials for Tesla all-hands meetings). "Written Communications" also includes talking points, scripts, Q&A, or similar materials that are used or reasonably expected to be used in or to prepare for earnings calls, investor calls, conferences, shareholder interviews, publicized interviews, or any other oral communication that has a high likelihood of being disseminated outside of Tesla.

- Written Communications that contain, or reasonably could contain, information material to Tesla or its stockholders must, prior to posting or other publication, be submitted to Tesla's General Counsel and Disclosure Counsel (or in the event of the General Counsel's unavailability, Tesla's Chief Financial Officer and Disclosure Counsel) for pre-approval.  Authorized Executives are not authorized to post or publish Written Communications that contain, or reasonably could contain, information material to Tesla or its stockholders without obtaining pre-approval.

  - "**Disclosure Counsel**" means, with respect to this Policy, Tesla's in-house securities law attorney who has been designated by the Disclosure Controls Committee of the Tesla Board of Directors (the "**Committee**") to assist in reviewing Written Communications in accordance with this Policy.

- Information on the following subjects may, depending on its significance, be material to Tesla or its stockholders (it being noted that this is not an exhaustive list):

  - financial condition, statements or results, including earnings or guidance;

  - mergers, acquisitions, tender offers, joint ventures, or other fundamental transactions;

  - communications regarding new products, production progress or delays, sales or delivery numbers or other major business developments;

  - projections, forecasts, or estimates regarding Tesla's business;

1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY TESLA,
NOT SUBJECT TO DISCLOSURE PURSUANT TO 5 U.S.C. §552(b)

TSLA_SECSF0061958

A-55

- o changes in control or significant changes in management;

- o events regarding Tesla's securities or credit facilities; and

- o any other significant legal or regulatory developments, including any event requiring the filing of a Form 8-K with the Securities and Exchange Commission or a pre-notification to Tesla's stock exchange.

- Any Written Communication that has been pre-approved should be disseminated outside of Nasdaq trading hours (specifically, between 1:00 pm PT and before 5:30 am PT).  This is intended to allow all investors equal, unhurried access to such information and prevent possible halts in the trading of Tesla stock.

- If an Authorized Executive (i) further edits a pre-approved Written Communication, or (ii) desires to release a Written Communication more than two (2) days, after receipt of written pre-approval, such Authorized Executive will re-confirm the pre-approval in writing in accordance with this Policy prior to release.

Pre-Approval Process

- For any Written Communication which requires  pre-approval pursuant to this Policy, the Authorized Executive will send a draft to Tesla's General Counsel and Disclosure Counsel (or in the event of the General Counsel's unavailability, Tesla's Chief Financial Officer and Disclosure Counsel) for review and pre-approval.  The draft Written Communication will be reviewed for (i) content (i.e., accuracy and suitability of subject matter for the intended form of communication), (ii) word choice and (iii) timing.  The reviewers may consult with any other appropriate Tesla personnel, including the members of the Committee, or third parties, such as outside legal counsel, as necessary.

- Reviewers of draft Written Communications will be given sufficient time to permit them to reasonably undertake the process required by this Policy.

Monitoring and Audit

- The Committee and Tesla's General Counsel and Disclosure Counsel will periodically review past Written Communications, provide guidance to the applicable Authorized Executive, and provide regular reports to the Committee.

- Tesla's internal audit function will periodically audit compliance with this Policy and report any exceptions to the Committee.

- The Committee shall provide oversight over this Policy, and recommend to Tesla's Board of Directors any action to be taken in the event of any non-compliance with this Policy.

- This Policy shall be amended only by action of the Committee.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY TESLA,
NOT SUBJECT TO DISCLOSURE PURSUANT TO 5 U.S.C. §552(b)

TSLA_SECSF0061959

A-56



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**

**DIVISION OF ENFORCEMENT**

February 20, 2019

**Via Email (SFarina@wc.com)**

Elon Musk
c/o Steven Farina, Esq.
Williams & Connolly LLP

    Re:    *SEC v. Musk,* 1:18-cv-8865-AJN

Dear Mr. Farina:

    In connection with the Final Judgment as to Defendant Elon Musk (the "Musk Judgment") entered in the above-captioned matter, the staff requests that your client, Elon Musk, voluntarily provide the information and documents set forth below by 5:00 pm ET on February 21, 2019:

- Please confirm whether you complied with Tesla's pre-approval procedures as required by Section IV(b) of the Musk Judgment before you published the written communication on Twitter at 7:15 pm ET on February 19, 2019, that stated, "Tesla made 0 cars in 2011, but will make around 500k in 2019" ("the 7:15 tweet"). If so, please describe the process by which you complied with Tesla's pre-approval procedures.

- Please provide all documents concerning or related to the 7:15 tweet, including, but not limited to, any review and/or pre-approval of the 7:15 tweet by Tesla's General Counsel and/or Securities Counsel.

- Please confirm whether you complied with Tesla's pre-approval procedures as required by Section IV(b) of the Musk Judgment before you published the written communication on Twitter at 11:41 pm ET on February 19, 2019, that stated, "Meant to say annualized production rate at end of 2019 probably around 500k, ie 10k cars/week. Deliveries for year still estimated to be about 400k" ("the 11:41 tweet"). If so, please describe the process by which you complied with Tesla's pre-approval procedures.

- Please provide all documents concerning or related to the 11:41 tweet, including, but not limited to, any review and/or pre-approval of the 11:41 tweet by Tesla's General Counsel and/or Securities Counsel.

Please send responsive information and documents to:

> U.S. Securities and Exchange Commission
> Attn: Cheryl L. Crumpton
> Supervisory Trial Counsel
> Division of Enforcement
> U.S. Securities and Exchange Commission
> 100 F Street, N.E.
> Washington, DC 20549-5985
> CrumptonC@sec.gov

If you have any questions or would like to discuss this matter, you may call me at 202-551-4459.

> Sincerely,
>
> *s/ Cheryl L. Crumpton*

A-58



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**

**DIVISION OF ENFORCEMENT**

February 20, 2019

**<u>Via Email (bbondi@cahill.com)</u>**

Tesla, Inc.
c/o Bradley J. Bondi, Esq.
Cahill Gordon & Reindel LLP

Re:    *SEC v. Tesla*, 1:18-cv-8947-AJN; *SEC v. Musk,* 1:18-cv-8865-AJN

Dear Mr. Bondi:

In connection with the final judgments entered in the above-captioned matters, the staff requests that your client, Tesla, Inc. ("Tesla") voluntarily provide the information and documents set forth below by 5:00 pm ET on February 21, 2019:

- Please confirm whether the written communication published by Elon Musk on Twitter at 7:15 pm ET on February 19, 2019, that stated, "Tesla made 0 cars in 2011, but will make around 500k in 2019," ("the 7:15 tweet") was reviewed by Tesla's Securities Counsel, as required by Section IV(c) of the Final Judgment as to Defendant Tesla, Inc. ("the Tesla Judgment"). If so, please describe the process by which the 7:15 tweet was reviewed.

- Please provide all documents concerning or related to the 7:15 tweet, including, but not limited to, any review and/or pre-approval of the 7:15 tweet by Tesla's General Counsel and/or Securities Counsel.

- Please confirm whether the written communication published by Elon Musk on Twitter at 11:41 pm ET on February 19, 2019, that stated, "Meant to say annualized production rate at end of 2019 probably around 500k, ie 10k cars/week. Deliveries for year still estimated to be about 400k," ("the 11:41 tweet") was reviewed by Tesla's Securities Counsel, as required by Section IV(c) of the Tesla Judgment. If so, please describe the process by which the 11:41 tweet was reviewed.

- Please provide all documents concerning or related to the 11:41 tweet,

including, but not limited to, any review and/or pre-approval of the 11:41 tweet by Tesla's General Counsel and/or Securities Counsel.

Please send responsive information and documents to:

> U.S. Securities and Exchange Commission
> Attn: Cheryl L. Crumpton
> Supervisory Trial Counsel
> Division of Enforcement
> U.S. Securities and Exchange Commission
> 100 F Street, N.E.
> Washington, DC 20549-5985
> CrumptonC@sec.gov

If you have any questions or would like to discuss this matter, you may call me at 202-551-4459.

> Sincerely,
>
> *s/ Cheryl L. Crumpton*

CAHILL GORDON & REINDEL LLP

EIGHTY PINE STREET

NEW YORK, NY 10005-1702

ROBERT A. ALESSI
HELENE R. BANKS
ANIRUDH BANSAL
DAVID L. BARASH
LANDIS C. BEST
BRADLEY J. BONDI
BROCKTON B. BOSSON
JAMES J. CLARK
CHRISTOPHER W. CLEMENT
AYANO K. CREED
SEAN M. DAVIS
STUART G. DOWNING
ADAM M. DWORKIN
ANASTASIA EFIMOVA
JENNIFER B. EZRING
JOAN MURTAGH FRANKEL
JONATHAN J. FRANKEL
PIERRE M. GENTIN

CHARLES A. GILMAN
ARIEL GOLDMAN
JASON M. HALL
WILLIAM M. HARTNETT
NOLA B. HELLER
CRAIG M. HOROWITZ
DOUGLAS S. HOROWITZ
TIMOTHY B. HOWELL
DAVID G. JANUSZEWSKI
ELAI KATZ
BRIAN S. KELLEHER
RICHARD KELLY
CHÉRIE R. KISER*
JOEL KURTZBERG
TED B. LACEY
MARC R. LASHBROOK
ALIZA R. LEVINE

TELEPHONE: (212) 701-3000
WWW.CAHILL.COM

1990 K STREET, N.W.
WASHINGTON, DC 20006-1181
(202) 862-8900

CAHILL GORDON & REINDEL (UK) LLP
24 MONUMENT STREET
LONDON EC3R 8AJ
+44 (0)20 7920 9800

WRITER'S DIRECT NUMBER

(202) 862-8910

JOEL H. LEVITIN
GEOFFREY E. LIEBMANN
BRIAN T. MARKLEY
WILLIAM J. MILLER
NOAH B. NEWITZ
MICHAEL J. OHLER
DAVID R. OWEN
JOHN PAPACHRISTOS
LUIS R. PENALVER
KIMBERLY PETILLO-DÉCOSSARD
SHEILA C. RAMESH
MICHAEL W. REDDY
OLEG REZZY
JAMES ROBINSON
THORN ROSENTHAL
TAMMY L. ROY
JONATHAN A. SCHAFFZIN

MICHAEL A. SHERMAN
DARREN SILVER
JOSIAH M. SLOTNICK
RICHARD A. STIEGLITZ JR.
SUSANNA M. SUH
ANTHONY K. TAMA
JONATHAN D. THIER
SEAN P. TONOLLI*
JOHN A. TRIPODORO
GLENN J. WALDRIP, JR.
HERBERT S. WASHER
MICHAEL B. WEISS
S. PENNY WINDLE
DAVID WISHENGRAD
COREY WRIGHT
JOSHUA M. ZELIG
DANIEL J. ZUBKOFF

*ADMITTED IN DC ONLY

February 22, 2019

**VIA FEDEX AND EMAIL**
Cheryl L. Crumpton
Supervisory Trial Counsel
Division of Enforcement
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-5985
CrumptonC@sec.gov

Re:   *SEC v. Tesla*, 1:18-cv-8947-AJN; *SEC v. Musk*, 1:18-cv-8865-AJN

Dear Ms. Crumpton:

    We write on behalf of Tesla, Inc. ("Tesla" or the "Company") and Elon Musk in response to your voluntary requests, dated February 20, 2019 (the "Requests"), in connection with the final judgments entered in the above-referenced matters (the "Final Judgments").

**I.    Background**

    Tesla and Mr. Musk take seriously their obligations under the Final Judgments and have made significant changes to the Company's compliance and governance within the short time since the Final Judgments were entered.  Pursuant to the terms of the Final Judgments, Tesla has:

- appointed a new independent Chair of the Board on November 7, 2018;

- appointed two new independent directors to the Board of Directors on December 28, 2018;

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

A-61

Cahill Gordon & Reindel llp

- 2 -

- created a permanent, independent Disclosure Controls Committee of the Board of Directors, as of December 11, 2018, to oversee the matters set forth in the Final Judgments;

- designated an experienced securities lawyer (the "Designated Securities Counsel") whose qualifications are not unacceptable to the staff of the Securities and Exchange Commission (the "SEC") on December 18, 2018, to review communications made through Twitter and other social media by the Company's senior officers as set forth in the Final Judgments and to advise the Company on securities issues; and

- implemented revised mandatory procedures and controls relating to communications in any format by the Company's senior executives, including the "Disclosure Controls and Procedures," the "External Communications Policy," and the "Senior Executives Communications Policy," each revised as of December 11, 2018.

In each case, Tesla and Mr. Musk have certified compliance with the above undertakings to the SEC staff within the relevant timeframes set forth in the Final Judgments.

Tesla and Mr. Musk have implemented the revised mandatory procedures and controls relating to communications by the Company and its senior executives. For example, the Designated Securities Counsel, along with other members of Tesla's legal department, reviewed and pre-approved (i) Tesla's January 2, 2019 Q4 Vehicle Production and Deliveries Release; (ii) Mr. Musk's January 18, 2019 email to employees; (iii) Tesla's January 30, 2019 Fourth Quarter & Full Year 2018 Update; (iv) Mr. Musk's fourth quarter earnings call script; and (v) Tesla's February 19, 2019 10-K.

Since Tesla updated its disclosure controls and procedures, the Disclosure Controls Committee and the Designated Securities Counsel have engaged in continuous monitoring and audit of compliance with the Final Judgments. The Designated Securities Counsel and other members of Tesla's legal department have reviewed the updated controls and procedures with Mr. Musk on multiple occasions. Further, the Disclosure Controls Committee and the Designated Securities Counsel have reviewed past written communications and provided guidance to applicable authorized executives, and the Designated Securities Counsel has reported to the Disclosure Controls Committee as to the effectiveness of the Company's policies and procedures.

## II.    Response to Requests

The subject matter of Mr. Musk's tweet at 7:15 PM EST on February 20, 2019 had been communicated previously in pre-approved public updates on January 30, 2019. Specifically, in the Company's Fourth Quarter & Full Year 2018 Update, Tesla stated that:

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

Cahill Gordon & Reindel llp

- 3 -

Model 3 production volumes in Fremont should gradually continue to grow throughout 2019 and reach a sustained rate of 7,000 units per week by the end of the year. We are planning to continue to produce Model 3 vehicles at maximum production rates throughout 2019.  Inclusive of Gigafactory Shanghai, where we are initially aiming for 3,000 Model 3 vehicles per week, *our goal is to be able to produce 10,000 vehicles per week on a sustained basis*.  Barring unexpected challenges with Gigafactory Shanghai, *we are targeting annualized Model 3 output in excess of 500,000 units sometime between Q4 of 2019 and Q2 of 2020*. (emphasis added)

These forward-looking statements were echoed in an earnings call, also on January 30, 2019, during which Mr. Musk stated:

[W]e do feel quite confident at this point, at least for the factories that are in our control, that we can achieve volume production in Shanghai by the end of the year. And that should allow us to get to the 10,000 vehicles a week rate or very close to it by the end of the year.

The January 30, 2019 statements were pre-approved by the General Counsel and the Designated Securities Counsel in compliance with Tesla's internal policies and procedures.

Mr. Musk's 7:15 PM EST tweet—in which he stated that "Tesla made 0 cars in 2011, but will make around 500k in 2019"—was intended to recapitulate the information set forth in these pre-approved statements, which had been published only 20 days prior.  Although the 7:15 PM EST tweet was not individually pre-approved, Mr. Musk believed that the substance had already been appropriately vetted, pre-approved, and publicly disseminated.  Moreover, the tweet was made outside of NASDAQ trading hours.

Tesla and Mr. Musk are cognizant of the applicable policies and procedures mandated by the Final Judgments where a written communication contains, or reasonably could contain, material information.  The Designated Securities Counsel continually monitors Mr. Musk's tweets.  Upon seeing the 7:15 PM EST tweet, the Designated Securities Counsel immediately arranged to meet with Mr. Musk at the Fremont factory.  Mr. Musk and the Designated Securities Counsel together drafted a clarifying tweet.  That tweet, issued at approximately 11:41 PM EST—still well outside NASDAQ trading hours—stated: "Meant to say annualized production rate at end of 2019 probably around 500k, ie 10k cars/week. Deliveries for year still estimated to be about 400k," thus again restating the contents of the January 30, 2019 Fourth Quarter & Full Year 2018 Update.

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

Cahill Gordon & Reindel llp

- 4 -

If you have any questions or wish to discuss, please do not hesitate to contact me.

Respectfully submitted,

Bradley J. Bondi

cc:    Steve Buchholz (SEC)
       FOIA Officer (SEC)
       Steven Farina, Williams & Connolly LLP (counsel to Elon Musk)

\*           \*           \*

Tesla respectfully requests that this letter and the materials it encloses be afforded confidential treatment under the Freedom of Information Act ("FOIA") pursuant to 17 C.F.R. § 200.83.  We have marked this letter with the legend "Confidential Treatment Requested Under the Freedom of Information Act" in accordance with 17 C.F.R. § 200.83(c)(2).  In the event a FOIA Request is received pursuant to which this letter or the enclosed materials could be deemed responsive, Tesla requests, pursuant to 17 C.F.R. § 200.83(d), that prompt notice be provided to the above signed counsel along with a reasonable opportunity to respond prior to any determination by the Commission that any document will be produced.  Tesla's request for confidentiality under FOIA is without prejudice to any other rights, objections, or arguments it may have with respect to the confidential nature, and any production to third parties, of this letter or its enclosed materials.

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

A-64



### Tesla Fourth Quarter & Full Year 2018 Update

- **Q4 operating income stable compared to Q3 at $414M, operating margin of 5.7%**
- **Operating cash flow less capex improved from Q3 to $910M in Q4**
- **Cash and cash equivalents of $3.7B at Q4-end, increased by $718M in Q4**
- **Q4 GAAP net income of $139M impacted by $54M non-cash charge**
- **Model 3 GAAP and non-GAAP gross margin remained stable at >20% in Q4**

Last year was the most pivotal year in Tesla's history.  During our Model 3 production ramp, we went through significant challenges with the battery module line at Gigafactory 1 in Nevada, and later with our general assembly line in Fremont.  Thanks to the hard work and ingenuity of our manufacturing teams, by mid-2018 we successfully overcame these challenges and stabilized Model 3 production at high volumes.  Model 3 then went on to become the best-selling passenger car in the US in terms of revenue in both Q3 and Q4.  With nearly 140,000 units sold, Model 3 was also the best-selling premium vehicle (including SUVs) in the US for 2018 – the first time in decades an American carmaker has been able to secure the top spot.



*Premium vehicle sales in the US (2018)*



*Operating (EBIT) margin of premium carmakers*

Model 3's success has carried over to our financial performance in Q3 and Q4 of 2018.  Operating income in Q4 remained stable at $414 million despite a sequential decline in revenue from the sale of regulatory credits, higher import duties on components from China, a price reduction for Model S and Model X in China, and the introduction of a lower-priced mid-range version of Model 3.  Our operating margin also improved significantly in the second half of 2018, changing from being negative to on-par with other premium carmakers.  Despite margins in the automotive industry typically being lower in Q4, that was not true for us as our operating margin remained strong at 5.7% in Q4.  Our GAAP net income of $139 million was impacted by a non-cash charge of $54 million attributable to non-controlling interests. Free cash flow (operating cash flow less capital expenditures) also improved sequentially in Q4 to $910 million.  In the second half of 2018, our cash position improved by $1.45 billion despite the scheduled repayment of a $230 million convertible bond in Q4.  We have sufficient cash on hand to comfortably settle in cash our convertible bond that will mature in March 2019.

In 2019, full-year Model 3 volumes will grow substantially over 2018 due to a full year of high production rates at our Fremont facility.  Also, by the end of this year we are expecting to start producing Model 3 vehicles at our Gigafactory Shanghai using a complete vehicle production line. We expect the capital spend per unit of capacity for this factory to be less than half of that of our Model 3 line in Fremont.  Additionally, this year we will start tooling for Model Y to achieve volume production by the end of 2020, most likely at Gigafactory 1.  All of these activities are setting us up for very significant annual growth in 2019 and beyond.

### AUTOMOTIVE PRODUCTS

Model 3's production rate progressively improved through Q4, with December 2018 being our highest volume month ever.  In our Fremont facility, we are now past the steep portion of the production S-curve, and we expect our production rate to continue to gradually improve.  Every part of the Model 3 production process has demonstrated over a 24-hour period the ability to produce at an extrapolated rate of 7,000 vehicles per week.  By the end of this year, we expect to be able to produce Model 3 at this rate on a sustained basis.

As we improve the production rate of Model 3, the cost per vehicle continues to decline.  It is critical that we continue this trend so that we can keep increasing the affordability of Model 3 while retaining a sustainable level of profitability.  The labor hours per Model 3 vehicle declined yet again by roughly 20% compared to Q3 and by about 65% in the second half of 2018 alone.  Despite introducing a lower-priced mid-range variant and other headwinds, Model 3's gross margin remained stable in Q4 at over 20%.

Our delivery and logistics systems continued to progress in Q4, but there remains room for more improvement. In order to reduce vehicle transportation time and improve the timeliness of scheduled deliveries, we have purchased and are continuing to purchase our own car-hauling truck capacity for vehicle shipments. This gives us far more control while lowering costs and improving customer satisfaction.

In the past two years, Tesla vehicles have accounted for all of the electric vehicle (EV) volume growth in the US. Even with the radical EV growth in the second half of 2018, EVs still account for just 2% of the total US market, and there remains a substantial opportunity for EVs to continue to gain market share in the US and globally. Consumer purchases have demonstrated that EVs are becoming a preferred option, as EVs in Q4 2018 outsold hybrid electric vehicles (HEVs) in the US for the first time in history.



*EV sales in the US*



*Model 3 trade-ins by vehicle type*

The appeal of Model 3 continues to go far beyond the mid-sized premium sedan market. Our trade-in data suggests that consumers are significantly changing their purchasing habits in order to buy a Model 3. Of all trade-ins we've ever received from customers buying a Model 3, only 17% are other mid-sized premium sedans. Perhaps more surprisingly, almost 60% of these trade-ins are non-premium vehicles. We are also seeing that a significant number of Model 3 buyers are trading down in size from a larger car or a SUV to a Model 3. Designed from the ground up to be electric, Model 3 has more interior space than its gas-powered equivalents. Interestingly, Model S accounted for only a small portion (4%) of total Model 3 trade-ins.

In Q4, we delivered 63,359 Model 3 vehicles to customers in North America. In January 2019, we started to produce Model 3 vehicles for Europe and China, and the car is now fully certified for sale in these markets. The market opportunity for Model 3 in Europe and China exceeds North America based on the most recent sales of mid-sized premium sedans. Model 3 was designed from the outset for a global market, and shares more than 98% of its parts in common across its regional variants.



*Model 3 vs other premium sedans in 2018*

In January 2019, we started construction of Gigafactory Shanghai. Local manufacturing is an essential component of our ability to provide to customers in the region a truly affordable version of Model 3. Most other mid-sized premium sedans in China are locally produced, which allows them to have a lower average selling price. In the initial phase of Gigafactory Shanghai, we expect to have stamping, paint shop, body joining, and general assembly shops in operation by the end of 2019. This accelerated timeframe should be possible due to the radical simplification of our manufacturing layout and processes compared to our first-generation production line in Fremont. Higher-spec models such as our long-range all-wheel drive (AWD) and Performance versions will continue to be shipped to China from the US.

In Q4, we delivered 27,607 Model S and Model X vehicles to customers. For the full year, we delivered 99,475 Model S and Model X vehicles, which was in line with our guidance. We recently stopped taking orders for the 75 kWh versions of Model S and Model X and will focus on the longer-range versions of these flagship products instead, with the recent introduction of a 310 mile range base Model S and 270 mile range base Model X. Over the years, we have been gradually simplifying options for Model S and Model X by standardizing options such as the air suspension, AWD, premium package, and glass roof. This is yet another step towards increased standardization, which results in significantly lower manufacturing cost. Additionally, we believe this will provide more differentiation between Model S and Model 3. As a result of this change and improving efficiencies in our production lines, we have reduced Model S and Model X production hours accordingly. Last year alone, Model S and X production efficiencies improved 15%. Our objective is to

continue to achieve further efficiencies, which will reduce the manufacturing cost while providing us the flexibility to increase output as necessary.

Our Autopilot team recently publicly launched "Navigate on Autopilot", a feature that allows, on most controlled-access roads such as highways, any Tesla vehicle with Enhanced Autopilot to change lanes, transition from one highway to another, and ultimately exit the highway when approaching the final destination.  We expect to increase the functionality of Autopilot to navigate increasingly complex environments and situations.

During Q4, we opened 27 new store and service locations, resulting in 378 locations worldwide at the end of the quarter.  Our largely electrified Mobile Service fleet continued to grow further to 411 service vehicles on the road at the end of Q4.  In 2018, the total Tesla vehicle fleet grew by 85%, mainly due to the steep Model 3 production ramp.  We see upgrading our service capacity and improving customer service as a top priority at the moment.  Where needed, our service centers are moving to two-shift operations in order to double service capacity quickly, and we are simplifying processes in order to increase service throughput.  We are also increasing the functionality of the Tesla App for scheduling service in order to improve responsiveness and convenience for our customers. Furthermore, we are changing our parts distribution approach to ensure that spare parts are available in a timely manner at all our service centers globally.

In Q4, we opened 69 new Supercharger locations for a total of 1,421 Supercharger stations globally.  In 2018, we opened 293 Supercharger locations, many of which have 20 to 50 stalls per location.  To date, we have approximately 12,000 dedicated Supercharging connectors and over 21,000 Destination Charging connectors globally.  In addition to our continued investment in global charging infrastructure, our engineering team is finalizing plans for the rollout of our V3 Supercharger technology early this year, which will enable significantly faster charge times.  We anticipate V3 to not only provide a better customer experience for Tesla vehicle owners, but to also significantly lower Tesla's operational and capital expenditures.

## ENERGY PRODUCTS

While 2018 was predominantly the year of Model 3, our Energy business also reached a significant milestone.  In 2018, we deployed 1.04 GWh of energy storage, nearly tripling our energy storage deployments compared to 358 MWh deployed in 2017.  In Q4, energy storage deployments reached 225 MWh, a decrease of 6% sequentially, and up 57% compared to Q4 2017.  A new manufacturing line made by Tesla Grohmann is further increasing production of Powerwall and Powerpack modules at Gigafactory 1.  With a better supply of cells and new manufacturing equipment, we are aiming to more than double energy storage deployments to over 2 GWh in 2019. Through various operational efficiencies, our average sale-to-installation time also decreased by about 50% in 2018.



We see growth opportunities for Powerwall not only in North America, but also in Australia and Europe where electricity rates are high and solar panels combined with Powerwall units will help reduce electricity bills.  South Australia has recently initiated a Virtual Power Plant program where the plan is to install 50,000 interconnected Powerwall units that will provide increased grid reliability and lower cost for all customers.  The profitability of our energy products continued to improve partially due to the increased efficiency of Powerwall installations.  Each Powerwall is an internet connected device, enabling us to continue to introduce new functionality and improvements over time, just like we do with our vehicles.

*GWh of energy storage deployed*

While the Hornsdale battery that we built in South Australia is still the largest battery in the world, we have recently received multiple requests to build significantly larger battery projects.  The Hornsdale project has generated substantial savings and is likely to pay for itself within a few years.  This has generated interest from governments and municipalities to invest in large battery storage projects rather than in conventional peak energy generation.  In addition to providing backup generation and cost savings to businesses, Powerpack units are now used in over 100 microgrid projects across 32 countries.

We deployed 73 MW of retrofit solar systems in Q4, a 21% decrease sequentially.  We are still in the process of transitioning our sales channel from former partners to our Tesla stores and training our sales team to sell solar systems in addition to vehicles.  Cash and loan sales made up 75% of residential deployments in Q4, up from 51% in Q4 2017.  Likewise, while total deployments decreased by 38% to 326 MW in 2018, cash and loan residential deployments increased from 39% in 2017 to 71% in 2018.  This was an important contributor to improving the cash generation and profitability of the solar business.

We plan to ramp up the production of Solar Roof with significantly improved manufacturing capabilities during 2019, based on the design iterations and testing underway. In the meantime, we are continuing to install Solar Roofs at a slow pace to gather further learnings from our design changes, as well as about the viability of our installation processes by implementing them in areas around the U.S. that are experiencing inclement weather.

**Q4 2018 RESULTS**

**Revenue & Gross Margin**

| | Three Months Ended | | | Change | |
|---|---|---|---|---|---|
| | December 31, 2018 | September 30, 2018 | December 31, 2017 | QoQ | YoY |
| Automotive revenue ($000) | $ 6,323,219 | $ 6,098,766 | $ 2,702,195 | 4% | 134% |
| Automotive gross margin – GAAP | 24.3% | 25.8% | 18.9% | -149 bp | 540 bp |
| Automotive gross margin excluding SBC and ZEV credit – non-GAAP | 24.7% | 25.5% | 13.8% | -85 bp | 1,086 bp |

- Automotive revenue in Q4 increased by 4% sequentially over Q3 and by 134% compared to Q4 2017, primarily due to a sharp increase in Model 3 deliveries. In Q4, we recognized less than $1 million in ZEV credit sales compared to $52 million in Q3.
- With the adoption of the new revenue recognition standard starting January 1, 2018, lease accounting generally applies only to vehicles directly leased by us without using bank partners. As a result, only 4% of vehicles delivered in Q4 were subject to lease accounting.
- GAAP Automotive gross margin slightly decreased to 24.3% in Q4 from 25.8% in Q3 primarily due to lower regulatory credit sales in Q4. Non-GAAP Automotive gross margin decreased to 24.7% in Q4 from 25.5% in the prior quarter due to a $43 million decline in non-ZEV credit revenue and negative impact from Chinese import duties.
- Model 3 gross margin stayed flat compared to Q3, remaining above 20% despite the headwinds described above. The mix of the Performance versions of Model 3 remained only slightly above the percentage mix of Performance versions of Model S and X.
- Gross margin of Model S and Model X declined very slightly compared to Q3, which was in line with our guidance. Further cost reductions partially offset lowered prices in China as well as other negative factors. For full year 2018, Model S and Model X non-GAAP gross margin improved by over 500 bp and GAAP gross margin improved by over 300 bp compared to 2017, mainly due to significant cost reductions.

| | Three Months Ended | | | Change | |
|---|---|---|---|---|---|
| | December 31, 2018 | September 30, 2018 | December 31, 2017 | QoQ | YoY |
| Energy generation and storage revenue ($000) | $ 371,497 | $ 399,317 | $ 298,037 | -7% | 25% |
| Energy generation and storage gross margin | 11.5% | 17.2% | 5.5% | -570 bp | 604 bp |

- Energy generation and storage revenue in Q4 decreased by 7% over Q3 and increased by 25% compared to Q4 2017. This year-over-year increase was mainly driven by a substantial growth in energy storage deployments.
- GAAP gross margin of the Energy business in Q4 dropped significantly to 11.5% compared to Q3 mainly due to the typical seasonal decline in solar energy production and correspondingly lower lease revenue in the winter months, Solar Roof ramp cost, and a higher mix of lower margin energy storage business.

**Other Highlights**

- Service and Other revenue in Q4 increased by 63% compared to Q3. This was mainly due to increased used car sales and higher revenue from service and merchandise sales.
- Service and Other gross margin in Q4 improved sequentially to negative 26%. Total gross loss of Service and Other increased compared to Q3.
- Our total GAAP operating expenses decreased to $1.03 billion in Q4, which was 7% less than in Q3. Excluding one-time restructuring and other costs, operating expenses decreased by 5% sequentially.
- Income attributable to non-controlling interests impacted our income statement negatively by $71 million in Q4. The asset backed securitization (ABS) of auto leases completed in Q4 resulted in a change of ownership structure of those leased vehicles. This required a non-cash charge of $54 million attributable to non-controlling interests.
- Interest and Other expenses, net were $182 million in Q4 compared to $145 million in Q3. Non-cash items accounted for $87 million of total interest expense in Q4.
- There were approximately 172 million basic shares outstanding at the end of Q4.

**Cash Flow and Liquidity**

- Our cash position increased by $718 million in Q4, despite the scheduled repayment of our $230 million convertible bonds.
- Cash flow from operating activities in Q4 was $1.23 billion. Operating cash flow remained strong although our days payable outstanding decreased significantly, partially limiting the positive impact of working capital.
- Customer deposits decreased sequentially by $113 million in Q4 to $793 million as we continue to work through our Model 3 backlog.
- Our capital expenditures were $325 million in Q4. Because our acquisition of land in China is a 50-year lease from the Chinese government, our payment of $141 million for it is excluded from capex and reflected in operating cash flow. Capital expenditures, including our China land acquisition payment, were at $2.24 billion in 2018.

**OUTLOOK**

Model 3 production volumes in Fremont should gradually continue to grow throughout 2019 and reach a sustained rate of 7,000 units per week by the end of the year.  We are planning to continue to produce Model 3 vehicles at maximum production rates throughout 2019.  Inclusive of Gigafactory Shanghai, where we are initially aiming for 3,000 Model 3 vehicles per week, our goal is to be able to produce 10,000 vehicles per week on a sustained basis. Barring unexpected challenges with Gigafactory Shanghai, we are targeting annualized Model 3 output in excess of 500,000 units sometime between Q4 of 2019 and Q2 of 2020.

While the number of Model 3 vehicles produced should increase sequentially in Q1, deliveries in North America during Q1 will be lower than the prior quarter as we start delivering cars in Europe and China for the first time. As a result of the start of Model 3 expansion into Europe and China, deliveries will be lower than production by about 10,000 units due to vehicle transit times to these markets.

Because of the first scheduled reduction of the federal EV tax credit on January 1, 2019, we likely saw a pull-forward of demand in the US for Model S and Model X into 2018.  Both Model S and Model X reached all-time high market shares in the US in the second half of 2018.  Model S, for example, accounted for 38% of its segment in the US.  Because this high level of demand presumably represented a pull-forward, we are expecting our Model S and Model X deliveries in Q1 2019 to be slightly below Q1 2018.

We continue to target a 25% Model 3 non-GAAP gross margin at some point in 2019.  While there are many moving parts that will ultimately determine gross margin, we believe that significant cost reductions combined with better fixed-cost absorption and careful management of mix should enable us to get to this profit level.  We expect that gross margin for Model S and Model X should remain relatively stable compared to 2018.

Energy generation and storage revenue should increase significantly in 2019, mainly due to the storage business.  We expect that the deployment of retrofit solar systems in Q1 will be slightly lower than in Q4 due to seasonality.  The gross margin of our Energy business should grow as the energy storage margin continues to improve from its current level.

We expect our Services and Other business to continue to grow, mainly due to projected used car sales volumes in 2019.  We should continue to see further sequential improvements in gross margin throughout this year.

Our operating expenses will grow by less than 10% in 2019, thus creating massive leverage given the top line growth in 2019.  This year, we will continue to implement more automation projects, and our ongoing cost reduction efforts will also make an impact.  Since about 70% of Model 3 customers made a purchase without a test drive in the second half of 2018, we believe we can leverage our retail network further.

We expect that the restructuring actions taken in Q1 will reduce our costs by about $400 million annually. Our Q1 financials will reflect a one-time restructuring cost.  The gap between production and deliveries in Q1 will create a temporary but predictable dip in our revenues and earnings.  As a result, our optimistic target is to achieve a very small GAAP net income in Q1, but that will require us to successfully execute on many fronts including handling logistics and delivery challenges in Europe and China.  The higher in-transit inventory will also negatively impact operating cash flows in Q1.

In total, we are expecting to deliver 360,000 to 400,000 vehicles in 2019, representing a growth of approximately 45% to 65% compared to 2018.  In this range, we are expecting to have positive GAAP net income and to generate positive free cash flow (operating cash flow less capex) in every quarter beyond Q1 2019.  We believe these results will be substantially driven by our restructuring action and the ongoing financial discipline with which we are managing the business.

Our 2019 capex, the vast majority of which will be to grow our capacity and develop new vehicles, is expected to be about $2.5 billion.  We believe this amount should be sufficient to continue to develop our main projects, such as Gigafactory Shanghai, Model Y and Tesla Semi, as well as for the further expansion of our Supercharger, service and retail networks.  We expect to arrange financing through local banks in China to fund most of the capex for Gigafactory Shanghai.

Since Model Y will be built on the Model 3 platform and is designed to share about 75% of its components with Model 3, the cost of the Model Y production line should be substantially lower than the Model 3 line in Fremont, and the production ramp should also be faster.

This year should be a truly exciting one for Tesla.  Model 3 will become a global product, the profitability of our business should become sustainably positive, our new Gigafactory Shanghai should start producing cars, and we will start tooling for Model Y production.  Our growth opportunities are massive.  Our accomplishments have been possible thanks to the exceptional effort of our employees and the support of our customers, suppliers and investors.  We hope you're as excited as we are about 2019.


Elon Musk                                                                 Deepak Ahuja

WEBCAST INFORMATION

Tesla will provide a live webcast of its fourth quarter and full year 2018 financial results conference call beginning at 2:30 p.m. PT on January 30, 2019, at ir.tesla.com.  This webcast will also be available for replay for approximately one year thereafter.


NON-GAAP FINANCIAL INFORMATION

Consolidated financial information has been presented in accordance with GAAP as well as on a non-GAAP basis to supplement our consolidated financial results.  Our non-GAAP financial measures include non-GAAP gross margin, non-GAAP net income (loss) attributable to common stockholders, non-GAAP net income (loss) attributable to common stockholders on a per share basis, and operating cash flows plus change in collateralized lease borrowing.  Management believes that it is useful to supplement its GAAP financial statements with this non-GAAP information because management uses such information internally for its operating, budgeting and financial planning purposes.  These non-GAAP financial measures also facilitate management's internal comparisons to Tesla's historical performance as well as comparisons to the operating results of other companies.  Management also believes that presentation of the non-GAAP financial measures provides useful information to our investors regarding our financial condition and results of operations because it allows investors greater transparency to the information used by Tesla management in its financial and operational decision-making so that investors can see through the eyes of Tesla management regarding important financial metrics that Tesla management uses to run the business as well as allows investors to better understand Tesla's performance.  Non-GAAP information is not prepared under a comprehensive set of accounting rules and therefore, should only be read in conjunction with financial information reported under U.S. GAAP when understanding Tesla's operating performance.  A reconciliation between GAAP and non-GAAP financial information is provided below.


FORWARD-LOOKING STATEMENTS

Certain statements in this letter, including statements in the "Outlook" section; statements relating to the development, production, production rates, ramp and timing of existing and future Tesla products and technologies such as Model 3, Autopilot, Solar Roof, Model Y, Tesla Semi and Supercharger; statements regarding growth in the number of Tesla store, service center, Supercharger and Destination Charger locations and in other service and repair capabilities; statements regarding growth of our energy business and the means to achieve such growth; statements regarding growing market opportunities for Tesla products and the catalysts for that growth; statements regarding the ability to achieve our targets with respect to product demand, volume, production, delivery, leasing, market share, inventory and deployment; statements regarding revenue, cash availability and generation, cash flow, gross margin, product pricing, spending, capital expenditure and profitability targets; statements regarding productivity improvements, cost reductions and capacity expansion plans, such as for customer deliveries, logistics and vehicle servicing; statements regarding our Fremont factory, Gigafactory 1 and Gigafactory Shanghai, including cost, project financing and timing, plans and output expectations, including those related to vehicle, battery and other production; and statements regarding our investment in and the impact of changes to our customer delivery infrastructure, are "forward-looking statements" that are subject to risks and uncertainties.  These forward-looking statements are based on management's current expectations, and as a result of certain risks and uncertainties, actual results may differ materially from those projected.  The following important factors, without limitation, could cause actual results to differ materially from those in the forward-looking statements: the risk of delays in the manufacture, production, delivery and/or completion of our vehicles and energy products, particularly Model 3; the ability of Tesla to design and grow simultaneous and separate market acceptance of and demand for Model S, Model X, Model 3 and their variants, as well as new vehicle models such as Model Y; the ability of suppliers to meet quality and part delivery expectations at increasing volumes, especially with respect to Model 3 parts; adverse foreign exchange movements; any failures by Tesla products to perform as expected or if product recalls occur; Tesla's ability to continue to reduce or control manufacturing and other costs; consumers' willingness to adopt electric vehicles; competition in the automotive and energy product markets generally and the alternative fuel vehicle market and the premium sedan, premium SUV and small to medium-sized sedan markets in particular; Tesla's ability to establish, maintain and strengthen the Tesla brand; Tesla's ability to manage future growth effectively as we rapidly grow, especially internationally; the unavailability, reduction or elimination of government and economic incentives for electric vehicles and energy products; Tesla's ability to establish, maintain and strengthen its relationships with strategic partners such as Panasonic; potential difficulties in performing and realizing potential benefits under definitive agreements for our existing and future manufacturing facilities; Tesla's ability to maintain schedules, output and cost estimates for our manufacturing facilities; and Tesla's ability to execute on our strategy for new store, service center, Supercharger and other locations and capabilities. More information on potential factors that could affect our financial results is included from time to time in our Securities and Exchange Commission filings and reports, including the risks identified under the section captioned "Risk Factors" in our quarterly report on Form 10-Q filed with the SEC on November 2, 2018.  Tesla disclaims any obligation to update information contained in these forward-looking statements whether as a result of new information, future events, or otherwise.


**Investor Relations Contact:**
Martin Viecha
Investor Relations
ir@tesla.com

**Press Contact:**
Dave Arnold
Communications
press@tesla.com

Tesla, Inc.
**Condensed Consolidated Statements of Operations**
**(Unaudited)**
**(In thousands, except per share data)**

| | Three Months Ended | | | Year Ended | |
|---|---|---|---|---|---|
| | December 31, 2018 | September 30, 2018 | December 31, 2017 | December 31, 2018 | December 31, 2017 |
| **Revenues** | | | | | |
| Automotive sales | $ 6,073,471 | $ 5,878,305 | $ 2,409,109 | $ 17,631,522 | $ 8,534,752 |
| Automotive leasing | 249,748 | 220,461 | 293,086 | 883,461 | 1,106,548 |
| Total automotive revenue | 6,323,219 | 6,098,766 | 2,702,195 | 18,514,983 | 9,641,300 |
| Energy generation and storage | 371,497 | 399,317 | 298,037 | 1,555,244 | 1,116,266 |
| Services and other | 531,157 | 326,330 | 288,017 | 1,391,041 | 1,001,185 |
| Total revenues | 7,225,873 | 6,824,413 | 3,288,249 | 21,461,268 | 11,758,751 |
| **Cost of revenues** | | | | | |
| Automotive sales | 4,658,517 | 4,405,919 | 1,999,631 | 13,685,572 | 6,724,480 |
| Automotive leasing | 127,731 | 119,283 | 191,541 | 488,425 | 708,224 |
| Total automotive cost of revenues | 4,786,248 | 4,525,202 | 2,191,172 | 14,173,997 | 7,432,704 |
| Energy generation and storage | 328,706 | 330,554 | 281,715 | 1,364,896 | 874,538 |
| Services and other | 668,019 | 444,992 | 376,576 | 1,880,354 | 1,229,022 |
| Total cost of revenues | 5,782,973 | 5,300,748 | 2,849,463 | 17,419,247 | 9,536,264 |
| **Gross profit** | 1,442,900 | 1,523,665 | 438,786 | 4,042,021 | 2,222,487 |
| **Operating expenses** | | | | | |
| Research and development | 356,297 | 350,848 | 354,637 | 1,460,370 | 1,378,073 |
| Selling, general and administrative | 667,452 | 729,876 | 682,290 | 2,834,491 | 2,476,500 |
| Restructuring and other | 5,615 | 26,184 | — | 135,233 | — |
| Total operating expenses | 1,029,364 | 1,106,908 | 1,036,927 | 4,430,094 | 3,854,573 |
| **Income (loss) from operations** | 413,536 | 416,757 | (598,141) | (388,073) | (1,632,086) |
| Interest income | 7,348 | 6,907 | 6,280 | 24,533 | 19,686 |
| Interest expense | (174,723) | (175,220) | (146,363) | (663,071) | (471,259) |
| Other (expense) income, net | (14,205) | 22,876 | (41,677) | 21,866 | (125,373) |
| **Income (loss) before income taxes** | 231,956 | 271,320 | (779,901) | (1,004,745) | (2,209,032) |
| Provision (benefit) for income taxes | 21,878 | 16,647 | (9,094) | 57,837 | 31,546 |
| **Net income (loss)** | 210,078 | 254,673 | (770,807) | (1,062,582) | (2,240,578) |
| Net income (loss) attributable to noncontrolling interests and redeemable noncontrolling interests | 70,595 | (56,843) | (95,457) | (86,491) | (279,178) |
| **Net income (loss) attributable to common stockholders** | $ 139,483 | $ 311,516 | $ (675,350) | $ (976,091) | $ (1,961,400) |
| Net income (loss) per share of common stock attributable to common stockholders – basic and diluted | | | | | |
| Basic | $ 0.81 | $ 1.82 | $ (4.01) | $ (5.72) | $ (11.83) |
| Diluted | $ 0.78 | $ 1.75 | $ (4.01) | $ (5.72) | $ (11.83) |
| Weighted average shares used in computing net income (loss) per share of common stock – basic and diluted | | | | | |
| Basic | 172,026 | 170,893 | 168,314 | 170,525 | 165,758 |
| Diluted | 179,026 | 178,196 | 168,314 | 170,525 | 165,758 |

**Tesla, Inc.**
**Condensed Consolidated Balance Sheets**
**(Unaudited)**
**(In thousands)**

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 3,685,618 | $ 3,367,914 |
| Restricted cash | 192,551 | 155,323 |
| Accounts receivable, net | 949,022 | 515,381 |
| Inventory | 3,113,446 | 2,263,537 |
| Prepaid expenses and other current assets | 365,671 | 268,365 |
| Total current assets | 8,306,308 | 6,570,520 |
| Operating lease vehicles, net | 2,089,758 | 4,116,604 |
| Solar energy systems, leased and to be leased, net | 6,271,396 | 6,347,490 |
| Property, plant and equipment, net | 11,330,077 | 10,027,522 |
| Goodwill and intangible assets, net | 350,651 | 421,739 |
| MyPower customer notes receivable, net of current portion | 421,548 | 456,652 |
| Restricted cash, net of current portion | 398,219 | 441,722 |
| Other assets | 571,657 | 273,123 |
| **Total assets** | $ 29,739,614 | $ 28,655,372 |
| **Liabilities and Equity** | | |
| Current liabilities | | |
| Accounts payable | $ 3,404,451 | $ 2,390,250 |
| Accrued liabilities and other | 2,094,253 | 1,731,366 |
| Deferred revenue | 630,292 | 1,015,253 |
| Resale value guarantees | 502,840 | 787,333 |
| Customer deposits | 792,601 | 853,919 |
| Current portion of long-term debt and capital leases (1) | 2,567,699 | 896,549 |
| Total current liabilities | 9,992,136 | 7,674,670 |
| Long-term debt and capital leases, net of current portion (1) | 9,403,672 | 9,418,319 |
| Deferred revenue, net of current portion | 990,873 | 1,177,799 |
| Resale value guarantees, net of current portion | 328,926 | 2,309,222 |
| Other long-term liabilities | 2,710,403 | 2,442,970 |
| **Total liabilities** | 23,426,010 | 23,022,980 |
| Redeemable noncontrolling interests in subsidiaries | 555,964 | 397,734 |
| Convertible senior notes (1) | — | 70 |
| Total stockholders' equity | 4,923,243 | 4,237,242 |
| Noncontrolling interests in subsidiaries | 834,397 | 997,346 |
| **Total liabilities and equity** | $ 29,739,614 | $ 28,655,372 |
| | - | - |
| (1) Breakdown of our debt is as follows: | | |
| Recourse debt | $ 7,080,584 | $ 6,755,376 |
| Non-recourse debt | $ 3,551,891 | $ 2,873,458 |

A-72

Tesla, Inc.
**Condensed Consolidated Statement of Cash Flows**
**(Unaudited)**
**(In thousands)**

| | Three Months Ended | | | Year Ended | |
| --- | --- | --- | --- | --- | --- |
| | December 31, 2018 | September 30, 2018 | December 31, 2017 | December 31, 2018 | December 31, 2017 |
| **Cash Flows from Operating Activities** | | | | | |
| Net income (loss) | $ 210,078 | $ 254,673 | $ (770,807) | $ (1,062,582) | $ (2,240,578) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | | | |
| Depreciation, amortization and impairment | 496,737 | 502,825 | 469,606 | 1,901,050 | 1,636,003 |
| Stock-based compensation | 205,313 | 204,728 | 134,348 | 749,024 | 466,760 |
| Losses related to the SolarCity acquisition | — | — | 27,950 | — | 57,746 |
| Other | 123,385 | 77,737 | 151,756 | 452,359 | 516,018 |
| Changes in operating assets and liabilities, net of effect of business combinations | 199,048 | 351,318 | 497,038 | 57,951 | (496,603) |
| Net cash provided by (used in) operating activities | 1,234,561 | 1,391,281 | 509,891 | 2,097,802 | (60,654) |
| **Cash Flows from Investing Activities** | | | | | |
| Capital expenditures | (324,978) | (510,271) | (786,688) | (2,100,724) | (3,414,814) |
| Payments for the cost of solar energy systems, leased and to be leased | (28,923) | (49,494) | (119,455) | (218,792) | (666,540) |
| Business combinations, net of cash acquired | (11,108) | (1,200) | (5,376) | (17,912) | (114,523) |
| Net cash used in investing activities | (365,009) | (560,965) | (911,519) | (2,337,428) | (4,195,877) |
| **Cash Flows from Financing Activities** | | | | | |
| Net cash flows from debt activities | (184,099) | (195,760) | 28,056 | 37,202 | 2,414,896 |
| Collateralized lease (repayments) borrowings | (216,081) | (142,568) | 94,894 | (559,167) | 511,321 |
| Net borrowings under Warehouse Agreements and automotive asset-backed notes | 193,086 | 114,942 | 116,820 | 596,125 | 283,811 |
| Net cash flows from noncontrolling interests - Auto | 37,575 | 17,224 | 31,763 | 111,753 | 43,417 |
| Net cash flows from noncontrolling interests - Solar | (18,567) | 27,070 | (5,479) | 92,120 | 484,070 |
| Proceeds from issuances of common stock in public offerings | — | — | — | — | 400,175 |
| Other | 75,777 | 94,874 | 19,788 | 295,722 | 277,174 |
| Net cash (used in) provided by financing activities | (112,309) | (84,218) | 285,842 | 573,755 | 4,414,864 |
| Effect of exchange rate changes on cash and cash equivalents and restricted cash | (3,821) | (6,370) | 3,990 | (22,700) | 39,726 |
| Net increase (decrease) in cash and cash equivalents and restricted cash | 753,422 | 739,728 | (111,796) | 311,429 | 198,059 |
| Cash and cash equivalents and restricted cash at beginning of period | 3,522,966 | 2,783,238 | 4,076,755 | 3,964,959 | 3,766,900 |
| Cash and cash equivalents and restricted cash at end of period | $ 4,276,388 | $ 3,522,966 | $ 3,964,959 | $ 4,276,388 | $ 3,964,959 |

Tesla, Inc.
**Reconciliation of GAAP to Non-GAAP Financial Information**
**(Unaudited)**
**(In thousands, except per share data)**

| | Three Months Ended | | | Year Ended | |
|---|---|---|---|---|---|
| | December 31, 2018 | September 30, 2018 | December 31, 2017 | December 31, 2018 | December 31, 2017 |
| **Automotive gross profit – GAAP** | $ 1,536,971 | $ 1,573,564 | $ 511,023 | $ 4,340,986 | $ 2,208,596 |
| Stock-based compensation expense in automotive cost of revenue | 22,566 | 20,955 | 16,182 | 71,797 | 43,845 |
| ZEV credit revenue recognized | (768) | (52,269) | (179,142) | (103,351) | (279,717) |
| **Automotive gross profit excluding SBC and ZEV credit – non-GAAP** | $ 1,558,769 | $ 1,542,250 | $ 348,063 | $ 4,309,432 | $ 1,972,724 |
| | | | | | |
| **Automotive gross margin – GAAP** | 24.3% | 25.8% | 18.9% | 23.4% | 22.9% |
| Stock-based compensation expense | 0.4% | 0.3% | 0.6% | 0.4% | 0.5% |
| ZEV credit revenue recognized | 0.0% | -0.6% | -5.7% | -0.4% | -2.3% |
| **Automotive gross margin excluding SBC and ZEV credit – non-GAAP** | 24.7% | 25.5% | 13.8% | 23.4% | 21.1% |
| | | | | | |
| **Net income (loss) attributable to common stockholders – GAAP** | $ 139,483 | $ 311,516 | $ (675,350) | $ (976,091) | $ (1,961,400) |
| Stock-based compensation expense | 205,313 | 204,728 | 134,348 | 749,024 | 466,760 |
| Losses related to the SolarCity acquisition | — | — | 27,950 | — | 57,746 |
| **Net income (loss) attributable to common stockholders – non-GAAP** | $ 344,796 | $ 516,244 | $ (513,052) | $ (227,067) | $ (1,436,894) |
| | | | | | |
| **Net income (loss) per share attributable to common stockholders, basic – GAAP** | $ 0.81 | $ 1.82 | $ (4.01) | $ (5.72) | $ (11.83) |
| Stock-based compensation expense | 1.19 | 1.20 | 0.80 | 4.39 | 2.82 |
| Losses related to the SolarCity acquisition | — | — | 0.17 | — | 0.35 |
| **Net income (loss) per share attributable to common stockholders, basic – non-GAAP** | $ 2.00 | $ 3.02 | $ (3.04) | $ (1.33) | $ (8.66) |
| **Shares used in per share calculation, basic – GAAP and non-GAAP** | 172,026 | 170,893 | 168,314 | 170,525 | 165,758 |
| | | | | | |
| **Net income (loss) per share attributable to common stockholders, diluted - GAAP** | $ 0.78 | $ 1.75 | $ (4.01) | $ (5.72) | $ (11.83) |
| Stock-based compensation expense | 1.15 | 1.15 | 0.80 | 4.39 | 2.82 |
| Losses related to the SolarCity acquisition | — | — | 0.17 | — | 0.35 |
| **Net income (loss) per share attributable to common stockholders, diluted - non-GAAP** | $ 1.93 | $ 2.90 | $ (3.04) | $ (1.33) | $ (8.66) |
| **Shares used in per share calculation, diluted - GAAP and non-GAAP** | 179,026 | 178,196 | 168,314 | 170,525 | 165,758 |

A-74

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : No. 1:18-cv-8865-AJN-GWG |
| | : |
| ELON MUSK | : |
| | : |
| Defendant. | : |

~~[PROPOSED]~~ **ORDER REQUIRING DEFENDANT ELON TO SHOW CAUSE WHY HE SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATING THE COURT'S FINAL JUDGMENT**

This matter is before the Court on the motion of the United States Securities and

Exchange Commission for an Order to show cause why Defendant Elon Musk should not

be held in civil contempt for violating the terms of the Court's October 16, 2018 Final

Judgment as to Defendant Elon Musk (the "Final Judgment").

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED** that

Defendant Elon Musk shall submit to this Court by **March 11**, 2019, briefing to show

cause, if any, why he should not be found in contempt of the Court's Final Judgment.

SO ORDERED:

Dated: **Feb 26**, 2019

_____
Hon. Alison J. Nathan
United States District Judge

# EXHIBIT  6

0

| | |
|---|---|
| **From:** | Farina, Steve |
| **To:** | MacDonald, Amanda; Schiffmann, Eden |
| **Subject:** | FW: Confidential: SEC v. Tesla, 1:18-cv-8947-AJN; SEC v. Musk, 1:18-cv-8865-AJN |
| **Date:** | Sunday, February 24, 2019 2:34:44 PM |

**Steven M. Farina**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington, DC 20005
(P) 202-434-5526 | (M) 202-746-9299
sfarina@wc.com | www.wc.com/sfarina

---

**From:** Bondi, Bradley J. [mailto:bbondi@cahill.com]
**Sent:** Sunday, February 24, 2019 5:27 PM
**To:** Crumpton, Cheryl <CrumptonC@sec.gov>
**Cc:** Buchholz, Steven <BuchholzS@sec.gov>; Farina, Steve <SFarina@wc.com>; Schneider, Erin <SchneiderE@sec.gov>; Newell, Walker S <newellw@sec.gov>; Atwood, Barrett <atwoode@sec.gov>
**Subject:** Re: Confidential: SEC v. Tesla, 1:18-cv-8947-AJN; SEC v. Musk, 1:18-cv-8865-AJN

Cheryl,

I am about to board a 6:00 pm flight back to DC following an all-day, out-of-town meeting at the US Attorney's Office relating to an ongoing trial in a different matter.

We will endeavor to provide answers as promptly as possible, but your deadline today is not realistic given above and also that it is Sunday and people aren't in the office.

We are looking into your questions and hope to be able to respond in full tomorrow.

Best regards,
Brad

---

**Bradley J. Bondi | Partner**
**Cahill Gordon & Reindel LLP**
1990 K Street, N.W., Suite 950, Washington, D.C. 20006
80 Pine Street, New York, NY 10005
**t:** +1.202.862.8910 | **t:** +1.212.701.3710| **f:** +1.866.836.0501 | bbondi@cahill.com
www.cahill.com

On Feb 24, 2019, at 1:28 PM, Crumpton, Cheryl <CrumptonC@sec.gov> wrote:

Dear Brad and Steve:

Thank you for your letter of February 22, 2019.  Based on the information you provided in your letter, including the examples of statements made by Mr. Musk that were pre-approved, it does not appear that any of the tweets regarding Tesla that Mr. Musk has published since December 11, 2018, have been pre-approved before publication.  Accordingly, we write to ask for additional information.  We request that Mr. Musk and Tesla provide the following additional information to the staff before 5pm Pacific Time today:

1.  After December 11, 2018, has Mr. Musk, in accordance with the pre-approval provisions of the mandatory polices implemented by Tesla pursuant to the final judgment entered in *SEC v. Tesla*, submitted any tweets for pre-approval before publishing them?
2. If so, please identify the tweets Mr. Musk submitted for pre-approval.
3. After December 11, 2018, has Tesla, in accordance with the pre-approval provisions of the mandatory polices implemented by Tesla pursuant to the final judgment entered in *SEC v. Tesla*, approved any of Mr. Musk's tweets before he published them?
4. If so, please identify which tweets Tesla approved before Mr. Musk published them and explain how they were pre-approved.

Best regards,
Cheryl

Cheryl L. Crumpton
Supervisory Trial Counsel
Division of Enforcement
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-5985
202-551-4459
CrumptonC@sec.gov

---

**From:** Bondi, Bradley J. [mailto:bbondi@cahill.com]
**Sent:** Friday, February 22, 2019 2:30 PM
**To:** Buchholz, Steven; Crumpton, Cheryl
**Cc:** Bondi, Bradley J.; Steven M. Farina
**Subject:** Confidential: SEC v. Tesla, 1:18-cv-8947-AJN; SEC v. Musk, 1:18-cv-8865-AJN

*Confidential Treatment Requested Under FOIA*

Steve and Cheryl,

Please see the attached correspondence in response to your voluntary requests, dated February 20, 2019.  A copy of the letters will be sent to you by FedEx.

Respectfully,
Brad Bondi

cc:  Steven Farina (Counsel to Mr. Musk)

---

**Bradley J. Bondi | Partner**
**Cahill Gordon & Reindel LLP**
1990 K Street, N.W., Suite 950, Washington, D.C. 20006
80 Pine Street, New York, NY 10005
**t**: +1.202.862.8910 | **t**: +1.212.701.3710| **f**: +1.866.836.0501 | bbondi@cahill.com
www.cahill.com

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The information contained in this e-mail message is confidential and may be privileged.  If the reader
of this message is not the intended recipient, or an employee or agent responsible for delivering it to
the intended recipient, you are hereby notified that any dissemination, distribution, copying or other
use of this communication is strictly prohibited and no privilege is waived. If you believe you have
received this communication in error, please notify the sender immediately by replying to this email
and then delete this email from your system.  Thank you.

# EXHIBIT  8

0

WILMERHALE

March 11, 2019

**Matthew T. Martens**

+1 202 663 6921 (t)
+1 202 663 6363 (f)
matthew.martens@wilmerhale.com

Cheryl L. Crumpton
Supervising Trial Attorney
Division of Enforcement
U.S. Securities and Exchange Commission
100 F Street N.E.
Washington, D.C. 20549-5985
CrumptonC@sec.gov

Re: *SEC v. Tesla, Inc., 1:18-cv-8947-AJN*

Dear Ms. Crumpton:

I write on behalf of Tesla, Inc. ("Tesla" or the "Company") in response to your letter dated February 26, 2019. In your letter, you made eleven specific Requests for Information from Tesla. Tesla has addressed each request in Appendix A to this letter. I would also like to take this opportunity to respond to your concerns regarding Tesla's oversight of Mr. Musk's Twitter communications pursuant to the Final Judgment entered as to Tesla in the above-referenced matter on October 16, 2018 ("Final Judgment").

Tesla takes seriously its obligations under the Final Judgment. This commitment is evidenced by the significant enhancements to governance that the Company has made since the entry of the Final Judgment. With regard to Mr. Musk's communications, Tesla is obligated by the Final Judgment to implement mandatory procedures and controls to oversee all of Elon Musk's communications regarding the Company made in any format, and to implement procedures and controls to pre-approve certain of his written communications. In accordance with these requirements, Tesla issued its Senior Executives Communications Policy ("Communications Policy"), dated December 11, 2018. Tesla sought and addressed comments from the Staff of the Securities and Exchange Commission on the Communications Policy before it was issued, and Tesla provided a copy of the final policy to the Staff on December 13, 2018.

Under the Communications Policy, and consistent with the Final Judgment, Mr. Musk is not required to obtain pre-approval of all written communications. Indeed, Mr. Musk need not even obtain pre-approval of all written communications *about Tesla*. Rather, only those written communications "that contain, or reasonably could contain, information material to the Company or its shareholders" are subject to mandatory pre-approval. The Communications Policy provides examples of topics that "may" be material to Tesla or its stockholders depending on the significance of the information in question, and the policy vests discretion in its Authorized Executives, including Mr. Musk, to make a judgment in the first instance about whether the information contained in a written communication meets that applicable standard. If it does meet

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006

Beijing   Berlin   Boston   Brussels   Denver   Frankfurt   London   Los Angeles   New York   Palo Alto   Washington

A-81

WILMERHALE

Cheryl L. Crumpton
March 11, 2019
Page 2

that standard, Mr. Musk is to submit the statement to Tesla's designated Disclosure Counsel and
General Counsel, who will review it, including for accuracy and timing.

The Communications Policy does not rely entirely on the exercise of discretion of the
Authorized Executives, of course. The Policy states that, among other things, the Company will
"periodically review" past communications of Authorized Executives and "provide guidance,"
contemplating that the Company will provide constructive feedback where needed. With respect
to Mr. Musk's statements posted on Twitter, Tesla did much more than a "periodic review."
Senior Tesla officers monitored Mr. Musk's Twitter feed in real-time. This allowed Tesla to
assure that Mr. Musk was exercising his discretion appropriately in submitting for pre-clearance
those communications that "contain, or reasonably could contain, information material to the
Company or its shareholders," in accordance with the Communications Policy, and to provide
additional guidance to him where appropriate.

The Communications Policy also contains a provision stating that if an Authorized
Executive receives pre-approval for a written communication but wishes to release it more than
two days later, the Authorized Executive must re-confirm the pre-approval. This provision
addresses the time frame in which a pre-approved communication must be released in order for
the pre-approval to remain effective, not whether a communication is subject to mandatory pre-
approval in the first instance. Under the Communications Policy, whether a communication is
subject to mandatory pre-approval turns on whether it "contains, or reasonably could contain,
information material to Tesla or its stockholders." And that determination depends on, among
other things, the total mix of information in the public domain at the time of the communication.

We understand that the Staff has concerns about Mr. Musk's February 19 tweet, made
after NASDAQ trading hours, in which he stated: "Tesla made 0 cars in 2011, but will make
around 500k in 2019." Tesla believes that Mr. Musk's decision not to submit that statement for
pre-approval under the Communications Policy was reasonable and appropriate. The statement
was a comparative one, plainly meant to do nothing more than celebrate how far the Company
has come in such a short period of time. The post was added to a tweet thread featuring a photo
of Tesla cars "loading … for Europe," reinforcing the cheerleading aspect of the message. As
for the shorthand phrase, "around 500k in 2019," it was non-specific, not even referencing any
particular Tesla model or models. What is more, that expected rate of production was previously
disseminated, with additional context, in Tesla's recent "Fourth Quarter & Full Year 2018
Update" and management's perspectives on that guidance provided during the Company's
related earnings call, both on January 30, 2019. Even if a reader of the tweet understood Mr.
Musk to be referring to total vehicle production in 2019, the estimated range of "around 500k"
for 2019 was consistent with information previously disclosed by Tesla. Merely reiterating
recently disseminated information in a shorthand way as part of a statement reasonably
understood to convey nothing more than that Tesla has accomplished much in a relatively short
time period is not remotely material. No reasonable investor would understand that comparative

A-82

WILMERHALE

Cheryl L. Crumpton
March 11, 2019
Page 3

statement of corporate pride in what Tesla has accomplished to significantly alter the total mix of information already in the public domain.

Nonetheless, as with all of Mr. Musk's tweets, this tweet was monitored by Tesla in real-time. Even though the tweet was not material, Mr. Musk, after consulting with Tesla's Disclosure Counsel, issued a clarifying tweet just a few hours later out of an abundance of caution in order to avoid even the possibility of confusion about what the "around 500k" figure referred to. The subsequent tweet indicated that "around 500k" referenced "annualized production rate at the end of 2019, ie 10k cars/week." This was consistent with the recent January 30 guidance and Mr. Musk's gloss on that guidance during the January 30 earnings call, in which he expressed confidence that Tesla would "get to the 10,000 vehicles a week rate or very close to it by the end of the year."

From Tesla's perspective, Mr. Musk's February 19 tweet, made outside NASDAQ trading hours, followed by a prompt clarification designed to eliminate even the possibility for confusion about what was being communicated, demonstrates Tesla's and Mr. Musk's good faith and their commitment to compliance generally and to fulfilling their obligations under the Final Judgment specifically. Mr. Musk cited information previously disseminated by Tesla in making a general statement of corporate pride and optimism. As part of the discretion vested in him to make an initial judgment regarding the materiality of a communication, Mr. Musk reasonably determined that the tweet did not require pre-approval. Tesla monitored his tweets and, with Mr. Musk, took a conservative approach when this communication was made: Mr. Musk promptly issued a clarifying tweet intended to address even the possibility of any confusion about the figure he had referenced. Both tweets were posted outside of NASDAQ trading hours and neither caused any harm to investors. Thus, even if the Staff disagrees in hindsight with Mr. Musk's and Tesla's good faith determinations regarding materiality, any possible issue regarding those judgments was remedied and addressed promptly with the subsequent communication by Mr. Musk. As a matter of sound public policy, the Commission should not take an approach here that could suggest that good faith efforts by public companies to clarify information will be punished.

We trust that this letter, as well as Tesla's responses in the attached to your inquiries, will allay your concerns. Tesla values its dialogue with the Staff and would welcome further discussion on any of these topics. If after reviewing these responses, you continue to have concerns or questions, please do not hesitate to contact me.

WILMERHALE

Cheryl L. Crumpton
March 11, 2019
Page 4

Sincerely,

Matthew T. Martens

Enclosure

## APPENDIX A

### Tesla, Inc. Responses to February 26, 2019 Requests for Information

#### Information Requests 1 – 4

Under the Final Judgment entered on October 16, 2018, in *SEC v. Tesla, Inc.,* 1:18-cv-8947-AJN, Tesla is obligated to implement mandatory procedures and controls to oversee all of Elon Musk's communications regarding the Company made in any format, and to implement mandatory procedures and controls to pre-approve certain written communications. In accordance with these requirements, Tesla issued its Senior Executives Communications Policy ("Communications Policy"), dated December 11, 2018.

Tesla's Communications Policy has several important components, including: (a) mandatory pre-approval of written communications that contain, or reasonably could contain, information material to Tesla or its stockholders; (b) monitoring of senior executives' communications and guidance; (c) auditing by Tesla's Internal Audit function of compliance with the Communications Policy; and (d) oversight of the Communications Policy by the Disclosure Controls Committee of Tesla's Board of Directors, including through reports to the Committee by the Company's designated Disclosure Counsel and Internal Audit.

Tesla has applied each of these components of the Communications Policy to Mr. Musk's Tesla-related written communications, especially his Twitter communications, since the adoption of the Policy. As most relevant to these information requests, each of the then-current General Counsels and the designated Disclosure Counsel have monitored Mr. Musk's Tesla-related tweets on a real-time basis. Since the entry of the Final Judgments, Mr. Musk has approached his Tesla-related communications—especially Twitter communications—with heightened awareness. An examination of Mr. Musk's Twitter feed during the months of May, June, and July 2018, compared to Mr. Musk's Twitter feed during the three months following the entry of the Final Judgements (November and December 2018 and January 2019) shows that Mr. Musk's average monthly Tesla-related tweets were cut nearly in half. This dramatic decrease in Mr. Musk's Tesla-related Twitter activity reflects Tesla's and Mr. Musk's commitments to adhering to the Communications Policy.

From December 11, 2018, when the Communications Policy became effective, until the Commission's extraordinary Court filing following Mr. Musk's February 19, 2019 tweet, Mr. Musk did not seek pre-approval for any of his Twitter communications.[1] The Company believes that Mr. Musk has exercised reasonable and appropriate judgment under the Communications Policy in deciding that the tweets neither contained, nor reasonably could contain, information that is material to Tesla or its stockholders. Mr. Musk's Tesla-related Twitter communications since December 11 have (i) reiterated information previously disclosed by the Company; (ii) consisted of immaterial customer relations; and/or (iii) dealt with clearly immaterial matters. Tesla does not believe that there was a substantial likelihood that the information contained in Mr. Musk's tweets could reasonably be viewed by a reasonable investor as having "significantly

---

[1]     Following the Commission's contempt proceeding against Mr. Musk on February 25, 2019, and although not required by the Communications Policy, Mr. Musk has sought pre-approval for a wide range of Tesla-related proposed tweets, even those that are clearly immaterial.

1

altered the total mix of information" available to the public concerning the Company. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). As such, under the terms of the Communications Policy, Mr. Musk was not required to seek pre-approval for any of his post-December 11 tweets to date before they were posted. To the extent the Staff disagrees with the Company's judgments in this regard or has specific concerns about any of Mr. Musk's written communications during this timeframe, Tesla would appreciate the opportunity to discuss the issue further and explain the Company's perspective concerning the immateriality of Mr. Musk's post-December 11 tweets.

Although the Company does not believe that any of Mr. Musk's post-December 11 tweets required pre-approval pursuant to the Communications Policy, Mr. Musk's Twitter communications have been subject to significant and robust monitoring and attention by Tesla during this period, reflecting Tesla's and Mr. Musk's commitment to fulfilling their obligations under the Final Judgments. Indeed, through this real-time monitoring, on February 19, 2019, Tesla's designated Disclosure Counsel identified the tweet that the Staff has inquired about and followed-up on it. Even though the tweet was not material, after consulting with Disclosure Counsel, Mr. Musk promptly issued a clarifying tweet in order to avoid even the possibility of confusion. Both the original tweet and the clarifying tweet were posted outside NASDAQ trading hours and caused no investor harm.

Tesla has devoted and continues to devote considerable time and attention to the effective operation and implementation of the Communications Policy. At all times, Tesla has been committed to assuring its proper functioning and to fulfilling its obligations under the Final Judgments.

### Information Request 5

The materials that were pre-approved by Tesla in accordance with the Communications Policy and that were used in connection with Tesla's Q4 2018 Financial Results and Q&A call and webcast held on January 30, 2019 are the January 30, 2019 shareholder and the January 30 Script, consisting of a set of talking points. Tesla will provide both documents to the Staff under separate cover.

The January 30 shareholder letter was prepared with the active participation of Tesla's Management Disclosure Committee, which includes the General Counsel and designated Disclosure Counsel. In that process, on January 30, the Management Disclosure Committee, of which the General Counsel and Disclosure Counsel were members, approved the final document for dissemination. The January 30 Script was prepared under a similar process. Also on January 30, the Management Disclosure Committee approved the content of the January 30 Script for use in connection with the January 30 Q&A call and webcast.

### Information Requests 6 & 7

As of the date of your letter, February 26, Tesla had not revised its public guidance, as originally stated in Tesla's Fourth Quarter & Full Year 2018 Update letter ("Q4 Letter"), that it is "expecting to deliver 360,000 to 400,000 vehicles in 2019." Nor had Tesla, as of that date, revised its public guidance, as originally stated in the Q4 letter, that Tesla is "targeting

2

A-86

annualized Model 3 output in excess of 500,000 units sometime between Q4 of 2019 and Q2 of 2020."

Mr. Musk's initial tweet on February 19 – stating "Tesla made 0 cars in 2011, but will make around 500k in 2019" – was intended only to recapitulate the Company's recently-issued guidance and Mr. Musk's gloss on that guidance during the earnings call, and did not amount to a change in guidance. His tweet was comparative, employed the word "around," and did not even reference any specific Tesla model. It was intended only to convey and celebrate how far the Company has come in a short period of time. Mr. Musk's subsequent clarifying tweet, issued only a few hours later, made clear that the initial tweet was not a change in guidance. Mr. Musk wrote: "Meant to say annualized production rate at end of 2019 probably around 500k, ie 10 cars/week. Deliveries for year still estimated to be about 400k." This tweet reinforced that Tesla's recent January 30 guidance remained in effect and had not been revised. Nor did this tweet, referencing "about" 400k deliveries, alter Tesla's guidance regarding expected vehicle delivery in 2019.

### Information Requests 8-10

Tesla has made substantial changes to its governance since the entry of Final Judgments on October 16, 2018. Tesla appointed a new independent Chair of the Board of Directors on November 7, 2018, and appointed two new independent directors to the Board of Directors on December 28, 2018. Tesla created a permanent, independent Disclosure Controls Committee of the Board of Directors, as of December 11, 2018, to oversee the matters set forth in the Final Judgments. Also on December 11, 2018, the Board approved the Company's Communications Policy, which states that the Committee will provide oversight over the Policy and specifies that the Policy may be amended only by action of the Committee. And on December 18, 2018, Tesla designated a Disclosure Counsel whose qualifications are not unacceptable to the Staff of the Securities Exchange Commission; indeed, the Staff met with the candidate by telephone before he was appointed.

In the short period of time between the formation of the Disclosure Controls Committee and Mr. Musk's February 19 tweet that prompted the present inquiries, the Disclosure Controls Committee has taken appropriate steps to oversee the matters set forth in the Final Judgments, including the procedures concerning mandatory pre-approval of certain written communications. The Committee's directors have heard multiple reports on the operation of the Communications Policy. The directors of the Committee, who each also serve on the Audit Committee, heard a report from the designated Disclosure Counsel to the Audit Committee on January 29, 2019. In addition, the Disclosure Controls Committee convened on February 14, 2019. During that meeting, the directors received a second report from the Disclosure Counsel. Also in that meeting, the Committee received a report from Internal Audit on the operation of the Policy, and Internal Audit did not report any exceptions. The Disclosure Controls Committee has not made any recommendations to the Board to address any non-compliance with the Communications Policy because no instances of non-compliance have been identified.

Following the Staff's inquiries to Tesla, the full Board has met and discussed these matters, including in executive session. The Disclosure Controls Committee also has been actively monitoring these matters. The directors have received regular reports from the

3

Disclosure Counsel, and the Committee convened on March 8 and 11. The Board and the
Disclosure Controls Committee will continue to monitor these matters closely going forward.

In further response to this question, Tesla declines to waive its attorney-client privilege to
disclose the content of any advice provided by Tesla's General Counsel or designated Disclosure
Counsel.

**Information Request 11**

Tesla and Mr. Musk remain committed to ensuring full compliance with their obligations
under the Final Judgments, including their obligations related to pre-approval of certain of Mr.
Musk's written communications. The Disclosure Controls Committee will be evaluating the
effectiveness of the Communications Policy and its operation and will make any enhancements
or changes to the Policy that it deems warranted. Tesla also welcomes any input the Staff may
have on these matters.

4

A-88

## DECLARATION OF ELON R. MUSK

I, Elon R. Musk, declare as follows:

1.    I am the co-founder and Chief Executive Officer at Tesla, Inc. ("Tesla").  I have personal knowledge of the facts set forth in this Declaration and, if called to testify, I could and would testify competently thereto.

2.    I submit this Declaration in support of the Response To Order To Show Cause Why Defendant Elon Musk Should Not Be Held In Contempt For Violating The Court's Final Judgment.

3.    On September 28, 2018, I was party to a Consent Motion for Entry of Final Judgment in the matter of *Securities & Exchange Commission v. Musk*, 18-cv-08865-AJN.  This Court entered Final Judgment on October 16, 2018 (the "Order").  The Order requires, among other things, that I comply with certain "mandatory procedures" implemented by Tesla.  These procedures include "the pre-approval" of "written communications that contain, or reasonably could contain, information material to" Tesla or its shareholders.

4.    As required by the Order, Tesla subsequently developed a policy for the "pre-approval" of written communications, referred to as the Senior Executives Communications Policy (the "Policy").  The Policy went into effect on December 11, 2018.

5.    The Policy tracks the language of the Order, providing that any "Authorized Executive" must submit to Tesla's General Counsel and Disclosure Counsel for pre-approval "Written Communications" that "contain, or reasonably could contain, information material to Tesla or its stockholders."  As Tesla's CEO, I am an Authorized Executive, and I understand I must abide by the Policy.

6.    The Order and the Policy vest the relevant Authorized Executive with discretion to determine in good faith whether a Written Communication "contain[s], or reasonably could contain," material information, and thus whether it requires pre-approval.  Accordingly, when I issue a written statement (including a tweet), I exercise, in good faith, the discretion granted to me to determine whether the statement contains, or reasonably could contain, material information.  This grant of discretion was carefully negotiated with the Securities and Exchange Commission

- 1 -

5494118

1   (the "SEC").  I did not and would not consent to a court order or to a policy that operated as a gag

2   or prior restraint on my ability to speak about Tesla.  But because the Order and the Policy allow

3   me to make good-faith determinations of the materiality of my communications before publication,

4   I agreed to them.

5          7.     I have taken my obligation to comply with the Order and the Policy seriously.

6   Among other things, I have dramatically decreased the amount that I tweet about Tesla.  Compared

7   to the months of May, June, and July 2018, during the three months following the entry of the

8   Order (November and December 2018 and January 2019), I have cut my average monthly Tesla-

9   related tweets nearly in half.  This is not because I am concerned about non-compliance, but rather

10   because I want to err on the side of caution to avoid unnecessary disputes with the SEC.  I have

11   also taken steps to ensure that, when I do tweet information, I am compliant with the Order and the

12   Policy.  The Disclosure Counsel and other members of Tesla's legal department have reviewed the

13   updated controls and procedures with me on multiple occasions.  With my knowledge and

14   approval, Tesla's General Counsel and Disclosure Counsel have been reviewing all tweets

15   promptly in real time upon publication to double-check compliance with the Policy and to ensure

16   that any errors are caught and rectified quickly.  Additionally, since the entry of the Order and the

17   enactment of the Policy, I have not tweeted information that I believe is, or could reasonably be,

18   material.

19          8.     At 7:15 p.m. Eastern Time on February 19, 2019, I posted a tweet that celebrated

20   Tesla's success since 2011 and exhibited pride for what Tesla anticipated achieving in 2019.  The

21   7:15 tweet was part of the same chain as a 7:02 p.m. Eastern Time tweet, which showed a picture

22   of thousands of Tesla cars headed from San Francisco to Europe.  Those two tweets are reproduced

23   here:

24

25

26

27

28

- 2 -

5494118



9.      The 7:15 tweet reflected information that had already been publicly disclosed in Tesla's Form 8-K, published on January 2, 2019; Tesla's Fourth Quarter and Full Year 2018 Update, published on January 30, 2019; the associated earnings call, also on January 30, 2019; and

5494118

1  Tesla's Annual Report (Form 10-K), filed with the SEC the same day as the tweet (February 19,

2  2019).

3        10.     Because the 7:15 tweet only repeated publicly-disclosed information, and was a

4  reflection of my pride in Tesla's success and its future, I did not believe that it contained, or

5  reasonably could contain, any information material to Tesla or its shareholders.

6        11.     To be clear, notwithstanding the SEC's contempt motion, I continue to believe that

7  the 7:15 tweet did not contain any information material to Tesla or its shareholders.  If I believed

8  otherwise, I would not have issued the tweet without pre-approval under the Policy.

9        12.     After the 7:15 tweet, I spoke with Tesla's Disclosure Counsel.  After consultation, I

10  continued to believe that the 7:15 tweet neither contained, nor reasonably could contain, material

11  information.  However, out of an abundance of caution and because pundits and others were

12  consistently looking for any reason to criticize me or Tesla, I posted another tweet at 11:41 p.m.

13  Eastern Time.  That tweet is reproduced here:





25        13.     There is no doubt that I have been a vocal critic of the SEC's approach to protecting

26  shareholders, as I believe that they materially and disproportionately favor short-term over long-

27  term constituencies.  However, there can also be no doubt that I am tirelessly working, along with

28  my team at Tesla, on creating value for our shareholders and attempting to accelerate the world's

- 4 -

5494118

1   transition to sustainable energy.  That is, the shareholder protection goal that should be at the heart

2   of the SEC's mission is one that I share emphatically.

3          I declare under penalty of perjury that the foregoing is true and correct.

4          Executed on this 11th day of March, 2019, at Los Angeles, California.

5

6

7                                                 _____
                                                   Elon R. Musk

- 5 -

5494118

**A-93**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES SECURITIES AND**
**EXCHANGE COMMISSION**

       **Plaintiff,**

**v.**

**ELON MUSK**

       **Defendant.**

---

No. 1:18-cv-8865-AJN-GWG

**DECLARATION OF CHRISTOPHER F. NOE, PH.D.**

**March 11, 2019**

## Table of Contents

I.     Qualifications ................................................................................................................. 1

II.    Case Background and Summary of Allegations ........................................................... 2

III.   Assignment and Compensation ................................................................................... 4

IV.    Summary of Opinions .................................................................................................. 4

V.     The 7:15 PM Tweet Did Not Contain Material Information for Tesla's shareholders ................... 5

  A.   Materiality ................................................................................................................. 5

  B.   Opening Price and Trading Volume of Tesla's Common Stock on February 20, 2019 .............. 5

  C.   After-Market Trading of Tesla's Common Stock on February 19, 2019 ........................... 7

  D.   Pre-Market Trading of Tesla's Common Stock on February 20, 2019 ............................. 9

  E.   Market Reaction to SEC's Contempt Motion Was Greater Than to February 19 Tweets ........... 11

VI.    Market Commentary ................................................................................................... 11

VII.   Conclusion ................................................................................................................. 13

## I.   QUALIFICATIONS

1.  I am a Senior Lecturer in Accounting at the Massachusetts Institute of
    Technology's Sloan School of Management.  I have taught at MIT Sloan since
    2005 and have been a full-time member of the faculty since 2011.  My teaching
    focuses on accounting principles, financial statement analysis, disclosure,
    forecasting, and valuation.  Between 1995 and 2000, I served on the faculty of the
    Harvard Business School where I taught similar subjects.  During the course of
    my academic career, I have published articles in peer-reviewed journals as well as
    authored teaching case studies.  My peer-reviewed academic articles include the
    use of event studies to examine how various corporate disclosures affect stock
    prices.

2.  I received a B.A. in Economics from Emory University in 1990, an M.S. in
    Applied Economics from the University of Rochester in 1993, and a Ph.D. in
    Business Administration from the University of Rochester in 1996.

3.  In addition to my academic experience, I worked at Charles River Associates, an
    economics, finance, and business consulting firm, between 2000 and 2011.  My
    consulting assignments at Charles River dealt primarily with the fields of
    financial accounting and corporate finance, primarily in the context of securities
    litigation.  While at Charles River, I came to lead the firm's securities litigation
    marketing efforts, which included overseeing the development of a software
    product for analyzing daily stock price movements in the context of securities
    lawsuits.

A-96

4. A copy of my curriculum vitae, which includes my publications and a list of all matters in which I have provided expert testimony, is attached as **Appendix A**.

## II. CASE BACKGROUND AND SUMMARY OF ALLEGATIONS

5. Elon Musk ("Defendant") is the Chief Executive Officer of Tesla, Inc. ("Tesla"), a publicly traded company since June 29, 2010.[1]  Tesla's stock is currently listed on the NASDAQ Stock Market ("NASDAQ").

6. In 2018, Tesla produced 254,530 vehicles and delivered 245,506 vehicles.[2]

7. On January 2, 2019, Tesla filed a Form 8-K, reporting its Fourth Quarter 2018 production numbers.  Tesla stated that production in Q4 grew to 86,555 vehicles, including 61,394 Model 3 vehicles and 25,161 Model S and X vehicles.[3]

8. In an update letter that the company released on January 30, 2019, Tesla announced that it expected to deliver 360,000 to 400,000 vehicles in 2019.[4]  In that same letter, Tesla also disclosed that it aimed to raise the annualized output for the Model 3, one of three vehicles that the company currently offers, to over 500,000 units between Q4 of 2019 and Q2 of 2020, "[b]arring unexpected challenges with Gigafactory Shanghai."[5]

9. On February 19, 2019, Tesla filed its Form 10-K for fiscal year 2018.  Tesla stated that its goal is to produce 10,000 Model 3 vehicles per week on a sustained

---

[1] Tesla, Form 10-K for the fiscal year ended December 31, 2018, pp. 27, 39.

[2] Tesla, Form 10-K for the fiscal year ended December 31, 2018, p. 42.

[3] Tesla, Form 8-K filed January 2, 2019.

[4] Tesla, "Tesla Fourth Quarter & Full Year 2018 Update," January 30, 2019.

[5] Tesla, "Tesla Fourth Quarter & Full Year 2018 Update," January 30, 2019; Tesla, Form 10-K for the fiscal year ended December 31, 2018, p. 1.

A-97

basis, with an annualized output rate in excess of 500,000 Model 3 vehicles sometime between the fourth quarter of 2019 and second quarter of 2020.[6]

10. After the close of NASDAQ's regular market trading on February 19, 2019,[7] Defendant posted a message on Twitter at 7:15 PM ET ("7:15 PM Tweet") regarding Tesla's production capacity:[8]

> Tesla made 0 cars in 2011, but will make around 500k in 2019.

11. Later at 11:41 PM ET on the same day, Defendant posted another message on Twitter ("11:41 PM Tweet"):[9]

> Meant to say annualized production rate at end of 2019 probably around 500k, ie 10k cars/week.  Deliveries for year still estimated to be about 400k.

12. After the close of NASDAQ's regular market trading on February 25, 2019, several news sources reported that the Securities and Exchange Commission ("SEC" or "Plaintiff") filed a motion ("Contempt Motion"), requesting that the United States District Court for the Southern District of New York hold Defendant in contempt over the 7:15 PM Tweet.[10]  The SEC alleges that the 7:15 PM Tweet was "inaccurate" and that Defendant violated the terms of his October 2018 settlement with the SEC, under which Defendant is required to seek pre-

---

[6] Tesla, Form 10-K for the fiscal year ended December 31, 2018, p. 16.

[7] "NASDAQ Trading Schedule," available at <https://www.nasdaq.com/about/trading-schedule.aspx>, accessed March 7, 2019.

[8] Twitter, available at <https://twitter.com/elonmusk/status/1098013283372589056>, accessed March 10, 2019.

[9] Twitter, available at <https://twitter.com/elonmusk/status/1098080063801585664>, accessed March 10, 2019.

[10] This news was first reported by Bloomberg at 6:10 PM ET.  *See* "SEC Asks Judge To Hold Elon Musk In Contempt For Violating Deal," *Bloomberg*, February 25, 2019; *see also* "SEC Asks Manhattan Federal Court to Hold Elon Musk in Contempt," *The Wall Street Journal*, February 25, 2019; *United States Securities And Exchange Commission v. Elon Musk*, United States Securities and Exchange Commission's Motion and Memorandum of Law in Support of an Order to Show Cause, February 25, 2019, p. 1.

approval from Tesla officials for any written statements that "contain[] or reasonably could contain information material to Tesla or its shareholders."[11]

## III.   ASSIGNMENT AND COMPENSATION

13. I have been retained by counsel for Defendant to evaluate whether the 7:15 PM Tweet contained material information for Tesla's shareholders.  A list of documents that I have relied upon in this declaration is provided in **Appendix B**.  Staff from Analysis Group, operating under my direction, have provided me with research assistance in preparing this declaration.  My billing rate in this matter is $700 per hour.  My compensation is not contingent upon my findings or the outcome of this proceeding.

## IV.   SUMMARY OF OPINIONS

14. Based on my review of stock price and trading volume data, news articles, and analyst reports, I have reached the following conclusions:

   (i)   The 7:15 PM Tweet did not contain material information for Tesla's shareholders;

   (ii)   More specifically, the lack of meaningful price reaction and relatively low trading volume following the 7:15 PM Tweet (and the lack of meaningful price reaction and relatively low trading volume following the 11:41 PM Tweet, which the SEC alleges "correct[ed]" the 7:15 PM Tweet[12]) indicate

---

[11] Contempt Motion, p. 1; *see also* "SEC Asks Manhattan Federal Court to Hold Elon Musk in Contempt," *The Wall Street Journal*, February 25, 2019.

[12] Contempt Motion, pp. 5, 6.

4

A-99

that the 7:15 PM Tweet had no material impact on the price of Tesla's

common stock;

(iii) My review of market commentary following the 7:15 PM Tweet indicates

that analysts did not view information contained in this disclosure as

material, consistent with the lack of meaningful price reaction and

relatively low trading volume;

(iv) On the other hand, the market did react, based on price reaction, trading

volume, and market commentary, in response to the filing of the SEC's

Contempt Motion.

## V.   THE 7:15 PM TWEET DID NOT CONTAIN MATERIAL INFORMATION FOR TESLA'S SHAREHOLDERS

### A.  Materiality

15. From an economic perspective, the materiality of a statement to the value of an

actively traded security (such as Tesla stock) can be assessed through the market

reaction to that statement.  Information that is considered material to investors in

their decision as to whether to buy or sell a security tends to generate responsive

movements in trading volume and stock price as investors react to that

information.  These trends are observable through an analysis of trading data.

### B.  Opening Price and Trading Volume of Tesla's Common Stock on February 20, 2019

16. As discussed above, Tesla's common stock is traded on NASDAQ, for which

regular trading hours begin at 9:30 AM ET and end at 4:00 PM ET on each

A-100

trading day.[13]  The 7:15 PM Tweet and 11:41 PM Tweet (collectively, the
"February 19 Tweets") were both published after regular trading hours, i.e., after
4:00 PM ET.  If the February 19 Tweets contained material information to Tesla's
shareholders, one would expect this information to be reflected in its stock price
at the open of regular trading on the next trading day.[14]

17. I find that Tesla's stock price declined by only 0.4 percent from $305.64 per share
at the close of regular trading on February 19, 2019 to $304.41 per share at the
open of regular trading on February 20, 2019.[15]  To put this price reaction in
context, **Exhibit 1** shows Tesla's daily stock price movements for September
2018 through February 2019.  As this exhibit shows, a 0.4 percent change is small
in comparison to the general volatility of Tesla's stock price over this six-month
period.  In addition, the average absolute value of Tesla's close-to-open stock
returns between September 2018 and February 2019 is 1.53 percent, nearly four
times greater than 0.4 percent.  In contrast, following the filing of the SEC's
Contempt Motion, Tesla's stock price declined by 2.2 percent from the close of
regular trading hours on February 25, 2019 ($298.77 per share) to the open of
regular trading hours on February 26, 2019 ($292.22 per share).[16]

18. Tesla's small stock price change from the close of regular trading on February 19,
2019 to the open of regular trading on February 20, 2019 was roughly in line with

---

[13] "NASDAQ Trading Schedule," available at <https://www.nasdaq.com/about/trading-schedule.aspx>, accessed
March 7, 2019.

[14] I also reviewed stock price and trading volume data outside of regular trading hours, which I discuss later in this
declaration.

[15] Bloomberg.

[16] Bloomberg.

a small contemporaneous change in the NASDAQ Composite Index.[17]
Furthermore, Tesla's stock price remained stable within the first hour after the
open of regular trading on February 20, 2019, fluctuating between $303.00 per
share and $305.84 per share.  Thus, I conclude that the February 19 Tweets had
no material impact on Tesla's stock price.

19.    The trading volume of Tesla's stock on February 20, 2019 is lower than the
average daily volume over the six-month period from September 2018 through
February 2019.[18]  The lack of meaningful price reaction up to an hour after the
open of regular trading on February 20, 2019 coupled with relatively low trading
volume throughout the day indicates that the February 19 Tweets did not contain
material information for Tesla's shareholders.[19]

**C.  After-Market Trading of Tesla's Common Stock on February 19, 2019**

20.    Investors have the option to trade stocks outside of regular trading hours.  For
stocks listed on NASDAQ, investors can trade after the close of regular trading

---

[17] The NASDAQ Composite Index is a capitalization-weighted index of stocks in all three NASDAQ tiers: Global
Select, Global Market and Capital Market.  *See* "CCMP Quote - NASDAQ Composite Index", available at
<https://www.bloomberg.com/quote/CCMP:IND>, accessed March 10, 2019.  According to data from Bloomberg,
the NASDAQ Composite Index increased by 0.05 percent from 7486.77 at the close of regular trading on February
19, 2019 to 7490.31 at the opening of regular trading on February 20, 2019.

[18] The trading volume of Tesla's stock on February 20, 2019 is 7,142,117, and the average daily trading volume over
the six-month period from September 2018 through February 2019 is 8,738,667.  The daily trading volume reported
by Bloomberg includes only trading activities during regular trading hours.

[19] I note that other news related to Tesla was disclosed after the close of regular trading on February 19, 2019 and
before the open of regular trading on February 20, 2019.  First, *Electrek* reported at 7:15 PM ET on February 19,
2019 that Tesla was preparing to offer leasing options for its Model 3 vehicles.  Second, *The Wall Street Journal*
reported at 8:00 AM ET on February 20, 2019 that Tesla's general counsel had left the company.  To the extent that
information from either of these news events were material to Tesla shareholders, the trading activities attributable
to the February 19 Tweets would be even lower in magnitude.  *See* "Tesla is preparing to offer Model 3 leasing to
boost demand," *Electrek*, February 19, 2019; *see also* "Tesla Replaces Top Lawyer After Two Months in Latest
Major Departure," *The Wall Street Journal*, February 20, 2019.

between the hours of 4:00 PM ET and 8:00 PM ET ("After-Market Hours") or prior to the open of regular trading between the hours of 4:00 AM ET and 9:30 AM ET ("Pre-Market Hours").[20]  These expanded trading windows provide investors with the potential to respond quickly to news and events that occur outside of regular trading hours.[21]  Thus, I reviewed Tesla's stock price and trading volume during After-Market Hours on February 19, 2019 and Pre-Market Hours on February 20, 2019 to assess the materiality of the 7:15 PM Tweet.[22]

21. On February 19, 2019, investors had the opportunity to trade following the 7:15 PM Tweet during After-Market Hours between 7:15 PM and 8:00 PM.  As shown in **Exhibit 2**, Tesla's stock price declined by only 0.09 percent during this 45-minute interval, from $307.10 per share at 7:13 PM ET[23] to $306.82 per share at 7:59 PM ET.  In contrast, as shown in **Exhibit 3**, Tesla's stock price fell by 3.4 percent following news of the filing of the SEC's Contempt Motion at 6:10 PM ET on February 25, 2019,[24] from $298.02 per share at 6:09 PM ET to $287.87 per share at 7:59 PM ET.

22. The trading volume during the 45-minute time window between the 7:15 PM Tweet and the end of After Market Hours trading totaled 9,973 shares, which represents less than 0.01 percent of the total shares outstanding of Tesla's

---

[20] "NASDAQ Trading Schedule," available at <https://www.nasdaq.com/about/trading-schedule.aspx>, accessed March 7, 2019.

[21] "Extended Hours Trading," available at <https://www.nasdaq.com/extended-trading/>, accessed March 7, 2019.

[22] While trading activities outside regular trading hours tend to be limited, an assessment of the market reaction during this time may be informative.

[23] There were no trading activities at 7:14 PM ET on February 19, 2019.

[24] "SEC Asks Judge To Hold Elon Musk In Contempt For Violating Deal," *Bloomberg*, February 25, 2019, 6:10 PM ET.

8

common stock.[25]  Average trading volume per hour during After-Market Hours

prior to the 7:15 PM Tweet (21,087 shares per hour) is higher than afterwards

(13,297 shares per hour).  By comparison, average trading volume during After-

Market Hours following news of the filing of the SEC's Contempt Motion is

222,674 shares per hour, which is nearly seventeen times higher than the hourly

trading volume after the 7:15 PM Tweet.

23. The lack of meaningful price reaction and relatively low trading volume during

After-Market Hours on February 19, 2019 following the 7:15 PM Tweet (and

before the 11:41 PM Tweet was posted) is evidence that the 7:15 PM Tweet did

not contain material information for Tesla's shareholders.

**D.  Pre-Market Trading of Tesla's Common Stock on February 20, 2019**

24. The 11:41 PM Tweet occurred after the conclusion of After-Market Hours trading

on February 19, 2019.  Investors had the opportunity to trade following the 11:41

PM Tweet during Pre-Market Hours on February 20, 2019.  The SEC describes

the 11:41 PM Tweet as "correcting" the 7:15 PM Tweet.[26]  Were that so, I would

expect to see a noticeable change in stock price or trading volume during the Pre-

Market Hours on February 20, 2019.

25. That did not occur.  As shown in **Exhibit 2**, Tesla's stock price declined during

Pre-Market Hours by only 0.8 percent, from $306.82 per share at 7:59 PM ET on

---

[25] According to Tesla's Form 10-K for the fiscal year ended December 31, 2018, there were 172,721,487 shares of
Tesla's common stock outstanding as of February 12, 2019.

[26] Contempt Motion, p. 5.

9

February 19, 2019 to $304.41 per share at the open of regular trading on February 20, 2019.

26. The even more relevant window for observing any reaction to the supposedly corrective 11:41 PM Tweet is from 7:59 PM ET on February 19, 2019 to 7:59 AM ET on February 20, 2019 because the departure of Tesla's General Counsel was announced at 8:00 AM ET that morning, which caused its own stock price reaction.[27]  As shown in **Exhibit 2**, Tesla's stock price increased by only 0.7 percent from $306.82 per share at 7:59 PM ET on February 19, 2019 to $308.81 per share at 7:59 AM ET on February 20, 2019.

27. The trading volume during the four-hour time window during Pre-Market Hours prior to 8:00 AM ET totaled 23,993 shares, which represents approximately 0.01 percent of the total shares outstanding of Tesla's common stock.[28]  By comparison, average trading volume per hour during Pre-Market Hours on February 20, 2019 prior to 8:00 AM ET (5,998 shares per hour) is far lower than the average trading volume per hour during Pre-Market Hours on February 26, 2019 (52,876 shares per hour).

28. The lack of meaningful price reaction to the 11:41 PM Tweet and the relatively low trading volume during Pre-Market Hours prior to 8:00 AM ET on February 20, 2019 provides further evidence that the 7:15 PM Tweet did not contain material information for Tesla's shareholders.

---

[27] "Tesla Replaces Top Lawyer After Two Months in Latest Major Departure," *The Wall Street Journal*, February 20, 2019.

[28] As previously noted, there were 172,721,487 shares of Tesla's common stock outstanding as of February 12, 2019.

E. **Market Reaction to SEC's Contempt Motion Was Greater Than to February 19 Tweets**

29. As discussed above and shown in **Exhibit 2**, there was a minimal price or volume reaction in After-Market Hours trading of Tesla stock on February 19, 2019 following the 7:15 PM Tweet.  The next morning, during Pre-Market Hours trading, there was similarly minimal price or volume reaction to the 11:41 PM Tweet.

30. In contrast, as discussed above and shown in **Exhibit 3**, when the news of the SEC's Contempt Motion became public, there was an immediate negative reaction as Tesla's stock price fell 3.4 percent between the news release (at 6:10 PM ET) and the end of After-Market Hours trading.  On an hourly basis, 13,297 shares traded per hour after the 7:15 PM Tweet on February 19, 2019 while 222,674 shares traded per hour after the 6:10 PM ET news on February 25, 2019, nearly a seventeen fold difference.  This response demonstrates that a material event can be perceived in the trading activities during After-Market or Pre-Market Hours if one occurs.

## VI.   MARKET COMMENTARY

31. I reviewed market commentary regarding the February 19 Tweets and find that it is consistent with my conclusions discussed above.  If the information contained in the February 19 Tweets was material to investors, one would expect equity analysts following Tesla to publish reports commenting on the information.  I found a total of three analyst reports published between February 20 and February 24, 2019 available through Thomson One.  None of the three reports mentioned

11

A-106

the February 19 Tweets, indicating that the analysts did not consider these as new material information.  Two of the analyst reports, one by Jefferies and one by New Constructs, commented on the Form 10-K that Tesla had filed before the open of regular trading on February 19, 2019.[29]  The other report by CFRA mentioned the departure of Tesla's general counsel and that Tesla had planned to start leasing its Model 3 vehicles.[30]

32.  In contrast, I found a total of 13 analyst reports published between February 26 and February 27, 2019 available through Thomson One.  Analysts' commentary indicate that they viewed the SEC's action as negative news.  For example, analysts from J.P. Morgan commented that they "see a negative reaction in TSLA shares to these developments."[31]  Similarly, analysts from Cowen expected Tesla's stock to "trade down."[32]  Moreover, some analysts expressed concerns over the potential consequences.  For example, analysts from Wedbush commented that "now this latest tweet (which most investors shrugged off at the time) represents a wild card that could potentially bring this tornado of uncertainty back into the Tesla story until resolved."[33]  Analysts from J.P. Morgan noted that "[i]f the SEC were to seek Mr. Musk's removal (perhaps subject to yet

---

[29] Jefferies, "Estimates and Views Confirmed Post 10-K," February 20, 2019; New Constructs, "Stock Option Liabilities Add Risk in Today's Filing Season Find," February 21, 2019.

[30] CFRA, "Tesla, Inc.," February 20, 2019.

[31] J.P. Morgan, "See Negative Reaction to Further SEC Allegations Against Tesla CEO Elon Musk — Reiterate UW," February 26, 2019.

[32] Cowen, "SEC Asks Judge To Hold Elon Musk In Contempt For Violating Settlement," February 26, 2019.

[33] Wedbush, "SEC Asks Court to Hold Musk in Contempt; Uncertainty Will Weigh on Shares," February 26, 2019.

A-107

another settlement), we believe the shares may approach the mid-$200 levels seen in the aftermath of the earlier SEC suit."[34]

33. The lack of commentary on the February 19 Tweets indicates that equity analysts did not view information contained in these disclosures as material, consistent with the lack of meaningful price reaction and low trading volume.

## VII.   CONCLUSION

34. Based on my review of stock price and trading volume data, news articles, and analyst reports, it is my opinion that the 7:15 PM Tweet did not contain material information for Tesla's shareholders.  There was no meaningful price reaction and relatively low trading volume in Tesla's shares following the 7:15 PM Tweet. Nor was there any meaningful price reaction or noticeable change in trading volume after what the SEC refers to as the "corrective" 11:41 PM Tweet. Moreover, no equity analysts commented on the February 19 Tweets.

Executed on this _11th_ day of March, 2019, at _4:49 pm_ .

_____
Christopher F. Noe

---

[34] J.P. Morgan, "See Negative Reaction to Further SEC Allegations Against Tesla CEO Elon Musk — Reiterate UW," February 26, 2019.

A-108

**Appendix A**



**CHRISTOPHER F. NOE**
Senior Lecturer
Sloan School of Management
Massachusetts Institute of Technology
77 Massachusetts Ave., E62-681
Cambridge, MA 02139
e-mail: chrisnoe@mit.edu
phone: (617) 253-4903

**EMPLOYMENT**

| | |
|---|---|
| 2005- | *Senior Lecturer*, Sloan School of Management, Massachusetts Institute of Technology |
| 2008-11 | *Vice President*, Charles River Associates |
| 2005-08 | *Principal*, Charles River Associates |
| 2003-05 | *Associate Principal*, Charles River Associates |
| 2000-03 | *Senior Associate*, Charles River Associates |
| 1995-2000 | *Assistant Professor*, Harvard Business School, Harvard University |

**EDUCATION**

Ph.D. Accounting, William E. Simon Graduate School of Business Administration, University of Rochester, 1996

M.S. Applied Economics, William E. Simon Graduate School of Business Administration, University of Rochester, 1993

B.A. Economics, Emory University, 1990

**RESEARCH**

Duarte-Silva, T., H. Fu, C. Noe, and K. Ramesh, 2013, How Do Investors Interpret Announcements of Earnings Delays?, *Journal of Applied Corporate Finance* 25, 66-73.

Fisher, F., C. Noe, and E. Schouten, 2005, The Sale of the Washington Redskins: Discounted Cash Flow Valuation of S-Corporations, Treatment of Personal Taxes, and Implications for Litigation, *Stanford Journal of Law, Business & Finance* 10, 18-30.

Gilson, S., P. Healy, C. Noe, and K. Palepu, 2001, Analyst Specialization and Conglomerate Stock Breakups, *Journal of Accounting Research* 39, 565-82.

Bushee, B. and C. Noe, 2000, Disclosure Quality, Institutional Investors, and Stock Return Volatility, *Journal of Accounting Research* 38, 171-202.

Noe, C., 1999, Voluntary Disclosures and Insider Transactions, *Journal of Accounting and Economics* 27, 305-26.

1

**CASE STUDIES**

Noe, C. and J. Weber, 2018, Amazon.com, Inc., MIT Sloan Case #17-183.

Noe, C. and J. Weber, 2018, Amazon.com, Inc., MIT Sloan Teaching Note #19-192.

Noe, C. and J. Weber, 2018, Spartan Race Inc., MIT Sloan Case #17-184.

Noe, C. and J. Weber, 2018, Spartan Race Inc., MIT Sloan Teaching Note #18-187.

Noe, C., L. Pully, and C. Reavis, 2018, Hertz Global Holdings Inc., MIT Sloan Case #15-164.

Noe, C., 2018, Hertz Global Holdings, Inc., 2018, MIT Sloan Teaching Note #18-186.

Yu, G., C. Noe, J. Weber, and T. Samuelson, 2015, Microsoft's aQuantive Acquisition, Harvard Business School Case #9-115-039.

Yu, G., C. Noe, J. Weber, and T. Samuelson, 2015, Microsoft's aQuantive Acquisition, Harvard Business School Teaching Note #5-115-039.

Yu, G., C. Noe, J. Weber, and J. McClellan, 2013, For Profit Higher Education: University of Phoenix, Harvard Business School Case #9-114-024.

Yu, G., C. Noe, J. Weber, and J. McClellan, 2014, For Profit Higher Education: University of Phoenix, Harvard Business School Teaching Note #5-114-032.

Miller, G. and C. Noe, 2006, Sears, Roebuck and Co. vs. Wal-Mart Stores, Inc., Harvard Business School Case #9-101-011.

Miller, G. and C. Noe, 2001, Bausch & Lomb, Inc. (A), Harvard Business School Case #9-101-010.

Miller, G. and C. Noe, 2001, Bausch & Lomb, Inc. (B), Harvard Business School Case #9-101-008.

Miller, G. and C. Noe, 2000, Bausch & Lomb, Inc. (C), Harvard Business School Case #9-101-009.

Miller, G. and C. Noe, 2002, Bausch & Lomb, Inc. (A), (B) and (C), Harvard Business School Teaching Note #5-101-009.

Noe, C., Kmart Corp., 1999, Harvard Business School Case #9-199-017.


**EXPERT TESTIMONY**

Report, rebuttal report, deposition testimony, and trial testimony on behalf of respondent in William Richard Kruse Individually and as a Trustee for The Vivian Calvert Living Trust and The William Richard Kruse Living Trust vs. Synapse Wireless, Inc., Court of Chancery of the State of Delaware, C.A. No. 12392-VCMR, 2017-19.

Report, rebuttal report, and trial testimony on behalf of plaintiffs in Morgan Stanley and MS Solar Solutions Canada ULC v. Stikeman Elliott LLP, Ontario Superior Court of Justice, CV-12-457683, 2017-18.

Report, rebuttal reports, and deposition testimony on behalf of defendants in City of Ann Arbor Employees' Retirement System, et al. v. Sonoco Products Co., et al., United States District Court, District of South Carolina, 4:08-cv-02348-TLW-SVH, 2010-11.

A-110

Deposition and arbitration testimony on behalf of defendant in Federal Insurance Company v. Interdigital Communications Corporation and Interdigital Technology Corporation, Ref. #1450000228, 2007.

Rebuttal report on behalf of plaintiff in Matthew Bender & Company Inc. v. Gould Publications Inc., et al., AAA No. 13 489 Y 02155 05, 2006.

Affidavit on behalf of individuals from KPMG LLP in CVS Corp. before the United States Securities and Exchange Commission, B-02164, 2006.

Report and hearing testimony on behalf of Loudoun Hospital Center in Combined Review of Competing Certificate of Public Need Applications: VA-6859, VA-6860, VA-6861, Commonwealth of Virginia, Department of Health, 2003.

**AWARDS & HONORS**

MIT Sloan Teacher of the Year 2015-16

**MISCELLANEOUS**

Friends of Brookline Rowing, Treasurer 2018-

Temple Israel of Boston, Treasurer 2009-13, Vice President 2013-15, President 2015-17

*The Two Dollar Bill Documentary* film credit http://www.imdb.com/title/tt4083126/?ref_=ttfc_fc_tt, 2015

3

A-111

## Appendix B
## Documents Relied Upon

### *Legal Filing*

*United States Securities And Exchange Commission v. Elon Musk*, United States Securities and Exchange Commission's Motion and Memorandum of Law in Support of an Order to Show Cause, February 25, 2019.

### *News Articles*

"SEC Asks Judge To Hold Elon Musk In Contempt For Violating Deal," *Bloomberg*, February 25, 2019.

"SEC Asks Manhattan Federal Court to Hold Elon Musk in Contempt," *The Wall Street Journal*, February 25, 2019.

"Tesla is preparing to offer Model 3 leasing to boost demand," *Electrek*, February 19, 2019.

"Tesla Replaces Top Lawyer After Two Months in Latest Major Departure," *The Wall Street Journal*, February 20, 2019.

### *Analyst Reports*

CFRA, "Tesla, Inc.," February 20, 2019.

Cowen, "SEC Asks Judge To Hold Elon Musk In Contempt For Violating Settlement," February 26, 2019.

Jefferies, "Estimates and Views Confirmed Post 10-K," February 20, 2019.

J.P. Morgan, "See Negative Reaction to Further SEC Allegations Against Tesla CEO Elon Musk — Reiterate UW," February 26, 2019.

New Constructs, "Stock Option Liabilities Add Risk in Today's Filing Season Find," February 21, 2019.

Wedbush, "SEC Asks Court to Hold Musk in Contempt; Uncertainty Will Weigh on Shares," February 26, 2019.

### *Websites and Other Sources*

Bloomberg.

"CCMP Quote - NASDAQ Composite Index", available at <https://www.bloomberg.com/quote/CCMP:IND>, accessed March 10, 2019

"Extended Hours Trading," available at <https://www.nasdaq.com/extended-trading/>, accessed March 7, 2019.

Factiva.

"NASDAQ Trading Schedule," available at <https://www.nasdaq.com/about/trading-schedule.aspx>, accessed March 7, 2019.

1

A-112

Tesla, Form 8-K filed January 2, 2019.

Tesla, Form 10-K for the fiscal year ended December 31, 2018.

Tesla, "Tesla Fourth Quarter & Full Year 2018 Update," January 30, 2019.

Thomson One.

Twitter, available at <https://twitter.com/elonmusk/status/1098013283372589056>, accessed March 10, 2019.

Twitter, available at <https://twitter.com/elonmusk/status/1098080063801585664>, accessed March 10, 2019.

A-113

Follow



Elon Musk
@elonmusk

In other words, you may be able to get a Tesla before the $7500 US tax credit drops in 2 weeks, even if you haven't placed an order yet

11:46 AM - 15 Dec 2018

**569** Retweets **10,033** Likes



431    569    10K

**Elon Musk** **Follow**
@elonmusk

And, because electricity costs much less than gasoline, a Model 3 can cost about $1000 less per year to operate. Because it's electric, there are no oil changes, smog checks, tuneups, fuel filter, or brake pad replacements.

11:09 AM - 26 Dec 2018

**2,099** Retweets  **20,510** Likes

696       2.1K       21K



**Elon Musk**
@elonmusk

Replying to @JT_Richards @MMelinot @chuckyyyd

This is incorrect. Vast majority of vehicle motion is returned to the battery, as the electric motors act like a generator in reverse. Brake pads on a Tesla literally never need to be replaced for lifetime of the car.

11:31 AM - 26 Dec 2018

**631** Retweets  **7,479** Likes

334     631     7.5K

A-116



**Elon Musk**
@elonmusk

Follow

Yes. Supercharger coverage will extend to 100% of Europe next year. From Ireland to Kiev, from Norway to Turkey.

**Paul Kelly** @shortword

Replying to @elonmusk

Missing some locations out of Dublin, Ireland south towards Waterford. Badly needs some as no Ccs on that route (that works!). Any plans for more here? Should be in a model x in 2 weeks or so!

12:16 PM - 26 Dec 2018

**2,191** Retweets   **18,990** Likes

1.7K      2.2K      19K

A-117



**Alexandros Raikos** @alex_raikos · 26 Dec 2018
Replying to @elonmusk
Greece too?
2    3    134

**Elon Musk** @elonmusk · 26 Dec 2018
Yes
13    17    639

**Tesla Owners Silicon Valley** @teslaownersSV · 26 Dec 2018
Amazing
2    3    74

**Tesla Owners Silicon Valley** @teslaownersSV · 26 Dec 2018
What about Africa
2    6    136

**Elon Musk** @elonmusk · 26 Dec 2018
2020
86    32    819

**Alejandro Zuboff** @motorsen · 26 Dec 2018

Replying to @elonmusk

Any plans to build charging stations in Texas in 2019 ? (San Antonio / Austin in particular) The map shows there are several planned, but 2018 is over and none of those were built (and yes, I know there are notes for each that schedule might slip).

🗨 5        🔁 1        🤍 80

**Elon Musk**  @elonmusk · 26 Dec 2018

Definitely. All major highways in Texas will have Superchargers, all the way to Brownsville & across Mexico.

🗨 42       🔁 48       🤍 908

A-119

Case 1:18-cv-08865-AJN   Document 30-7   Filed 03/18/19   Page 7 of 15



**Elon Musk** ✔
@elonmusk

Follow

# Model 3 mid-range EPA rating is actually 264 miles, slightly higher than prior estimate of 260



**Design Your Model 3 | Tesla**
Design and order your Tesla Model 3, the car of the future. Learn about lease, loan and cash payment options, warranties, electric vehicle incentives, gasoline savings ...
3.tesla.com

2:31 PM - 3 Jan 2019

**774** Retweets **10,849** Likes

💬 532   ↻ 774   ♡ 11K



**Elon Musk**
@elonmusk

Looking forward to breaking ground on the @Tesla Shanghai Gigafactory today!

6:36 PM · 6 Jan 2019

**2,326** Retweets   **40,843** Likes



♡ 1.1K      ⟲ 2.3K      ♡ 41K

**Elon Musk** ✔ @elonmusk · Jan 6
Aiming to finish initial construction this summer, start Model 3 production end of year & reach high volume production next year

♡ 277      ⟲ 431      ♡ 8.9K

**Elon Musk** ✔ @elonmusk · Jan 6
Shanghai Giga production of Model 3/Y will serve greater China region



♡ 310      ⟲ 479      ♡ 13K

**Elon Musk** ✔ @elonmusk · Jan 6
Shanghai Giga will produce affordable versions of 3/Y for greater China. All Model S/X & higher cost versions of Model 3/Y will still be built in US for WW market, incl China.





♡ 445      ⟲ 648      ♡ 12K

Case 1:18-cv-08865-AJN   Document 30-7   Filed 03/18/19   Page 9 of 15



**Elon Musk**
@elonmusk

Follow

Btw, you can buy a Tesla online in less than 2 mins & give it back for a full refund for any reason



**Electric Cars, Solar Panels & Clean Energy Storage | Tesla**

Tesla is accelerating the world's transition to sustainable energy with electric cars, solar panels and integrated renewable energy solutions for homes and businesses.

tesla.com

2:02 PM – 9 Jan 2019

**4,580** Retweets  **40,287** Likes









2.9K  4.6K  40K

A-122



**@TheLonlyGuy_**

Follow

Replying to @elonmusk

Is Model S & X being phased out over the next year or two?

3:28 PM · 9 Jan 2019

4 Retweets   111 Likes

♡ 10      ⟲ 4      ♡ 111

**Elon Musk** @elonmusk · Jan 9

Replying to @TheLonlyGuy_

Def not

♡ 44      ⟲ 28      ♡ 1.2K



Case 1:18-cv-08865-AJN Document 30-7 Filed 03/18/19 Page 11 of 15

Ryan McCaffrey @DMC_Ryan · Jan 9

Any update on the Summon + new My-Fet Tesla that My-Fet follows

Parking Lot, while we're on the subject?

8    9    559

Elon Musk
@elonmusk

Replying to @DMC_Ryan

Going through final validation & regulatory
approval. Probably releases to early access
program owners in a few weeks. It's trippy!

10:50 PM - 9 Jan 2019

**76** Retweets  **1,787** Likes

57    76    1.8K

Follow

**A-124**



Elon Musk
@elonmusk

Follow

Tesla *with* Autopilot engaged is twice as safe & continues to make steady improvements

**TESLARATI** @Teslarati

Tesla Q4 2018 Vehicle Safety Report: 1 accident per 2.91M miles with Autopilot engaged, 1 accident for every 1.58M miles without Autopilot

teslarati.com/tesla-q4-2018-...

10:40 PM - 9 Jan 2019

**3,537** Retweets **38,130** Likes

1.0K   3.5K   38K



Case 1:18-cv-08865-AJN Document 30-7 Filed 03/18/19 Page 13 of 15

**Darion G.** @RaptorJesuss · Jan 18
@elonmusk Hey Elon my mom got into a car accident that totaled her car tonight. she's okay. but I suggested she get a Tesla next because of how long her commute is and how safe they are. She said "I'll get one if Elon tells me to" can you please tell her to. my convincing failed?

 8    17    332



**Follow**

**Elon Musk** ✔
@elonmusk

Replying to @RaptorJesuss

# Tesla is the safest car according to US govt testing

11:09 PM · 18 Jan 2019

**168** Retweets **1,812** Likes

          



 121    168    1,8K

**A-126**



Case 1:18-cv-08865-AJN Document 30-7 Filed 03/18/19 Page 15 of 15



**Elevator Renovations** @CabsandSurfaces · Jan 22
How is Advanced Summon coming along?

◯ 2          ⟲ 7          ♡ 459

**Elon Musk** ✔
@elonmusk

Follow

Replying to @CabsandSurfaces

Almost ready to roll out. Regulators just approved.

3:56 PM – 22 Jan 2019

**143** Retweets  **3,075** Likes

◯ 164        ⟲ 143        ♡ 3.1K

# EXHIBIT  9

0



**From:** Newell, Walker S <newellw@SEC.GOV>
**Date:** Thursday, Sep 20, 2018, 11:12 PM
**To:** Farina, Steve <SFarina@wc.com>, Campos, Roel C. <roel.campos@hugheshubbard.com>
**Cc:** Peikin, Steven <peikinst@SEC.GOV>, Avakian, Stephanie <avakians@SEC.GOV>, Choi, Jina <ChoiJ@sec.gov>, Schneider, Erin <SchneiderE@sec.gov>
**Subject:** In the Matter of Tesla Motors, Inc. (SF-4082)

Steve & Roel:

Attached are drafts of a (1) complaint; (2) consent; and (3) final judgment concerning your client Elon Musk.  Please provide factual corrections, if any, by the close of business tomorrow.

Regards,

Walker Newell
Counsel | Division of Enforcement
U.S. Securities & Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2325 | newellw@sec.gov

1  JINA L. CHOI (N.Y. Bar No. 2699718)
   ERIN E. SCHNEIDER (Cal. Bar No. 216114)
2  CHERYL L. CRUMPTON (DC Bar No. 483776)
   crumptonc@sec.gov
3  STEVEN BUCHHOLZ (Cal. Bar No. 202638)
   buchholzs@sec.gov
4  E. BARRETT ATWOOD (Cal. Bar No. 291181)
   atwoode@sec.gov
5  BERNARD B. SMYTH (Cal. Bar No. 217741)
   smythb@sec.gov
6  WALKER S. NEWELL (Cal. Bar No. 282357)
   newellw@sec.gov
7
   Attorneys for Plaintiff
8  SECURITIES AND EXCHANGE COMMISSION
   44 Montgomery Street, Suite 2800
9  San Francisco, California 94104
   Telephone:  (415) 705-2500
10 Facsimile:  (415) 705-2501

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                          SAN JOSE DIVISION

14

15 SECURITIES AND EXCHANGE COMMISSION,   Case No. _____

16                    Plaintiff,

17         v.                            **CONSENT OF DEFENDANT
                                         ELON MUSK**
18 ELON MUSK,
   TESLA, INC.
19
                      Defendants.
20

21         1.    Defendant Elon Musk ("Defendant") waives service of a summons and the complaint

22 in this action, enters a general appearance, and admits the Court's jurisdiction over Defendant and

23 over the subject matter of this action.

24         2.    Without admitting or denying the allegations of the complaint (except as provided

25 herein in paragraph 13 and except as to personal and subject matter jurisdiction, which Defendant

26 admits), Defendant hereby consents to the entry of the final Judgment in the form attached hereto (the

27 "Final Judgment") and incorporated by reference herein, which, among other things:

28         (a)    permanently restrains and enjoins Defendant from violation of Section 10(b) of

CONSENT OF ELON MUSK                                    *SEC v. MUSK, ET AL.*
                                                       CASE NO. _____

A-131

1      the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §

2      78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

3    (b)   orders Defendant to pay a civil penalty in the amount of $10,000,000 under

4      Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

5    (c)   requires Defendant to comply with the undertaking set forth in this Consent

6      and incorporated in the Final Judgment.

7    3.   Defendant acknowledges that the civil penalty paid pursuant to the Final Judgment

8 may be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act

9 of 2002, as amended.  Regardless of whether any such Fair Fund distribution is made, the civil

10 penalty shall be treated as a penalty paid to the government for all purposes, including all tax

11 purposes.  To preserve the deterrent effect of the civil penalty, Defendant agrees that he shall not,

12 after offset or reduction of any award of compensatory damages in any Related Investor Action based

13 on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he

14 further benefit by, offset or reduction of such compensatory damages award by the amount of any

15 part of Defendant's payment of a civil penalty in this action ("Penalty Offset").  If the court in any

16 Related Investor Action grants such a Penalty Offset, Defendant agrees that he shall, within 30 days

17 after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action

18 and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the

19 Commission directs.  Such a payment shall not be deemed an additional civil penalty and shall not be

20 deemed to change the amount of the civil penalty imposed in this action.  For purposes of this

21 paragraph, a "Related Investor Action" means a private damages action brought against Defendant by

22 or on behalf of one or more investors based on substantially the same facts as alleged in the

23 Complaint in this action.

24    4.   Defendant agrees that he shall not seek or accept, directly or indirectly, reimbursement

25 or indemnification from any source, including but not limited to payment made pursuant to any

26 insurance policy, with regard to any civil penalty amounts that Defendant pays pursuant to the Final

27 Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution

28 fund or otherwise used for the benefit of investors.  Defendant further agrees that he shall not claim,

CONSENT OF ELON MUSK      2      *SEC v. MUSK, ET AL.*
CASE NO. <mark>       </mark>

1  assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any

2  penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such

3  penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit

4  of investors.

5        5.    Defendant undertakes to:

6             (a)    resign from his role as Chairman of the Board of Directors of Tesla, Inc.

7                    ("Chairman") within fifteen (15) days of the filing of this Consent and agree

8                    not to seek reelection or to accept an appointment as Chairman for a period of

9                    two years thereafter;

10            (b)    comply with all mandatory procedures implemented by Tesla, Inc. (the

11                    "Company") regarding the oversight and approval of all of his public

12                    statements relating to the Company made in any format, including, but not

13                    limited to, posts on social media (*e.g.*, Twitter), the Company's website (*e.g.*,

14                    the Company's blog), press releases, and investor calls; and

15            (c)    certify, in writing, compliance with undertaking (a) set forth above.  The

16                    certification shall identify the undertaking, provide written evidence of

17                    compliance in the form of a narrative, and be supported by exhibits sufficient

18                    to demonstrate compliance.  The Commission staff may make reasonable

19                    requests for further evidence of compliance, and Defendant agrees to provide

20                    such evidence.  Defendant shall submit the certification and supporting

21                    material to Steven Buchholz, Assistant Regional Director, U.S. Securities and

22                    Exchange Commission, 44 Montgomery Street, 28th Floor, San Francisco, CA

23                    94104, with a copy to the Office of Chief Counsel of the Enforcement

24                    Division, 100 F Street NE, Washington, DC 20549, no later than fourteen (14)

25                    days from the date of the completion of the undertaking.

26        6.    Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule

27  52 of the Federal Rules of Civil Procedure.

28        7.    Defendant waives the right, if any, to a jury trial and to appeal from the entry of the

CONSENT OF ELON MUSK          3          *SEC v. MUSK, ET AL.*
                                                  CASE NO. _____

1   Final Judgment.

2       8.     Defendant enters into this Consent voluntarily and represents that no threats, offers,

3   promises, or inducements of any kind have been made by the Commission or any member, officer,

4   employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

5       9.     Defendant agrees that this Consent shall be incorporated into the Final Judgment with

6   the same force and effect as if fully set forth therein.

7       10.     Defendant will not oppose the enforcement of the Final Judgment on the ground, if

8   any exists, that he fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and

9   hereby waives any objection based thereon.

10       11.     Defendant waives service of the Final Judgment and agrees that entry of the Final

11   Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its

12   terms and conditions.  Defendant further agrees to provide counsel for the Commission, within thirty

13   days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration

14   stating that Defendant has received and read a copy of the Final Judgment.

15       12.     Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted

16   against Defendant in this civil proceeding.  Defendant acknowledges that no promise or

17   representation has been made by the Commission or any member, officer, employee, agent, or

18   representative of the Commission with regard to any criminal liability that may have arisen or may

19   arise from the facts underlying this action or immunity from any such criminal liability.  Defendant

20   waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the

21   imposition of any remedy or civil penalty herein.  Defendant further acknowledges that the Court's

22   entry of a permanent injunction may have collateral consequences under federal or state law and the

23   rules and regulations of self-regulatory organizations, licensing boards, and other regulatory

24   organizations.  Such collateral consequences include, but are not limited to, a statutory

25   disqualification with respect to membership or participation in, or association with a member of, a

26   self-regulatory organization.  This statutory disqualification has consequences that are separate from

27   any sanction imposed in an administrative proceeding.  In addition, in any disciplinary proceeding

28   before the Commission based on the entry of the injunction in this action, Defendant understands that

1   he shall not be permitted to contest the factual allegations of the complaint in this action.

2        13.      Defendant understands and agrees to comply with the terms of 17 C.F.R. § 202.5(e),

3   which provides in part that it is the Commission's policy "not to permit a defendant or respondent to

4   consent to a judgment or order that imposes a sanction while denying the allegations in the complaint

5   or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the

6   defendant or respondent states that he neither admits nor denies the allegations."  As part of

7   Defendant's agreement to comply with the terms of Section 202.5(e), Defendant:  (i) will not take

8   any action or make or permit to be made any public statement denying, directly or indirectly, any

9   allegation in the complaint or creating the impression that the complaint is without factual basis; (ii)

10  will not make or permit to be made any public statement to the effect that Defendant does not admit

11  the allegations of the complaint, or that this Consent contains no admission of the allegations, without

12  also stating that Defendant does not deny the allegations; (iii) upon the filing of this Consent,

13  Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation

14  in the complaint; and (iv) stipulates solely for purposes of exceptions to discharge set forth in Section

15  523 of the Bankruptcy Code [11 U.S.C. § 523] that the allegations in the complaint are true, and

16  further, that any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by

17  Defendant under the Final Judgment or any other judgment, order, consent order, decree or settlement

18  agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the

19  federal securities laws or any regulation or order issued under such laws, as set forth in Section

20  523(a)(19) of the Bankruptcy Code [11 U.S.C. § 523(a)(19)].  If Defendant breaches this agreement,

21  the Commission may petition the Court to vacate the Final Judgment and restore this action to its

22  active docket.  Nothing in this paragraph affects Defendant's:  (i) testimonial obligations; or (ii) right

23  to take legal or factual positions in litigation or other legal proceedings in which the Commission is

24  not a party.

25        14.      Defendant hereby waives any rights under the Equal Access to Justice Act, the Small

26  Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from

27  the United States, or any agency, or any official of the United States acting in his or her official

28  capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs

CONSENT OF ELON MUSK                     5                    *SEC v. MUSK, ET AL.*
                                                             CASE NO. _____

1  expended by Defendant to defend against this action.  For these purposes, Defendant agrees that

2  Defendant is not the prevailing party in this action since the parties have reached a good faith

3  settlement.

4      15.   Defendant agrees that the Commission may present the Final Judgment to the Court

5  for signature and entry without further notice.

6      16.   Defendant agrees that this Court shall retain jurisdiction over this matter for the

7  purpose of enforcing the terms of the Final Judgment.

8

9  Dated:  September __, 2018                    _____

10                                                              Elon Musk

11

12      On _____, 2018, _____, a person known to me, personally
    appeared before me and acknowledged executing the foregoing Consent.

13

14                                                    _____

15                                                    Notary Public
                                                          Commission expires:

16

17  Approved as to form:

18

19  _____

20  Steve Farina
    Williams & Connolly

21  725 Twelfth Street N.W.
    Washington, DC 20005

22  Attorney for Defendant

23

24

25

26

27

28

A-136

# EXHIBIT  10

0

| | |
|---|---|
| **From:** | Bondi, Bradley J. |
| **To:** | avakians@SEC.GOV; peikinst@SEC.GOV; BuchholzS@sec.gov |
| **Cc:** | Bondi, Bradley J.; Steven M. Farina |
| **Subject:** | Tesla |
| **Date:** | Sunday, September 23, 2018 9:05:10 PM |
| **Attachments:** | Complaint - Redline.docx |
| | ATT00001.htm |
| | Tesla Consent - Redline.docx |
| | ATT00002.htm |
| | Tesla Final Judgment - Redline.docx |
| | ATT00003.htm |
| | Musk Consent - Redline.docx |
| | ATT00004.htm |
| | Musk Final Judgment - Redline.docx |
| | ATT00005.htm |

*Confidential Treatment Requested Under FOIA*

*Confidential Settlement Communication Subject to FRE 408*


Stephanie, Steve, and Steve:


Attached please find redlines of the draft settlement documents for the company and Mr. Musk. For your convenience, we will send to you clean copies of these documents later this evening.


We would appreciate the opportunity to speak with you tomorrow morning or later, at your convenience, to explain our thinking on the revisions. Please let us know what time(s) would work best for you.


Best regards,

Brad Bondi

---

**Bradley J. Bondi | Partner**
**Cahill Gordon & Reindel LLP**
1990 K Street, N.W., Suite 950, Washington, D.C. 20006
80 Pine Street, New York, NY 10005
**t**: +1.202.862.8910 | **t**: +1.212.701.3710| **f**: +1.866.836.0501 | bbondi@cahill.com
www.cahill.com

1  JINA L. CHOI (N.Y. Bar No. 2699718)
   ERIN E. SCHNEIDER (Cal. Bar No. 216114)
2  CHERYL L. CRUMPTON (DC Bar No. 483776)
   crumptonc@sec.gov
3  STEVEN BUCHHOLZ (Cal. Bar No. 202638)
   buchholzs@sec.gov
4  E. BARRETT ATWOOD (Cal. Bar No. 291181)
   atwoode@sec.gov
5  BERNARD B. SMYTH (Cal. Bar No. 217741)
   smythb@sec.gov
6  WALKER S. NEWELL (Cal. Bar No. 282357)
   newellw@sec.gov
7
   Attorneys for Plaintiff
8  SECURITIES AND EXCHANGE COMMISSION
   44 Montgomery Street, Suite 2800
9  San Francisco, California 94104
   Telephone:   (415) 705-2500
10 Facsimile:   (415) 705-2501

11                   UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                         SAN JOSE DIVISION

14

15 SECURITIES AND EXCHANGE COMMISSION,    Case No. _____

16            Plaintiff,

17     v.                                 **CONSENT OF DEFENDANT
                                          ELON MUSK**
18 ELON MUSK,
   TESLA, INC.,
19
20            Defendants.

21

22       1.     Defendant Elon Musk ("Defendant") waives service of a summons and the complaint in

23 this action, enters a general appearance, and admits the Court's jurisdiction over Defendant and over

24 the subject matter of this action.

25       2.     Without admitting or denying the allegations of the complaint (except as provided

26 herein in paragraph 13 and except as to personal and subject matter jurisdiction, which Defendant

27 admits), Defendant hereby consents to the entry of the final Judgment in the form attached hereto (the

28 "Final Judgment") and incorporated by reference herein, which, among other things:

1    (a)    permanently restrains and enjoins Defendant from violation of Section 10(b) of

2           the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)]

3           and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

4    (b)    orders Defendant to pay a civil penalty in the amount of $10,000,000 under

5           Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

6    (c)    requires Defendant to comply with the undertaking set forth in this Consent and

7           incorporated in the Final Judgment.

8       3.    Defendant acknowledges that the civil penalty paid pursuant to the Final Judgment may

9    be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of

10   2002, as amended.   Regardless of whether any such Fair Fund distribution is made, the civil penalty

11   shall be treated as a penalty paid to the government for all purposes, including all tax purposes.   To

12   preserve the deterrent effect of the civil penalty, Defendant agrees that he shall not~~, after offset or~~

13   ~~reduction of any award of compensatory damages in any Related Investor Action based on Defendant's~~

14   ~~payment of disgorgement in this action,~~ argue that he is entitled to, nor shall he further benefit by, offset

15   or reduction of ~~such~~any award of compensatory damages ~~award~~in any Related Investor Action by the

16   amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset").   If the

17   court in any Related Investor Action grants such a Penalty Offset, Defendant agrees that he shall,

18   within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel

19   in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund,

20   as the Commission directs.   Such a payment shall not be deemed an additional civil penalty and shall

21   not be deemed to change the amount of the civil penalty imposed in this action.   For purposes of this

22   paragraph, a "Related Investor Action" means a private damages action brought against Defendant by

23   or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint

24   in this action.

25      4.    Defendant agrees that he shall not seek or accept, directly or indirectly, reimbursement

26   or indemnification from any source, including but not limited to payment made pursuant to any

27   insurance policy, with regard to any civil penalty amounts that Defendant pays pursuant to the Final

28   Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution

CONSENT OF ELON MUSK                    2                    *SEC v. MUSK, ET AL.*
                                                            CASE NO.

1  fund or otherwise used for the benefit of investors.   Defendant further agrees that he shall not claim,

2  assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any

3  penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such

4  penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of

5  investors.

6       5.    Defendant undertakes to:

7          (a)    resign from his role as Chairman of the Board of Directors of Tesla, Inc.

8                ("Chairman") ~~within fifteen (15) days of the filing of this Consent~~<u>no later than</u>

9                <u>February 28, 2019</u> and agree not to seek reelection or to accept an appointment

10               as Chairman for a period of two years thereafter;

11         (b)    comply with all mandatory procedures implemented by Tesla, Inc. (the

12               "Company") regarding the oversight ~~and approval of all~~ of his public statements

13               relating to the Company made in any format, including, but not limited to, posts

14               on social media (*e.g.*, Twitter), the Company's website (*e.g.*, the Company's

15               blog), press releases, and investor calls; and

16         (c)    certify, in writing, compliance with undertaking (a) set forth above.   The

17               certification shall identify the undertaking, provide written evidence of

18               compliance in the form of a narrative, and be supported by exhibits sufficient to

19               demonstrate compliance.   The Commission staff may make reasonable requests

20               for further evidence of compliance, and Defendant agrees to provide such

21               evidence.   Defendant shall submit the certification and supporting material to

22               Steven Buchholz, Assistant Regional Director, U.S. Securities and Exchange

23               Commission, 44 Montgomery Street, 28th Floor, San Francisco, CA 94104,

24               with a copy to the Office of Chief Counsel of the Enforcement Division, 100 F

25               Street NE, Washington, DC 20549, no later than fourteen (14) days from the

26               date of the completion of the undertaking.

27      6.    Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule

28  52 of the Federal Rules of Civil Procedure.

CONSENT OF ELON MUSK         3         *SEC V. MUSK, ET AL.*
                                                CASE NO.

1       7.     Defendant waives the right, if any, to a jury trial and to appeal from the entry of the

2  Final Judgment.

3       8.     Defendant enters into this Consent voluntarily and represents that no threats, offers,

4  promises, or inducements of any kind have been made by the Commission or any member, officer,

5  employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

6       9.     Defendant agrees that this Consent shall be incorporated into the Final Judgment with

7  the same force and effect as if fully set forth therein.

8       10.    Defendant will not oppose the enforcement of the Final Judgment on the ground, if any

9  exists, ~~that he fails to comply~~of lack of compliance with Rule 65(d) of the Federal Rules of Civil

10  Procedure, and hereby waives any objection based thereon.

11       11.    Defendant waives service of the Final Judgment and agrees that entry of the Final

12  Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its

13  terms and conditions.   Defendant further agrees to provide counsel for the Commission, within thirty

14  days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating

15  that Defendant has received and read a copy of the Final Judgment.

16       12.    Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted <u>or</u>

17  <u>that could have been asserted</u> against Defendant in this civil proceeding.   Defendant acknowledges

18  that no promise or representation has been made by the Commission or any member, officer, employee,

19  agent, or representative of the Commission with regard to any criminal liability that may have arisen or

20  may arise from the facts underlying this action or immunity from any such criminal liability.

21  Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding,

22  including the imposition of any remedy or civil penalty herein.   Defendant further acknowledges that

23  the Court's entry of a permanent injunction may have collateral consequences under federal or state

24  law and the rules and regulations of self-regulatory organizations, licensing boards, and other

25  regulatory organizations.   Such collateral consequences include, but are not limited to, a statutory

26  disqualification with respect to membership or participation in, or association with a member of, a

27  self-regulatory organization.   This statutory disqualification has consequences that are separate from

28  any sanction imposed in an administrative proceeding.   In addition, in any disciplinary proceeding

1  before the Commission based on the entry of the injunction in this action, Defendant understands that

2  he shall not be permitted to contest the factual allegations of the complaint in this action.

3       13.    Defendant understands and agrees to comply with the terms of 17 C.F.R. § 202.5(e),

4  which provides in part that it is the Commission's policy "not to permit a defendant or respondent to

5  consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or

6  order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the

7  defendant or respondent states that he neither admits nor denies the allegations."   As part of

8  Defendant's agreement to comply with the terms of Section 202.5(e), Defendant:   (i) will not take any

9  action or make or permit to be made any public statement denying, directly or indirectly, any allegation

10  in the complaint or creating the impression that the complaint is without factual basis; (ii) will not make

11  or permit to be made any public statement to the effect that Defendant does not admit the allegations of

12  the complaint, or that this Consent contains no admission of the allegations, without also stating that

13  Defendant does not deny the allegations; (iii) upon the filing of this Consent, Defendant hereby

14  withdraws any papers filed in this action to the extent that they deny any allegation in the complaint;

15  and (iv) stipulates solely for purposes of exceptions to discharge set forth in Section 523 of the

16  Bankruptcy Code [11 U.S.C. § 523] ~~that the allegations in the complaint are true, and further,~~ that any

17  debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under the

18  Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in

19  connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws

20  or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy

21  Code [11 U.S.C. § 523(a)(19)].   If Defendant breaches this agreement, the Commission may petition

22  the Court to vacate the Final Judgment and restore this action to its active docket.   Nothing in this

23  paragraph affects Defendant's:   (i) testimonial obligations; or (ii) right to take legal or factual

24  positions in litigation or other legal proceedings in which the Commission is not a party.  _Nothing in_

25  _this Agreement is intended to have preclusive effect in any other proceeding in which the Commission_

26  _is not a party._

27       14.    Defendant hereby waives any rights under the Equal Access to Justice Act, the Small

28  Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the

CONSENT OF ELON MUSK                5                *SEC v. MUSK, ET AL.*
                                                      CASE NO. � ▁▁▁▁▁▁

1  United States, or any agency, or any official of the United States acting in his or her official capacity,

2  directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by

3  Defendant to defend against this action.   For these purposes, Defendant agrees that Defendant is not

4  the prevailing party in this action since the parties have reached a good faith settlement.

5          15.      Defendant agrees that the Commission may present the Final Judgment to the Court for

6  signature and entry without further notice.

7          16.      Defendant agrees that this Court shall retain jurisdiction over this matter for the purpose

8  of enforcing the terms of the Final Judgment.

9

10  Dated:   September __, 2018                    _____

11                                                                  Elon Musk

12

13          On _____, 2018, _____, a person known to me, personally
    appeared before me and acknowledged executing the foregoing Consent.

14

15                                                                  _____

16                                                                  Notary Public
                                                                        Commission expires:

17

18  Approved as to form:

19

20  _____

21  ~~Steve~~Steven M. Farina
    Williams & Connolly LLP

22  725 Twelfth Street N.W.
    Washington, DC 20005

23  Attorney for Defendant

24

25

26

27

28

CONSENT OF ELON MUSK                              6                          *SEC V. MUSK, ET AL.*
                                                                                        CASE NO. _____

A-144

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States Securities and Exchange
Commission,

                              Plaintiff,

            —v—

Elon Musk,

                              Defendant.

18-cv-8865 (AJN)

ORDER

ALISON J. NATHAN, District Judge:

For the reasons stated on the record at oral argument yesterday, the parties are required to

meet and confer for at least one hour in an effort to resolve the pending motion to hold Mr. Musk

in contempt, as well as any modifications to the consent judgment and Tesla's Senior Executives

Communications Policy.

No later than April 18, 2019, the parties shall submit a joint letter indicating whether they

have reached an agreement.  If no agreement has been reached, the Court will issue a decision

resolving the current SEC motion to hold Mr. Musk in contempt.  If Mr. Musk is held in

contempt, the Court will allow further briefing on sanctions.


        SO ORDERED.

Dated: April ____, 2019
        New York, New York

                                        _____
                                        ALISON J. NATHAN
                                        United States District Judge

1

A-145

J443SECC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   U.S. SECURITIES and EXCHANGE
    COMMISSION,
4
                Plaintiff,
5
           v.                              18 CV 8865 (AJN)
6
    ELON MUSK,
7
                Defendant.
8
    ------------------------------x
9                                          New York, N.Y.
                                           April 4, 2019
10                                         2:00 p.m.

11  Before:

12                  HON. ALISON J. NATHAN,

13                                     District Judge

14                     APPEARANCES

15  U.S. SECURITIES AND EXCHANGE COMMISSION
    BY:  CHERYL L. CRUMPTON
16       STEVEN D. BUCHHOLZ
         E. BARRETT ATWOOD
17
    HUESTON HENNIGAN, LLP
18       Attorneys for Defendant
    BY:  JOHN C. HUESTON
19       MOEZ M. KABA
         ALISON L. PLESSMAN
20

21

22

23

24

25

A-146

J443SECC

1          THE DEPUTY CLERK:  This is in the matter of the United

2     States Securities and Exchange Commission v. Elon Musk.

3     Starting with the government, counsel, please state your name

4     for the record.

5          MS. CRUMPTON:  On behalf of the Securities and

6     Exchange Commission, I'm Cheryl Crumpton.  With me is Barrett

7     Atwood and Steven Buchholz.

8          THE COURT:  For the defendant?

9          MR. HUESTON:  Good afternoon, your Honor.  John

10    Hueston, Moez Kaba, and Alison Plessman appearing on behalf of

11    Elon Musk, who is also with us at counsel table.

12         THE COURT:  Good afternoon, counsel.  Good afternoon,

13    Mr. Musk.

14         We are here on the SEC's order to show cause why

15    contempt should not be ordered.  I have received the parties'

16    briefing, including sur-reply briefing.  I thank counsel for

17    that.

18         We'll organize ourselves today as follows:  You'll

19    have 45 minutes per side, if we need it.  And it is the SEC's

20    motion, so you'll go first, and you may reserve time if you'd

21    like, Ms. Crumpton.

22         MS. CRUMPTON:  Thank you, your Honor.  If your Honor

23    doesn't mind, I'm going to use the lecturn because I have a

24    couple of documents that I'm going to want to show.

25         THE COURT:  I prefer actually both counsel to use the

J443SECC

1    podium.  And I often say the room is beautiful on the eye, but

2    not on the ear, so please do speak into the microphone.

3              MS. CRUMPTON:  Absolutely.  Thank you, your Honor.  I

4    doubt it's going to take us 45 minutes, but I would like to

5    reserve a few minutes for rebuttal.

6              May it please the Court --

7              THE COURT:  Five minutes then?

8              MS. CRUMPTON:  Five minutes should be plenty.  Thank

9    you.

10             May it please the Court.  We are here today because

11   Elon Musk has disregarded the preapproval requirement of this

12   Court's order, and has offered a series of shifting

13   justifications to ignore the plain language of what he agreed

14   to and what this Court required him to do.

15             I'd like to start with a bit of background, and then

16   walk through each of the elements of the standard for civil

17   contempt.

18             The Court will recall that the SEC brought this case,

19   and the Court entered the order that's at issue based on Elon

20   Musk recklessly tweeting out material information that had no

21   basis in fact to tens of millions of people.  It was his lack

22   of judgment and his recklessness that led to serious market

23   disruption and confusion.

24             Based on Mr. Musk's conduct, the SEC charged him with

25   10b securities fraud, and two days later, both Mr. Musk and

J443SECC

1    Tesla agreed to settlements with the SEC.  But before this

2    Court would enter those settlements, it required the parties to

3    come before it and explain why they were fair, why they were

4    reasonable, and why they were in the public interest.  And your

5    Honor will recall that what the SEC told the Court about why

6    these settlements were fair, reasonable, and in the public

7    interest, is because they included specific corporate

8    governance undertakings, like the preapproval requirement.

9          This preapproval requirement was the heart of the

10   relief that the Court ordered in this case, because it was

11   designed to address the very harm that was the basis of the

12   fraud charge against Mr. Musk.  This preapproval requirement

13   was designed to keep him from publishing inaccurate statements

14   again in the future.  But the only way this preapproval

15   requirement serves its necessary purpose --

16         THE COURT:  Just to pause for a moment.  Because that

17   briefing in response to my order wasn't in the parties' papers,

18   I don't think.  But I looked at it today, and noted that in sub

19   (e) of that document on page two, which is under the broad

20   heading "proposed settlement terms," it takes what is arguably

21   the sort of broadest view that's been briefed to me on the

22   meaning of the provision.  It says, "Comply with mandatory

23   procedures to be adopted by Tesla concerning the oversight and

24   approval of his Tesla-related public statements."  Right?

25         MS. CRUMPTON:  That's correct.  That is correct.  And

J443SECC

1    that preapproval requirement only serves its necessary purpose

2    if Mr. Musk complies with it in good faith.

3           It's become pretty clear over the course of the last

4    few weeks that he is not doing that.  For example, we learned

5    for the first time during the course of this proceeding that

6    Mr. Musk has failed to submit a single tweet for preapproval

7    during the over two-month period from the time that Tesla

8    implemented the preapproval policy to the time that the SEC

9    brought this motion in February.

10          THE COURT:  Just let me pause you for a moment because

11   I tend to think in certain boxes.  You're laying out the test

12   for good faith.

13          MS. CRUMPTON:  That's correct.

14          THE COURT:  What you just said was what's become clear

15   is he's failed to comply with the procedures in good faith.

16   Then you're citing a number of post the tweet in issue pieces

17   of evidence.

18          MS. CRUMPTON:  Right.

19          THE COURT:  Where does that fit in?  Is it in the

20   language of the consent judgment.  Maybe it fits in under

21   diligent effort to comply, etc.  Where are you putting that

22   since you're starting me with the question of good faith?

23          MS. CRUMPTON:  Well, we would argue it fits within

24   diligent efforts to comply.  And I mean, as Mr. Musk has

25   correctly pointed out, there is some degree of discretion in

J443SECC

1    the language here.  It doesn't say this is a binary process

2    where every single tweet about Tesla has to be preapproved.

3             THE COURT:  I don't think that, do you?

4             MS. CRUMPTON:  No.

5             THE COURT:  What would be a Tesla-related tweet or

6    communication that wouldn't require preapproval?

7             MS. CRUMPTON:  For example, if Mr. Musk wanted to

8    communicate with individual Tesla owners about their personal

9    vehicles on Twitter, something he actually does quite

10   regularly.  That's clearly an immaterial tweet that wouldn't

11   require preapproval.  But that is not the communication that we

12   are talking about here.  The communication that we are talking

13   about here is very, very different.  And --

14            THE COURT:  Can I ask you, in your reply brief you

15   listed, similar to what you said a moment ago, I think 10 or so

16   additional communications of Mr. Musk that you said needed

17   preapproval on any of these, and that's something you say about

18   diligent efforts.

19            Is it the SEC's position that any of those

20   communications required preapproval?

21            MS. CRUMPTON:  Your Honor, we have not moved for a

22   contempt sanction based on any of those tweets.  We don't offer

23   them to say that they are all necessarily violations.

24            THE COURT:  My question is are any of them?

25            MS. CRUMPTON:  They may well be.  They may well be.

A-151

J443SECC

1    We haven't undertaken that analysis.  We are looking at the

2    tweet that is the most clear violation, which is the 7:15

3    tweet.  We would offer that there very well may be tweets

4    within those 10 that we submitted.  There is at least one

5    tweet, I believe about the opening of the Tesla Gigafactory,

6    that actually moved the market.  So it may very well be that

7    some of those tweets required preapproval.

8          But we offered them to show that he is regularly

9    tweeting about topics that are specifically laid out in Tesla's

10   policy as communications that could be material and just

11   blowing past that preapproval requirement.  He has stated that

12   he's substituted his own procedures for the preapproval

13   requirement.

14         If you look at paragraph seven of Mr. Musk's

15   declaration to this Court, he says, and I quote:  "With my

16   knowledge and approval, Tesla's general counsel and disclosure

17   counsel have been reviewing all tweets promptly in real time

18   upon publication to ensure that any errors are caught and

19   rectified quickly."

20         That is not what the SEC negotiated in its settlement,

21   and that is not, most importantly, what this Court ordered.

22         THE COURT:  You've taken that out of context, right.

23   He says earlier, the topic sentence here is he's taking his

24   obligations seriously.  He's cut his tweeting down

25   substantially.  And I think he's pointing here to sort of

J443SECC

1    diligence efforts, just as you point to post tweeting conduct

2    to show lack of diligence, he is in a sense pointing to post

3    tweeting conduct to show diligence, right.  He's not saying

4    that's what the policy requires of him as a sort of after

5    communication step.

6            MS. CRUMPTON:  But what he's not saying in that

7    declaration, and what he doesn't say anywhere in any of the

8    pages and pages of briefing that he submitted to this Court, is

9    the actual analysis that he underwent before he published this

10    7:15 tweet without preapproval.  He's offered you a lot of

11    justifications, but he has never said here is the analysis I

12    went through to decide this reasonably could not contain

13    material information.  And instead, he says look at these other

14    things that I did.

15            And I would submit that there's no need for the

16    general counsel and disclosure counsel to review his tweets in

17    real time upon publication to catch and rectify errors if the

18    preapproval policy is being followed in the way that this

19    Court's order requires it to be.

20            THE COURT:  What if he thought he was just repeating

21    information that had already been publicly disclosed.  So let's

22    focus on that.  From the SEC's perspective, if he's doing that,

23    if he's simply repeating information that has already been

24    disclosed, there is no question, there is no delta between what

25    he says and what's previously been put out there.  Does he

J443SECC

1     require preapproval?

2              MS. CRUMPTON:  I think it would depend on whether that

3     particular communication fell within the Court's language of

4     communication that reasonably could contain material

5     information.  Sometimes merely repeating prior guidance later

6     in time shows that the company is still on track for that

7     guidance, it could potentially be material.  So I wouldn't say

8     that there's never a situation --

9              THE COURT:  There is an approved communication that

10    gets put out that says we're going to produce 500,000 cars in

11    2019, and Mr. Musk -- let's start with a hypo of he retweets

12    that or forwards that as a tweet.  Danger of judges not using

13    social media.  So he retweets that with some celebratory

14    language.  This is great news, see below.

15             Does that communication need prior approval?

16             MS. CRUMPTON:  I mean, understanding that it is a

17    hypothetical, and I'm giving it the thought as I'm standing

18    here, I --

19             THE COURT:  That's the game.

20             MS. CRUMPTON:  Right.  Exactly.  I would say that's

21    highly unlikely to be material.  If it's just merely repeating

22    something that Tesla has already published.

23             But that is not the factual situation that we have

24    here.

25             THE COURT:  Of course.  And then let's say he makes

J443SECC

1    some changes, puts a gloss, are the words in the briefing, and

2    it is essentially the same information.  Maybe he converts

3    500,000 cars a year in 2019 to 10,000 cars a week.

4              Does that need preapproval?

5              MS. CRUMPTON:  Tesla's policy already addresses that

6    scenario.  It says if it is not a verbatim unwritten

7    communication that's already been approved, it requires a

8    subsequent preapproval.

9              THE COURT:  The edit provision.

10             MS. CRUMPTON:  Right.  This is the provision that says

11   if you've sought preapproval of a communication, and you want

12   to rerelease that communication with any edits, you have to

13   submit it again for preapproval.  So Tesla --

14             THE COURT:  I think it is an interesting point which

15   you raise in your opening brief.  It wasn't really addressed in

16   the response brief, and then you didn't come back to it in

17   reply.  I didn't know why.  Just focusing on that language for

18   a second.

19             I think when I first read that argument in your

20   briefing, I thought, well, that's a good point.  I wonder what

21   Mr. Musk is going to say in reply, and then I didn't find

22   anything.  So, obviously, Mr. Hueston, you'll have your chance.

23             But if you look at that language, right, which is on

24   page two of the policy, the second bolded bullet point.

25   There's two subsections to this provision, right, (i) and (ii).

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-155

J443SECC

1    You noted both in your briefing.  Mr. Musk's briefing responded

2    to the (ii), but not (i).  And the (i) seems the more important

3    point.  Reading that and editing out the (ii), it says if an

4    authorized executive further edits a preapproved written

5    communication, after receipt of written preapproval, such

6    authorized executive will reconfirm the preapproval in writing

7    in accordance with this policy, prior to release.

8            So, also, in Tesla's letter which was attached that

9    focused on (ii) here, and said he is in compliance, SEC, you

10   misunderstood what this means.  They, too didn't focus on (i).

11   So why didn't you come back to that in your reply?

12           MS. CRUMPTON:  Your Honor has focused, as we did, with

13   the fact there are shifting justifications here.

14           The first thing we raised in the first instance in our

15   initial brief, because we were responding to the first

16   justification that Mr. Musk and Tesla offered for why this was

17   okay.  If you look at the exhibit that we attached to our first

18   filing, there was a letter from Tesla's counsel on behalf of

19   both Tesla and Mr. Musk.  They offered the explanation that

20   this tweet did not -- was not preapproved because it had -- the

21   substance had already been preapproved.  And we pointed out

22   that is still a violation of the policy.

23           THE COURT:  Can I ask you, you read this provision as

24   not containing a materiality analysis with respect to the edit?

25   In other words, this provision says if you have a preapproved

J443SECC

1    statement, so it was originally material.  If it gets approved

2    and you make any edits, you have to get it approved again, no

3    matter the nature of the edits?

4              MS. CRUMPTON:  Well, that's what the policy says.

5              THE COURT:  That's the facial meaning of the policy.

6    Do we know from Tesla if it has a different interpretation?  We

7    don't.

8              MS. CRUMPTON:  Tesla has not offered a different

9    interpretation that I am aware of, of that provision.

10             But, I'm glad the Court brings up Tesla, because

11   Tesla's conduct is also troubling to the SEC.  This Court

12   ordered Tesla to implement a mandatory preapproval process, but

13   they are apparently fine with Mr. Musk making up his own

14   procedure instead, and deciding whether something needs

15   preapproval based on whether he thinks the sum and substance is

16   already in the public record.

17             And we would submit that the Court should, for that

18   reason, give no weight to Tesla's opinion with respect to

19   Mr. Musk's conduct in this matter.  In fact, the Court should

20   be concerned that, despite the corporate governance

21   undertakings that the Court ordered, Tesla still appears to be

22   unwilling to exercise any meaningful control over the conduct

23   of its CEO.  I'd like to focus --

24             THE COURT:  Well, they did get within a few hours a

25   corrective tweet; did they not?

J443SECC

1            MS. CRUMPTON:  They did get a corrective tweet,

2    because the preapproval procedure was not correctly followed.

3    That corrective tweet highlighted that the preapproval

4    procedure was not correctly followed.

5            While we do not fault Tesla or Mr. Musk for correcting

6    that statement promptly, that's not what this Court ordered

7    Mr. Musk and Tesla to do.  We don't want to be in a situation

8    where this designated securities counsel for Tesla is reacting

9    at the same time that the entire world is reading the

10   information that Mr. Musk is tweeting out.  The whole point is

11   to stop that before it happens in the first instance.

12           THE COURT:  Right.  And the question is, when is he

13   required to do that.  You were going to start with the -- I

14   turned you away from the "reasonably could contain" language.

15           MS. CRUMPTON:  Sure.  So why don't we start with that.

16   Why don't we start with the fact that that language is clear

17   and unambiguous.

18           THE COURT:  What does it mean?

19           MS. CRUMPTON:  It mean, we know it's broader than the

20   standard for securities fraud, because it contains the language

21   that not just a communication that contains material

22   information, but that reasonably could contain information

23   material to Tesla or its shareholders.  So we know just --

24           THE COURT:  Sometimes when I read it I think it's

25   missing something.  Like, reasonably could be seen to contain

J443SECC

1   or reasonably could be -- its meaning seems more like arguably

2   could contain.

3           Is that phrasing one that you've used before,

4   "reasonably could contain"?

5           MS. CRUMPTON:  Your Honor will be not be surprised to

6   learn that this is a somewhat unusual factual situation, so I

7   don't believe that we have used that formulation.

8           THE COURT:  It's not an SEC term of art.

9           MS. CRUMPTON:  It is not an SEC term of art.  But just

10  because something is not capable of mathematical determination,

11  that is what we do in the law.  We interpret the words, and we

12  figure out whether the facts before us fit within those words.

13  And I would submit to the Court that this is not even a close

14  call.  And the way you know that --

15          THE COURT:  The question is it clear and unambiguous.

16          MS. CRUMPTON:  It is clear and unambiguous.

17          THE COURT:  What does it mean?

18          MS. CRUMPTON:  It means it is broader than the

19  standard that the law puts forth for materiality, and we would

20  argue it essentially means unless something is obviously

21  immaterial, it needs to get preapproval.

22          THE COURT:  Interesting.  And you get that as a

23  textual matter?  There's case law that sort of suggests that

24  gloss?  That what reasonably could contain material information

25  means that, unless it obviously -- unless something is

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

A-159

J443SECC

 1    obviously immaterial, I'm not sure on a spectrum of

 2    materiality, if that's right.  Where do you get that from?

 3             MS. CRUMPTON:  Your Honor, I think we can look at

 4    Tesla's own policy to inform what reasonably could contain --

 5             THE COURT:  Do I need to do that to interpret the

 6    consent judgment?

 7             MS. CRUMPTON:  I don't think you do, because I think

 8    that this tweet clearly needed preapproval under either the

 9    reasonably could contain language or even the contained

10    language.

11             THE COURT:  In other words, I could conclude it's

12    material, and you win, and not have to touch that language.

13             MS. CRUMPTON:  Right.  Right.

14             THE COURT:  But if I think it's on the gray area of

15    materiality, if I were to come to that conclusion, I will have

16    to know what that means, and the first step in the contempt

17    analysis is, is that clear and unambiguous.  Right?

18             MS. CRUMPTON:  I would note that Mr. Musk did not even

19    raise any ambiguity in the Court's order until his sur-reply.

20    And that there has been no argument up until that point --

21             THE COURT:  Right, but you differ on the meaning.  As

22    you pointed out in your briefing, he is just saying

23    materiality.  So --

24             MS. CRUMPTON:  Right.

25             THE COURT:  He's read it out.

J443SECC

1              MS. CRUMPTON:  The fact that the parties -- that one

2       party offers a different interpretation can't be the test for

3       ambiguity.  All anyone would have to say is, well, I disagree

4       with the SEC's interpretation, and voila, it's now ambiguous.

5              There is no ambiguity here.  If you look at his

6       interpretation of what the language means, it flies in the face

7       of the plain language of the order.

8              First of all, Mr. Musk argues that preapproval is

9       required only if a communication is material using the

10      narrowest possible definition of materiality.  Just absolutely

11      reading out, as you say, the reasonably could contain language

12      that's in the Court's order.

13             Secondly, Mr. Musk has repeatedly urged the Court to

14      decide whether his communication required preapproval based on

15      whether it moved the market.  That can't possibly be the

16      standard.  No one is going to know before they publish a

17      communication whether it's going to move the market or not.  So

18      that just disregards the concept of preapproval.

19             There can't be a serious argument here that this 7:15

20      tweet was not required to be preapproved, either under the

21      materiality prong or the reasonably could contain material

22      information prong.  It is material under either definition, and

23      the way we know that is by the course of conduct on

24      February 19.  Up until February 19, even though Mr. Musk had

25      been tweeting about Tesla regularly, the SEC assumed that he

J443SECC

1    had been seeking and receiving preapproval.  It wasn't until we

2    saw the February 19 tweets that we were confronted with the

3    obvious evidence of non-compliance.

4            And for this point, I want to use the document camera

5    just to put up before the Court the two communications that are

6    at issue.

7            THE COURT:  I have them here, but go ahead.

8            MS. CRUMPTON:  At 7:15 Eastern Time, on February 19,

9    Mr. Musk tweeted:  Tesla made zero cars in 2011 but will make

10   around 500K in 2019.

11           And then, according to what happened next, according

12   to what Tesla and Musk said what happened next, is that the

13   securities counsel for Tesla immediately arranged to meet with

14   Mr. Musk at the Fremont factory, and together they drafted a

15   clarifying tweet.  And that clarifying tweet, as they call it,

16   is this tweet that was published a little over four hours later

17   at 11:41 p.m. Eastern Time, where Mr. Musk says what he meant

18   to say, and what he meant to say, was Tesla's previous guidance

19   on vehicle deliveries and Model 3 production rates.

20           And so just those events show you that this was

21   something that had to be corrected.  And the Court doesn't need

22   to wade into the materiality analysis that Mr. Musk's attorneys

23   have suggested.  And I would submit to the Court that the mere

24   fact that you have to take his 7:15 tweet and compare it to

25   various pieces of other information that was arguably in the

J443SECC

1    public domain in order to determine that it may or may not have

2    been material, shows it is not a communication that so clearly

3    could not have contained material information that he properly

4    blew past the preapproval requirement.

5           THE COURT:  It goes back to the line I started you on

6    and you pointed to the editing language.  But I am still

7    curious, setting aside the argument about editing, if he is

8    repeating without any new information, any significant new

9    information into the mix, in his communication, does that

10   require preapproval?

11          MS. CRUMPTON:  That would be a violation of Tesla's

12   policy, if he hasn't sought preapproval.

13          THE COURT:  Let's say Mr. Hueston's got a great answer

14   on the editing provision, and I don't know what it is.  It's

15   not a question of editing.  So just in the first instance, is

16   this a communication that needs to be preapproved.  And my hypo

17   is it contains no new information.

18          MS. CRUMPTON:  I suspect what Mr. Hueston will

19   argue --

20          THE COURT:  Before you guess that, answer my question.

21          MS. CRUMPTON:  What I was going to say is, if it -- I

22   would suspect that the -- sorry.  It's going to be that

23   materiality is the umbrella over which all of this has to be

24   considered.  So if it's just simply a repeating of other

25   information verbatim, then how could that be material.

J443SECC

1          But the Court doesn't have to wade into that difficult

2     question here.  Because --

3          THE COURT:  I might if I think that reasonably could

4     contain is not clear or unambiguous.  Then I might, right, or I

5     may not even need to get to that question I think it's

6     material.

7          MS. CRUMPTON:  What I'll point your Honor to is the

8     fact that Tesla had never, up until the 7:15 tweet, ever said

9     how many cars it was going to produce in 2019.

10         THE COURT:  That's the analysis, that's the analysis

11    that they just started saying don't worry about that, judge.

12    That's the hypo which you still haven't quite answered.  If

13    he's just repeating indisputably already public information, if

14    it adds nothing new to the mix, does he need to get

15    preapproval?

16         MS. CRUMPTON:  As I said before, reaffirming guidance

17    could be material.  It depends on the amount of time that has

18    passed between --

19         THE COURT:  Maybe yes, maybe no.

20         MS. CRUMPTON:  Maybe yes, maybe no.  It is a

21    fact-specific inquiry under whether or not this is a

22    communication that reasonably could contain material

23    information.

24         THE COURT:  So the reasonably could contain doesn't

25    answer that question.  You are not saying, look, if it's --

J443SECC

1     yes, always.  It's things like production numbers, if it is the

2     kind of information.

3              MS. CRUMPTON:  No.

4              THE COURT:  So always yes, so if -- I'm just trying to

5     focus.  If he's repeating exactly verbatim information what's

6     already out there, even if it is not verbatim.  If he's

7     repeating information that's already out there, it came out

8     yesterday, he's repeating it today.  Does he need preapproval?

9              MS. CRUMPTON:  We are not saying always yes or always

10    no to that.  It depends, is the answer.  But, again, I don't

11    think --

12             THE COURT:  Why?  The question is why?  Because if we

13    have this incredibly broad notion of reasonably could contain,

14    it's really anything that's in that ballpark, he's got to the

15    get preapproval because we've got to make sure it exactly lines

16    up.  That could be an answer.

17             MS. CRUMPTON:  But that's not the answer.  The answer

18    is, if it reasonably could contain information that's material

19    to Tesla or its shareholders, then it has to be --

20             THE COURT:  So a tweet about production numbers,

21    forecasted, timeframe, all that.  Not necessarily reasonably

22    could contain?  That's -- I thought you were proposing a

23    broader meaning to that language.

24             MS. CRUMPTON:  It is going to always be a

25    fact-specific inquiry in terms of what does reasonably could

J443SECC

1   contain material information.

2          THE COURT:  What does that inquiry look like?

3          MS. CRUMPTON:  The inquiry looks like is this

4   information that on its face is not material.  That it does not

5   need the second opinion of a securities lawyer at Tesla before

6   I publish this information to the world.  And if you look at --

7          THE COURT:  Sorry.  So Mr. Musk can make the

8   assessment, I'm going to put out numbers that are already out.

9   And wow, in the abstract, yes, those might be the kinds of

10  stuff that would be material and I'm constrained on.  But I

11  know that it's just exactly like what's been put out already.

12  So I don't need preapproval to make sure I'm right about that.

13          That is the SEC's position?

14          MS. CRUMPTON:  No, that is not the SEC's position.

15  The problem is that judgment.  That, oh, I know that I'm right

16  about this, and I don't need to show it to anybody else because

17  I know that if you combine in various combinations that my

18  lawyer will argue makes this not material, then I don't have to

19  get preapproval.  That's what we've seen in this case.

20          THE COURT:  Why doesn't it follow from that, that

21  anything sort in that subject area, that's not his assessment

22  to make under the policy and judgment?  I don't understand -- I

23  would have thought the SEC's position is yes, exactly, he can't

24  make that assessment.  That's what we've agreed to.  He's got

25  to check it with other folks to make sure.

J443SECC

1          But you won't give me -- I'm surprised.  I accept it

2     that it's not the SEC's position that categorically, anything

3     that involves something as clear -- something otherwise

4     seemingly material as projection numbers, production numbers,

5     timeframe, he doesn't need to go to preapproval, because that

6     may be just exactly the information that's already out there.

7          MS. CRUMPTON:  We would still point to Tesla's policy

8     and say that could be a violation of Tesla's policy, if he is

9     putting out information without getting preapproval, and it

10    doesn't fall within (i) and (ii) that the Court identified in

11    the policy.

12         If you're talking strictly about does this fall under

13    the materiality standard or not, it is impossible to say

14    categorically that anything falls in or out of -- there are

15    certain things, like I said before.  Tweeting with individual

16    customers about their individual Tesla.  That's pretty close to

17    categorically immaterial.  But we're nowhere close to that.

18         We are talking about a car company's production

19    numbers for the year that have never been tweeted out before.

20    I don't think the Court has to reach the thornier issue of if

21    he had just been verbatim repeating something that had already

22    been said.

23         THE COURT:  That's what he effectively says he did.

24         MS. CRUMPTON:  That's what he says, but that's not

25    correct.  It is just not correct.

1           THE COURT:  It is not correct that he was right about

2    that?

3           MS. CRUMPTON:  No, it's not correct that he was just

4    tweeting out information.

5           THE COURT:  He was wrong about that?

6           MS. CRUMPTON:  He was wrong about that.  And there's

7    no evidence that he actually did this analysis before he

8    decided that he didn't have to get preapproval.  You've seen

9    pages and pages of argument, but they're all lawyer-created

10   arguments about why, if you look at the certain case law that

11   arguably this is not a communication that reasonably could

12   contain material information.  But we don't see any subjective

13   analysis prepublication by Mr. Musk.

14          THE COURT:  Is that relevant to the question of

15   whether he has violated the order?

16          MS. CRUMPTON:  It's not relevant to the question of

17   whether he's violated the order.  It might be relevant to the

18   question of whether he's diligently tried to comply.

19          THE COURT:  Even if he went through that process,

20   would you still argue that he violated the order?

21          MS. CRUMPTON:  He violated the order because he was

22   wrong.  It doesn't require a willful violation in order to be

23   found in civil contempt.

24          THE COURT:  He was wrong that it was the same as

25   information that was already out there.

J443SECC

```
 1              MS. CRUMPTON:  That is correct.

 2              THE COURT:  But you don't take the position that he

 3    always needs preapproval to make that assessment.

 4              MS. CRUMPTON:  Again, it depends on the facts and

 5    circumstances of what the information is.  We can't say

 6    categorically that any particular piece of information is or

 7    isn't always material.

 8              THE COURT:  Tell me what authority you have for the

 9    imposition of contempt when you've got that sort of what you

10    just described.  You can't say, can't know for sure whether it

11    crosses the line or not.

12              What's your best authority that says even with that

13    kind of soft standard -- I want to say "ambiguous" but you'll

14    just say no, we're not -- but that sort of standard, that sort

15    of I can't answer you categorically what, as I stand here,

16    what's in and what's out, you've got to look at all of these

17    factors.

18              What's your best authority for imposing contempt,

19    given the first requirement of contempt is that the order is

20    clear and unambiguous?

21              MS. CRUMPTON:  Again, you don't need a mathematical

22    categorical certainty in order --

23              THE COURT:  Where is that language coming that you

24    don't need -- that clear and unambiguous doesn't mean

25    mathematical certainty?
```

J443SECC

1              MS. CRUMPTON:  If you look at all of the contempt

2      cases that Mr. Musk cites --

3              THE COURT:  I am asking you.  What cases do you cite

4      for that proposition.

5              MS. CRUMPTON:  Well, for example, if you look at the

6      case, I believe it's called Paramedics Electromedicina

7      Comercial, Ltda. v. GE Medical Systems Information

8      Technologies, Inc.  In that case, the court ordered a Brazilian

9      company to dismiss a suit that it brought in Brazilian court.

10     And what the company said was, well, we understood that to mean

11     that we just needed to suspend the suit, and that's what we

12     did.  And the court said, no, it's not.  You don't get to come

13     up with a standard that is close enough to what I ordered; you

14     have to do what I actually ordered.

15             And that's the situation we have here, where Mr. Musk

16     has decided to come up with a standard that is, well, if I can

17     make an argument after the fact that this didn't require

18     preapproval, then I didn't have to get preapproval.  But that

19     is not what the Court's order says.  The Court says if a

20     communication contains or reasonably could contain material

21     information, it requires preapproval.  And that language is the

22     same materiality language that the Court --

23             THE COURT:  I started our conversation by saying have

24     you ever used "reasonably could contain" before.  Is there a

25     case law that comes from, is that SEC term of art.  And I think

J443SECC

 1    the answer was no.  This case is unusual.

 2              MS. CRUMPTON:  That's right.  This case is unusual.

 3    But if you look at -- let's take it back just to the

 4    materiality standard then.  Like, just putting aside reasonably

 5    could contain for a moment.

 6              If you look at the seminal Supreme Court case on

 7    materiality, <u>Basic v. Levinson</u>.  The Supreme Court says, look,

 8    this is not a categorical test for materiality.  It doesn't

 9    mean that we can't figure out what materiality is, because

10    there's not a categorical test.

11              THE COURT:  I think I'm with you on that.  But then I

12    think, well, then I am asking was this material.  Then the

13    analysis is what's the difference between what he said and what

14    was already out there, right?

15              MS. CRUMPTON:  Well, I would submit that it's not,

16    because it still contains the language reasonably could

17    contain.  And while you can't say --

18              THE COURT:  When I push down on material, you go to

19    reasonably could contain.  When I push down on reasonably could

20    contain, you go to material.  I need you to stand still for a

21    moment.

22              Do we know what reasonably could contain, do you have

23    any authority for imposition of contempt standards with that

24    sort of fluid multi-factored test?  I think the answer to that

25    is no, but you'll let me know if you've got some authority for

J443SECC

1    that.

2          And when I focus on materiality, if I say, well,

3    maybe -- so I'm intimating no view.  If I think that reliance

4    on the reasonably could contain would make it difficult to

5    conclude that the order is clear and unambiguous, then I might

6    say, well, that doesn't answer the question because I just can

7    start with whether or not it was material information.  Right?

8    I don't need to worry about that.  It's clear materiality, I

9    think we'll assume, is clear and unambiguous.

10         Then I think the analysis is, what's the difference

11   between what Mr. Musk put in the tweet and what was already out

12   there.

13         I want to know if you approach materiality different

14   than that.

15         MS. CRUMPTON:  That is one way the Court could

16   approach this.  I would submit that even under just the

17   materiality standard, this was a tweet that required

18   preapproval.  But what I would -- but --

19         THE COURT:  That's because the information contained

20   was different.

21         MS. CRUMPTON:  It was different, and it was nothing

22   like the types of immaterial statements that Mr. Musk has

23   pointed to in the cases that he cites in his brief, and I'm

24   happy to take the Court through that.

25         THE COURT:  I agree with you.

J443SECC

1           MS. CRUMPTON:  They're nothing like that.  This is a

2      statement that Tesla will make around 500,000 cars in 2019.

3           THE COURT:  If we could focus on, what do you think,

4      because I think there a couple of differences, right.  So, I

5      think you are about to walk me through.  Let's try to describe

6      this best we can what the difference is between the information

7      out there and what the tweet contained.

8           MS. CRUMPTON:  Sure.  With the Court's indulgence,

9      just before we go into that analysis, I would just say that the

10     reason why I shift back to the reasonably could contain

11     language is because, even though I submit that we would win

12     under just if it just said materiality, we know it's broader

13     than that.  Because we know reasonably could contain is broader

14     than the legal standard.

15          THE COURT:  I absolutely agree.  But I don't think

16     that answers whether it's clear and unambiguous.  It's clearly

17     and unambiguously broader than materiality, but where it draws

18     the line I'm not sure.

19          MS. CRUMPTON:  It draws the line I would submit well

20     beyond where we are.  Which is a tweet that was material under

21     the materiality standard, and it clearly reasonably could have

22     contained material information.

23          And I'll point the Court, I want to show the Court the

24     communications that Mr. Musk has pointed to, to show this was

25     information that had already been out in the public domain.

J443SECC

1          First I want to focus on the investor letter.  This is

2     an exhibit that we attached earlier.  And this is basically

3     what, after Mr. Musk was forced to correct his tweet, by

4     Tesla's designated securities counsel, it is what he went back.

5     What it says is, Tesla is targeting annualized Model 3 output

6     in excess of 500,000 units, some time between the last quarter

7     of 2019 and the second quarter of 2020.

8          He says, oh, well, that's consistent with about

9     500,000 cars.  But it's not at all consistent.  I mean,

10    reaching an annualized run rate, either at the end of this year

11    or sometime in the middle of next year, is not at all the same

12    as we're going to make 500,000 cars this year.

13          THE COURT:  So one thing it does is it shifts the

14    timeframe.

15          MS. CRUMPTON:  That's right.

16          THE COURT:  From this, which says annualized rate in

17    excess of 500,000 units between Q4 2019 and Q -- so end of

18    2019, middle of 2020, it moves that to 2019.  Right?

19          MS. CRUMPTON:  Right.  It moves -- they would already

20    have to be running at that production rate right now in order

21    for his statement to be correct that we will make around

22    500,000 cars in 2019.

23          THE COURT:  That would be material or what definition?

24          MS. CRUMPTON:  Under any definition.

25          THE COURT:  Right.

J443SECC

```
 1              MS. CRUMPTON:  Under any definition.  So, the other

 2      statement that we would point the Court to in this investor

 3      letter is this statement:  In total, we are expecting to

 4      deliver 360,000 to 400,000 vehicles in 2019.

 5              This is also what the corrective tweet went back to

 6      after Mr. Musk was forced to correct the 7:15 tweet.  All he

 7      says about this in -- he completely ignores it in his response

 8      brief.  And then the only thing he says about it in his

 9      sur-reply brief is that it's neither here nor there.

10              THE COURT:  Because it's delivery.

11              MS. CRUMPTON:  Because it's deliveries versus

12      production.  This is a huge gap between Tesla's deliveries

13      guidance and Musk's statement that Tesla will produce 500,000

14      cars in 2019.  That's extremely relevant.

15              THE COURT:  This is overly simplifying, but it's kind

16      of moving 2019 production -- what his tweet does -- from

17      400,000 to 500,000.

18              MS. CRUMPTON:  That's exactly right.  They say, oh,

19      no, it's not the same.  But historically, the deliveries and

20      production have been very close on an annual basis.  And if it

21      is their position now that Tesla was going to make 500,000 cars

22      in 2019, but was planning on delivering only 360 to 400,000 of

23      them?  That means that Tesla was planning on producing at least

24      100,000 more cars than it was planning on delivering and

25      recognizing revenue on in 2019.  That would have been billions
```

J443SECC

1     of dollars in undelivered inventory, and it would have been a

2     departure from Tesla's historical practice.  That would have

3     been highly material information.

4              If that is in fact what they're saying now, I would

5     suggest that is a post hoc justification, because that is not

6     what he said in his corrective tweet.  He went back to the

7     official guidance.

8              Then I would finally, Mr. Musk puts a lot of weight

9     on, as we call it, a cryptic statement during the earnings

10    call.

11             THE COURT:  Does that count, that communication?  Is

12    that another violation?  I wasn't sure if they clearly rely on

13    it, but do you think it's appropriate to take that into account

14    as to the information that's out there in the market?

15             MS. CRUMPTON:  So that's a good question.  Because it

16    is, first of all, an oral statement, so it wouldn't fall under

17    the preapproval requirement.  However, the talking points that

18    were prepared for that earnings call did not include the

19    statement that he made on the earnings call.

20             THE COURT:  Talking points are a written

21    communication.

22             MS. CRUMPTON:  Yes, they are written communication and

23    they did not include it.  And I would -- in Mr. Musk's brief,

24    he makes it seem like he said, yes, we are going to make 350 to

25    500,000 Model 3s this year in 2019.

J443SECC

1          Let's look at the transcript.  That is not at all what

2     was said during this earnings call.  Even if it was what he

3     said, the fact that you are going to make the high end of the

4     range versus some other point in the range we would submit is

5     material.

6          But look at what was actually said.  So you have an

7     analyst who asks a question about the geographic dispersion of

8     where they're expecting to sell the Model 3s in 2019.  And then

9     Tesla's former CEO answers the question, we will start

10    delivering Model 3s in Europe and China, we share a chart

11    showing the potential market size for midsize premium sedans in

12    North America, Europe, and Asia, so that gives a good sense of

13    where we'll be.  And then Mr. Musk says, yes, it's maybe on the

14    order of 350,000 to 500,000 Model 3s, something like that this

15    year.  With no reference to what "it's" is.  Is he talking

16    about sales?  Is he talking about deliveries?  Who knows what

17    he's talking about.  It's not in the talking points, it is

18    never repeated again in any Tesla official guidance.

19         In fact, just yesterday, Tesla put out again its

20    delivery guidance, and said it expects to deliver 360 to

21    400,000 cars.  And so, this is the closest thing to anything

22    that was already out in the market, and there's no way that

23    investors would understand from context that he was saying

24    Tesla is going to make 500,000 cars in 2019.

25         This is a material statement no matter how you cut it,

J443SECC

1    regardless of the standard the Court uses, and it was a

2    violation to not get it preapproved.

3            THE COURT:  Let me just tell you, you're out of your

4    time minus your five minutes reserved.  I wanted to ask

5    briefly, there's no mention of sanctions in the SEC's briefing.

6    Are you not seeking sanctions if I hold Mr. Musk in contempt?

7            MS. CRUMPTON:  I'm happy to talk about that now.  We

8    have thought about sanctions, and we're happy to address it now

9    or we're happy to wait, if it is appropriate after the Court

10   makes a finding on whether or not to hold Mr. Musk in contempt.

11           THE COURT:  Would you be seeking sanctions?

12           MS. CRUMPTON:  Yes.  We -- well, we would be seeking,

13   we would be seeking additional remedies to prevent future

14   violations.

15           THE COURT:  Such as?

16           MS. CRUMPTON:  So, first of all, we think the most

17   important thing to the SEC is that the Court reject Mr. Musk's

18   interpretation of this policy.  That if you can come up with a

19   justification after the fact that it's arguably not material,

20   then you don't have to get preapproval.  We want the Court to

21   tell him this has to be observed in the way that it's written.

22           But, we would also suggest that it's appropriate for

23   the Court to impose some additional things to compel compliance

24   with the order.  First of all, we think the Court should

25   require Musk to report periodically regarding his compliance.

J443SECC

1      We think that could be accomplished by providing the Court with

2      a list of his written communications about Tesla, and

3      indicating for each one whether and when he sought preapproval,

4      and if not, why not.  And initially we would request those

5      reports be filed monthly.

6              Second, in the event there are future violations of

7      the Court's order, we believe that a series of escalating fines

8      would be appropriate.  And the Court certainly has discretion

9      and broad power to determine the amount of those fines, but

10     they would obviously need to take Mr. Musk's wealth into

11     account as well as statements that he's made in the past about

12     the deterrent effect of the penalty in the underlying

13     securities fraud case.

14             Just one data point for the Court to consider, Musk

15     has publicly stated that the $20 million penalty he paid as a

16     result of the false tweets about taking Tesla private was,

17     quote, worth it.  So we would ask the Court for any future

18     violations to impose a meaningful fine to make it not worth it

19     to have future violations of this Court's order.

20             THE COURT:  So your basic position would be you want

21     some additional compliance compelling mechanism, and what you

22     propose is a monthly reporting mechanism.  And clarity that any

23     future violations would lead to a series of escalating but

24     substantial fines.  That's the basic outline?

25             MS. CRUMPTON:  That is the basic outline, your Honor.

J443SECC

1            THE COURT:  Thank you.

2            MS. CRUMPTON:  Thank you very much.

3            THE COURT:  Mr. Hueston.

4            MR. HUESTON:  Good afternoon, your Honor.

5            THE COURT:  Good afternoon.

6            MR. HUESTON:  Your Honor, the SEC has the burden to

7    show by clear and convincing evidence that the order was clear

8    and unambiguous as written, and also that the proof of

9    non-compliance is clear and convincing, and finally, that the

10   party is not diligently attempting to comply.  And their proof

11   has failed on each.

12           I do want to start with the first showing they must

13   make, and your Honor asked counsel a number of questions about

14   the policy.  That, to me, illustrated that it's not clear, and

15   it is ambiguous, because counsel kept hopping from one

16   quasi-definition to another.  I'm going to run through them, a

17   series of standards, I heard today what I'm going to describe

18   as yet the fifth standard that Mr. Musk is supposedly going to

19   submit himself to that's not defined in a policy.  And if we

20   are looking at, as your Honor has written in your own opinions,

21   the very powerful tool of contempt, there should be a clear and

22   unambiguous policy, and they have not defined it here.  In

23   fact, they've defined ambiguity.

24           THE COURT:  Let me ask analytically, and then I'd love

25   for you to do that.  If I think this is material information

J443SECC

1     that was contained in the tweet because it significantly added

2     to the mix of information than what was previously out there,

3     does the uncertainty as to that standard matter?

4              MR. HUESTON:  Yes.  Because the SEC has basically

5     stated that the definition of materiality is uncertain.  We

6     asserted in our brief, your Honor, the traditional definition

7     of materiality, and they said that doesn't apply.

8              THE COURT:  Let's say I think it meets that.  It meets

9     what you've proposed as the definition of materiality.  Then it

10    doesn't matter, does it, for purposes of this contempt motion

11    that I might agree with you that the broadening language is

12    unclear?

13             MR. HUESTON:  I think, your Honor, it does.  First of

14    all, they have to meet yet the other showings.  No diligence,

15    and proof of non-compliance being clear and convincing.

16             THE COURT:  We'll get to that.

17             MR. HUESTON:  Right.  But within this, your Honor, the

18    non-definition of materiality, it's not defined, they've

19    contested what it is.  In the murk of everything else they

20    describe as a sliding standard, gives an entire context and

21    documents that is simply too ambiguous.

22             We can't take one word and say it must have been clear

23    to Mr. Musk because now the Court will import and now define

24    definitively what the SEC refused to do, importing definition

25    that's recognized in the courts for what, quote unquote,

J443SECC

 1   materiality is.

 2          THE COURT:  What could he be held in contempt for?  It

 3   sounds like you're saying this order can't be violated by

 4   Mr. Musk in a way that leads to a contempt conclusion.

 5          MR. HUESTON:  Well, there are two different questions

 6   here, your Honor.  There is, can he make a mistake, can there

 7   be an issue?  Yes.  Is that separate from should he be held in

 8   contempt?  That's separate.  There you have the very high

 9   standards before you bring that very powerful tool.

10          THE COURT:  Just start with prong one.

11          MR. HUESTON:  Let's go to prong one.  Here's our

12   position, your Honor.  I'm going to get into the policy.

13          First of all, we think it's very clear that Mr. Musk

14   retained discretion in the policy in the first instance.  And

15   the policy makes clear that the tweet is subject to a

16   fact-based determination in that first instance by Mr. Musk.

17          THE COURT:  So I think I'll ask for a direct answer on

18   this.  Is there any set of circumstances of what Mr. Musk could

19   do that could lead me to conclude that prong one is met?

20          MR. HUESTON:  That the SEC meets prong one?

21          THE COURT:  Yes.  Is there any factual hypothetical

22   you could give me that you can say, yes, under that set of

23   circumstances, the SEC could show that he has failed to comply

24   with --

25          MR. HUESTON:  Yes.

J443SECC

 1                THE COURT:  What would that be?

 2                MR. HUESTON:  Here's the answer.  If they had a

 3     clearly defined standard --

 4                THE COURT:  No.  In the world, this world.

 5                MR. HUESTON:  No.

 6                THE COURT:  So he can't violate?

 7                MR. HUESTON:  Not for contempt.  Given the murk that

 8     is -- the policy in place.

 9                THE COURT:  If I agree with you on that, aren't I

10     obligated -- the Court has to give clear and unambiguous

11     orders.

12                MR. HUESTON:  Yes.

13                THE COURT:  I don't give wishy-washy orders.  Doesn't

14     that require either a modification or vacating of this

15     settlement agreement and consent judgment?

16                MR. HUESTON:  Yes, I've given a lot of thought to

17     that, your Honor.  Your Honor entered an order, signed, that

18     was subject to very extensive negotiation back and forth.  The

19     order doesn't self-execute.  It refers to the Tesla policy.

20                THE COURT:  Sure.

21                MR. HUESTON:  And that's where the rubber hits the

22     road, and why we included the drafting history.  Because the

23     SEC pretends here today that they're shocked that Mr. Musk had

24     the ability to make his decisions from the get-go, but that's

25     exactly what Tesla negotiated for, and got in the negotiation

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

J443SECC

1    with the SEC.

2              So if we're talking ambiguity, and I think we are, you

3    have to look at the fact that the SEC wanted in the

4    implementing policy the language of, quote, oversight and

5    approval of all his public statements.  And they conceded in

6    taking out "and approval of all," which meant simply oversight

7    processes, which Tesla then implemented.  They don't like them,

8    but that's what they implemented pursuant to the order that

9    they have.

10             To answer your question, well, what should the SEC do

11   now, this is what the SEC --

12             THE COURT:  I am asking what should the Court do if I

13   adopted the position that there can be no determination of

14   violation of the Court's order because of lack of clarity.

15             MR. HUESTON:  You should instruct the SEC to clarify

16   with further negotiation with Tesla the terms of the policy.

17   Which I would offer --

18             THE COURT:  I should vacate the consent judgment,

19   modify the consent judgment, and say work it out or litigate?

20             MR. HUESTON:  First of all, let me -- I don't think

21   vacate would necessarily be right, because we've already paid

22   money.  That would mean money goes back, we might be back to

23   square one.

24             What we anticipated, your Honor, if there was an

25   issue, is what parties normally do instead of running to court.

J443SECC

1    They knock on the door and say, hey, we've seen something here,

2    is there an issue?  Let's try to work it out.  There was no

3    attempt here to do so.  Had that happened --

4         THE COURT:  I'll admit surprise.  This screams of

5    working it out.

6         MR. HUESTON:  Exactly.  Had that effort been made, I

7    assure you, Tesla was ready to join and make sure there was no

8    misunderstanding.

9         That effort wasn't, and that's why we're here today.

10   And the last thing that should happen in the context of

11   admitted ambiguity is now throw the bomb of contempt on

12   Mr. Musk.  That's not fair.

13        THE COURT:  Well, in the face of ambiguity, no

14   contempt can be brought.  But the question then is, if you

15   prevail, and again, I intimate no view.  If you were to prevail

16   in that regard, something has to change.  Either a modification

17   of the consent judgment or a vacating of the consent judgment

18   because --

19        MR. HUESTON:  I don't think -- your Honor, I don't

20   think your Honor needs to go in and sit at the table.  Your

21   Honor can encourage the parties --

22        THE COURT:  That's good.  I'm busy.

23        MR. HUESTON:  I know you are, and I'm trying to

24   respect that.  The parties should be meeting, conferring, and

25   providing some clarity, so this sort of issue doesn't happen

J443SECC

1    again.

2            We certainly want that, your Honor.  Mr. Musk doesn't

3    want to come to court and worry about a contempt sanction which

4    he believes will freeze his ability to operate as an effective

5    entrepreneur to get messages out well beyond Tesla to speak

6    even as a shareholder, as he owns 20 percent of stock.  Your

7    Honor --

8            THE COURT:  Let me ask you about, I did put out an

9    order, the Second Circuit says I don't have much role, but I

10   did put out an order asking for justification -- I don't like

11   being a rubber stamp -- justification for approving this

12   settlement and entering the consent judgment.  I talked about

13   it with your opposing colleague.  It says that Mr. Musk, under

14   the proposed settlement terms, Mr. Musk will comply with

15   mandatory procedures to be adopted by Tesla concerning the

16   oversight and approval of his Tesla-related public statements.

17           And I mean, now in your brief, you would think if you

18   saw that, you would say, oh, no, no, no way, First Amendment,

19   we're not signing on to anything like that, given that it's

20   suggesting that the terms of the settlement include oversight

21   and approval of his Tesla-related public statements.  But you

22   didn't.

23           MR. HUESTON:  Your Honor, that was a gateway

24   instruction for the negotiation that did happen afterwards

25   about the policy that would actually govern the day to day.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-186

J443SECC

1    And in that, after that gateway, which your Honor provided,

2    they engaged knowledgeably, knowingly, crossed stuff out,

3    inserted language like they're trying -- we're going to get to

4    this -- to say it's going to be per se if it hits one of these

5    topics.  They conveniently ignore "may, depending on the

6    significance."  That is a discretionary allocation that goes to

7    the authorized executive, who is Mr. Musk, and they agreed to

8    take out language that said everything has to be approved.

9    There has to be an oversight process, and Tesla has an

10   oversight process.  They're not happy about that today, but we

11   implemented the oversight process.

12           You provided the clear gateway, and the parties

13   negotiated, and here we are.

14           THE COURT:  So then I think if I think that the policy

15   doesn't require preapproval of --

16           MR. HUESTON:  And it doesn't.

17           THE COURT:  -- statements that are material or

18   reasonably could contain material information -- and you said

19   "and it doesn't"?

20           MR. HUESTON:  Well, sorry, I spoke --

21           THE COURT:  Then Tesla is in violation of my order,

22   no?

23           MR. HUESTON:  No.  Because what Tesla did is it

24   followed in good faith your instruction.  Negotiate with the

25   SEC, under the umbrella of oversight and approval, and that's

J443SECC

1   exactly what we did.

2         THE COURT:  I don't think -- no, that's not what I

3   said.

4         MR. HUESTON:  I apologize.

5         THE COURT:  Well, I mean, I might have proposed,

6   right, you might have proposed that I say you'll negotiate in

7   good faith.

8         MR. HUESTON:  When you say according to the policy

9   that was then of course negotiated between the two parties,

10  it's difficult, I think, for us to understand what else could

11  have happened.

12        And again, your Honor, in the context of a contempt

13  hearing, the very fact that we're having some of this back and

14  forth, illustrates that there's simply not a clear enough

15  standard to use the harsh penalty of contempt.

16        THE COURT:  That might be true.  But then I am still

17  curious.  Your answer is what happens after that, is you go

18  back to the drawing board.

19        MR. HUESTON:  What happens after that is what the

20  parties should have done, what the SEC should have done, is

21  approached in good faith to try to work things out.  If hands

22  were thrown up, then it may have been time for the parties to

23  come back to the Court to seek further clarification and

24  finalization.  But that first step should happen, your Honor,

25  and your Honor should invite that first step.

J443SECC

1          THE COURT:  My intent is not only to invite it, but to

2     order it.  But we'll we get to that.

3          Turning to the policy, I understand your position on

4     that.  I don't know your position, it is nowhere in your

5     briefing, and correct me if I'm wrong, but I don't see it.

6     Nowhere in your briefing, nowhere in Tesla's letters is there

7     any explanation of your understanding of the meaning of the (i)

8     language in, for lack of a better term, the editing clause.

9          MR. HUESTON:  Yes.  I'll give you the citation in a

10    moment, your Honor.  We did answer it.

11         THE COURT:  I think what you answered is (ii) and not

12    (i).

13         MR. HUESTON:  You're right, we did.

14         THE COURT:  As did Tesla.  Tesla did the same thing.

15         MR. HUESTON:  Because that was what was teed up.

16         THE COURT:  No, they teed up both.

17         MR. HUESTON:  Okay.  Here's my answer to this.  First,

18    this is not a situation where Mr. Musk is editing anything.

19    He's not editing one of his earlier approved written

20    communications.

21         Your Honor, what that policy says, if it says

22    approved, your Honor, it presumes it must have been material

23    and not escaped the preapproval process by being immaterial.

24         Our position here is, what Mr. Musk tweeted was

25    immaterial, and not close to the ambiguous standards which the

J443SECC

1    SEC has struggled to answer.

2          THE COURT:  But I understood your argument to be

3    that's so because it is, essentially, and certainly true with

4    the corrective tweet, repetitive of information already out

5    there.  In other words, this is quoting from your brief:  The

6    tweet was simply Musk's shorthand gloss, and entirely

7    consistent with prior public disclosures.

8          And I presume those prior public disclosures were

9    preapproved written communications.

10          MR. HUESTON:  No, not necessarily, your Honor.  The

11   standard is not what you just stated.  It's the standard of

12   materiality, and this again goes back to not sure what we're

13   dealing with in terms of clear standards, but if we look at

14   court-adopted notions of materiality, did what Mr. Musk put out

15   there significantly alter the total mix of information.  The

16   answer is clearly no.  And if he made a statement, they don't

17   like it because it guts their position that there are going to

18   be 350 to 500,000 Model 3 alone cars produced, which when you

19   add it to the 100,000 that's already coming out for S and X,

20   all of which is fairly characterized by "cars," he's clearly

21   within the total mix of information.  It does not matter

22   whether some element of that had been preapproved or not.

23   That's not part of the guidance.  That's not part of

24   materiality standards.

25          THE COURT:  Just to run it through.  If he wanted to,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-190

J443SECC

1    say, send out a tweet that said we're going to hit 500,000 cars

2    in 2019, and he got preapproval -- let me change that.  We're

3    going to hit 400,000 cars in 2019.  He got preapproval for that

4    because it would be clearly material.  And then before it went

5    out, he wanted to change it to 500,000.  You would need to get

6    new approval, right?

7              MR. HUESTON:  Well, with all the premises of your

8    hypothetical.

9              THE COURT:  Of course.

10             MR. HUESTON:  Yes.  Because you said it would need

11   approval at first.  It had some examination.  And then for him

12   to edit it, you would go under the policy and have to abide by

13   the policy, yes.

14             THE COURT:  If the same set of factual circumstances,

15   but he edits it after he sends out the original tweet.

16             MR. HUESTON:  He edits --

17             THE COURT:  He sends out a tweet.  He gets preapproval

18   for a tweet.  400,000 cars in 2019.  He gets preapproval.  He

19   sends it out.  And then he edits to say 400,005 cars in 2019.

20             MR. HUESTON:  No.  And the answer is there is --

21             THE COURT:  No, he doesn't need preapproval?

22             MR. HUESTON:  He does not, your Honor.  Because if in

23   fact you are making an immaterial statement, as that would be,

24   some minor variance would not be viewed by anyone as material.

25   You don't even begin getting into the mechanisms of the policy

J443SECC

1    that presumes that something is material to begin with.

2          THE COURT:  Just so I understand, forgive the

3    tediousness of the hypo.  If he wants to send out a tweet that

4    says 400,000 cars in 2019.  He gets preapproval, and before he

5    sends it out, he wants to change it to 400,005 cars.

6          Does he need approval for that edit before it goes

7    out?

8          MR. HUESTON:  Well, it's not an edit.  A tweet is just

9    itself an independent document.

10          THE COURT:  He doesn't send the tweet out.  He wants

11    to edit the tweet.

12          MR. HUESTON:  Okay.

13          THE COURT:  Can you do that?

14          MR. MUSK:  No.

15          MR. HUESTON:  No.  Not only that, if we're having to

16    debate what this language really means, we are in ambiguity

17    land.

18          THE COURT:  Just because you can propose an argument

19    doesn't mean we are in ambiguity land.  My job here is to start

20    with the language you've agreed to and what the policy says.

21    That's what I am trying to do with the hypo, so don't move away

22    from them.

23          MR. HUESTON:  I won't.

24          THE COURT:  If he gets approval for a tweet that says

25    400,000 cars in 2019.  Before he sends it out, he says 400,005

J443SECC

1    cars in 2019.

2             Does he need approval for that tweet?

3             MR. HUESTON:  My argument would be he would not,

4    because 405 is immaterial.

5             THE COURT:  How is that consistent with the language

6    "If an authorized executive further edits a preapproved written

7    communication, after receipt of written preapproval, such

8    authorized executive will reconfirm the preapproval in writing

9    in accordance with this policy prior to release."

10            You are ignoring that language.

11            MR. HUESTON:  Your Honor, I'm not.  I think partly

12   I've struggled with two things.  That the second -- first of

13   all, that's not an edit.  Let's just say for the hypothetical,

14   so you don't believe I'm running away from the hypothetical --

15            THE COURT:  That's a change from 400,000.

16            MR. HUESTON:  So the premise --

17            THE COURT:  If I write on this paper "400,000 in

18   2019."

19            MR. HUESTON:  If the premise --

20            THE COURT:  Then I cross out it so it says "400,005 in

21   2019."  Your argument is that it's not an edit?

22            MR. HUESTON:  If in fact -- I'm going to agree with

23   you under the following.  If in fact the first draft was

24   something that was material or could be material, subjecting

25   itself to approval -- and we're outside of that here, because

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-193

J443SECC

1      obviously we are talking about Model 3 and Model S and X.

2              THE COURT:  All assumed in my hypothetical.

3              MR. HUESTON:  If in fact, then with Mr. Musk's good

4      faith efforts, there is, okay, I'm going to submit this for

5      approval, because it's material, and then two days later he

6      scratches it out and makes an alteration, yes, under the

7      literal term of the policy, he would bring that back again

8      because he is already in the area of materiality.

9              Here, we're not.

10             THE COURT:  Right.  So that's a question.  But, I

11     understand your position, you don't think the editing language

12     includes an additional examination of whether the difference

13     between in the edit is material.  Under the policy, there is an

14     edit, it needs new approval.

15             MR. HUESTON:  Under the policy, if there is an edit to

16     something that was already deemed to be material, then you

17     can't just rely on that.  If you change it, you are going to

18     have to bring something that was already deemed material back

19     to the attention and approval.  Yes.

20             Which is not, of course, the circumstance here.

21             THE COURT:  Except it parallels your argument that

22     what Mr. Musk did was simply put a gloss on already existing

23     material, which is another way of saying "edit."

24             MR. HUESTON:  No, your Honor.  What is --

25             THE COURT:  Do we know what Tesla's view is as to

J443SECC

1    that?

2              MR. HUESTON:  Tesla's view as to what?

3              THE COURT:  As to whether --

4              MR. HUESTON:  Yes.

5              THE COURT:  How do we know that?

6              MR. HUESTON:  Tesla submitted a letter stating that it

7    did not view -- that it did not view Mr. Musk's tweet as

8    material, and viewed him as in compliance with the policy.

9              THE COURT:  To be clear, do we have any idea of

10   Tesla's view as to the meaning of that (i) sentence, the

11   editing sentence?

12             MR. HUESTON:  Your Honor, the editing sentence is not

13   part of what has been submitted, because there wasn't an edit

14   that was really done here and brought to issue.  So, there

15   isn't anything submitted on that by Tesla.

16             I think Tesla very much, by saying he is in

17   compliance -- and by the way, this is something that is a Tesla

18   policy.  Tesla has said that he has the discretion to make the

19   call, they viewed what he did as appropriate and not material.

20   In and of itself, your Honor, shows compliance.  There has to

21   be deference to the company's interpretation of its own policy.

22   So, they, obviously, coming to that conclusion, that was

23   submitted by Wilmer Hale on behalf of the company.  They didn't

24   believe that (ii) somehow rendered what was otherwise

25   appropriate inappropriate.

J443SECC

1        THE COURT:  And I appreciate that, and that's helpful.

2    I don't have their view on the argument that the SEC made with

3    respect to (i).

4        MR. HUESTON:  Remember that letter was submitted, and

5    there has been no amendment to it, despite the argument.  Their

6    view is he is in compliance.  That (ii) does not render

7    anything in non-compliance.

8        Your Honor, I do want to very briefly state in terms

9    of clear and unambiguous, the SEC has very much struggled with

10   the definition themselves.  They put out two standards that are

11   not even in the written documents, which in and of itself takes

12   you out of the area of contempt.

13       One, they say, quote, it should contain -- there

14   should be submitting of tweets, if it, quote, contains

15   substantive information about Tesla and its business.

16       If that were true, there would be no need for the

17   illustrative subcategories that were present.  They simply read

18   that out.

19       THE COURT:  They're not exhaustive.

20       MR. HUESTON:  Why put it in there if it was just as

21   clear if there is any substantive information about Tesla.

22   There is even something broader.  They put in, quote --

23       THE COURT:  Sometimes examples focus the mind.

24       MR. HUESTON:  Examples could, your Honor, but what

25   should happen here, if the SEC thinks that's the appropriate

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-196

J443SECC

1    definition, it ought to be in the document.  You can't simply

2    articulate something that wasn't there, and say now under our

3    articulated standard, they violated.

4            THE COURT:  How do you define the "reasonably could

5    contain" language?  I don't see it in your papers.

6            MR. HUESTON:  Well, first of all, it's difficult, it's

7    difficult to assess, but what we believe is that if in fact

8    something is immaterial, that is certainly a proxy for it can't

9    reasonably be material.  That is a logical and appropriate

10   inference based in these policies.  That is how Mr. Musk has in

11   fact --

12           THE COURT:  You just said it can't reasonably be

13   material.

14           MR. HUESTON:  Not, if it is immaterial.

15           THE COURT:  Sorry.  Right.  Is that the same as saying

16   reasonably could contain material information?

17           MR. HUESTON:  I'm having trouble understanding what

18   that means.

19           THE COURT:  Well, but, what you just said -- I'll read

20   it from the LiveNote.

21           MR. HUESTON:  Okay.

22           THE COURT:  You said if it's immaterial, then it can't

23   reasonably be -- that's a proxy that it can't reasonably be

24   material.

25           MR. HUESTON:  It can't reasonably contain --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-197

J443SECC

1           THE COURT:  Is your change of language, did that

2    matter?

3           MR. HUESTON:  No, I don't think so.  At least in

4    the -- there is nothing definitionally that undermines my

5    position.  Again, I think that's a problem of the SEC's burden

6    and not our own.  I think, your Honor --

7           THE COURT:  So just work with me on this.  I'll read

8    two sentences.  You'll tell me if they have similar meaning.

9           "The communication could reasonably be material to

10   Tesla or its stockholders." That's number one.  Number two,

11   "The communication reasonably could contain material

12   information to Tesla or its stockholders."

13          Isn't the second sentence broader?  maybe it's

14   ambiguous.  Isn't it broader than the first?

15          MR. HUESTON:  I'm not sure it is, your Honor.  I agree

16   that those are different words, and you can argue for greater

17   breadth.

18          THE COURT:  It's two changes.  It's changing "contain"

19   to "be," and it's changing what "could" modifies.  From "could"

20   so "reasonably could contain."

21          MR. HUESTON:  Right.

22          THE COURT:  To "could reasonably be material."

23          MR. HUESTON:  It can't -- your Honor, even under --

24   let's just assume for the argument that there is a broader

25   connotation to "reasonably could contain."  I think, again,

J443SECC

1    Mr. Musk has the right, as the authorized executive looking at

2    these standards, to make the first judgment.

3              THE COURT:  He has to apply that standard.

4              MR. HUESTON:  Okay.  First of all, it is an ambiguous

5    standard because the SEC has struggled.

6              I want to make sure I put in my argument, those 15

7    tweets?  So happy they put them in.  I'm going to go through

8    several examples, I'd like a five-minute warning on my

9    argument, because they show, by suggesting that he wasn't

10   diligent, that apparently contempt can fall on him for things

11   that he is just merely clearly repeating that's out there from

12   websites and others.

13             So they want to argue an incredibly broad compass to

14   that, that can't possibly exist.

15             THE COURT:  I'll give you time to do that.  But just

16   to follow up on that question.  Whatever you would say, even I

17   think your broad argument is Mr. Musk has to in good faith

18   apply the standard contained in the policy, right?

19             MR. HUESTON:  As best he can, with what is there in

20   the policy.

21             THE COURT:  He can't decide on a narrower version of

22   that, just because it's arguably ambiguous.

23             MR. HUESTON:  No.  And that's not what we're arguing.

24             THE COURT:  In paragraph seven of his declaration, he

25   did exactly what you did with the words.  Last sentence:

J443SECC

1    "Additionally since the entity of the order and enactment of

2    the policy, I have not tweeted information that I believe is or

3    could reasonably be material."

4            So he changed, just as you did, and I think narrowed

5    it, he changed "reasonably could contain" to "could reasonably

6    be."

7            Why is that?

8            MR. HUESTON:  Your Honor, you're asking why a

9    layperson felt that that was his reasonable interpretation of a

10   murky policy.  I think it's very difficult.  I stumbled and did

11   the same thing, and didn't quite quote the same language.

12   Frankly, it's not just our issue, it's the SEC's because they

13   came up with two new formulations, including a fifth one today,

14   unless something is obviously immaterial.  If it's that clear,

15   that standard five, that language ought to be in there.  I

16   don't think we'd have the issues that we're fighting about

17   today.

18           THE COURT:  You don't think the language adds

19   anything.  They might as well say "material."

20           MR. HUESTON:  No.  I guess, no, it's difficult for me.

21           THE COURT:  It adds something.  It broadens it.

22           MR. HUESTON:  There is a connotation of potentially

23   greater depth.  It is wholly undefined.  Therefore, you cannot

24   have a basis on that for contempt.  That's the problem the SEC

25   faces here.

J443SECC

1          THE COURT:  And then just to circle back, I don't need

2     to worry about material.

3          MR. HUESTON:  No.  Because, first of all, what

4     definition of material are we talking about?  They've argued

5     that the one under law doesn't apply.

6          Let's talk about whether proof of non-compliance is

7     clear and convincing.  Point number one, it's Tesla's -- under

8     the order, Mr. Musk has to comply with Tesla's policy.  Tesla

9     explains that topics may be material, depending on

10    significance, and that judgment, they say, rests first and

11    foremost with the authorized executive who is Mr. Musk.  That

12    is a good faith determination, he's made that in good faith.

13    Tesla found him to make the correct determination.  They should

14    be in the position to best interpret their own policy.

15         THE COURT:  It's interesting, because that was your

16    argument in the papers, and I thought that adds nothing to the

17    analysis.  But now I understand, because you think it's not the

18    Court's judgment -- you don't think the Court has a role in the

19    evaluation of whether Mr. Musk violated the policy and

20    therefore the contempt judgment.

21         MR. HUESTON:  Well, when you say a role, I mean, you

22    are the signatory to the order.  But the implementation is the

23    policy.  And then we go to what the policy is clearly saying

24    and not saying.

25         THE COURT:  You don't think I have any involvement in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J443SECC

1     the analysis of whether Mr. Musk complied with the policy.

2              MR. HUESTON:  Oh.

3              THE COURT:  And therefore complied with the consent

4     judgment.

5              MR. HUESTON:  I'm not saying you don't have.  You

6     certainly have a role, and that's why we're here today.

7              THE COURT:  Yes, but if you prevail today, your

8     argument is I have no future role.

9              MR. HUESTON:  Well, not necessarily.  Your Honor, the

10    way this -- there was an order that was a gateway to a

11    negotiation with the policy between the two parties.  Tesla,

12    one side of the party, has made a submission to the Court

13    saying here's how this policy works.  It gives him discretion

14    in the first instance, he has reasonably exercised the

15    discretion.  We find that there was nothing material and did

16    not reach the standards.

17             THE COURT:  I shouldn't evaluate whether Tesla's off

18    its rocker or not, right?

19             MR. HUESTON:  No, I think you have to give deference

20    to the fact that Tesla, because this is an interpretation of a

21    policy interpreted between and negotiated between two parties,

22    I think Tesla gets a lot of deference.

23             THE COURT:  So I do apply it myself, but I defer to

24    Tesla.

25             MR. HUESTON:  Because it's their policy, and they're

A-202

J443SECC

1    implementing it, and they are overseeing it, and they've opined

2    on what Mr. Musk did.  And of course, because there's

3    discretion provided to Mr. Musk, they are also talking about --

4    there is the discretion and he exercised it reasonably.  That

5    to me is probative.  It is not necessarily conclusive, but is

6    highly probative evidence of compliance in and of itself in a

7    contempt proceeding.  Let me --

8            THE COURT:  I'm still confused about when it might be

9    somehow different.  I can't recall if you did answer this or

10   not.  But I think the answer is no, there is no set of

11   circumstances you can imagine by which the Court could conclude

12   that he has failed to comply.  That there is some communication

13   he could put out there, without preapproval, and that it's my

14   job to decide whether he's in compliance with the policy or

15   not.

16           MR. HUESTON:  I'll give you a hypothetical that will

17   make it an easier situation.

18           He puts out a wholly new concrete piece of information

19   that's not forward looking, it's not in the context of cars.

20   It is very specific.  Tesla's admits he didn't follow the

21   policy, and it's clearly material.

22           I suppose -- even here I have trouble, because

23   materiality the SEC says is not the standard that your Honor is

24   speaking with me today.

25           That may be a situation where, okay, there's no --

J443SECC

1    even with the discretion provided by Tesla, he didn't abide by

2    that allowance, he didn't exercise his judgment in good faith.

3    We haven't even talked about diligently attempting to comply,

4    your Honor.  The fact that there was an effort to correct it

5    later.

6          THE COURT:  I'll still waiting for an answer.

7    Honestly, I don't know.  Just say if it is --

8          MR. HUESTON:  I'm having trouble.

9          THE COURT:  Whatever Mr. Musk does, whatever

10   communication he puts out there without preapproval, it is for

11   his determination whether to seek that preapproval, and Tesla's

12   determination as to whether he did that appropriately.

13         MR. HUESTON:  That's right.

14         THE COURT:  Go home, Judge Nathan.

15         MR. HUESTON:  No, your Honor.  Well, no.  With a

16   caveat that --

17         THE COURT:  I just want an example of where that

18   wouldn't be.

19         MR. HUESTON:  Sure.  If we had materiality clearly

20   defined.

21         THE COURT:  Under this consent judgment.

22         MR. HUESTON:  Right.

23         THE COURT:  Give me an example of where I have some

24   role in the evaluation as to whether or not he's in violation

25   of the policy and the order.

J443SECC

1          MR. HUESTON:  You do not on the ambiguous standard set

2     forth here.  If it was clear, you would.  It is not.  I can't

3     even describe a hypothetical materiality issue, because that's

4     been in dispute and not defined.

5          THE COURT:  Right.  You're not very imaginative.  I

6     can think of things but --

7          MR. HUESTON:  Okay.

8          THE COURT:  I steered you away from the things you

9     wanted to do with the tweets, so I invite that.

10         MR. HUESTON:  Okay.  Let me talk first, though, about

11    diligent attempt to comply, your Honor.  That is an independent

12    basis for finding that contempt should not apply.

13         Mr. Musk has diligently attempted to comply.  The

14    first thing the SEC put forth as their proof is statements on

15    60 Minutes.

16         THE COURT:  Before the policy.  I am not sure what I

17    do with that, if anything.

18         MR. HUESTON:  Nothing.  He gave an honest assessment

19    that there is a possibility a mistake could be made.

20         By the way, the SEC appears to be following his every

21    word.  That was their moment to say, wait a minute, Mr. Musk

22    and Tesla, are you saying he has some ability to decide in the

23    first instance?  It was right there in the first transcript.

24         THE COURT:  It was before the policy.

25         MR. HUESTON:  Sure, it was in December.  If they say,

J443SECC

1   wow, that's their intent, they must be closing in on some

2   different interpretation, that would have been an invitation to

3   reach out and resolve any issues.

4        Mr. Musk hasn't been hiding his approach here, and

5   Tesla has said his approach is appropriate.  What they say in

6   reply is they say, well, here are 15 different tweets which

7   show that he is rogue and out of control.  Not one of those 15

8   is misleading.  Not one is inaccurate.  Almost every one of

9   them doesn't fit under the illustrative topics and categories.

10  Most every one repeats or responds or -- either repeats public

11  guidance or responds directly to a customer, and not one is

12  material.

13       So I'll give you a few examples of the 15.  By the

14  way, he may have tweeted upwards of 80 times arguably in this

15  time period in something related to Tesla.  Presumably these

16  are their 15 best examples.

17       Here's one.  "Model 3 midrange EPA rating is actually

18  264 miles.  Slightly higher than prior estimate of 260."  Your

19  Honor, that simply repeats updated and accurate information

20  that was available the same time from Tesla's website.  That

21  can't possibly be a basis for finding improper behavior, and it

22  illustrates that they don't know and even today can't define

23  what the standard is.

24       THE COURT:  Ms. Crumpton pointed to one.  It is

25  escaping me now.  But it was a factory or something?

A-206

J443SECC

1          MR. HUESTON:  I'm sorry.  There is one in here about

2     breaking ground on the Gigafactory.

3          THE COURT:  Gigafactory.

4          MR. HUESTON:  Right.  And that was out there for

5     months in terms of there was already an announcement that the

6     Gigafactory was going forward.  There was already information

7     in the press that was moving forward with a timeline, and the

8     actual groundbreaking was being talked about.  That is my

9     understanding, and again, they haven't provided all their

10    positions for that.  That was all publicly available

11    information, nothing new, and not material.

12         Couple of other examples, your Honor, that they put

13    forward as examples of his egregious misconduct.  "Tesla is the

14    safest car per U.S. government testing."  That's repeated old

15    news.  That had been reported by Tesla as recently as October

16    of 2018 and as far back as 2013 with each of the models being

17    regarded as the safest car under U.S. testing.

18         Here's another one.  "By the way, you can buy a Tesla

19    online in less than two minutes and give it back for full

20    refund for any reason."  That was entirely consistent with

21    Tesla's return policy available online.  The policy had been in

22    place as early as October 22, 2018.

23         And then another one.  "Tesla with autopilot engaged

24    is twice as safe and continues to make steady improvements."

25    On that tweet he actually cites in the tweet the Tesla

J443SECC

1    quarterly vehicle safety report, which provides the very

2    figures to say twice as safe.

3           Your Honor, let me just close if I can, because I know

4    my time is short, with the following.  Your Honor, they have

5    not shown that the proof of non-compliance is clear and

6    convincing.  There is the Tesla policy itself, and Tesla's

7    judgment that he did not violate.  We have the 600,000 cars

8    that is in the total mix of information, that when he says

9    around 500, in a tweet sequence that is celebratory and forward

10   looking, with every hallmark of immateriality, that can't

11   possibly be clearly material, and something that is appropriate

12   for sanction.

13          One thing that has been glossed over is that we had a

14   Professor Christopher Noe of MIT do an assessment of what the

15   market did.  The SEC waves that off and says that's not

16   appropriate to consider.  But the case law in this district,

17   U.S. v. Hatfield, U.S. v. Bilzerian, says, although not

18   dispositive, stock price movement afterwards is a consideration

19   for whether it is material or not.  The trading volume didn't

20   move, it was lower than normal.  The stock price moved less

21   than it did on a usual daily occurrence.

22          If it was material what he did, the corrected tweet

23   should have been material, and it was not.  He looked at

24   analyst reports.  No one noted it.

25          Conclusion, your Honor:  Tesla was right that it was

J443SECC

1     immaterial.  Mr. Musk was right that it was immaterial.  And

2     the market gave the judgment immaterial.  That can't be a basis

3     for declaring it is material and contempt under these ambiguous

4     standards.

5          Your Honor, one last thing I will say.  If the SEC is

6     right, and Mr. Musk, according to them, made some kind of

7     mistake, that's not a place to bring down contempt.  They ran

8     in here because Mr. Musk -- this is the facts -- did something

9     he believed was right.  The original 7:15 tweet, it's not

10    material.  Tesla says, then and now, not material.  Disclosure

11    counsel says put out and repeat some other numbers guidance.

12    Mr. Musk doesn't agree, but does it anyway.

13         This is not someone who is wantonly saying I don't

14    care about processes and procedures in place.  He actually does

15    what he is told.  And in that situation, your Honor, when

16    someone does make an error, if it is an error, and promptly

17    corrects it, that's not the kind of wanton behavior that merits

18    contempt finding.  That is somebody who is trying his best to

19    comply, and who has been diligent.  And for the SEC to outline

20    broad ambiguous areas they now say gotcha without an effort to

21    meet and confer earlier, really takes us well outside the area

22    of contempt.

23         THE COURT:  I'll give you a couple minutes, if you

24    want, if I do determine that Mr. Musk is in contempt, do you

25    want to respond to what's been suggested as appropriate

J443SECC

1   sanctions?

2          MR. HUESTON:  Your Honor, obviously, we do not believe

3   there should be a contempt finding.  Let me --

4          THE COURT:  I wasn't clear on that, so thank you.

5          MR. HUESTON:  And also, your Honor, I think there can

6   be -- we've talked about and I see your Honor's, yes, why did

7   you rush in.

8          There is another pathway if your Honor is concerned

9   about where things are moving forward.  It can order the

10  parties to meet and confer and come back if there is a material

11  dispute.  If we're going to go down another pathway, that

12  should be not a hammer on Mr. Musk, with his ears ringing, told

13  to go ahead and retool the policy that is ambiguous.  We don't

14  believe that's appropriate, your Honor.

15         We think the right approach here would be, look, there

16  has been a lot of disagreement.  There should not be any sort

17  of rewarding of somebody running into court and claiming the

18  sky is falling without some sort of good faith efforts to try

19  to meet and confer and work it out.

20         That's where I think we expected the SEC to come from.

21  And frankly, if there is an action, that should be the nature

22  of the action here, and nothing more.  Because Mr. Musk acted

23  in good faith, he was diligent.  And even under the worst of

24  characterizations, promptly corrected what -- or clarified an

25  earlier tweet, even though it wasn't material by anyone's

J443SECC

1    assessment nor the market's.

2              THE COURT:  Thank you, Mr. Hueston.

3              Ms. Crumpton, you have five minutes if you want it.

4              MS. CRUMPTON:  Thank you, your Honor.

5              I'd like to correct a couple of things that have been

6    mischaracterized by the SEC's position.  First of all, we have

7    not ever said that the materiality law doesn't apply.  What we

8    have said is that right standard of the court's order is

9    broader, because it has the "reasonably could contain"

10   language.  But if the Court decides that that reasonably could

11   contain language is ambiguous, it doesn't have to throw out the

12   baby with the bathwater, because this was material, even under

13   the broader materiality standard.

14             THE COURT:  But then aren't we just going to be back

15   here again?  Even if that's right, and again, I'm not

16   expressing my view, but if you were to prevail on that, it

17   seems to me we still need to solve the potential problem of an

18   unclear aspect of that.

19             MS. CRUMPTON:  That may be so.  We can propose a

20   modification.  But I really do think this argument is a bit

21   disingenuous.  This is the second time that Mr. Musk's counsel

22   has brought up settlement communications to argue that his

23   interpretation of this order is correct and that the SEC's is

24   wrong.

25             But he has omitted other very relevant settlement

J443SECC

1   communications we would offer now that would explain what the

2   parties understood when they negotiated this --

3          THE COURT:  I don't think we need to -- I don't think

4   we need to get into that.  I have the understanding of the

5   history of the negotiation of this provision.  At the end of

6   the day, I'm not sure that matters at all.

7          To the extent Mr. Hueston is saying that failure to

8   negotiate prior to the contempt is somehow relevant.  Whether

9   or not I think that's right as to how I would expect folks to

10  act, I don't know that it comes into the analysis at all.  But,

11  I'm going to give a speech on how that's going to happen going

12  forward.

13         MS. CRUMPTON:  I would like to give the Court a little

14  history of how we came to be standing here.  It is not we

15  rushed in to court at the first opportunity.  As I said before,

16  there had been a number of tweets over time, Mr. Houston went

17  through some of them.  There were others that we attached.  As

18  he said, Mr. Musk has tweeted upward of 80 times about Tesla,

19  and the SEC thought nothing of it.  We assumed that everyone

20  was proceeding in good faith.  That's even after the 60 Minutes

21  interview.

22         We haven't abandoned the 60 Minutes interview.  We

23  offered additional evidence.  We didn't feel it necessary to

24  repeat the same points we made in our opening brief.

25         I would like to point the Court to some particular

J443SECC

1    language that give us trouble about the 60 Minutes interview.

2    It's the question of Does someone to have to read your tweets

3    before they go out?  And Mr. Musk says No.  And so then he's

4    asked, So your tweets are not supervised?  And he says, Well,

5    the only tweets that would have to be say reviewed would be if

6    a tweet had a probability of causing a movement in the stock.

7            THE COURT:  I hear you.  And that's not the only

8    question.  As Mr. Houston said, that's not dispositive.  But

9    that is before the policy.  So it's hard to know how that's

10   supposed to move the needle as to Mr. Musk's approach to the

11   policy.

12           MS. CRUMPTON:  I would suggest that he was saying on

13   national television, before the policy even went into effect,

14   that he didn't intend to comply with it as it was written.  He

15   intended to comply with it -- at the time we didn't reach out,

16   because we hoped that was just Mr. Musk saying what he wanted

17   to say on television, and that he was going to actually comply

18   with the policy, and we assumed that that's what happened,

19   until February 19, when designated securities counsel for Tesla

20   had to swoop in, and correct what was unquestionably a material

21   statement that was wrong.

22           And Mr. Houston has said that he's diligently tried to

23   comply, that the Court shouldn't look at these prior tweets

24   because they're not misleading and they're not inaccurate.

25   That's not the standard.  We haven't sued Mr. Musk for

J443SECC

1    securities fraud.  We have brought this action to say he is not

2    seeking preapproval of tweets that if you were a prudent person

3    seeking to seriously comply with this Court's order, you would

4    have submitted for preapproval.

5          He has just decided that he doesn't have to do that.

6    He can just have his securities counsel read the tweets at the

7    same time as the rest of us do, and if he gets something wrong,

8    well, securities counsel will fix it.

9          That's not what the Court ordered, that's not the

10   policy, and it's not what the SEC negotiated in this case.

11         And the last thing I want to address is what weight we

12   should give Tesla, or Tesla's opinion about this policy.  The

13   language that is operative here doesn't come from the Tesla

14   policy, it comes from the Court's order.  If this is a

15   communication that contains or reasonably could contain

16   material information, the Court ordered him to comply with the

17   preapproval requirement.  And Tesla has, for whatever reason,

18   thrown its lot in with Mr. Musk.  It has refused to let there

19   be any daylight between him, between their CEO and them.  And

20   that is the problem.  The reason --

21         THE COURT:  If that's right, has Tesla done what's

22   required of them?

23         MS. CRUMPTON:  We would submit that Tesla's conduct is

24   very troubling, and we're still evaluating whether Tesla has

25   complied with the policy.  But we will say that we believe that

J443SECC

1    the gravamen of the problem is with Mr. Musk's conduct.  But

2    there is also a problem that you have a company who undertook

3    to take certain actions to provide oversight of the CEO that

4    appears to have just completely abrogated that responsibility.

5             Thank you, your Honor.

6             THE COURT:  The motion is submitted.  But I did want

7    to make a few points in closing, and, as I've alluded, to a

8    call to action.

9             Point number one, I must and I will ensure that court

10   orders are followed.  It's not optional; it is not a game.  I

11   don't care if you're a small potato or a big fish.  If you are

12   you under a court order, you proceed cautiously, you follow it,

13   or you seek relief pursuant to available process, period.

14   That's the rule of law.

15            And point number two, contempt of court is serious

16   business.  It is a serious charge to be made, and it is a

17   serious conclusion for a Court to reach.  I don't take it

18   lightly, and the SEC carries a significant burden here.  In my

19   view, government lawyers should take all available steps to

20   work out disputed issues, be reasonable, come to an agreed-upon

21   resolution if possible, before invoking the significant Court's

22   contempt powers.

23            Point number three.  I have serious concerns that no

24   matter what I decide here, this issue will not be finally

25   resolved.  For example, from the SEC's perspective, and again,

J443SECC

1    I intimate no view, but the SEC could prevail here because I

2    conclude that the relevant tweet was material, but this may not

3    resolve whether the "reasonably could contain" language is

4    clear and unambiguous, and that may open up finality of this

5    consent judgment.  Or the SEC may lose here, because they

6    haven't met their burden on one or more the grounds, and that

7    may undermine the enforcement efforts going forward.

8            The same is true for Mr. Musk, and again, I'm giving

9    no view, but I may conclude that he prevails because I think

10   the judgment or the policy lacked the requisite clarity for

11   contempt purposes.  What then happens?  Judicial orders must be

12   clear and unambiguous.  That would raise the question of

13   whether the judgment needs to be modified or potentially

14   vacated.  Or, of course, he may lose and face a contempt

15   determination and sanctions.

16           So with those points in mind, my call to action is for

17   everybody to take a deep breath, put your reasonableness pants

18   on, and work this out.

19           I am requiring you within the next two weeks to meet

20   and confer for at least an hour, to make a good faith effort to

21   resolve this matter, both for the immediate contempt motion,

22   and to ensure absolute clarity moving forward so we are not

23   back here again.

24           So within two weeks from today, I will require a joint

25   letter to the Court confirming that the meet and confer has

J443SECC

1   taken place, and indicating whether you've reached resolution

2   or are on the cusp of doing so.  If not, you'll hear from me in

3   due course with my decision.

4           I thank counsel for their briefing and argument.  We

5   are adjourned.

6           (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-217

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | : : : | |
| Plaintiff, | : : | |
| vs. | : : | No. 1:18-cv-8865-AJN-GWG |
| ELON MUSK | : : : | |
| Defendant. | : : : | |

## JOINT SUBMISSION REGARDING STATUS OF EFFORTS TO RESOLVE THE SEC'S PENDING MOTION

Pursuant to this Court's April 4, 2019 Order, counsel for Plaintiff United States

Securities and Exchange Commission ("SEC") and Defendant Elon Musk provide this

submission to inform the Court of our efforts to reach an agreement to resolve the SEC's

pending motion and modify the consent judgment previously entered by the Court.

While we have not reached an agreement, counsel for the SEC, Mr. Musk, and counsel

for Tesla met and conferred for over an hour by telephone earlier this week and are

continuing to discuss potential resolution.  Because our discussions are ongoing, we

respectfully request to provide the Court with another joint submission on or before April

25, 2019, indicating whether we have reached an agreement in principle.

Dated: April 18, 2019                                    Respectfully submitted,

Cheryl Crumpton                                          Elon Musk
100 F Street, N.E.
Washington, D.C. 20549
202-551-4459
crumptonc@sec.gov

*Counsel for the SEC*

A-218

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** | : | |
| Plaintiff, | : | |
| vs. | : | No. 1:18-cv-8865-AJN-GWG |
| **ELON MUSK** | : | |
| Defendant. | : | |

### JOINT SUBMISSION REGARDING STATUS OF EFFORTS TO RESOLVE THE SEC'S PENDING MOTION

Pursuant to this Court's April 18, 2019 Order, counsel for Plaintiff United States Securities and Exchange Commission ("SEC") and Defendant Elon Musk provide this second submission to inform the Court of our continued efforts to reach an agreement to resolve the SEC's pending motion and modify the consent judgment previously entered by the Court. Since our last submission on April 18, 2019, the parties have continued to actively discuss resolution. These discussions continue to be productive and are still ongoing. Accordingly, we respectfully request to provide the Court with another joint submission on or before April 30, 2019, indicating whether we have reached an agreement in principle.

Dated: April 25, 2019                                    Respectfully submitted,

*Cheryl Crumpton*                                        *[signature]*

Cheryl Crumpton                                          Elon Musk
100 F Street, N.E.
Washington, D.C. 20549
202-551-4459
crumptonc@sec.gov

*Counsel for the SEC*

A-219

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES AND** | : | |
| **EXCHANGE COMMISSION** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **No. 1:18-cv-8865-AJN-GWG** |
| | : | **[rel. 1:18-cv-8947]** |
| **ELON MUSK,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

---

<u>**CONSENT MOTION TO AMEND FINAL JUDGMENT**</u>
<u>**AS TO DEFENDANT ELON MUSK**</u>

In accordance with the parties' agreement, the Securities and Exchange Commission (the "Commission") respectfully submits this consent motion to amend the Final Judgment entered by this Court as to Defendant Elon Musk ("Defendant") on October 16, 2018 (the "Final Judgment"). In support of this motion, the Commission states the following:

1. On September 27, 2018, the Commission filed a Complaint against Defendant alleging that he violated the federal securities laws. Dkt. No. 1.

2. On September 29, 2018, the parties reached a settlement agreement that was submitted to the Court for its approval. Dkt. No. 6. On the same day, the Commission filed a settled Complaint against Tesla, Inc. ("Tesla" or the "Company") alleging that the Company violated the federal securities laws. *SEC v. Tesla, Inc.*, 1:18-cv-8947-AJN-GWG, Dkt. Nos. 1, 3.

3. On October 16, 2018, the Court entered Final Judgments against both Musk and Tesla. The Final Judgment as to Musk ordered him to comply with procedures implemented by Tesla that would require him to seek pre-approval of any written communications that contained or reasonably could contain information material to the Company or its shareholders. Dkt. No.

1

A-220

14, at 13-14.  Similarly, the Court's Final Judgment as to Tesla ordered the Company to

implement mandatory procedures and controls to pre-approve any written communications by

Musk that contained, or reasonably could contain, information material to the Company or its

shareholders.  *SEC v. Tesla, Inc.*, Dkt. No 14, at 6.

4.      On February 25, 2019, the Commission filed a motion alleging that Defendant

violated the pre-approval requirement of the Final Judgment by not obtaining pre-approval of a

written communication published via Twitter on February 19, 2019.  Dkt. Nos. 18, 30.

Defendant opposed this motion.  Dkt Nos. 27, 33.

5.      On April 5, 2019, the Court held oral argument and ordered the parties to meet

and confer for at least one hour in an effort to resolve the Commission's contempt motion and

consider modifications to the Court's Final Judgment and Tesla's Senior Executives

Communications Policy.  Dkt. No. 39.

6.      Attorneys for the Commission, Defendant, and the General Counsel of Tesla met

and conferred, and the parties have reached an agreement to resolve the Commission's pending

contempt motion and modify the Court's Final Judgment in this case, as well as the Final

Judgment in the related case of *SEC v. Tesla, Inc.*, 1:18-cv-8947-AJN-GWG.  Attached hereto as

Exhibit 1 is the executed Consent of Defendant Musk, setting forth the terms of his agreement

with the Commission.

7.      Attached hereto as Exhibit 2 is the proposed Order Amending the Final Judgment

(the "Order") to which Defendant agreed.  The proposed Order would replace and supersede

subpart (b) of paragraph IV of the Final Judgment with the following language:

> comply with all mandatory procedures implemented by Tesla, Inc. (the
> "Company") regarding the oversight of communications relating to the Company
> made in any format, including, but not limited to, posts on social media (*e.g.*,
> Twitter), the Company's website (*e.g.*, the Company's blog), press releases, and

investor calls; and obtain the pre-approval of an experienced securities lawyer employed by the Company ("Securities Counsel") of any written communication that contains information regarding any of the following topics:

- the Company's financial condition, statements, or results, including earnings or guidance;
- potential or proposed mergers, acquisitions, dispositions, tender offers, or joint ventures;
- production numbers or sales or delivery numbers (whether actual, forecasted, or projected) that have not been previously published via pre-approved written communications issued by the Company ("Official Company Guidance") or deviate from previously published Official Company Guidance;
- new or proposed business lines that are unrelated to then-existing business lines (presently includes vehicles, transportation, and sustainable energy products);
- projection, forecast, or estimate numbers regarding the Company's business that have not been previously published in Official Company Guidance or deviate from previously published Official Company Guidance;
- events regarding the Company's securities (including Musk's acquisition or disposition of the Company's securities), credit facilities, or financing or lending arrangements;
- nonpublic legal or regulatory findings or decisions;
- any event requiring the filing of a Form 8-K by the Company with the Securities and Exchange Commission, including:
  - a change in control; or
  - a change in the Company's directors; any principal executive officer, president, principal financial officer, principal accounting officer, principal operating officer, or any person performing similar functions, or any named executive officer; or
- such other topics as the Company or the majority of the independent members of its Board of Directors may request, if it or they believe pre-approval of communications regarding such additional topics would protect the interests of the Company's shareholders; and

8.      In reviewing the terms of a consent judgment in an SEC enforcement case, the district court's role is to determine whether the proposed consent judgment is "fair and reasonable." *SEC v. Citigroup Global Markets, Inc.*, 752 F.3d 285, 294 (2d Cir. 2014). In this case, the proposed amendment to the Final Judgment is fair, reasonable, and in the interest of the parties and investors because the proposed revisions will provide additional clarity regarding the written communications for which the Defendant is required to obtain pre-approval pursuant to the Final Judgment. Specifically, the proposed amendment provides that Defendant must seek

pre-approval of any written communication that contains information regarding a list of specific topics.[1] This enhanced clarity will reduce the likelihood of future disputes regarding compliance with this provision of the Final Judgment.

9.      If the Court grants this motion and enters the proposed Order, this will resolve the Commission's pending motion.

For these reasons, the parties respectfully request that the Court approve and enter the proposed Order Amending the Final Judgment.

Dated: April 26, 2019                              Respectfully submitted,

                                                   _s/ Cheryl L. Crumpton_
                                                   Cheryl L. Crumpton*
                                                   E. Barrett Atwood*

                                                   *Admitted *pro hac vice*

                                                   U.S. Securities and Exchange Commission
                                                   100 F Street, N.E.
                                                   Washington, D.C. 20549
                                                   (202) 551-4459 (Crumpton)
                                                   crumptonc@sec.gov

                                                   44 Montgomery Street, Suite 2800
                                                   San Francisco, CA 94104
                                                   (415) 705-2467 (Atwood)
                                                   atwoode@sec.gov

Of counsel:

Erin E. Schneider
Steven Buchholz
Walker S. Newell

---

[1] This list is not intended to be an exhaustive list of topics that may be material for purposes of the federal securities laws.

## CERTIFICATE OF SERVICE

I certify that on April 26, 2019, a copy of the foregoing was filed through the Court's

CM/ECF system, which will send copies to all counsel of record.

*s/ Cheryl L. Crumpton*
Counsel for the SEC

A-224

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **No. 1:18-cv-8865-AJN-GWG** |
| | : | **[rel. 1:18-cv-8947]** |
| **ELON MUSK,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## CONSENT OF DEFENDANT ELON MUSK

1.      On September 28, 2018, Defendant Elon Musk ("Defendant") consented to the entry of a Final Judgment in this matter (the "September 2018 Consent"). Dkt. No. 14, at 3-9. The Court entered the Final Judgment as to Defendant on October 16, 2018 (the "Final Judgment"). *Id.* at 10-14.

2.      Defendant hereby consents to the entry of an Order amending the Final Judgment in the form attached hereto (the "Order") to replace and supersede subpart (b) of paragraph IV of the Final Judgment with the following:

> comply with all mandatory procedures implemented by Tesla, Inc. (the "Company") regarding the oversight of communications relating to the Company made in any format, including, but not limited to, posts on social media (*e.g.*, Twitter), the Company's website (*e.g.*, the Company's blog), press releases, and investor calls; and obtain the pre-approval of an experienced securities lawyer employed by the Company ("Securities Counsel") of any written communication that contains information regarding any of the following topics:
>
> - the Company's financial condition, statements, or results, including earnings or guidance;
> - potential or proposed mergers, acquisitions, dispositions, tender offers, or joint ventures;
> - production numbers or sales or delivery numbers (whether actual, forecasted, or projected) that have not been previously published via pre-approved written communications issued by the Company

A-225

("Official Company Guidance") or deviate from previously published Official Company Guidance;

- new or proposed business lines that are unrelated to then-existing business lines (presently includes vehicles, transportation, and sustainable energy products);
- projection, forecast, or estimate numbers regarding the Company's business that have not been previously published in Official Company Guidance or deviate from previously published Official Company Guidance;
- events regarding the Company's securities (including Musk's acquisition or disposition of the Company's securities), credit facilities, or financing or lending arrangements;
- nonpublic legal or regulatory findings or decisions;
- any event requiring the filing of a Form 8-K by the Company with the Securities and Exchange Commission, including:
  - a change in control; or
  - a change in the Company's directors; any principal executive officer, president, principal financial officer, principal accounting officer, principal operating officer, or any person performing similar functions, or any named executive officer; or
- such other topics as the Company or the majority of the independent members of its Board of Directors may request, if it or they believe pre-approval of communications regarding such additional topics would protect the interests of the Company's shareholders; and

3.      Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Securities and Exchange Commission (the "Commission") or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

4.      Defendant agrees that this Consent shall be incorporated into the Order with the same force and effect as if fully set forth therein.

5.      Defendant agrees that the Commission may present the Order to the Court for signature and entry without further notice.

6.      Defendant agrees that all other provisions of the September 2018 Consent and the Final Judgment shall remain in effect.

2

A-226

7.      Defendant agrees that this Court shall retain jurisdiction over this matter for the
purpose of enforcing the terms of the Final Judgment and the Order.


Dated:  April 26, 2019

_____
Elon Musk


On _____, 2019, _____, a person known to me,
personally appeared before me and acknowledged executing the foregoing Consent.


_____
Notary Public
Commission expires:

3

A-227

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**          **CIVIL CODE § 1189**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                                    )
County of _Los Angeles_                               )

On _4/26/19_ before me, _Matilda Simon-Ferrigno_,
    _Date_                                  _Here Insert Name and Title of the Officer_

personally appeared _Elon Musk_
                                _Name(s) of Signer(s)_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

MATILDA N. SIMON-FERRIGNO
Notary Public - California
Los Angeles County
Commission # 2174858
My Comm. Expires Dec 8, 2020

Signature _____
            _Signature of Notary Public_

      _Place Notary Seal Above_

——————————————— **OPTIONAL** ———————————————
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____ Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Individual      ☐ Attorney in Fact | ☐ Individual      ☐ Attorney in Fact |
| ☐ Trustee         ☐ Guardian or Conservator | ☐ Trustee         ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

A-228

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **vs.** : | **No. 1:18-cv-8865-AJN-GWG** |
| : | **[rel. 1:18-cv-8947]** |
| **ELON MUSK,** : | |
| : | |
| **Defendant.** : | |
| : | |

---

<u>**ORDER AMENDING FINAL JUDGMENT AS TO DEFENDANT ELON MUSK**</u>

The Securities and Exchange Commission and Defendant Elon Musk having moved and consented to amend the Final Judgment entered by this Court as to Defendant Elon Musk on October 16, 2018 (the "Final Judgment") and for good cause shown:

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that subpart (b) of paragraph IV of the Final Judgment is replaced and superseded by the following:

> comply with all mandatory procedures implemented by Tesla, Inc. (the "Company") regarding the oversight of communications relating to the Company made in any format, including, but not limited to, posts on social media (*e.g.*, Twitter), the Company's website (*e.g.*, the Company's blog), press releases, and investor calls; and obtain the pre-approval of an experienced securities lawyer employed by the Company ("Securities Counsel") of any written communication that contains information regarding any of the following topics:
>
> - the Company's financial condition, statements, or results, including earnings or guidance;
> - potential or proposed mergers, acquisitions, dispositions, tender offers, or joint ventures;
> - production numbers or sales or delivery numbers (whether actual, forecasted, or projected) that have not been previously published via pre-approved written communications issued by the Company ("Official Company Guidance") or deviate from previously published Official Company Guidance;
> - new or proposed business lines that are unrelated to then-existing business lines (presently includes vehicles, transportation, and sustainable energy products);

A-229

- projection, forecast, or estimate numbers regarding the Company's business that have not been previously published in Official Company Guidance or deviate from previously published Official Company Guidance;
- events regarding the Company's securities (including Musk's acquisition or disposition of the Company's securities), credit facilities, or financing or lending arrangements;
- nonpublic legal or regulatory findings or decisions;
- any event requiring the filing of a Form 8-K by the Company with the Securities and Exchange Commission, including:
  - a change in control; or
  - a change in the Company's directors; any principal executive officer, president, principal financial officer, principal accounting officer, principal operating officer, or any person performing similar functions, or any named executive officer; or
- such other topics as the Company or the majority of the independent members of its Board of Directors may request, if it or they believe pre-approval of communications regarding such additional topics would protect the interests of the Company's shareholders; and

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all other provisions of the Final Judgment shall remain in effect.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of the Final Judgment, as amended by this Order.

Dated: _____

_____
Hon. Alison J. Nathan
UNITED STATES DISTRICT JUDGE

A-230

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: APR 3 0 2019

---

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

    Plaintiff,     :
             :
  vs.          :  **No. 1:18-cv-8865-AJN-GWG**
             :  **[rel. 1:18-cv-8947]**
ELON MUSK,       :
             :
    Defendant.    :
             :
             :

---

## ORDER AMENDING FINAL JUDGMENT AS TO DEFENDANT ELON MUSK

   The Securities and Exchange Commission and Defendant Elon Musk having moved and

consented to amend the Final Judgment entered by this Court as to Defendant Elon Musk on

October 16, 2018 (the "Final Judgment") and for good cause shown:

   IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that subpart (b) of

paragraph IV of the Final Judgment is replaced and superseded by the following:

> comply with all mandatory procedures implemented by Tesla, Inc. (the
> "Company") regarding the oversight of communications relating to the Company
> made in any format, including, but not limited to, posts on social media (*e.g.*,
> Twitter), the Company's website (*e.g.*, the Company's blog), press releases, and
> investor calls; and obtain the pre-approval of an experienced securities lawyer
> employed by the Company ("Securities Counsel") of any written communication
> that contains information regarding any of the following topics:
>
> - the Company's financial condition, statements, or results, including
>   earnings or guidance;
> - potential or proposed mergers, acquisitions, dispositions, tender offers,
>   or joint ventures;
> - production numbers or sales or delivery numbers (whether actual,
>   forecasted, or projected) that have not been previously published via
>   pre-approved written communications issued by the Company
>   ("Official Company Guidance") or deviate from previously published
>   Official Company Guidance;
> - new or proposed business lines that are unrelated to then-existing
>   business lines (presently includes vehicles, transportation, and
>   sustainable energy products);

- projection, forecast, or estimate numbers regarding the Company's business that have not been previously published in Official Company Guidance or deviate from previously published Official Company Guidance;
- events regarding the Company's securities (including Musk's acquisition or disposition of the Company's securities), credit facilities, or financing or lending arrangements;
- nonpublic legal or regulatory findings or decisions;
- any event requiring the filing of a Form 8-K by the Company with the Securities and Exchange Commission, including:
  - a change in control; or
  - a change in the Company's directors; any principal executive officer, president, principal financial officer, principal accounting officer, principal operating officer, or any person performing similar functions, or any named executive officer; or
- such other topics as the Company or the majority of the independent members of its Board of Directors may request, if it or they believe pre-approval of communications regarding such additional topics would protect the interests of the Company's shareholders; and

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all other provisions of the Final Judgment shall remain in effect.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of the Final Judgment, as amended by this Order.

Dated: _____4/30/19_____

Hon. Alison J. Nathan
UNITED STATES DISTRICT JUDGE

2

A-232

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7364**

WRITER'S EMAIL ADDRESS
**alexspiro@quinnemanuel.com**

February 17, 2022

**Via ECF**

Honorable Alison J. Nathan
United States District Judge
Southern District of New York
40 Foley Square, Room 906
New York, NY 10007

Re:     *SEC v. Elon Musk*, No. 1:18-cv-8865-AJN; *SEC v. Tesla, Inc.*, No. 1:18-cv-8947-AJN

Dear Judge Nathan:

We write to alert the Court to a pattern of conduct by the Securities and Exchange Commission (the "SEC") that has gone beyond the pale. Simply stated, the SEC has failed to comply with its promise to pay Tesla's shareholders the $40 million it collected as part of the settlement in these cases and that it purports to be holding for them. Instead, it has been devoting its formidable resources to endless, unfounded investigations into Mr. Musk and Tesla. We are respectfully requesting that the Court schedule a conference to address why the SEC has failed to distribute these funds to shareholders but has chosen to spend its energy and resources investigating Mr. Musk's and Tesla's compliance with the consent decree by issuing subpoenas unilaterally, without Court approval.

When Mr. Musk and Tesla agreed to the consent decrees in 2018, Tesla was a less mature company. They elected to resolve the matter (without admitting or denying wrongdoing relative to the SEC's dubious legal theories) because protracted litigation was not in the interests of the

**quinn emanuel urquhart & sullivan, llp**
LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON | SALT LAKE CITY
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

company and its shareholders, and stood to jeopardize the company's financing (*i.e.*, the proverbial gun of losing company financing was pointed at their heads). My clients did so in reliance on certain promises made by the SEC—in particular, that the SEC would distribute the $20 million from Mr. Musk and the $20 million from Tesla to Tesla's shareholders. Plus, Mr. Musk and Tesla understood that settling with the SEC would at last end the SEC's harassment and, importantly, make this Court, and not the SEC alone, the monitor over any perceived compliance issues going forward. But the SEC has broken its promises. Without coming before this Court, it has been weaponizing the consent decree by using it to try to muzzle and harass Mr. Musk and Tesla, while ignoring its Court-ordered duty to remit the $40 million that it continues to hold while Tesla's shareholders continue to wait. Worst of all, the SEC seems to be targeting Mr. Musk and Tesla for unrelenting investigation largely because Mr. Musk remains an outspoken critic of the government; the SEC's outsized efforts seem calculated to chill his exercise of First Amendment rights rather than to enforce generally applicable laws in evenhanded fashion.

Pursuant to the final judgments in this matter in October 2018, Mr. Musk and Tesla each paid $20,000,000 for distribution to Tesla shareholders pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended by the Dodd-Frank Act of 2010, 15 U.S.C. §7246(a). *Tesla*, Dkt. No. 14; *Musk*, Dkt. No. 14. Without moving for appointment of an agent to distribute the funds promptly, however, the SEC instead spent the next year monitoring Mr. Musk's Twitter account. *See Musk*, Dkt. Nos. 18, 19, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 39, 40, 42, 44, 46, 47, 48; *Tesla*, Dkt. Nos. 16, 17. Only on February 24, 2020, *nearly 500 days* after Mr. Musk and Tesla deposited the funds, did the SEC at last move to establish a Fair Fund and appoint a tax administrator. *Musk*, Dkt. No. 52. After that, the SEC sat for *nearly another 500 days* before seeking to appoint a distribution agent. *Musk*, Dkt. No. 54 (Apr. 30, 2021). Once it had done so, the distribution agent failed to file any status reports with the Court in 2021, in defiance of Your Honor's order. *Musk*, Dkt. No. 56. According to the SEC's own Rules of

2

Practice, which apply in Commission administrative proceedings, "[u]nless ordered otherwise, the Division of Enforcement shall submit a proposed plan no later than 60 days after the respondent has turned over the funds or other assets."  17 C.F.R. § 201.1101.  Here, the SEC has been in possession of funds owed to Tesla investors for more than 1,200 days, and it has yet to announce anything like a distribution plan.  As such, the SEC has taken nearly twenty times longer than its specified outer limit.

Despite the SEC's inattention and dereliction when it comes to paying Tesla's shareholders, it has been more than energetic in going after Mr. Musk and Tesla, largely to police Mr. Musk's public pronouncements via Twitter.  Mr. Musk and Tesla respectfully seek a course correction.  The SEC has not once come before Your Honor to seek discovery concerning compliance under the consent decree.  Instead, it has gone rogue and unilaterally opened its own investigations.  The SEC has conducted these investigations wholly outside of this Court's supervision.  But this Court's consent decree, by design and by its terms, regulates Mr. Musk and Tesla's compliance, and they never agreed to a settlement that allows the SEC to issue subpoenas absent oversight and approval from this Court.  If the SEC truly perceives non-compliance and can identify a good-faith basis, it must proceed before Your Honor.  It is unsurprising that, despite the SEC's serial investigations—some of which involved one investigation being closed only for another to be opened at the same time—there has been no finding of any wrongdoing.

Enough is enough.  Mr. Musk and Tesla write in the hope that the Court can bring the SEC's harassment campaign to an end, while ensuring that the SEC finally delivers, at long last, on its commitment to Tesla's shareholders and this Court.

Respectfully submitted,

*/s/ Alex Spiro*

Alex Spiro

3

A-235



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
44 MONTGOMERY STREET, SUITE 2800
SAN FRANCISCO, CA 94104

SAN FRANCISCO
REGIONAL OFFICE

February 18, 2022

**Via ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

  Re: *SEC v. Tesla, Inc.*, 1:18-cv-8947-AJN; *SEC v. Musk*, 1:18-cv-8865-AJN

Dear Judge Nathan:

  We write in response to the February 17, 2022 letter filed by Alex Spiro, Esq. on behalf of Tesla, Inc. and Elon Musk in the above-referenced matters. Dkt. No. 61 (all docket citations refer to the *SEC v. Musk* matter).

  Contrary to Mr. Spiro's assertions, the Commission is in compliance with the Court's orders regarding the filing of status reports. As delineated in the status report of Rust Consulting filed on January 5, 2022, Dkt. No. 57, and endorsed by the Court on January 10, 2022, Dkt. No. 58, all status reports are due 45 days after the Court's approval of the distribution plan. We note that Mr. Spiro's letter is the first time we have seen Tesla and Mr. Musk express any concerns regarding the distribution of the penalties Mr. Musk and Tesla paid to settle this litigation.

  As the Court knows, the Commission's Distributions staff petitioned the Court to establish a fair fund and to appoint a tax administrator and distribution agent. Dkt. No. 52. The staff has been working closely with the distribution agent and the Commission's Division of Economic and Risk Analysis to develop a methodology to compensate investors who were harmed by the misconduct alleged in the Commission's Complaints against Tesla and Mr. Musk. Given the complexity of the distribution, it has taken time to develop the plan of allocation. That process is nearing completion and, barring any unforeseen circumstances, the Distributions staff expects to submit the proposed plan of distribution for the Court's approval by the end of March 2022.

  Mr. Spiro also complains that the Commission's enforcement staff has been communicating with Tesla and Mr. Musk regarding certain of Mr. Musk's tweets since

the Amended Judgments were signed by the Court. Specifically, Mr. Spiro claims that "Mr. Musk and Tesla understood that settling with the SEC would ... make this Court, and not the SEC alone, the monitor over any perceived compliance issues going forward." Dkt. No. 61, at 2. However, the Court did not order any such monitoring process by the Court. To the contrary, during the April 4, 2019 contempt hearing, Dkt. No. 40 at 70-71, the Court encouraged the parties to make good faith efforts to meet and confer before raising with the Court any issues about compliance with the Amended Judgments. The Commission's enforcement staff have, accordingly, sought to meet and confer with counsel for Tesla and Mr. Musk to address any concerns regarding Tesla and Mr. Musk's compliance with the Court's Amended Judgments.

Finally, Mr. Spiro's letter incorrectly implies that the Commission staff have issued subpoenas in this litigation. That simply is not true—the Commission staff have not issued any subpoenas in this litigation. If Tesla and Mr. Musk have legitimate objections with the SEC's processes outside this litigation, they should pursue those objections in the appropriate forum. *See Sprecher v. Von Stein*, 772 F.2d 16, 18 (2d Cir. 1985) (citing *Sprecher v. Graber*, 716 F.2d 968, 975 (2d Cir. 1983)) (ruling that "[t]he exclusive method for testing the validity of the SEC's investigatory motives or methods is a contested subpoena enforcement proceeding under 15 U.S.C. § 78u(c).").

The SEC is happy to provide any additional briefing requested by the Court.

Respectfully submitted,

*/s/ Steven Buchholz*

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7364**

WRITER'S EMAIL ADDRESS
**alexspiro@quinnemanuel.com**

February 21, 2022

**Via ECF**

Honorable Alison J. Nathan
United States District Judge
Southern District of New York
40 Foley Square, Room 906
New York, NY  10007

Re:    *SEC v. Elon Musk*, No. 1:18-cv-8865-AJN; *SEC v. Tesla, Inc.*, No. 1:18-cv-8947-AJN

Dear Judge Nathan:

We came to Your Honor this past week to express grave concerns about the conduct of the Securities and Exchange Commission ("SEC" or the "Commission"), which has failed Tesla shareholders and weaponized this Court's consent decree for illicit ends.  In its written response to this Court, the Commission tried to waive away these concerns.  At the same time, the SEC does not and cannot deny that it has yet to pay the $40 million-and-counting that it promised to pay Tesla shareholders.  *See* Sec. & Exch. Comm, Elon Musk Settles SEC Fraud Charges; Tesla Charged With and Resolves Securities Law Charge (2018-226) (Sept. 29, 2018) https://www.sec.gov/news/press-release/2018-226.  More than 1,200 days following the SEC's receipt of the funds in question, it has not distributed a penny.

**quinn emanuel urquhart & sullivan, llp**
LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON | SALT LAKE CITY
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

The Commission's claim that its "staff have not issued any subpoenas in this litigation" is disingenuous at best. Lest this Court be misled, we are obliged to pinpoint specifics that may shine light on the Commission's representation. In a subpoena sent to Tesla in November 2021, the Commission specifically demanded documents concerning my clients' "compliance or non-compliance with Tesla's disclosure controls and procedures, executive communications policy, external communications policy, other policies or procedures relating to public statements or communications by Tesla executives, or the final judgment or amended final judgment in *SEC v. Musk*, 1:18-cv-8865-AJN (S.D.N.Y.)." The Commission issued a subpoena with similar demands to Mr. Musk.

But our concerns now go well beyond niceties of the Commission's representations. It has become clearer and clearer that the Commission is out to retaliate against my clients for exercising their First Amendment rights—most recently by criticizing the Commission on the public docket and by petitioning this Court for relief. Upon information and belief, after I filed the February 17, 2022 letter to this Court regarding the Commission's conduct, at least one member of the SEC staff responded by leaking certain information regarding its investigation. This leak is emblematic of the vindictive, improper conduct that occasioned my letter: the SEC is retaliating against Mr. Musk and Tesla, without answering to the constraints of principle or law in so doing. *See* 17 CFR § 203.2 ("Information or documents obtained by the Commission in the course of any investigation or examination, unless made a matter of public record, shall be deemed non-public . . ."); 17 CFR § 203.5 ("Unless otherwise ordered by the Commission, all formal investigative proceedings shall be non-public.").

By letter dated February 19, 2022, we respectfully requested that specific SEC staff members preserve their records and devices. We have also reported the matter to the SEC Office of Inspector General. No denial has been forthcoming as of yet. So that the Court is advised of the premises and able to address the ostensible misconduct before it, we now respectfully seek

2

A-239

on-the-record assurance that the Commission has not leaked investigative details in violation of its own rules and policies, and is otherwise acting in accordance with the law.

Respectfully submitted,

*/s/ Alex Spiro*

Alex Spiro

A-240

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/24/22

| | | |
|---|---|---|
| United States Securities and Exchange Commission, | | |
| | Plaintiff, | 18-cv-8865 (AJN) |
| –v– | | |
| Elon Musk, | | |
| | Defendant. | |

| | | |
|---|---|---|
| United States Securities and Exchange Commission, | | |
| | Plaintiff, | 18-cv-8947 (AJN) |
| –v– | | ORDER |
| Tesla, Inc., | | |
| | Defendant. | |

ALISON J. NATHAN, District Judge:

The Court is in receipt of the Defendants Elon Musk and Tesla, Inc.'s letter dated February 17, 2022, as well as the Commission's response dated February 18, 2022, and the Defendants' further letter dated February 21, 2022. Dkt. Nos. 61, 63, 64.

The Defendants' precise application to the Court is unclear. They request a conference to address "why the SEC has failed to distribute these funds to shareholders but has chosen to spend its energy and resources investigating Mr. Musk's and Tesla's compliance with the consent decree by issuing subpoenas unilaterally, without Court approval." Dkt. No. 61 at 1. The Court

A-241

DENIES this request for a conference.  To the extent that the Defendants seek to impose a deadline on the Commission's implementation of a Plan of Distribution of the Fair Fund, the Defendants may file a motion and submit briefing in support of doing so.  Otherwise, the Court cannot enforce a deadline that does not currently exist.  *E.g.*, Dkt. Nos. 14, 53, 55.

Further, to the extent that the Defendants have a non-frivolous basis to quash a subpoena in light of the Court's prior orders in this case, the Defendants may make a motion, supported by briefing, that requests specific relief from the Court.

The Defendants also seek "on-the-record assurance that the Commission has not leaked investigative details in violation of its own rules and policies, and is otherwise acting in accordance with the law."  Dkt. No. 64 at 2–3.  The letter does not contain specific facts or legal authority to justify this request.  Moreover, the Court doubts that the regulations invoked by the Defendants, 17 C.F.R. §§ 203.2, 203.5, are judicially enforceable against the Commission, *see LaMorte v. Mansfield*, 438 F.2d 448, 450–51 (2d Cir. 1971) (explaining that the regulations describe only "the discretion possessed by the agency in determining whether to disclose information," a privilege that "is the agency's, not the witness'[s]").  The request is DENIED.

SO ORDERED.

Dated: February 24, 2022
       New York, New York

_____
ALISON J. NATHAN
United States District Judge

2

A-242

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br>v.<br><br>**ELON MUSK,**<br><br>**Defendant.** | **Civil Action No. 1:18-cv-08865-AJN** |

### DEFENDANT ELON MUSK'S NOTICE OF MOTION TO QUASH & TO TERMINATE CONSENT DECREE

Please take notice, that upon the Memorandum of Law in Support of his Motion to Quash and Motion to Terminate Consent Decree, dated March 8, 2022 and all exhibits attached thereto; the Declaration of Elon Musk, dated March 8, 2022, and upon all the papers and proceedings had herein, Defendant Elon Musk will move this Court, before the Honorable Alison J. Nathan, at the United States Courthouse for the Southern District of New York located at 40 Foley Square, New York, New York, 10007, for an Order quashing certain portions of an administrative subpoena issued *ultra vires* by Plaintiff, the Securities and Exchange Commission ("Commission" or "SEC"), and for an order terminating the consent decree.

A-243

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br><br>          **Plaintiff,** <br><br>   v. <br><br> ELON MUSK, <br><br>          **Defendant.** | **Civil Action No. 1:18-cv-08865-AJN** |

<u>**DEFENDANT ELON MUSK'S MOTION TO QUASH**</u>
<u>**& TO TERMINATE CONSENT DECREE**</u>

Defendant Elon Musk respectfully moves this Court for an Order quashing certain portions of an administrative subpoena issued *ultra vires* by Plaintiff, the Securities and Exchange Commission ("Commission" or "SEC"), and for an order terminating the consent decree.  Those portions of the subpoena should be quashed because the SEC lacks legal authority to issue those demands under either the purview of the securities laws or the judgments in this case and because the subpoena was issued in bad faith.  The consent decree should be terminated because it is inequitable to permit the SEC's roving and unbounded investigations into Mr. Musk while imposing *ex ante* prior restraints on, and *ex post* unending investigations of, Mr. Musk's exercise of his First Amendment rights.  Further, the circumstances under which the decree was entered strongly favor termination of the decree.

The grounds for these motions are set forth more fully in the Memorandum of Law.  Mr. Musk respectfully requests oral argument on these motions.

2

A-244

Dated: New York, New York
     March 8, 2022

Respectfully submitted,

/s/ Alex Spiro
Alex Spiro
QUINN EMANUEL
  URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com

*Attorney for Elon Musk*

A-245

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I caused the foregoing Notice and Motions to be filed with the Court's

CM/ECF system this 8th day of March, 2022, thereby causing it to be served on all counsel of

record.

Dated: New York, New York        Respectfully submitted,
       March 8, 2022

                                       /s/ Alex Spiro
                                       Alex Spiro
                                       QUINN EMANUEL
                                         URQUHART & SULLIVAN, LLP
                                       51 Madison Avenue, 22nd Floor
                                       New York, NY 10010
                                       Telephone: (212) 849-7000
                                       Facsimile: (212) 849-7100
                                       alexspiro@quinnemanuel.com

                                       *Attorney for Elon Musk*

4

A-246

# Exhibit A
# Filed Under Seal

# Exhibit B
# Filed Under Seal

# Exhibit C

## Privilege Log

| Date | Type of Communication | Parties | Privilege Basis | Privilege Description |
|---|---|---|---|---|
| November 1, 2021, at approximately 7:01 a.m. | Phone conversation | Elon Musk, CEO, and David Searle, Tesla Deputy General Counsel and Acting Head of Legal | ACC | Conversation regarding Mr. Musk's public preannouncement of his intent to sell Tesla stock. |
| November 1, 2021, at approximately 8:31 a.m. | Phone conversation | David Searle and Zach Kirkhorn, CFO | ACC | Conversation regarding Mr. Musk's public preannouncement of his intent to sell Tesla stock. |
| November 1, 2021, at approximately 9:05 a.m. | Phone conversation | David Searle and Cassie Zhang, Managing Counsel, Securities | ACC | Conversation regarding Mr. Musk's public preannouncement of his intent to sell Tesla stock. |

# Exhibit D
# Filed Under Seal

# Exhibit E

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7364**

WRITER'S EMAIL ADDRESS
alexspiro@quinnemanuel.com

May 22, 2020

**Via email to buchholzs@sec.gov**

Steven Buchholz
Assistant Reginal Director
U.S. Securities & Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, CA 94104

Dear Mr. Buchholz:

　　We write on behalf of our client Tesla, Inc. ("Tesla") in response to your letter dated May 20, 2020, requesting a further meet and confer and voluntary production of certain documents regarding Mr. Musk's May 1 tweet regarding his opinion of Tesla's stock price (the "May 1 Tweet"). Following our May 15 meet and confer, Tesla carefully considered the staff's position and requests for information. Tesla stands by its previous determination that Mr. Musk's May 1 Tweet did not fall within the parameters of the Amended Final Judgment and accordingly, Tesla declines to produce the documents requested.

　　As discussed, Mr. Musk's most recent tweet sharing his opinion about Tesla's stock price did not violate the Amended Final Judgment. That Judgment lists the enumerated topics on which Mr. Musk needed to seek pre-approval before tweeting. Tesla's stock price is not on that list. Nor can we fathom how anyone would have thought it belonged on that list, considering that CEOs remark about their companies' stock regularly (including when they state or suggest the price is lower than it should be) without the SEC raising issues. Further, the SEC's assertion that Tesla's stock price is "inextricably linked to its financial condition" ignores both Tesla and general market history in which stock prices as often as not have no correlation to the financial condition, and reflect other judgments including expectations for the future. Simply stated, Mr. Musk's May 1 Tweet does not violate the Amended Judgment. And absent a violation, the SEC has no right to inspection.

　　Worse yet, the SEC is attempting to use the Amended Judgment to trample the First Amendment rights of Mr. Musk—an outspoken critic of the SEC. This has no basis in the law. Consent decrees, like the Amended Judgment, must be interpreted narrowly—especially when constitutional rights, such as free speech, are involved. See *United States v. Armour & Co.*, 402 U.S. 673, 682–83 (1971). Mr. Musk has a right to tweet freely on matters not on the Amended Judgment's list. *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226,

A-253

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7364**

WRITER'S EMAIL ADDRESS
alexspiro@quinnemanuel.com

237 (2d Cir. 2019) ("[S]ocial media is entitled to the same First Amendment protections as other forms of media."). When Mr. Musk opines to the public via Twitter about his views on Tesla's stock price—whether it is too high, too low, laudable, or lamentable—he speaks to a matter of public concern and is entitled to corresponding protection under the First Amendment. *See, e.g.*, *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 441 (S.D.N.Y. 2014) (holding that speech with some commercial aspects is not "commercial speech" when the statements "relate to matters of public concern and do not themselves propose transactions"). Tesla will not enable the SEC to turn the Amended Judgment into a sword for First Amendment oppression by unilaterally expanding its mandate beyond the pre-approval-topics list and into abstract pronouncements on matters of free speech.

In the end, the current dispute appears to be nothing more than yet another attempt to harass Tesla and silence Mr. Musk. Over the course of many years, SEC investigations have overlapped endlessly with one another such that there has been no reprieve from the SEC's intense, and meritless, focus on Mr. Musk and his businesses. The serial nature of these investigations leaves us gravely concerned that the SEC is targeting Mr. Musk for an improper purpose.

Thank you,

Alex Spiro
QUINN EMANUEL URQUHART & SULLIVAN, LLP

A-254

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>            **Plaintiff,**<br>    **v.**<br><br>**ELON MUSK,**<br><br>            **Defendant.** | **Civil Action No. 1:18-cv-08865-AJN** |

<u>**DECLARATION OF ELON MUSK IN SUPPORT OF HIS MOTION TO QUASH**</u>
<u>**& TO TERMINATE CONSENT DECREE**</u>

I, Elon R. Musk, declare as follows:

1.   I am the Chief Executive Officer of Tesla, Inc. ("Tesla").

2.   On August 7, 2018, I learned that the Securities and Exchange Commission ("SEC" or "Commission") intended to investigate a Twitter communication I made on the same day.

3.   My August 7, 2018 tweet was written at a time when I *was* in fact considering taking Tesla private at $420 a share, funding *was* secured, and there *was* investor support. *See* Exhibit A at 1 (Defs.' Opp'n. to Pl.'s Mot. for Partial Summ. J., *In re Tesla, Inc. Securities Litig.*, No. 3:18-cv-04865-EMC (N.D. Cal. Feb. 1, 2022)).

4.   Despite this, the SEC's unrelenting regulatory pressure, combined with the attendant collateral consequence of the SEC's complaint against me, caused a scenario in which I was forced to sign the consent decree in 2018.  Tesla was a less mature company and the SEC's action stood to jeopardize the company's financing.  Defending against the SEC's action through

A-255

protracted litigation was not in the interests of the company and its shareholders.  As Tesla's CEO and Chairman at the time, I perceived that the company and its shareholders would be placed at undue risk unless I settled the matter promptly.

5.  In September 2018, before filing this action, the SEC offered me a no-admit, no-deny monetary settlement with no officer or director bar.  Moments before proceeding with this settlement, on September 26, I learned for the first time that the settlement could require *multiple* companies I was affiliated with—Tesla, SpaceX, The Boring Company, and Neuralink—to either seek a publicly accessible waiver letter regarding the SEC's allegations or risk their future ability to raise money through Regulation D offerings.

6.  Upon receipt of this information, I was adamant that we needed to withdraw from SEC negotiations.  I had only wanted to settle to help Tesla, but I did not wish to cause harm to the other companies.  It felt wrong to do so.

7.  On September 27, my counsel informed the SEC that I had withdrawn my consent to move forward with the settlement.  The Commission filed their complaint against me in this case the same day.

8.  The potential harms of the SEC's action to Tesla and its shareholders were immediately apparent.  On September 28, I learned from Tesla's Investor Relations team that several of Tesla's largest shareholders could cede their ownership in Tesla—substantially impacting Tesla's financing—if the case was not settled expediently.  I entered into the consent decree for the immediate survival of Tesla.

9.  I never lied to shareholders.  I would never lie to shareholders.  I entered into the consent decree for the survival of Tesla, for the sake of its shareholders.

2

A-256

I declare under penalty of perjury that the foregoing is true and correct.

Date: _____March 7, 2022_____          Respectfully submitted,

Place: _____New York, NY_____

3

A-257

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 04/27/2022
```

------------------------------------------------------------------X
                                     :

UNITED STATES SECURITIES AND        :
EXCHANGE COMMISSION,               :
                                       :

                         Plaintiff,        :             18-cv-8865 (LJL)
                                       :

           -v-                         :          OPINION AND ORDER
                                       :

ELON MUSK,                        :
                                       :

                       Defendant.     :
                                       :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendant Elon Musk ("Musk") moves for an order quashing certain portions of an

administrative subpoena issued by Plaintiff, the United States Securities and Exchange

Commission ("SEC") and terminating the consent decree he previously entered into with the

SEC.  Dkt. No. 70.

      For the following reasons, the motion is denied.

**BACKGROUND**

I.      **The SEC Action and the Consent Decree**

      Defendant Musk is a party to a final judgment entered by the Court on October 16, 2018,

Dkt. No. 14, after the SEC charged him in a complaint filed on September 27, 2018 with

violating Section 10(b)(5) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15

U.S.C. § 78u, and Rule 10b-5 promulgated thereunder, Dkt. No. 1.  The complaint alleged that

Musk published a series of false and misleading statements to millions of people, including

members of the press, using the social media platform Twitter.  In particular, the SEC alleged

that in August 2018, Musk tweeted to his then over twenty-two million Twitter followers that he

could take Tesla, Inc. ("Tesla") private at $420 per share (a substantial premium to its trading price at the time), that funding for the transaction had been secured, and that the only remaining uncertainty was a shareholder vote.  The tweet allegedly was false:  Musk had not discussed specific deal terms with any potential financing partners, and he knew the potential transaction was uncertain and subject to numerous contingencies.  His tweets caused Tesla's stock price to jump by over six percent on August 7, 2018 and led to significant market disruption.

The judgment, which was filed with Musk's consent, permanently enjoined him from violating Section 10(b) of the Exchange Act and Rule 10b-5 and ordered him to pay a civil penalty of $20 million.  Dkt. No. 14 (the "Musk Consent") ¶¶ 2(a)–(b).  It also ordered him to comply with a series of undertakings.  *Id.* ¶ 2(c).  In particular, Musk agreed to resign from his role as Chairman of the Board of Directors of Tesla and not to seek or accept an appointment as Chairman for a period of three years thereafter, *id.* ¶ 5(a); to comply with all mandatory procedures implemented by Tesla regarding (i) the oversight of communications relating to Tesla made in any format including posts on social media (*e.g.*, Twitter) and on Tesla's website; and (ii) the pre-approval of any such written communications that contain, or reasonably could contain, information material to Tesla or its shareholders, *id.* ¶ 5(b); and to certify in writing his compliance with the first undertaking set forth above, *id.* ¶ 5(c).[1]  The judgment recited that Musk "enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the [SEC] or any member, officer, employee, agent, or representative of [the SEC] to induce [Musk] to enter into this Consent."  *Id.* ¶ 8.  The Musk Consent reflected the mutual understanding that it "resolve[d] only the claims asserted against

---

[1] The judgment also permits the SEC to "make reasonable requests for further evidence" that Musk has complied with his obligations and requires Musk to provide such evidence.  *Id.* ¶ 5(c).

[Musk] in th[e] civil proceeding." *Id.* ¶ 12.  Further, as part of the settlement, Musk agreed not to "take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis" as well as not to "make or permit to be made any public statement to the effect that [Musk] d[id] not admit the allegations of the complaint, or that th[e] Consent contains no admission of the allegations, without also stating that [Musk] d[id] not deny the allegations." *Id.* ¶ 13.  In the common vernacular, Musk agreed not to deny the allegations of the complaint.

At the same time, Tesla agreed to a consent judgment against it (the "Tesla Consent"). *Securities and Exchange Commission v. Tesla, Inc.*, 18-cv-08947-LJL (S.D.N.Y.), ECF No. 14. The Tesla Consent contained the requirement that Tesla implement mandatory procedures to oversee and pre-approve Musk's Tesla-related written communications made in any format including but not limited to Twitter posts that reasonably could contain information material to the company or its shareholders.  *Id.* ¶ 6(d).  The judgment further required that Tesla set forth in its disclosure policies and procedures "the definition of, and the process to determine, which of [Musk's] communications contained or reasonably could contain, information material to [Tesla] or its shareholders."  *Id.*

In February 2019, within months of the entry of the consent judgments and on the SEC's application, the Court issued an order requiring Musk to show cause why he should not be held in contempt of the Court's judgment, Dkt. No. 19, after Musk tweeted: "Tesla made 0 cars in 2011, but will make around 500k in 2019," without seeking or receiving pre-approval, Dkt. No. 18 at 5.  The tweet had to be corrected by a second, pre-approved tweet several hours later: "Meant to say annualized production rate at end of 2019 probably around 500k, ie 10k cars/week.  Deliveries for year estimated to be about 400k."  *Id.*  The SEC alleged that the first

3

A-260

statement was inaccurate and that it was disseminated to over twenty-four million people.  *Id.* at 1.  Approval of the tweet was required by Tesla's Senior Executives Communications Policy (Dec. 11, 2018), which defined the written communications requiring approval to include "projections, forecasts, or estimates regarding Tesla's business."[2]  Dkt. No. 18-1 at 1.  The Court ordered the parties to meet and confer in an effort to resolve the pending motion and to agree upon modifications to the consent judgment and Tesla's Senior Executives Communications Policy, Dkt. No. 39; the parties then submitted a consent motion to modify the final judgment to require Musk to obtain pre-approval by an experienced securities lawyer employed by the Company of any one of a series of types of written communications, including "events regarding the Company's securities (including Musk's acquisition or disposition of the Company's securities)" and "any event requiring the filing of a Form 8-K by the Company with the Securities and Exchange Commission."  Dkt. No. 46.

## II.    The Instant Dispute

On November 6, 2021, Musk tweeted several times concerning his potential sale of a large portion of his holdings in Tesla without obtaining pre-approval for the tweets.  The first tweet, at 12:17 pm PT, asked:  "Much is made lately of unrealized gains being a measure of tax avoidance, so I propose selling 10% of my Tesla stock.  Do you support this?"  Dkt. No. 71 at 3.  Six minutes later, at 12:23 pm PT, he tweeted:  "I will abide by the results of this poll, whichever way it goes."  *Id.*  Ultimately, over seven million votes were cast—57.9% of the votes, or

---

[2] Musk took the position that his tweet was immaterial and was merely "celebratory"—"a statement of pride and optimism."  Dkt. No. 27 at 11.  The position bordered on the risible.  A reasonable observer could certainly conclude that when the CEO of a Fortune 100 company tells millions of followers that his company "will make" a specific production volume in the next year, the statement is not a casual one.

3,519,252 in total, answered yes.  *Id.*  The record does not reflect whether Musk abided by his public commitment.

The SEC served subpoenas on Musk and Tesla seeking, among other things, information about the tweets and the process that was employed before they were disseminated to the public. Specifically, on November 16, 2021, the SEC served a subpoena on Tesla requiring it to produce ten categories of documents, including all documents and communications concerning the two tweets as well as documents sufficient to determine whether the two tweets were submitted to Tesla's General Counsel or Securities Counsel for pre-approval or review before they were published.  Dkt. No. 69-2.  On November 21, 2021, the SEC served a subpoena on Musk requiring him to produce five categories of documents, including all documents and communications concerning the two tweets as well as documents related in any way to the submission of the tweets to Tesla's General Counsel or Securities Counsel for pre-approval or review before they were published.  Dkt. No. 69-1.  Both were served pursuant to a SEC Formal Order of Investigation (the "Formal Order") dated November 16, 2021, which stated that the SEC had information that tended to show violations of the federal securities laws.  In particular, the Formal Order, entitled "*In the Matter of Tesla, Inc.* (SF-4496)," and labeled with a non-public SEC filing number, recited that the SEC had information that tended to show that from at least November 5, 2021, Tesla and its officers engaged in conducted that violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Rule 13a-15 of the Exchange Act.  Dkt. No. 69-3.  It therefore ordered and authorized its staff to conduct a private investigation to determine whether any persons or entities had violated those provisions of the federal securities laws and to subpoena

A-262

witnesses and compel the production of "books, papers, correspondence, memoranda, or other evidence deemed relevant or material to the inquiry." *Id.*

On March 8, 2022, Musk filed this motion to quash certain portions of the SEC subpoena and to terminate the consent decree. Dkt. No. 70. The SEC filed a memorandum in opposition on March 22, 2020, Dkt. No. 78, and Musk filed a reply memorandum in further support of his motion on March 29, 2022, Dkt. No. 80.[3]

## DISCUSSION

Musk moves for two forms of relief: (1) an order quashing the subpoena served upon him, and (2) an order terminating the consent decree. The Court discusses each in turn.

### I.     Motion to Quash the Administrative Subpoenas

Musk moves to quash portions of the subpoena served upon him, arguing that the SEC lacks legal authority to issue those demands under the purview of either the securities laws or the judgments in this case and arguing that the subpoena was issued in bad faith. Dkt. No. 70. This proceeding, however, is not the proper forum for such a motion.

The SEC enjoys broad power under Section 21(b) of the Exchange Act, 15 U.S.C. § 78u, to "make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate" any provision of the federal securities laws, and to "require the production of any books, papers, correspondence, memoranda, or other records

---

[3] Musk's motion followed a series of letters filed by Musk and the SEC, beginning with a February 17, 2022 letter filed by Musk in which his counsel state that they "write to alert the Court to a pattern of conduct by the [SEC] that has gone beyond the pale," including "devoting its formidable resources to endless, unfounded investigations into Mr. Musk and Tesla," and argue that Musk and Tesla "never agreed to a settlement that allows the SEC to issue subpoenas absent oversight and approval from this Court." Dkt. No. 61. The Court issued an Order responding that "to the extent that the Defendants have a non-frivolous basis to quash a subpoena in light of the Court's prior orders in this case, the Defendants may make a motion, supported by briefing, that requests specific relief from the Court," Dkt. No. 65. Tesla apparently is cooperating with the subpoena issued to it. *See* Dkt. No. 78 at 5.

6

which the Commission deems relevant or material to the inquiry."  Under Section 78u(c), if

someone refuses to obey a subpoena issued by the SEC, it "may invoke" judicial aid "in

requiring the attendance and testimony of witnesses and the production of books, papers,

correspondence, memoranda, and other records."  A parallel provision exists under Section 19 of

the Securities Act of 1933.  *See* 15 U.S.C. § 77s.

The review authorized by Section 78u(c) is limited precisely to preserve the SEC's

investigative prerogatives and to ensure that it can accomplish its investigative goals on a timely

basis.  First, the process can be initiated only by the SEC and only in the case of "contumacy by,

or refusal to obey a subpoena issued to," a person.  15 U.S.C. § 78u(c).  If the SEC chooses not

to enforce a subpoena, the recipient of the subpoena cannot demand what is, in effect, an

advisory opinion.  Second, "[c]ommission enforcement proceedings may be summary in nature."

*Securities and Exchange Commission v. Knopfler*, 658 F.2d 25, 26 (2d Cir. 1981).  The court

need not grant the opponent of a subpoena an evidentiary hearing and he or she "has a heavy

burden if he [or she] seeks denial of enforcement on the ground that the subpoena is sought for

an invalid purpose."  *Id.*  The opponent of the subpoena "must prove that the improper purpose is

that of the Commission, not merely that of one of its investigators, and the burden may not be

met by the presentation of conclusory allegations.  An evidentiary hearing is not required in the

absence of a meaningful and substantial factual showing."  *Id.*  Section 78u(c) grants the SEC

wide-ranging investigative discretion.  15 U.S.C. § 78u(a).  It endows the SEC with "broad

powers to conduct investigations in support of its statutory mandate to protect the public interest

through prompt and effective enforcement of the federal securities laws."  *Treats Int'l Enters.,*

*Inc. v. Securities and Exchange Commission*, 828 F. Supp. 16, 18 (S.D.N.Y. 1993) (internal

quotation marks omitted) (quoting H. Rep. No. 1321, 96th Cong., 2d Sess. 4 (1980), *reprinted in*

A-264

1980 U.S.C.C.A.N. 3874, 3878).  The Section 78u(c) summary proceeding is designed to allow

some judicial review without "contraven[ing] . . . Congress's decision to confide the

investigative determination to the SEC."  *Id.*; *cf. Securities and Exchange Commission v. Jerry T.

O'Brien, Inc.*, 467 U.S. 735, 750–51 (1984) (declining to impose a notice requirement on the

SEC for investigations because such a requirement "'would cast doubt upon and stultify the

Commission's every investigatory move,'" and because imposing such a requirement would

mean that, if someone objected to such notification, "a district court would be obliged to conduct

some kind of hearing to determine the scope and thrust of the ongoing investigation," which

"would drain the resources of the judiciary as well as the Commission" (quoting *Donaldson v.

United States*, 400 U.S. 517, 531 (1971))).  As *Knopfler* makes clear, except in very limited

circumstances, the SEC, when it is conducting an investigation, is not subject to the time-

consuming procedures of discovery and a hearing incident to ordinary litigation.

　　　　The Second Circuit has squarely held "that Section 78u(c) is the exclusive method by

which the validity of SEC investigations and subpoenas may be tested in the federal courts."

*Sprecher v. Graber*, 716 F.2d 968, 975 (2d Cir. 1983).  "The exclusive method for testing the

validity of the SEC's investigatory motives or methods is a contested subpoena enforcement

proceeding under 15 U.S.C. § 78u(c)."  *Sprecher v. Von Stein*, 772 F.2d 16, 18 (2d Cir. 1985).  In

other words, the only mechanism for a party to challenge a subpoena issued to him by the SEC is

a proceeding brought by the SEC under Section 78u(c) to enforce that subpoena.  The SEC has

not commenced any such proceeding to date to compel Musk's compliance with the subpoena.

Dkt. No. 78 at 5.  While "[p]arties who are the subject of such subpoenas are free in a proceeding

under [Section 78u(c)] to raise claims of abuse of process," they are barred by the doctrine of

sovereign immunity from bringing their own actions against the SEC.  *Graber*, 716 F.2d at 974.

8

A-265

That principle has been applied time and again in this Circuit as well as elsewhere in response to efforts to circumvent the summary procedures authorized under the federal securities laws. *See, e.g.*, *Arjent LLC v. SEC*, 7 F. Supp. 3d 378, 383 (S.D.N.Y. 2014) (holding that Section 702 did not waive sovereign immunity in collateral suit for injunctive relief against SEC, reasoning that "[b]ecause . . . the subpoena enforcement proceeding provides an opportunity for judicial review of both an investigation's legitimacy, and a subpoena's legitimacy, the proceeding [pursuant to Section 78u(c)] 'is the exclusive method by which the validity of SEC investigations and subpoenas may be tested in the federal courts'" (quoting *Graber*, 716 F.2d at 975)); *Finazzo v. SEC*, 2008 WL 3521351, at *3 (S.D.N.Y. Aug. 8, 2008) (Sullivan, J.) (same); *Treats*, 828 F. Supp. at 19 (denying plaintiff's motion for a preliminary injunction and granting SEC's motion to dismiss for lack of subject matter jurisdiction, concluding that the "complaint seeking to enjoin the SEC's investigation is beyond the limited scope of review available in this court"); *see also, e.g.*, *Gentile v. Securities and Exchange Commission*, 2019 WL 2098832 (D.N.J. May 14, 2019); *Cook v. SEC*, 664 F. Supp. 2d 997, 999 (D. Minn. 2009) (denying motion to stay SEC investigation for lack of subject matter jurisdiction, explaining that "[a] subpoena enforcement action is the exclusive method by which the validity of [an SEC] investigation may be challenged").

In *Graber*, as here, the defendant, Sprecher, had been a party to a prior action where he was sued by the SEC for securities fraud; that action that was settled pursuant to a written stipulation in which he agreed not to engage in certain securities transactions for specific periods of time. *Graber*, 716 F.2d at 970. Just one year later, the SEC entered a Formal Order of Investigation authorizing the issuance of subpoenas, pursuant to which a subpoena was issued to him. Sprecher initiated a separate proceeding against the SEC, arguing, much like Musk does

9

A-266

here, that the investigation "was improperly motivated by . . . bias"—in his case by religious bias

and in Musk's case allegedly by political bias—"and a desire to harass him, that the subpoena

violated [the agreement he reached in connection with the earlier SEC action], and that it sought

to compel him to divulge materials protected by the attorney-client privilege." *Id.* Judge Winter

made short shrift of those arguments. Sprecher's "complaint allege[d] actions which are either

committed to the SEC's discretion or are subject to a statutory provision [Section 78u(c)] which

provides the exclusive relief available." *Id.* at 974. While it is true "that the procedures and

scope of judicial security under Section 78u(c) differ considerably from those which would be

available" in an alternative judicial proceeding, *Graber*, 716 F.2d at 975, the nature of a Section

78u(c) proceeding is summary by design, *see id.* (stating that the differences in the scope of

judicial scrutiny is "of little moment" because Congress in passing Section 78u(c) intended

subpoena enforcement to be "the exclusive method by which the validity of SEC investigations

and subpoenas may be tested in the federal courts").

Musk seeks to avoid the impact of *Graber* and the long line of cases applying the same

principle on the theory that, because he is a party to a SEC consent judgment that restricts him

from violating various provisions of the federal securities laws and because the subpoena refers

to the judgments in this case, the SEC is limited as a matter of law to following the procedures

for enforcement of the judgment in this case, including obtaining permission of the Court for

discovery in connection with a contempt proceeding. He argues that the *Graber* line of cases is

distinguishable because the SEC, having initiated this lawsuit, has waived any argument based

on sovereign immunity.

But *Graber* is not so easily distinguished. It may be that in *Graber* and the cases that

followed it, a subpoena recipient sought to avoid the summary procedures under Section 78u(c)

A-267

by the expedient of filing a new lawsuit, whereas here Musk seeks to limit the SEC's authority
by making a motion in a lawsuit that the SEC has already filed, but that is a distinction without a
difference. *Graber* did not turn alone or even primarily on the extent of the waiver of sovereign
immunity granted under Section 702 of the Administrative Procedure Act ("APA")—which
provides for a limited waiver of sovereign immunity—but instead on the Circuit's conclusion
that Section 78u(c) of the Exchange Act, and the parallel provision under the Securities Act,
expressed a "limitation on judicial review" and that therefore, as a result of the proviso to
Section 702 stating that the waiver of immunity does not affect other limitations on judicial
review, that restriction remained intact. *Graber*, 716 F.2d at 974.  In other words, the Circuit
concluded that Congress intended in Section 78u(c) itself, as it preexisted and survived the APA,
to channel all challenges to SEC investigations and subpoenas to subpoena enforcement
proceedings under that Section and not to allow any alternative channels for judicial review.  The
Circuit, honoring congressional intent, concluded without reservation that Section 78u(c) is the
only mechanism to bring motions like this.

Moreover, the mere fact that SEC brought an action against Musk and a related action
against Tesla for Musk's tweets in August 2018 does not waive the SEC's sovereign immunity
with respect to an investigation the SEC launched in late 2021 regarding conduct that occurred in
late 2021, after the 2018 case was settled.  Courts repeatedly have held that the filing of a lawsuit
by the federal government or one of its agencies does not waive sovereign immunity with respect
to counterclaims that the defendant might assert against the government or one of those agencies.
There must be an independent basis to infer the waiver of sovereign immunity. *See, e.g.*, *United
States v. All Right, Title & Interest*, 82 F. Supp. 893, 899 (S.D.N.Y. 1993) ("It is well established
that the United States Government has sovereign immunity and, consequently, can be sued only

A-268

to the extent it consents to be sued, and only in the manner established by law.  Thus, counterclaims against the United States can be maintained only where the Government has consented or waived its immunity from suit on that claim."); *United States v. $10,000.00 in U.S. Funds*, 863 F. Supp. 812, 816 (S.D. Ill. 1994) ("[T]he mere fact that the government is the plaintiff and has brought the forfeiture action does not constitute a waiver of sovereign immunity and authorize the bringing of a counterclaim."); *United States v. Krieger*, 773 F. Supp. 580, 589 (S.D.N.Y. 1991) ("[A]ny counterclaim in an action brought by the United States must show the authority by which the claim against the United States may be maintained in order for the court to be able to exercise its jurisdiction.").

It follows necessarily that the fact that the SEC previously brought an action against Musk (that was settled in a judgment filed with the court) also does not effect a waiver as to the sovereign immunity conferred by Section 78u(c) or give him an alternative means to challenge a SEC administrative subpoena issued pursuant to a formal Order of Investigation.  The judgment against Musk expressly stated that it was to settle "only the claims asserted against [Musk] in th[e] civil proceeding."  Musk Consent ¶ 12.  It did not give Musk any broader immunity from other SEC investigations or proceedings—including related ones.  It thus preserved the SEC's authority to investigate Musk for additional securities violations or to ask for documents and records from him in connection with an investigation of others should the SEC receive information that suggested he or others violated the securities laws again.  Musk may wish it were otherwise, but he remains subject to the same enforcement authority—and has the same means to challenge the exercise of that authority—as any other citizen.  Indeed, to conclude otherwise would be to hold that a serial violator of the securities laws or a recidivist would enjoy greater protection against SEC enforcement than a person who had never even been accused of a

12

A-269

securities law violation.  Musk points to nothing in the law or the language of the statute that would suggest that Congress intended such a perverse result.

The additional fact that the SEC subpoena calls for documents regarding Musk's adherence to the judgment and, in particular, information regarding whether his communication was pre-approved by counsel, does not entitle him to the independent judicial review in this proceeding that would be denied to any other person who had not been a defendant in a prior SEC enforcement action or the subject of a consent decree with the SEC.  The administrative subpoena was issued pursuant to authority granted the SEC under a Formal Order of Investigation.  The Formal Order recites that the SEC has information tending to show a violation of the securities laws and authorizes the SEC to investigate potential violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Rule 13a-15 under the Exchange Act, not possible violations of the Musk Consent or the Tesla Consent.

That the consent decree permits the SEC to make "reasonable requests" of Musk to investigate his compliance, that Musk is required to comply with those, and that the production of such evidence might support a finding of contempt in this Court does not limit the SEC's power to independently investigate whether Musk's activity in 2021 violated securities laws— even if the same activity could constitute a violation of the consent decree—nor does it undermine the validity or lawfulness of its current investigation.  *See, e.g., Grenda v. SEC*, 2017 WL 4053821, at *3 (W.D.N.Y. Sept. 14, 2017) (holding that the SEC's investigation of a potential violation of a prior settlement was "a legitimate inquiry, plain and simple").  It is not uncommon, for example, that the SEC will issue so-called "obey the law" injunctions.  *See U.S. S.E.C. v. Amerindo Inv. Advisors, Inc.*, 2013 WL 1385013, at *11 n.12 (S.D.N.Y. Mar. 11, 2013)

(citing David M. Weiss, Reexamining the SEC's Use of Obey-the-Law Injunctions, 7 U.C. Davis

Bus. L.J. 6 (2006)).  It also might issue more tailored injunctions.  But the provisions in the

consent decree for the SEC to investigate noncompliance with that decree and to seek a contempt

order against Musk if there is such a violation are provided as enforcement mechanisms for the

consent decree itself, not for the securities laws writ large.  They do not replace or derogate from

the power that the SEC has with respect to every person—whether or not that person was the

subject of any previous SEC action—to investigate whether that person has violated the laws

intended to protect investors and—if the facts support that the person has violated the law—the

right to bring an action against them.  Were it otherwise, the SEC could never settle with a

wrongdoer nor could the courts ever safely issue an injunction even in a case that did not reach a

settlement.  The incorrigible securities violator could readily buy a form of protection from

future investigation.  By agreeing to settle at the earliest hint of a first violation and perhaps on

the cheap, he would limit the SEC's ability independently to use its investigative tools to

investigate any future wrongdoing.[4]

 The Court has concluded that Section 78u(c) prevents it from reviewing whether the

subpoena was properly issued pursuant to that Formal Order.  But even if it were within this

Court's province to address the issue, the Court would not find that the information sought is

irrelevant to the SEC investigation.  Documents that would address whether Musk followed

---

[4] Musk argues that "[b]y specifically referring to the judgments in this case in its subpoena to
Tesla and seeking documents from Mr. Musk pertaining to review or pre-approval of his tweets,
the SEC seeks to circumvent the jurisdiction of this Court as it unilaterally grasps for documents
pertaining specially to the consent decree."  Dkt. No. 71 at 14.  But if the SEC engages in
misconduct in its investigation and if that misconduct prejudices Musk's litigation rights, Musk
can bring that challenge to the use of the evidence in a contempt proceeding—if the SEC brings
one.  The argument does not establish Musk's entitlement to any greater protection with respect
to a new SEC action than that enjoyed by any other person whose conduct is being investigated
by the SEC.

A-271

corporate policies with respect to the pre-approval of his tweet and received advice of counsel

bear directly on his culpability.  If he disseminated the tweets only after following Tesla's

corporate policies, including those demanded by the consent decree, he might have powerful

defenses at least at to some of the potential violations the SEC is investigating.  If, on the other

hand, he willfully bypassed those procedures, that evidence too would suggest a far greater level

of culpability.  The SEC plainly is entitled to probe the issue.  As to Tesla, whether it followed

its own internal practices in the case of these tweets and otherwise bears on whether its

representation in its SEC filings to investors that it had policies and procedures that were

addressed to all senior executives was truthful or whether, instead, that representation had a

material and significant omission.

## II.      Motion to Terminate the Consent Decree

Musk also asks the Court to terminate the consent decree pursuant to Federal Rule of

Civil Procedure 60(b)(5).  That rule permits a court to relieve a party from a final judgment if

"applying it prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5).  It does not permit a

court to relieve a party of the burden of a consent decree on the theory that "it is no longer

convenient to live with the terms of a consent decree."  *Rufo v. Inmates of Suffolk County Jail*,

502 U.S. 367, 383 (1992).  "Accordingly, a party seeking modification of a consent decree bears

the burden of establishing that a *significant* change in circumstances warrants revision of the

decree."  *Id.* at 383.  This "initial burden" may be met by showing "a significant change either in

factual conditions or in law."  *Id.* at 384.  For example, "[m]odification of a consent decree may

be warranted when changed factual conditions make compliance with the decree substantially

more onerous" or "when a decree proves to be unworkable because of unforeseen obstacles."  *Id.*

In addition, a consent decree must be modified if "as it later turns out, one or more of the

obligations placed upon the parties has become impermissible under federal law" and

modification also "may be warranted when the statutory or decisional law has changed to make legal what the decree was designed to prevent." *Id.* at 388. "If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.* at 383; *see also id.* at 391. "A motion for relief from judgment is generally not favored," and "[t]he burden of proof is on the party seeking relief from judgment." *United States v. International Brotherhood of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001); *see also Horne v. Flores*, 557 U.S. 433, 447 (2009) ("The party seeking relief bears the burden of establishing that changed circumstances warrant relief."). Particularly in a context involving a judgment against a private party, the Second Circuit has emphasized that the standard applied by courts should "promot[e] adherence to settlement agreements voluntarily entered into by parties to a litigation and ensur[e] that consent decrees are not so easily modifiable as to discourage parties from reaching constructive settlements." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 102 (2d Cir. 1995).

Thus, the party seeking relief must establish "'either a significant change in factual conditions or in law,'" including changes such as "'(1) changed factual conditions [which] make compliance with the decree substantially more onerous;' (2) 'a decree [which] proves to be unworkable because of unforeseen obstacles;' or (3) [a circumstance in which] 'enforcement of the decree without modification would be detrimental to the public interest.'" *Calderon v. Wambua*, 2012 WL 1075840, at *3 (S.D.N.Y. Mar. 28, 2012) (quoting *Rufo*, 502 U.S. at 383–84).

Musk argues that the consent decree in this case should be terminated because (1) it "intrudes on Mr. Musk's First Amendment right to be free of prior restraints," Dkt. No. 71 at 20; (2) "has been misused to launch endless, boundless investigation of his speech," *id.*; and (3) was

extracted from Musk through the exercise of economic duress, *id.* at 24.  None of the arguments hold water.

With regard to the First Amendment argument, it is undisputed in this case that Musk's tweets are at least presumptively "protected speech."  *Id.* at 21; *see also* Dkt. No. 78 at 13–14.  At the same time, however, even Musk concedes that his free speech rights do not permit him to engage in speech that is or could "be considered fraudulent or otherwise violative of the securities laws."  Dkt. No. 71 at 22–23.  The consent decree thus does not impose obligations that have "become impermissible under federal law."  *Rufo*, 502 U.S. at 384.

Moreover, to the extent that the consent decree imposes an additional restriction on Musk's speech by requiring him to obtain pre-approval of his communications about Tesla,[5] "parties can waive their First Amendment rights in consent decrees and other settlements of judicial proceedings."  *SEC v. Romeril*, 15 F.4th 166, 172 (2d Cir. 2021).  In *Romeril*, the SEC brought a civil enforcement action against Romeril; the case ended in a settlement.  *Id.* at 169.  As part of that settlement, Romeril entered into a consent agreement with the SEC where he agreed "not to take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis."  *Id.* at 170 (internal quotation marks omitted) (quoting J. App'x at 70).  Years later, Romeril moved for relief from the judgment; he argued that "the judgment was void because the provision barring public denials of the allegations against him – in his words a 'gag order' – constituted a prior restraint that infringes his First Amendment rights

---

[5] The parties dispute whether this pre-approval requirement burdens Musk's First Amendment rights.  For the reasons that follow, the Court need not reach the question whether the requirement that Musk's statements that may be material to Tesla's stockholders go through some form of review before they are disseminated to the public, including the investing public, would pass muster under the First Amendment.

17

A-274

and violated his right to due process." *Id.*  The Circuit denied his motion, stating that "[t]he Judgment does not violate the First Amendment because Romeril waived his right to publicly deny the allegations of the complaint." *Id.* at 172.  The Court added:

> In the course of resolving legal proceedings, parties can, of course, waive their rights, including such basic rights as the right to trial and the right to confront witnesses.  The First Amendment is no exception, and parties can waive their First Amendment rights in consent decrees and other settlements of judicial proceedings. To the extent that Romeril had the right to publicly deny the SEC's allegations against him, he waived that right by agreeing to the no-deny provision as part of a consent decree.

*Id.* at 172–73 (citations omitted).[6]  *Romeril*'s reasoning is squarely applicable here.  Musk, by entering into the consent decree in 2018, agreed to the provision requiring the pre-approval of any such written communications that contain, or reasonably could contain, information material to Tesla or its shareholders.  He cannot now complain that this provision violates his First Amendment rights.

Musk's argument that the SEC has used the consent decree to harass him and to launch investigations of his speech is likewise meritless and, in this case, particularly ironic.  The Supreme Court has instructed that "modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 385. Musk could hardly have thought that at the time he entered the decree he would have been immune from non-public SEC investigations.  The SEC has a historic mission to "achieve a high standard of business ethics in the securities industry," *Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963), and to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation, *see* U.S. Securities and Exchange Commission, What We Do, *available at* https://www.sec.gov/about/what-we-do

---

[6] Musk argues that a petition for certiorari has been filed in *Romeril*, but it remains the law in this Circuit.

A-275

(last accessed Apr. 26, 2022); *see also* Statement of Robert J. Jackson, Jr., *Nominations of David J. Ryder, Hester M. Peirce, and Robert J. Jackson, Jr.: Hearing Before the S. Comm. On Banking, Housing and Urban Affairs*, 115th Cong. 74 (2017) ("[T]he SEC's three-part statutory mandate requires the agency to protect investors, maintain fair and efficient markets, and facilitate capital formation."). That mission is essential to the protection of shareholders. *See Capital Gains Research Bureau*, 375 U.S. at 186 ("The Investment Advisers Act of 1940 was the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's. . . . A fundamental purpose, common to these statutes [including the Securities Act of 1933 and the Securities Exchange Act of 1934] was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry."); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 150–51 (1972) (citing *Capital Gains Research Bureau* for the same proposition).

Particularly against that backdrop, the SEC cannot be faulted for the limited requests it has issued. Far from the "sheer number of demands" that Musk claims the SEC has made, *see* Dkt. No. 71 at 17–18, the SEC has in fact made only limited requests. It has made only three sets of inquiries: inquiries related to the original enforcement actions that led to the consent decree here; inquiries related to the investigation that led to the amended final judgments; and the inquiries at issue in the investigation here, which arose after Musk tweeted about selling ten percent of his shares. *See* Dkt. No. 78 at 10–11. It is unsurprising that when Musk tweeted that he was thinking about selling ten percent of his interest in Tesla and that he planned to relinquish control over that decision to the majority opinion expressed by voters on his Twitter poll (or those who could muster control over the majority), the SEC would have some questions.

19

Finally, Musk's claim that he was the victim of economic duress is wholly unpersuasive. Musk argues that "[a]t the time [he] signed the consent in this case, Tesla was in no position to weather a fight with the SEC," because it "was a less mature company and the SEC's action stood to jeopardize the company's financing." Dkt. No. 71 at 24. But, even accepting as true that Musk—who was already a multibillionaire in 2018 and one of the wealthiest individuals in the world, *see* Deniz Çam & Jennifer Wang, *The Biggest Billionaire Winners and Losers of 2018*, Forbes (Dec. 21, 2018), https://www.forbes.com/sites/denizcam/2018/12/21/the-biggest-billionaire-winners-and-losers-of-2018/?sh=1e88d2d8526e, as well as the CEO of Tesla, which was already a Fortune 500 company, *see* Mike Sorrentino, *Tesla Leaps Up Fortune 500 and Apple Slips, But Walmart Beats Them All*, CNET (May 21, 2018), https://www.cnet.com/culture/tesla-leaps-up-fortune-500-and-apple-slips-but-walmart-beats-them-all/—was truly worried that engaging in a protracted litigation with the SEC would be financially ruinous for Tesla and felt that settling the lawsuit was the best thing for the company, that does not establish a basis for him to get out of the judgment he voluntarily signed.

It is a known fact that the commencement of a SEC lawsuit—just like any major litigation—can cause the distraction of management, lead to litigation costs, and ultimately be considered an undesirable event from the perspective of the subject company's shareholders and other stakeholders. That is perhaps a reason why no single SEC attorney can authorize a lawsuit; it requires Commission approval. *See* Office of Chief Counsel, Securities and Exchange Commission Division of Enforcement, *Enforcement Manual* §§ 2.5.1–.2 (Nov. 28, 2017), *available at* https://www.sec.gov/divisions/enforce/enforcementmanual.pdf. The lawsuit is a consequence of our federal securities regulator having information that the defendant has violated the securities laws. But the fact that a settlement can avoid those costs, and the negative

20

A-277

reaction by shareholders, does not mean that it is coercive or unenforceable.  It may simply mean

that the executive is acting in the best interests of those for whom he is a fiduciary.  Were it

otherwise, the SEC could never accept a settlement and a defendant thus would never be able to

get the advantages of settlement.  The agreement by a company or its senior executive would

always be subject to the option by the executive or the company—when obligation no longer was

convenient or when executive or the company believed that the SEC might be hobbled in its

litigative capabilities—to simply claim that they felt "forced" to agree to a settlement because

they "perceived that the company and its shareholders would be placed at undue risk unless

[they] settled the matter promptly."  *See* Dkt. No. 72 ¶ 4.

      The doctrine of economic duress is far more limited.  As Musk states, "[e]conomic duress

is an equitable doctrine which 'comes into play upon the doing of a *wrongful act* which is

sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to

succumb to the perpetrator's pressure.'"  Dkt. No. 71 at 25 (alteration adopted and emphasis

added) (quoting *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 1154, 1158 (1984)).[7]

But Musk's argument that the SEC acted wrongfully amounts to one sentence:  "In 2018, the

SEC took advantage of the position in which it put Mr. Musk."  *Id.* at 25.  That conclusory

assertion is insufficient to sustain a finding of economic duress.  Musk was not forced to enter

into the consent decree; rather, "for [his] own strategic purposes, [Musk], with the advice and

assistance of counsel, entered into these agreements voluntarily, in order to secure the benefits

thereof, including finality."  *Securities and Exchange Commission v. Conradt*, 309 F.R.D. 186,

187–88 (S.D.N.Y. 2015).  Musk cannot now seek to retract the agreement he knowingly and

---

[7] The parties assume that California law applies.  *See id.*; *see also* Dkt. No. 78 at 14.  The Court
has no occasion to consider that issue.

A-278

willingly entered by simply bemoaning that he felt like he had to agree to it at the time but now—once the specter of the litigation is a distant memory and his company has become, in his estimation, all but invincible—wishes that he had not.

### CONCLUSION

The motion to quash the subpoena and to terminate the consent decree is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 70.


SO ORDERED.

Dated: April 27, 2022
      New York, New York            _____
                                      LEWIS J. LIMAN
                             United States District Judge

A-279

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7364**

WRITER'S EMAIL ADDRESS
**alexspiro@quinnemanuel.com**

May 23, 2022

**<u>Via ECF</u>**

Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl St., Room 701
New York, NY  10007

Re:     <u>SEC v. Elon Musk</u>, No. 1:18-cv-8865-LJL

Dear Judge Liman:

On behalf of Mr. Musk, we write to respectfully request that the Court issue an order amending its opinion issued April 27, 2022, Dkt. 81, pursuant to Rule 60(a), striking the phrase "without obtaining pre-approval for the tweets," Dkt. 81 at 4, from its opinion or, alternatively, adding the word "allegedly" before the word "without."

Federal Rule of Civil Procedure 60(a) permits a court to "correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." Fed. R. Civ. P. 60(a).  "The general purpose of Rule 60(a) is to afford courts a means of modifying their [orders] in order to ensure that the record reflects the actual intentions of the court."  *Ferguson v. Lion Holding, Inc.*, No. 02-CV-04258, 2007 WL 2265579, at *7 (S.D.N.Y. Aug. 6, 2007).

As discussed in the Court's opinion, the SEC served subpoenas on both Mr. Musk and Tesla seeking information as to, among other things, whether Mr. Musk had obtained pre-approval for certain tweets posted on November 6, 2021. Dkt. 71, Exs. A, B.  On March 8, 2022, Mr. Musk moved this court to quash certain portions of a subpoena issued by the Commission and to terminate the consent decree in this case. Dkt. 70.  In their submissions, neither Mr. Musk nor the Commission asserted that Mr. Musk had not obtained pre-approval for the November 6th tweets.  Yet, in its order, the Court wrote that, "On November 6, 2021, Musk tweeted several times concerning his potential sale of a large portion of his holdings in Tesla without obtaining pre-approval for the tweets."  Dkt. 81 at 4.

**quinn emanuel urquhart & sullivan, llp**
LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON | SALT LAKE CITY
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

As the Court's opinion recognizes, whether Mr. Musk obtained pre-approval for the November 6, 2021, tweets was an unresolved question of fact under investigation at the time of the Court's order.  Dkt. 81 at 5.  Mr. Musk therefore respectfully requests that the Court issue an order amending its opinion pursuant to Rule 60(a), striking the phrase "without obtaining pre-approval for the tweets" from its opinion or, alternatively, adding the word "allegedly" before the word "without."

We have conferred in good faith with the Commission Staff by telephone regarding this proposed correction.  The Commission does not oppose this relief and does not plan to file any response to this letter motion.

Respectfully submitted,

*/s/ Alex Spiro*

Alex Spiro

2

A-281

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7364**

WRITER'S EMAIL ADDRESS
**alexspiro@quinnemanuel.com**

May 23, 2022

The Court's Opinion was not intended to express a finding that Musk did not preclear the communications, and it should not be interpreted as such. That issue is not before the Court, and the Court has no views on it.

**Via ECF**

SO ORDERED.

Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl St., Room 701
New York, NY 10007

LEWIS J. LIMAN
United States District Judge

Date:   May 25, 2022
New York, NY

Re:   *SEC v. Elon Musk*, No. 1:18-cv-8865-LJL

Dear Judge Liman:

On behalf of Mr. Musk, we write to respectfully request that the Court issue an order amending its opinion issued April 27, 2022, Dkt. 81, pursuant to Rule 60(a), striking the phrase "without obtaining pre-approval for the tweets," Dkt. 81 at 4, from its opinion or, alternatively, adding the word "allegedly" before the word "without."

Federal Rule of Civil Procedure 60(a) permits a court to "correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." Fed. R. Civ. P. 60(a). "The general purpose of Rule 60(a) is to afford courts a means of modifying their [orders] in order to ensure that the record reflects the actual intentions of the court." *Ferguson v. Lion Holding, Inc.*, No. 02-CV-04258, 2007 WL 2265579, at *7 (S.D.N.Y. Aug. 6, 2007).

As discussed in the Court's opinion, the SEC served subpoenas on both Mr. Musk and Tesla seeking information as to, among other things, whether Mr. Musk had obtained pre-approval for certain tweets posted on November 6, 2021. Dkt. 71, Exs. A, B. On March 8, 2022, Mr. Musk moved this court to quash certain portions of a subpoena issued by the Commission and to terminate the consent decree in this case. Dkt. 70. In their submissions, neither Mr. Musk nor the Commission asserted that Mr. Musk had not obtained pre-approval for the November 6th tweets. Yet, in its order, the Court wrote that, "On November 6, 2021, Musk tweeted several times concerning his potential sale of a large portion of his holdings in Tesla without obtaining pre-approval for the tweets." Dkt. 81 at 4.

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON | SALT LAKE CITY
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

As the Court's opinion recognizes, whether Mr. Musk obtained pre-approval for the November 6, 2021, tweets was an unresolved question of fact under investigation at the time of the Court's order.  Dkt. 81 at 5.  Mr. Musk therefore respectfully requests that the Court issue an order amending its opinion pursuant to Rule 60(a), striking the phrase "without obtaining pre-approval for the tweets" from its opinion or, alternatively, adding the word "allegedly" before the word "without."

We have conferred in good faith with the Commission Staff by telephone regarding this proposed correction.  The Commission does not oppose this relief and does not plan to file any response to this letter motion.

Respectfully submitted,

*/s/ Alex Spiro*

Alex Spiro

2

A-283

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

---

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**

                    **Plaintiff,**

        v.                                          **Civil Action No. 1:18-cv-08865-LJL**

**ELON MUSK,**

                    **Defendant.**

---

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Elon Musk, Defendant in the above-named case, hereby appeals to the United States Court of Appeals for the Second Circuit from the Court's Opinion and Order entered on April 27, 2022 denying relief from judgment under Fed. R. Civ. P. 60(b).

Dated:  June 15, 2022                        Respectfully submitted,


                                             /s/ Alex Spiro
                                             Alex Spiro
                                             QUINN EMANUEL
                                               URQUHART & SULLIVAN, LLP
                                             51 Madison Avenue, 22nd Floor
                                             New York, NY 10010
                                             Telephone: (212) 849-7000
                                             Facsimile: (212) 849-7100
                                             alexspiro@quinnemanuel.com

                                             *Attorney for Elon Musk*

A-284

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I caused the foregoing Notice to be filed with the Court's CM/ECF

system this 15th day of June, 2022, thereby causing it to be served on all counsel of record.


Dated: New York, New York
      June 15, 2022

Respectfully submitted,

<u>/s/ Alex Spiro</u>          
Alex Spiro
QUINN EMANUEL
  URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com

*Attorney for Elon Musk*

A-285