# 22-1291-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

– v. –

ELON MUSK,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT

WILLIAM A. BURCK
RACHEL G. FRANK
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000

ALEX SPIRO
ELLYDE R. THOMPSON
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................1

JURISDICTIONAL STATEMENT ........................................................4

ISSUES PRESENTED FOR REVIEW ....................................................4

STATEMENT OF THE CASE ..............................................................5

      A.      Factual Background.................................................................5

            1.      The Complaint And Consent Decree ...........................5

            2.      Tesla's Implementation Of A Pre-Approval Policy .................8

            3.      The 2019 Amendments To The Consent Decrees .....................9

            4.      The SEC's Investigations Into Mr. Musk And Tesla ..............10

      B.      Proceedings Below ........................................................14

SUMMARY OF ARGUMENT ............................................................16

STANDARD OF REVIEW .................................................................18

ARGUMENT ....................................................................................19

I.      THE CONSENT DECREE'S PRE-APPROVAL PROVISION
      VIOLATES MR. MUSK'S FIRST AMENDMENT RIGHTS AND IS
      UNENFORCEABLE ....................................................................19

      A.      The Pre-Approval Provision Violates The First Amendment............20

            1.      The Pre-Approval Provision Is A Prior Restraint That
                    Chills Mr. Musk's Speech........................................20

             2.      The SEC Cannot Show The Pre-Approval Provision Is
                    Narrowly Tailored To Serve A Compelling Government
                    Interest........................................................25

i

B.  Mr. Musk Did Not Knowingly And Voluntarily Waive His Future Constitutional Rights ..................................................29

C.  In Any Event, Any Waiver Of Mr. Musk's First Amendment Rights Is Unenforceable ......................................................34

    1.  The Pre-Approval Provision Cannot Be Enforced Because It Is An Unconstitutional Condition ...........................35

    2.  Any Waiver Violates Public Policy And Cannot Be Enforced .................................................................39

D.  The Court Should Excise The Pre-Approval Provision From The Consent Decree ...........................................................43

II.  ALTERNATIVELY, EQUITABLE CONSIDERATIONS REQUIRE MODIFICATION OF THE CONSENT DECREE ......................................44

A.  The SEC's Conduct Has Magnified the Constitutional Defects Of The Pre-Approval Provision, Rendering It Unworkable And Contrary To The Public Interest ...........................................45

B.  Modification Is Further Warranted Because The Objective Of The Pre-Approval Provision Has Been Achieved .............................52

CONCLUSION ..............................................................53

# TABLE OF AUTHORITIES

**Page**

## Cases

*11126 Baltimore Boulevard, Inc. v. Prince George's Cty., Md.*,
 58 F.3d 988 (4th Cir. 1995) ............................................................49

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
 570 U.S. 205 (2013) ............................................................ 35, 36

*Alexander v. Bahou*,
 512 F. Supp. 3d 363 (N.D.N.Y. 2021) .................................. 43, 44

*Alexander v. United States*,
 509 U.S. 544 (1993) ....................................................................22

*Barcia v. Sitkin*,
 367 F.3d 87 (2d Cir. 2004) ................................................. 19, 46

*Barron v. Burnside*,
 121 U.S. 186 (1887) ....................................................................36

*Brady v. United States*,
 397 U.S. 742 (1970) ....................................................................30

*Brown v. Ent. Merchants Ass'n*,
 564 U.S. 786 (2011) ....................................................................26

*CBS, Inc. v. Davis*,
 510 U.S. 1315 (1994) ..................................................................28

*Chaffin v. Stynchcombe*,
 412 U.S. 17 (1973)......................................................................34

*Citizens United v. Fed. Election Comm'n*,
 558 U.S. 310 (2010) ....................................................................41

*Crosby v. Bradstreet Co.*,
 312 F.2d 483 (2d Cir. 1963) ........................................... 24, 37, 40

*Crumpton v. Bridgeport Educ. Ass'n*,
    993 F.2d 1023 (2d Cir. 1993) ........................................39

*Curtis Publishing Co. v. Butts*,
    388 U.S. 130 (1967) ......................................................30

*D. H. Overmyer Co. v. Frick Co.*,
    405 U.S. 174 (1972) ......................................................33

*Davies v. Grossmont Union High Sch. Dist.*,
    930 F. 2d 1390 (9th Cir. 1991) ........................... 33, 35, 41, 42, 44

*Davis v. New York City Hous. Auth.*,
    278 F.3d 64 (2d Cir. 2002) .................................... 18, 45

*Dolan v. City of Tigard*,
    512 U.S. 374 (1994) ........................................... 35, 38

*Duran v. Elrod*,
    760 F.2d 756 (7th Cir. 1985) ........................................51

*FCC v. League of Women Voters*,
    468 U.S. 364 (1984) ....................................................35

*Fomby-Denson v. Dep't of the Army*,
    247 F.3d 1366 (Fed. Cir. 2001) ......................................42

*Frew v. Hawkins*,
    540 U.S. 431 (2004) ........................................... 46, 52

*Frisby v. Schultz*,
    487 U.S. 474 (1988) ....................................................27

*Fuentes v. Shevin*,
    407 U.S. 67 (1972)......................................................30

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
    23 F.3d 1071 (6th Cir. 1994) ................................. 36, 41

*Hollins v. Methodist Healthcare, Inc.*,
　379 F. Supp. 2d 907 (W.D. Tenn. 2005),
　*aff'd*, 474 F.3d 223 (6th Cir. 2007) .............................................................34

*Hurd v. Hodge*,
　334 U.S. 24 (1948)......................................................................................44

*Husain v. Springer*,
　494 F.3d 108 (2d Cir. 2007) ........................................................................23

*In re Anonymous Online Speakers*,
　661 F.3d 1168 (9th Cir. 2011) .....................................................................21

*In re George F. Nord Bldg. Corp.*,
　129 F.2d 173 (7th Cir. 1942) .......................................................................32

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
　138 S. Ct. 2448 (2018)................................................................................30

*Johnson v. Zerbst*,
　304 U.S. 458 (1938) ...................................................................................30

*Juan F. By & Through Lynch v. Weicker*,
　37 F.3d 874 (2d Cir. 1994) ..........................................................................51

*Koontz v. St. John's River Water Mgmt. Dist.*,
　570 U.S. 595 (2013) ............................................................................ 36, 38

*Lee v. Habib*,
　424 F.2d 891 (D.C. Cir. 1970)......................................................................39

*Legal Servs. Corp. v. Velazquez*,
　531 U.S. 533 (2001) ...................................................................................36

*Leonard v. Clark*,
　12 F.3d 885 (9th Cir. 1993) .........................................................................32

*Lynch v. City of Alhambra*,
　880 F.2d 1122 (9th Cir. 1989) .....................................................................40

*Metro. Opera Ass'n, Inc. v.*
    *Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*,
    239 F.3d 172 (2d Cir. 2001) .................................................... 22, 49

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ....................................................................40

*Nat'l Ass'n for Advancement of Colored People v. Button*,
    371 U.S. 415 (1963) ....................................................................23

*Nebraska Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) ............................................................. 29, 27

*New York Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) .......................................................51

*Nollan v. California Coastal Comm'n*,
    483 U.S. 825 (1987) ....................................................................38

*Org. for a Better Austin v. Keefe*,
    402 U.S. 415 (1971) ....................................................................21

*Overbey v. Mayor of Baltimore*,
    930 F.3d 215 (4th Cir. 2019) ......................................... 40, 41, 42

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017)................................................................21

*Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*,
    13 F.3d 33 (2d Cir. 1993) ............................................. 45, 46, 52

*Pee Dee Health Care, P.A. v. Sanford*,
    509 F.3d 204 (4th Cir. 2007) .....................................................42

*People v. Smith*,
    502 Mich. 624 (2018) ................................................................41

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ....................................................................26

vi

*Reed v. Town of Gilbert*,
 576 U.S. 155 (2015) ............................................................... 21, 26

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
 487 U.S. 781 (1988) .................................................................29

*Ronnie Van Zant, Inc. v. Cleopatra Recs., Inc.*,
 906 F.3d 253 (2d Cir. 2018) .....................................................31

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
 515 U.S. 819 (1995) .................................................................50

*Rufo v. Inmates of Suffolk County Jail*,
 502 U.S. 367 (1992) ......................................... 26, 43, 46, 50, 51

*Sambo's Restaurants Inc. v. City of Ann Arbor*,
 663 F.2d 686 (6th Cir. 1981) ....................................................30

*Schmidt v. Lessard*,
 414 U.S. 473 (1974) .................................................................31

*SEC v. Citigroup Global Markets, Inc.*,
 752 F.3d 285 (2d Cir. 2014) .....................................................39

*SEC v. Romeril*,
 15 F.4th 166 (2d Cir. 2021) ............................. 1, 30, 31, 32, 36, 37

*Snepp v. United States*,
 444 U.S. 507 (1980) .................................................................33

*Speiser v. Randall*,
 357 U.S. 513 (1958) ............................................................. 22, 23

*St. Johnsbury Academy v. D.H.*,
 240 F.3d 163 (2d Cir. 2001) .....................................................18

*Stamford Bd. of Educ. v. Stamford Educ. Ass'n*,
 697 F.2d 70 (2d Cir. 1982) .......................................................39

*Stamicarbon, N.V. v. Am. Cyanamid Co.*,
 506 F.2d 532 (2d Cir. 1974) .....................................................30

*Still's Pharmacy, Inc. v. Cuomo*,
    981 F.2d 632 (2d Cir. 1992) ........................................................46

*Thomas James Assocs., Inc. v. Jameson*,
    102 F.3d 60 (2d Cir. 1996) .........................................................41

*Thompson v. U.S. Dep't Of Hous. & Urb. Dev.*,
    404 F.3d 821 (4th Cir. 2005) ......................................................50

*Town of Newton v. Rumery*,
    480 U.S. 386 (1987) ............................................................ 39, 42

*United States v. Am. Soc. of Composers, Authors & Publishers*,
    832 F. Supp. 82 (S.D.N.Y. 1993)
    *aff'd*, 32 F.3d 727 (2d Cir. 1994)..................................................4

*United States v. Eastman Kodak Co.*,
    63 F.3d 95 (2d Cir. 1995) ..........................................................45

*United States v. Hotaling*,
    634 F.3d 725 (2d Cir. 2011) ......................................................18

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen &*
    *Helpers of Am., AFL-CIO*,
    931 F.2d 177 (2d Cir. 1991) ......................................................32

*United States v. Int'l Bhd. of Teamsters*,
    998 F.2d 1101 (2d Cir. 1993) ....................................................39

*United States v. ITT Continental Baking Co.*,
    420 U.S. 223 (1975) .................................................................39

*United States v. Loc. 1804-1, Int'l Longshoremen's Ass'n, AFL-CIO*,
    44 F.3d 1091 (2d Cir. 1995) ................................................ 30, 42

*United States v. Lynch*,
    92 F.3d 62 (2d Cir. 1996) ..........................................................18

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) .................................................................26

*United States v. Quattrone,*
  402 F.3d 304 (2d Cir. 2005) ................................................ 20, 21, 22, 24, 40

*United States. v. Richards,*
  385 F. App'x 691 (9th Cir. 2010) ..............................................................41

*United States v. Sec'y of Hous. & Urban Dev.,*
  239 F.3d 211 (2d Cir. 2001) ......................................................... 18, 46, 50

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ...................................................................... 27, 28

*Wessel v. City of Albuquerque,*
  299 F.3d 1186 (10th Cir. 2002) ..................................................................41

*Wilkicki v. Brady,*
  882 F. Supp. 1227 (D.R.I. 1995) ..................................................................34

*Zervos v. Verizon New York, Inc.,*
  252 F.3d 163 (2d Cir. 2001) ..................................................................19

*Zieper v. Metzinger,*
  474 F.3d 60 (2d Cir. 2007) ................................................................ 23, 25

## Statutory Authorities

15 U.S.C. § 78aa ..................................................................................4

15 U.S.C. § 78u ...................................................................................4

28 U.S.C. § 1291 ..................................................................................4

28 U.S.C. § 1331 ..................................................................................4

## Rules & Regulations

17 C.F.R. § 202.5(e)......................................................................... 6, 29

17 C.F.R. § 240.10b-5(b) ........................................................................28

ix

Fed. R. App. P. 4(a)(1)(B)(ii) ...................................................................................4

Fed. R. Civ. P. 60(b)(5)...........................................................................................45

## **Other Authorities**

Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413
　　(1989).............................................................................................................35

## PRELIMINARY STATEMENT

This appeal arises from an order of the district court for the Southern District of New York (Liman, J.) denying a motion by Appellant Elon Musk to modify an amended judgment that contains an unconstitutional prior restraint on Mr. Musk's First Amendment protected speech that the SEC obtained through an invalid and unenforceable waiver. The amended judgment, which entered a consent decree between Mr. Musk and the SEC, indefinitely prohibits Mr. Musk from speaking on a range of subjects, unless Mr. Musk obtains the "pre-approval" of a government-mandated monitor (the "pre-approval provision"). The pre-approval provision is a classic prior restraint that the Constitution forbids: a government-imposed muzzle on Mr. Musk's speech before it is made. The effect of the provision is to inhibit and chill Mr. Musk's lawful speech. The breadth of the provision means the SEC cannot show that it is narrowly tailored to meet any compelling government interest. As a result, the pre-approval provision is unenforceable, and its inclusion in a consent decree does not change that conclusion.

The district court declined to address Mr. Musk's constitutional challenges, instead misapplying this Court's decision in *SEC v. Romeril*, 15 F.4th 166 (2d Cir. 2021), to find Mr. Musk had waived the First Amendment rights at issue. Yet, unlike the so-called "gag rule" at issue in *Romeril*, which restricted speech only on the precise allegations underlying the SEC's lawsuit, the speech targeted here covers a

1

broad range of topics, unrelated to the statements that gave rise to the SEC's 2018 lawsuit against Mr. Musk for alleged violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. In this way, the consent decree here deviates from the general standard that "consent decrees are normally compromises in which the parties give up something they might have won in litigation and waive their rights to litigation." *Id.* at 172. The SEC could not have obtained the right to police Mr. Musk's future speech on unrelated topics if it had litigated the underlying securities fraud action instead of entering into the consent decree precisely because such action violates the First Amendment.

That also means that the SEC extracted this provision in violation of the unconstitutional conditions doctrine, which specifically requires a close nexus between the constitutional rights the government may require a defendant to forgo in exchange for a government benefit. Thus, for example, while the government may require a criminal defendant to waive the right to a jury trial on the charges giving rise to a plea deal, the government may not require a criminal defendant to waive his right to a jury trial on any future charges brought as to unrelated conduct. That is exactly what the pre-approval provision does here because its requires Mr. Musk to sacrifice his First Amendment rights with regard to future statements, which the SEC has not given up any right to prosecute. In fact, the unknown scope of the future speech implicated by the pre-approval provision contradicts the district

2

court's determination that Mr. Musk knowingly waived his First Amendment rights. Because courts will not enforce settlement provisions that violate the Constitution, this Court should hold this prior restraint on constitutionally protected speech unenforceable.

At a minimum, good cause exists to modify the consent decree to excise the pre-approval provision. The SEC has used the pre-approval provision as a basis to investigate Mr. Musk's lawful and constitutionally protected speech and sought to hold Mr. Musk in contempt based on such speech. It has done so despite the fact that Tesla has implemented SEC-approved procedures governing the oversight of executive communications, which apply to Mr. Musk. Such a process serves any purported goal of minimizing the risk of future securities law violations. No objective would be served by continuing SEC and judicial oversight over Mr. Musk's future communication, subject to the court's contempt powers. Rather, oversight of Mr. Musk's compliance with Tesla's policy regarding pre-approval of Mr. Musk's statements about Tesla should be returned to Tesla.

This Court should vacate the district court's order, and remand with instructions to strike the pre-approval provision from the judgment and amended judgment.

3

**JURISDICTIONAL STATEMENT**

Mr. Musk appeals from the district court's Order, A258, denying his Rule 60(b)(5) motion to terminate or modify the consent decree, A243. The SEC initiated the underlying case pursuant to the Exchange Act, and the district court had jurisdiction pursuant to 15 U.S.C. §§ 78u(d)(e), 78aa, and 28 U.S.C. § 1331. Following entry of the final judgment, A41, and the amended final judgment, A231, the district court retained jurisdiction. A232; *see also United States v. Am. Soc. of Composers, Authors & Publishers*, 832 F. Supp. 82, 85, n.3 (S.D.N.Y. 1993), *aff'd*, 32 F.3d 727 (2d Cir. 1994).

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

The district court issued a final order denying Mr. Musk's motion to terminate or modify the judgment and amended final judgment on April 27, 2022. A258. On June 15, 2022, Mr. Musk timely noticed this appeal. A284; Fed. R. App. P. 4(a)(1)(B)(ii).

**ISSUES PRESENTED FOR REVIEW**

1.     Whether the government may require, as a condition to the settlement of claims brought by the government, a waiver of the future invocation of constitutional rights in connection with conduct unrelated to the settled claims, and whether such waiver is enforceable.

4

2.     Whether the consent decree should be modified in light of the SEC's subsequent conduct exacerbating the existing constitutional defect of the consent decree and given that the stated purpose of the pre-approval provision has been served.

## STATEMENT OF THE CASE

### A.     Factual Background

#### 1.     The Complaint And Consent Decree

Mr. Musk is the CEO and co-founder of Tesla and an active user of Twitter, a forum allowing its members to communicate with the public.  On September 27, 2018, the SEC sued Mr. Musk for violation of Exchange Act Section 10(b) for statements that Mr. Musk had posted to his Twitter account concerning the fact that he was considering taking Tesla private and that he had secured funding and investor support for the transaction.  A16.  The SEC separately sued Tesla for a disclosure controls and procedures violation under Rule 13a-15 of the Exchange Act. Complaint, *SEC v. Tesla, Inc.*, 1:18-cv-8947 (S.D.N.Y. 2018), ECF 1 (hereinafter *SEC v. Tesla*).

As the SEC acknowledged, the Complaint came at a precarious time for Tesla, with "stock analysts and investors increasingly beg[inning] to question whether Tesla could meet its previously announced production targets and begin to earn sufficient cash in order to sustain its operations and pay its existing debt load." A20. After the SEC's action jeopardized Tesla's financing, Mr. Musk and Tesla entered

5

into separate consent decrees with the SEC two days after the SEC filed its suit against Mr. Musk.  A39; Consent Motion for Entry of Judgment, *SEC v. Tesla*, ECF 3.  The Musk consent decree permanently restrains and enjoins Mr. Musk from violating Section 10(b) of the Exchange Act and SEC Rule 10b-5.  A50–51.  The Tesla consent decree permanently restrains and enjoins it from violating, directly or indirectly, Rule 13a-15 of the Exchange Act.  Final Judgment, *SEC v. Tesla*, ECF 14 at 11.  Mr. Musk and Tesla also agreed to each pay a civil penalty of $20 million.  A51; Final Judgment, *SEC v. Tesla*, ECF 14 at 12.  Mr. Musk further agreed to resign from his role as Chairman of the Board of Directors of Tesla and not resume that role for three years, A53, and Tesla agreed to add two independent directors to its board, Final Judgment, *SEC v. Tesla*, ECF 14 at 14.

Mr. Musk's consent decree also restricted his ability to communicate about a broad category of information regarding Tesla.  First, the consent decree contains the SEC's so-called gag rule, set forth in 17 C.F.R. § 202.5(e) (the "gag rule").  That regulation embodies the SEC's "policy not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings."  The consent decree requires Mr. Musk to comply with the gag rule, with an exception for testimony given or positions taken in litigation or other legal proceedings.  A47.

Beyond compliance with this gag rule, however, Mr. Musk's consent decree also contains restrictions on speech unrelated to the 2018 tweets at issue in the SEC's lawsuits against Mr. Musk and Tesla. The consent decree requires Mr. Musk to comply with communications oversight procedures that Tesla adopted regarding "the oversight of communications relating to the Company made in any format" and initially required Mr. Musk to obtain "the pre-approval of any such written communications that contain, or reasonably could contain, information material to the Company or its shareholders." A53–54. This provision thus made it a violation of the consent decree, and in turn the district court's judgment, for Mr. Musk to make any written statement on any subject that "reasonably could contain[] information material" to Tesla or its investors without obtaining approval in advance. A54.

In parallel, the consent decree required Tesla to create a permanent board committee composed of independent directors to oversee the implementation of the consent decree and the company's controls and procedures governing disclosures and public statements. Final Judgment, *SEC v. Tesla*, ECF 14 at 14. The consent decree provided the SEC with oversight over the original charter and composition of the committee. *Id.* The consent decree further required Tesla to appoint a Tesla securities lawyer to "review communications made through Twitter and other social media by the Company's senior officers in a manner that is consistent with the Company's disclosures policy and procedures." *Id.* Tesla was also required to

"implement mandatory procedures and controls to oversee all of Elon Musk's communications regarding the Company made in any format, including, but not limited to, posts on social media" and "pre-approve any such written communications that contain, or reasonably could contain, information material to the Company or its shareholders." *Id.* at 15.

The court entered the consent decrees as final judgments on October 16, 2018. A50; Final Judgment, *SEC v. Tesla*, ECF 14.

## 2. Tesla's Implementation Of A Pre-Approval Policy

Tesla adopted and implemented a Senior Executives Communications Policy (the "2018 Policy") in accordance with the consent decree. A55. Tesla's 2018 Policy required pre-approval of "Written Communications that contain, or reasonably could contain, information material to Tesla or its stockholders." *Id.* It listed categories of information that "may, depending on its significance, be material," including, among other things, production progress or delays, sales or delivery numbers, projections, forecasts, or estimates regarding Tesla business. *Id.* The 2018 Policy required Mr. Musk to determine, in the first instance, whether a communication "contain[s], or reasonably could contain," material information and thus required pre-approval. A82–83; A89–90. The 2018 Policy also provided for oversight by the new Tesla board committee formed to implement the consent decree, the Disclosure Controls Committee. A85, A87–88.

### 3.    The 2019 Amendments To The Consent Decrees

Only months after the consent decrees were entered, the SEC moved to hold Mr. Musk in contempt of court for a purported violation of the pre-approval provision of the consent decree.  After the court admonished the SEC for taking such drastic action, A215, the SEC agreed to resolve its motion for contempt if Mr. Musk and Tesla agreed to certain amendments to the consent decrees.  A223.  At this time, following the hearing and during settlement negotiations, Mr. Musk was unrepresented by counsel.  A218, A219.  He participated in the negotiations on the terms of the amended consent decrees with Tesla lawyers and the SEC's lawyers without separate representation.  *See* A218–19.

On April 30, 2019, pursuant to consent motions from the parties, the court issued an amended judgment modifying the pre-approval provision.  The amended judgment modified the pre-approval provision in two key ways:  First, rather than require that Mr. Musk comply with Tesla's procedures regarding the pre-approval of written communications, *see* A45, the amended judgment directly requires Mr. Musk to "obtain the pre-approval of an experienced securities lawyer employed by the Company."  A231.  Second, in lieu of a materiality standard, the amended judgment requires pre-approval "of any written communication that contains information" on an expansive list of topics, including "the Company's financial condition, statements, or results, including earnings or guidance," "production

9

numbers or sales or delivery numbers (whether actual, forecasted, or projected) that have not been previously published via pre-approved written communications issued by the Company," "events regarding the Company's securities," and "new or proposed business lines that are unrelated to then-existing business lines." A231–32. The modified consent decree and amended judgment removed any requirement to examine the materiality of a potential written communication. A231.

The amended judgment in *SEC v. Tesla* contains corresponding provisions requiring the company to "implement mandatory procedures and controls . . . requiring pre-approval by Securities Counsel of any written communication that contains information regarding any of the [listed] topics." Order Amending Final Judgment, *SEC v. Tesla*, ECF 17.

### 4. The SEC's Investigations Into Mr. Musk And Tesla

As it turned out, the SEC's contempt motion—made just months after the district court's entry of the final judgment—was just the start of the SEC's investigation of Mr. Musk's compliance with the pre-approval requirements. None of these investigations has led to any enforcement action by the SEC.

The SEC's contempt motion in February 2019 stemmed from a tweet from Mr. Musk about anticipated Tesla production numbers. At that time, the SEC launched its first inquiry into Mr. Musk's compliance with the pre-approval requirements. SEC Mot. for Order to Show Cause Why Defendant Elon Musk

Should Not Be Held in Contempt ("SEC Contempt Mot."), ECF 18. The day after the tweet, the SEC issued letters to counsel for Mr. Musk and for Tesla, demanding to know whether the tweet had been pre-approved. Musk Resp. to Order to Show Cause, ECF 27 at 8; *see also* A57, A59. On behalf of Tesla and Mr. Musk, counsel informed the SEC that Mr. Musk had complied with the 2018 Policy, which permitted him to exercise his reasonable discretion to determine whether his communications contained material information requiring pre-approval, and that Tesla had determined pre-approval was not required under the policy. Musk Resp. to Order to Show Cause, ECF 27 at 8; *see also* A61. Over the weekend, the SEC responded and demanded a same-day response providing further information. A77–78. After counsel informed the SEC it needed until Monday to provide the information, A77, the SEC filed its contempt motion before receiving a response.

In its motion, the SEC cited an interview Mr. Musk had done on *60 Minutes* as "evidence" of a lack of diligent effort to comply with the consent decree. In the interview, Mr. Musk expressed a lack of respect for the SEC but indicated he was abiding by, and would continue to abide by, the consent decree. SEC Contempt Mot., ECF 18 at 14–15.

The court reprimanded the SEC for moving for contempt without first attempting to work out its differences with Mr. Musk and Tesla, noting that "government lawyers should take all available steps to work out disputed issues, be

reasonable, come to an agreed-upon resolution if possible, before invoking the significant Court's contempt powers."  A215.

While the SEC has heeded the district court's reprimand and not since sought to invoke the court's contempt powers, the SEC regularly has invoked the terms of the consent decree to investigate Mr. Musk.  Since the SEC commenced its 2018 investigation, the SEC has kept at least one investigation open regarding Mr. Musk and Tesla.  The SEC has issued dozens of administrative subpoenas—not once going to the court—but has not brought any charges against Mr. Musk or Tesla.

At times, the SEC has opened new investigations before ever closing prior investigations, or it has terminated one investigation only to issue a subpoena in a new investigation the same day.  Musk Mem. of Law in Support of Mot. to Quash & to Terminate Consent Decree ("Musk Mem."), ECF 71 at 23–24.  Some of the SEC's subpoenas have been "voluntary," such as its May 2020 request (accompanied by a document retention notice) for information about Mr. Musk's tweets.  *Id.* at 24; A253.  Others have not.

On November 6, 2021, in response to well-publicized proposals for revising the federal tax code and criticism that unrealized capital gains are not subject to income tax, Mr. Musk tweeted a question:  "Much is made lately of unrealized gains being a means of tax avoidance, so I propose selling 10% of my Tesla stock.  Do you support this?"  Musk Mem., ECF 71 at 9.  Six minutes later, he tweeted, "I will

abide by the results of this poll, whichever way it goes." *Id.* Ultimately, 57.9% of the votes (3,519,252 in total) voted "yes." *Id.*

The SEC first sent a letter and then subpoenaed Tesla, directing it to produce documents and information concerning these tweets. Confidential Appendix (hereinafter "CA") 14–25. The subpoena repeatedly referenced, and demanded documents indicating compliance with, the consent decrees. CA25 at ¶ 7 (citing *SEC v. Musk*), ¶ 10 (citing *SEC v. Tesla*). The SEC next subpoenaed Mr. Musk, demanding he produce "All Documents and Communications Concerning" the tweets. CA12 at ¶ 3. The Musk subpoena similarly demanded "Documents related in any way to submission of the 12:17 tweet and/or the 12:23 tweet to Tesla's General Counsel or Securities Counsel, or any counsel acting in either capacity, *for pre-approval or review* before they were published." *Id.* at ¶ 4 (emphasis added).

The next day, through counsel, Mr. Musk and Tesla produced to the SEC a privilege log addressing these requests and providing documentation that Mr. Musk and Tesla's acting head of legal had a conversation regarding Mr. Musk's public pre-announcement of his intent to sell Tesla stock. A249–50. The SEC nevertheless continued to press its investigation. Tesla complied, producing more than 1,000 documents and making witnesses available for hours of testimony. *See, e.g.*, Musk Mem., ECF 71 at 10. Mr. Musk resisted, however, on the basis that the district court

13

retained jurisdiction over the consent decree and that the SEC's use of an administrative subpoena to evade the court's supervision was unlawful. *Id.* at 7–16.

Mr. Musk petitioned the district court for relief, alerting the court to the SEC's failure to distribute to Tesla's shareholders the $40 million collected as a part of the settlement in these cases, while devoting formidable resources to investigations into Mr. Musk and Tesla. A233. The district court declined to intervene. A241.

Mr. Musk then filed a motion to quash the portions of the subpoena pertaining to the pre-approval provision and to terminate or modify his consent decree to strike the pre-approval provision. A243. After the district court denied his motion, Mr. Musk complied with the SEC's subpoena and continues to do so.

## B.    Proceedings Below

Mr. Musk moved to quash certain SEC subpoena requests and to terminate or modify the consent decree in March 2022. A243, *see also* Musk Mem., ECF 71 at 21–24, A255. On April 27, 2022, the district court entered an opinion and order denying Mr. Musk's motion to quash certain subpoena requests and to terminate or modify the consent decree. A258, *as clarified*, A282.

With regard to Mr. Musk's motion to terminate or modify the consent decree, the district court concluded that Mr. Musk had not established a significant change in factual conditions or in the law. A273. While recognizing that Mr. Musk's tweets are presumptively protected speech, the court viewed the consent decree as only

14

requiring Mr. Musk to refrain from fraudulent or otherwise illegal speech.  A274.

To the extent the consent decree goes further, the court determined that "parties can

waive their First Amendment rights in consent decrees," relying on this Court's

recent decision in *Romeril*.  A275.  The court deemed *Romeril* "squarely applicable,"

*id.*, even though *Romeril* involved only a gag rule provision restricting speech

concerning the allegations underlying the complaint, as opposed to a pre-approval

provision about future unknown events.

The district court further held that Mr. Musk had not demonstrated changed

circumstances as a result of the SEC's conduct.  Remarking that Mr. Musk's

argument was "particularly ironic," the court relied on the SEC's "historic" mission

to find "the SEC cannot be faulted for the limited requests it has issued," without

addressing the effect of the SEC's conduct on the continuing viability of the consent

decree.  A275–76.  Instead, the court noted it believed it was "unsurprising" that "the

SEC would have some questions" about the November 2021 tweets, without citing

to any potential violation of the securities laws that could form a legitimate basis for

the inquiry.  A276.  The court concluded that Mr. Musk had knowingly and willingly

entered the consent decree.  A278–79.

On May 25, 2022, the district court issued an endorsement of Mr. Musk's

letter to the court requesting a correction to the opinion.  A282.  As issued, the

opinion had stated that Mr. Musk had not obtained pre-approval for the November

2021 tweets, A261, a matter still under investigation by the SEC.  A280.  In its

endorsement, the court noted it "has no views" on whether Mr. Musk obtained pre-

approval for the tweets and its opinion "was not intended to express [such] a

finding."  A282.

On June 15, 2022, Mr. Musk noticed this appeal challenging denial of his

motion to terminate the consent decree.  A284.

## SUMMARY OF ARGUMENT

The district court erred in declining to modify the consent decree and amended

judgment to eliminate the unconstitutional prior restraint of Mr. Musk's speech.

**I.**     The pre-approval provision in the consent decree qualifies as a prior

restraint on speech that runs afoul of the First Amendment.  It forbids future lawful

speech on a range of topics absent approval.  It does so under the threat of contempt

and subject to the asserted oversight and investigatory authority of the SEC.  And it

chills such lawful speech due to the threat of burdensome investigation and

prosecution.   The pre-approval provision thus infringes Mr. Musk's First

Amendment rights and is subject to strict scrutiny.  The SEC cannot meet this

demanding standard to justify the violation of Mr. Musk's free speech rights.  The

pre-approval provision is not narrowly tailored; rather, it covers a wide range of

lawful future communications and restrains Mr. Musk's speech even though other

means exist for the SEC to deter future violations of the securities laws (certain of

which are contained in the consent decree and which Mr. Musk does not challenge). As a result, the SEC cannot show a compelling interest in the burdensome restrictions on Mr. Musk's speech.

The district court did not reach this question only because it concluded Mr. Musk had waived his constitutional right. But a defendant cannot knowingly waive rights that are untethered from the prosecution at issue and which he could not contemplate at the time of the purported waiver. Even in the event of a valid waiver, the pre-approval provision violates the unconstitutional conditions doctrine, which forbids the government from extracting as a condition of a government benefit (here, the settlement of a pending securities fraud action) the relinquishment of constitutional rights that do not bear a close connection to the benefit received. And enforcement of the pre-approval provision runs contrary to the American principles of free speech and open debate, and thus infringes the public's interest and cannot be enforced in this instance.

**II.**    Beyond this constitutional defect, the pre-approval provision has proven unworkable in practice in light of the SEC's pursuit of Mr. Musk for violating the pre-approval provision (as opposed to the securities laws). Within months after the entry of the consent decree, the SEC sought to have Mr. Musk held in contempt for a tweet that had not been pre-approved. Ever since, under the shadow of the consent decree, the SEC has increasingly surveilled, policed, and

attempted to curb Mr. Musk's protected speech that does not touch upon the federal securities laws. The consent decree should be modified in light of the SEC's conduct, the public interest, and the vindication of the purpose of the decree.

## STANDARD OF REVIEW

This Court reviews First Amendment claims *de novo*. *United States v. Hotaling*, 634 F.3d 725, 728 (2d Cir. 2011). "[A] district court's conclusion regarding a defendant's waiver of his constitutional rights is subject to *de novo* review." *United States v. Lynch*, 92 F.3d 62, 65 (2d Cir. 1996).

The district court's conclusions as to questions of law pertaining to a consent decree, or as to mixed questions of fact and law, are reviewed *de novo*. *See, e.g.*, *St. Johnsbury Academy v. D.H.*, 240 F.3d 163, 168 (2d Cir. 2001). "The interpretation of a consent decree is also an issue of law that is freely reviewable by the court of appeals," as is "the legal significance of the effects that the court has found likely to occur." *Davis v. New York City Hous. Auth.*, 278 F.3d 64, 79 (2d Cir. 2002). This Court reviews a district court's decision on a Rule 60(b) motion for abuse of discretion. *United States v. Sec'y of Hous. & Urban Dev.*, 239 F.3d 211, 216 (2d Cir. 2001). "A district court abuses or exceeds its discretion when: (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the

range of permissible decisions." *Barcia v. Sitkin*, 367 F.3d 87, 99, (2d Cir. 2004) (citing *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 168–69 (2d Cir. 2001)).

## ARGUMENT

## I. THE CONSENT DECREE'S PRE-APPROVAL PROVISION VIOLATES MR. MUSK'S FIRST AMENDMENT RIGHTS AND IS UNENFORCEABLE

By prohibiting Mr. Musk from issuing written communications on certain topics, the pre-approval provision is among "the most serious and the least tolerable infringement on First Amendment rights": a prior restraint. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). The pre-approval provision does not just "chill" speech, it effectively "freezes" it. *Nebraska Press Ass'n*, 427 U.S. at 559.

The district court erred in holding that Mr. Musk waived his right to challenge the constitutionality of the pre-approval provision by relying wholly on this Court's decision in *Romeril*, a case that concerned a prior restraint of vastly smaller scope and without the infinite prospective reach of the pre-approval provision here. Indeed, Mr. Musk could not knowingly waive his right to vindicate his freedom of speech on unknowable future topics. Even if waived, such waiver is unenforceable, because the government put itself in the position of policing and potentially punishing constitutionally protected speech and did so as to speech unrelated to the conduct underlying the settled lawsuit.

19

## A.    The Pre-Approval Provision Violates The First Amendment

The pre-approval provision forbids Mr. Musk from making written communications on certain topics without first obtaining pre-clearance of those communications from a government-mandated monitor.  Compliance is not simply subject to oversight by Tesla, but also the SEC with the full force of the district court's contempt powers behind it.  The SEC cannot show that this prior restraint, restricting speech on a range of topics indefinitely, is narrowly tailored or serves a compelling government interest.  As a result, the pre-approval provision should be invalidated.

### 1.    The Pre-Approval Provision Is A Prior Restraint That Chills Mr. Musk's Speech

By restricting what Mr. Musk can say on a range of topics before he says it, the pre-approval provision is a textbook prior restraint.

"A 'prior restraint' on speech is a law, regulation or judicial order that suppresses speech—or provides for its suppression at the discretion of government officials—on the basis of the speech's content and in advance of its actual expression."  *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) (Sotomayor, J.) (holding that a court order restricting the media's publication of jurors names is an unconstitutional prior restraint).  "Governmental action constitutes a prior restraint when it is directed to suppressing speech because of its content before the speech is communicated."  *Id.* at 309 n.5.

"It has long been established that such restraints constitute the most serious and the least tolerable infringement on our freedoms of speech and press." *Id.* at 309. Thus, "[a]ny prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (vacating injunction prohibiting peaceful pamphleteering that failed to meet "heavy burden" justifying prior restraint).

*First*, Mr. Musk's written communications relating to Tesla are protected First Amendment speech, as the district court recognized. A274 ("[I]t is undisputed in this case that Musk's tweets are at least presumptively 'protected speech.'" (citations omitted)); *see, e.g.*, *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) ("[S]ocial media users employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought."); *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) ("[O]nline speech stands on the same footing as other speech—there is no basis for qualifying the level of First Amendment scrutiny that should be applied to online speech.").

*Second*, the pre-approval provision restricts future speech based on its content. The amended judgment "provides for" the suppression of Mr. Musk's speech "on the basis of the speech's content and in advance of its actual expression." *Quattrone*, 402 F.3d at 309. *See also Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (content-based speech "target[s] speech based on its communicative content,"

21

restricting "particular speech because of the topic discussed"). The provision delineates specified categories of speech for which Mr. Musk must seek and obtain pre-approval prior to publication. A231–32. The categories are defined by their content (*e.g.* whether they include information as to production status or sales and delivery numbers), placing the provision within the clear definition of a content-based regulation. Indeed, restraints like this one violate the First Amendment even when content neutral. *Quattrone*, 402 F.3d at 309 n.5; *see also Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001) (injunction against defamatory statements "plainly constitute[d] a broad prior restraint on speech"). It thus fits squarely within the definition of a prior restraint: "In its simple, most blatant form, a prior restraint is a law which requires submission of speech to an official who may grant or deny permission to utter or publish it based upon its contents." *Alexander v. United States*, 509 U.S. 544, 566 (1993) (Kennedy, J., dissenting); *see also Speiser v. Randall*, 357 U.S. 513, 518 (1958) (The government may not "place limitations upon the freedom of speech which if directly attempted would be unconstitutional.").

Not only does the pre-approval provision restrict speech, but it also imposes an impermissible chilling effect by threatening Mr. Musk's speech with sanctions. "It is well-established that First Amendment rights may be violated by the chilling effect of governmental action [even when] that falls short of a direct prohibition

against speech." *Zieper v. Metzinger*, 474 F.3d 60, 65–66 (2d Cir. 2007) (reversing summary judgment because genuine issues of material fact existed as to whether school discipline violated First Amendment). Thus, "[t]he First Amendment prohibits government officials from encouraging the suppression of speech in a manner which can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Id.* at 65–66. "The threat of sanctions may deter" the exercise of First Amendment rights "almost as potently as the actual application of sanctions." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 433 (1963).

The terms of the consent decree fit squarely in this category as well. The SEC demanded, as a condition of Mr. Musk's avoidance of SEC litigation and contempt-of-court charges, that Mr. Musk permanently relinquish his First Amendment right to speak freely on specific topics without prior approval. Such a demand "necessarily... ha[d] the effect of coercing" Mr. Musk into surrendering his freedom to "engag[e] in certain speech" protected by the First Amendment. *Speiser*, 357 U.S. at 519. The pre-approval provision thus chills lawful speech. *See Zieper*, 474 F.3d at 67 (concluding that government agents' efforts to "convince" the plaintiff to take down a video were actually "coercive" and therefore impermissible); *Husain v. Springer*, 494 F.3d 108, 128 (2d Cir. 2007) (holding state university

official's action nullifying student election because of content published by the school newspaper was coercive against the newspaper because of the chilling effect it had on the publication).

*Finally*, the pre-approval provision constitutes government action. To start, the amended final judgment is a judicial order. Mr. Musk remains bound by that amended judgment subject to the court's contempt power, as the SEC's prior contempt motion demonstrates. These facts alone satisfy the requirement of government action. *See Crosby v. Bradstreet Co.*, 312 F.2d 483, 485 (2d Cir. 1963) (holding district court consent order restraining defendant from publishing any past or future report about certain persons constitutes impermissible prior restraint enforceable through the contempt power). As this Court held in *Crosby*, a consent decree in which the defendant agreed to refrain from issuing any comment about the plaintiffs and their business activities "constitute[d] a prior restraint by the United States against the publication of facts which the community has a right to know and which [the defendant] had and has the right to publish." *Id.* at 485. The pre-approval provision, and the prior restraint it imposes on Mr. Musk, is government-mandated pre-publication suppression of speech, which the Constitution prohibits. *Id.*; *Quattrone*, 402 F.3d at 309 (noting "judicial order" qualifies as prior restraint).

Beyond that, however, the SEC has insisted that ultimately it has supervisory and enforcement power over whether Mr. Musk and Tesla are complying with the

pre-approval provision. *See* Resp. in Opp. to Mot. to Quash & to Terminate Consent Decree, ECF 78 at 5–7. And the SEC has not been shy to use other methods to flex its oversight muscles through demands for information and subpoenas.

In 2019, the SEC usurped greater control by reducing the discretion the original consent decree afforded to Mr. Musk and Tesla to evaluate what communications are subject to pre-approval by adding specific enumerated categories provided by the Commission. *See* A214; *compare* A53–54 at ¶ IV(b) *with* A231–32; *see also* A234; Resp. in Opp. to Mot. to Quash & to Terminate Consent Decree, ECF 78 at 9 n.2. To avoid tweeting and later facing a penalty, Mr. Musk must monitor his speech knowing that "some form of punishment or adverse regulatory action will follow," *Zieper*, 474 F.3d at 65, if he steps outside the line the SEC decides to draw that day, regardless of whether the tweet violated the securities laws or required pre-approval under the consent decree.

## 2. The SEC Cannot Show The Pre-Approval Provision Is Narrowly Tailored To Serve A Compelling Government Interest

The SEC cannot justify this prior restraint because it cannot show the pre-approval provision is narrowly tailored to serve any identified compelling government interest.

"A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus

toward the ideas contained in the regulated speech." *Reed*, 576 U.S. at 165. Thus, the government bears the burden of proving "that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 171.

At the threshold, the SEC cannot show that the pre-approval provision serves a compelling government interest. "The State must specifically identify an 'actual problem' in need of solving and the curtailment of free speech must be actually necessary to the solution. . . . That is a demanding standard." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822 (2000) and citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992)).

Before the district court, the SEC sought to justify its prior restraint on the basis of its interest in enforcing securities laws. But the pre-approval provision, by design, covers not only illegal speech (that is, *materially* false statements made with scienter), but Mr. Musk's protected speech on a wide range of topics. In this regard, the district court was correct that "[Mr. Musk's] free speech rights do not permit him to engage in speech that is or could be considered fraudulent or otherwise violative of the securities laws," but it erred in concluding "[t]he consent decree [] does not impose obligations that have 'become impermissible under federal law.'" A274 (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992)). The pre-approval provision covers Mr. Musk's truthful speech about Tesla's business

26

activities. No one—not even the SEC—has ever proposed that every communication that requires pre-clearance violates the law. And the SEC has not sought to prove that any statements it contends are subject to the pre-approval provision violated the securities laws. If the SEC perceives a violation of the law, it may take action. In that case, Mr. Musk would be afforded "the whole panoply of protections" of judicial process before "the law's sanction become[s] fully operative." *Nebraska Press Ass'n*, 427 U.S. at 559 (rejecting a court order prohibiting reporting or commentary on judicial proceedings held in public as a prior restraint). The SEC has failed to demonstrate any compelling interest that justifies the "immediate and irreversible sanction" of a prior restraint on lawful speech. *Id.*

But, even if the SEC could identify a compelling government interest, the pre-approval provision is not narrowly tailored to serve such interest. A regulation is considered "narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). If "a substantial portion of the burden on speech does not serve to advance" the goal of the restraint, then it is not narrowly tailored. *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). "Even where questions of allegedly urgent national security, or competing constitutional interests, are concerned, [courts] have imposed this most extraordinary remedy [of a prior restraint] only where the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive

measures." *CBS, Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) (citations and quotation marks omitted).

Here, the SEC cannot demonstrate that the pre-approval provision targets no more than the speech necessary to serve its goal. The pre-approval provision does not simply target speech that might violate the securities laws. The amended judgment removed any materiality requirement even though the securities law are not concerned with immaterial facts. 17 C.F.R. § 240.10b-5(b) ("To make any untrue statement of a material fact or to omit to state a material fact . . . ."). And the pre-approval provision has no sunset provision, no deadline upon which it expires, or conditions precedent to its dissolution. Thus, a "substantial portion of the burden on speech does not serve to advance" the government's interest in the restraint. *Ward*, 491 U.S. at 799.

In this same vein, the SEC cannot show the absence of less restrictive means of pursuing its interest in upholding the securities laws. Indeed, the consent decree contains key provisions serving such government interests. *First*, and most importantly, it permanently restrains and enjoins Mr. Musk from violating Section 10(b) of the Exchange Act and SEC Rule 10b-5. A50–51. That is, the consent decree already prohibits any potential violation of the securities laws. *Second*, Tesla's consent decree required it to add two independent directors to its board, Final Judgment, *SEC v. Tesla*, ECF 14 at 14, and to create a permanent board committee

composed of independent directors to oversee the company's controls and procedures governing disclosures and public statements. *Id. Finally*, Mr. Musk's consent decree embodies the SEC's gag rule, which reflects the speech restriction the SEC deems necessary "to avoid creating, or permitting to be created, an impression that a decree is being entered or a sanction imposed, when the conduct alleged did not, in fact, occur." 17 C.F.R. § 202.5(e).

Beyond these specific provisions, the SEC may also enforce its anti-fraud laws and disclosure controls regulatory requirements in the ordinary course. "If [those are] not the most efficient means of preventing fraud, we reaffirm simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988) (invalidating a state statute that restricted any fee paid to charitable fundraisers under the guise of preventing fraud as an unconstitutional restriction on speech).

### B. Mr. Musk Did Not Knowingly And Voluntarily Waive His Future Constitutional Rights

The district court did not address the above-explained constitutional infirmity of the pre-approval provision because it determined that Mr. Musk had waived his First Amendment right as to such speech. This conclusion rests on an erroneous view of the law and fails to account for the fact that the restraint applies to a vast

swath of speech regarding events that had not yet occurred and that could not have been contemplated at the time of the decree.

Courts must "indulge every reasonable presumption against [a defendant's] waiver of fundamental constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (internal quotation marks omitted). This is true "in the civil no less than the criminal area." *Fuentes v. Shevin*, 407 U.S. 67, 94 n.31 (1972); *see also Stamicarbon, N.V. v. Am. Cyanamid Co.*, 506 F.2d 532, 537–38 (2d Cir. 1974). While it is true that "parties *can* waive their First Amendment rights in consent decrees and other settlements of judicial proceedings," *Romeril*, 15 F.4th at 172 (emphasis added), in the First Amendment context, "to be effective, the waiver must be freely given and shown by 'clear and compelling' evidence," *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2486 (2018) (quoting *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 145 (1967)); *see also Sambo's Restaurants Inc. v. City of Ann Arbor*, 663 F.2d 686, 690 (6th Cir. 1981).

The waiver of a fundamental right is only valid if it was made knowingly, voluntarily, and intelligently. *United States v. Loc. 1804-1, Int'l Longshoremen's Ass'n, AFL-CIO*, 44 F.3d 1091, 1098 n.4 (2d Cir. 1995). This determination depends "in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson*, 304 U.S. at 464; *see also Brady v. United States*, 397 U.S. 742, 748 (1970) (emphasizing

the importance of analyzing the "awareness of . . . likely consequences" of waiver). "'Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.'" *Ronnie Van Zant, Inc. v. Cleopatra Recs., Inc.*, 906 F.3d 253, 258 (2d Cir. 2018) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)).

Mr. Musk's waiver was neither knowing or voluntary. Mr. Musk could not possibly have known the circumstances and consequences of the pre-approval provision because the provision applies to future speech about circumstances no one could anticipate in advance. While the district court relied on *Romeril* to conclude that Mr. Musk knowingly waived his First Amendment rights, this Courts' decision in *Romeril* does not address the waiver of First Amendment rights on topics unrelated to the facts giving rise to the underlying action.

In *Romeril*, this Court determined that the SEC's use of the gag rule, requiring a "no-admit, no-deny" provision in a consent decree, should not be vacated. The Court reasoned that Mr. Romeril, by electing to enter the settlement rather than litigate, could and did waive his First Amendment rights to deny the SEC's allegations. 15 F. 4th at 171–74. But this Court's decision in *Romeril* did not answer the question here because the prohibited speech at issue in *Romeril* concerned only the allegations underlying the securities case the SEC brought against him. *Id.* at 170. By contrast, the pre-approval provision here presents a novel problem as a

31

result of the sheer scope of speech it implicates.  The pre-approval provision requires

Mr. Musk to seek approval to speak his mind about a host of past, present, and future

events, including events entirely unrelated to the specific conduct that gave rise to

the settlement.  *Romeril* did not give carte blanche to the government to compel

defendants to sign away their right to speak freely about significantly broader topics

and a potentially infinite set of events that have not yet occurred.[1]

The cases *Romeril* cites for support are also inapposite to the present case.  In

each case in which the court ultimately upheld a waiver of First Amendment rights,

the waiver was strictly tailored to specific and existing concerns, not broad,

unending, and free-wheeling restrictions on protected speech.  *See, e.g.*, *Leonard v.

Clark*, 12 F.3d 885, 889–92 (9th Cir. 1993), *as amended* (Mar. 8, 1994) (provision

narrowly tailored to penalize speech endorsing specific payroll legislation that would

impact the city's budget); *In re George F. Nord Bldg. Corp.*, 129 F.2d 173, 176 (7th

Cir. 1942) (restraining order tailored to written communications relating to ongoing

reorganization proceeding); *United States v. Int'l Bhd. of Teamsters, Chauffeurs,

Warehousemen & Helpers of Am., AFL-CIO*, 931 F.2d 177, 187 (2d Cir. 1991)

---

[1]  Further, as a matter of procedure, *Romeril* addressed the viability of Mr. Romeril's claim to vacate his judgment under Rule 60(b)(4), *id.* at 171–74, a standard requiring a jurisdictional showing that does not apply in this case, which seeks relief from an inequitable judgment under Rule 60(b)(5).

(consent decree tailored to certain election abuses and further narrowed by court).[2] *Romeril* thus provides little guidance here.

Casting further doubt on Mr. Musk's ability to knowingly waive his constitutional rights about unknowable circumstances is the fact that, at the time he signed the amended judgment, Mr. Musk was not represented by counsel. Indeed, he represented himself in negotiations regarding the SEC's contempt motion and the amended judgment. *See* A218 ("While we have not reached an agreement, *counsel* for the SEC, *Mr. Musk*, and *counsel* for Tesla met and conferred for over an hour by telephone earlier this week and are continuing to discuss potential resolution.") (emphasis added) (signed by counsel for SEC and Mr. Musk personally); A219 (similar). And, unlike in other contexts, such as guilty pleas in criminal matters, the district court did not conduct an inquiry of Mr. Musk prior to entering the amended judgment to ensure that he understood the constitutional rights he was forgoing. Courts pay special attention when individuals and those without counsel face accusations of waiver because they face greater risks of unknowingly forgoing their rights. *See Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1395 (9th Cir. 1991); *see also D. H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 186–87 (1972).

---

[2] While *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980), did uphold a waiver of First Amendment rights to future speech, it did so only in the context of national security interests, and thus provides no analogy here.

Mr. Musk could not have knowingly waived rights he could not fairly anticipate and without counsel to advise him on the full scope of the waiver.

Nor was Mr. Musk's waiver voluntary. For example, a defendant may waive his right to a jury trial when he takes a plea deal because waiver of that right is "inevitable" to the compromise. *Chaffin v. Stynchcombe*, 412 U.S. 17, 31 (1973); *see also Wilkicki v. Brady*, 882 F. Supp. 1227, 1235 (D.R.I. 1995) ("[I]n return for . . . the dropping of part of the charges, the defendant pleads guilty to the related charge.") (cleaned up). Here, in contrast, the SEC sought a waiver of First Amendment rights about future speech that has nothing to do with effectuating the settlement and with which Mr. Musk could not have reasonably anticipated would follow. *See, e.g.*, *Hollins v. Methodist Healthcare, Inc.*, 379 F. Supp. 2d 907, 912 (W.D. Tenn. 2005) (finding waiver of First Amendment right not knowing and voluntary when it could not have been a reasonably anticipated consequence of agreement), *aff'd*, 474 F.3d 223 (6th Cir. 2007).

Thus, the district court erred in concluding that the SEC had demonstrated by clear and convincing evidence that Mr. Musk waived his First Amendment rights.

### C. In Any Event, Any Waiver Of Mr. Musk's First Amendment Rights Is Unenforceable

Even if the district court were correct that Mr. Musk waived his First Amendment rights over a broad swath of otherwise protected future speech, any such waiver would be invalid and unenforceable.

34

### 1. The Pre-Approval Provision Cannot Be Enforced Because It Is An Unconstitutional Condition

"Under the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government where the benefit sought *has little or no relationship*" to the forgone constitutional right. *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994) (emphasis added); *see also Davies*, 930 F.2d 1390 ("Before the government can require a citizen to surrender a constitutional right as part of a settlement or other contract, it must have a legitimate reason for including the waiver in the particular agreement. A legitimate reason will almost always include a close nexus—a tight fit—between the specific interest the government seeks to advance in the dispute underlying the litigation involved and the specific right waived."); *see also* Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413, 1458–68 (1989) (outlining the significance of germaneness to unconstitutional conditions analysis).

In this regard, the government may not condition anyone's ability to receive a benefit on the surrender of a constitutional right that lacks a close nexus to the benefit received. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 215–16 (2013) (explaining that any relinquishment of speech rights to obtain a benefit conferred by the government must be closely connected to the benefit received); *see also FCC v. League of Women Voters*, 468 U.S. 364, 399–401 (1984)

35

(striking down as an unconstitutional condition a requirement that recipients of federal financial assistance for non-commercial television and radio stations be barred from editorializing, even when using private funds).

Thus, "the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'" *Agency for Int'l Dev.*, 570 U.S. at 214 (citations omitted).[3] That the government could refuse to offer the benefit at all does not permit the otherwise unconstitutional conditioning of that benefit upon the relinquishment of constitutional rights. *See Koontz v. St. John's River Water Mgmt. Dist.*, 570 U.S. 595, 608 (2013) ("We have repeatedly rejected the argument that if the government need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights.").

As this Court has recognized in *Romeril*, "consent decrees are normally compromises in which the parties give up something they might have won in

---

[3]  *See also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547 (2001) (forbidding Congress from conditioning its funding "lest the First Amendment be reduced to a simple semantic exercise"); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1077 (6th Cir. 1994) (holding unenforceable a city's contract that attempted to condition a benefit on the waiver of a party's right to free expression); *Barron v. Burnside*, 121 U.S. 186, 200 (1887) (the government may not make its decision to refrain from its adverse exercise of power "dependent upon the surrender . . . of a privilege secured . . . by the constitution . . . of the United States").

litigation and waive their rights to litigation." 15 F.4th at 172.[4]  Mr. Musk does not seek to relitigate numerous things he gave up in the consent decree:  three years as Tesla's CEO and Chairman, Tesla board seats, or the $20 million fine.  A51, A53.  But he does object to the limits on his speech imposed by the pre-approval provision that go far beyond the scope of the SEC's 2018 allegations.  The speech constrained by the pre-approval provision relates to future statements on issues implicating many aspects of Tesla's business.

While the consent decree arose from the settlement of the 2018 securities fraud action concerning Mr. Musk's tweets related to taking Tesla private, the consent decree covers these allegations in the gag rule provision.  The pre-approval provision goes much further, barring future statements on a range of topics absent sign off from an SEC-mandated monitor.  Mr. Musk did not settle any claims related to such future statements on such broad topics (indeed, the SEC has continued to investigate such statements for a potential enforcement action) and thus the pre-

---

[4]  The *Romeril* court's analysis of whether the gag rule violated the unconstitutional conditions doctrine ended here, as this Court did not otherwise address the enforceability of waiver.  Further, *Romeril* relied on the fact that "Romeril did not establish 'a total want of jurisdiction' rendering the Judgment void" under Rule 60(b)(4)—it explicitly did not consider a challenge under Rule 60(b)(5).  *Id.* at 174.  And the Court differentiated *Crosby*, 312 F.2d 483, on the grounds that the speech restraint in *Crosby* was excessively broad and affected non-parties to the litigation— precisely as the restraint does here.  *Id.* at 173.

approval provision fails to satisfy "the nexus and rough proportionality standards" delineated by the Supreme Court. *Koontz*, 570 U.S. at 612.

The SEC has not even attempted to show a nexus here. Nor could it. The pre-approval provision covers plainly lawful speech and its restraint of such speech extends indefinitely into the future. Such speech bears no connection to the underlying securities fraud action, which involved statements regarding Mr. Musk's consideration of a take-private transaction for Tesla that did not occur. Instead, the pre-approval provision explicitly and prospectively restrains Mr. Musk from engaging in a broad range of communications about Tesla absent approval. The restriction thus chills *any* communication concerning the company because Mr. Musk is under constant threat that the SEC may disagree with his understanding or interpretation of the categories of information governed by the pre-approval process. This "absence of a nexus" demonstrates that the SEC obtained this restraint on Mr. Musk's speech "through gimmickry, which converted a valid [settlement] into 'an out-and-out plan of extortion.'" *Dolan*, 512 U.S. at 387 (quoting *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 837 (1987)). The doctrine of unconstitutional conditions forbids the SEC making such a demand, rendering the pre-approval provision unenforceable.

## 2. Any Waiver Violates Public Policy And Cannot Be Enforced

Any waiver of Mr. Musk's First Amendment rights likewise cannot be enforced for the separate reason that it violates public policy.

As a general matter, waivers of constitutional rights are only enforceable if they are in the public interest. *Town of Newton v. Rumery*, 480 U.S. 386 (1987). "The relevant principle is well established: a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Id.* at 392; *see also Stamford Bd. of Educ. v. Stamford Educ. Ass'n*, 697 F.2d 70, 73 (2d Cir. 1982) ("It is clear that public policy circumscribes agreements between private parties in order to prevent the courts from becoming 'vehicles of discrimination.'" (quoting *Lee v. Habib*, 424 F.2d 891, 902 (D.C. Cir. 1970)); *SEC v. Citigroup Global Markets, Inc.*, 752 F.3d 285, 297 (2d Cir. 2014) (explaining that "a consent decree may disserve the public interest").

This principle applies to settlements of government actions. *United States v. Int'l Bhd. of Teamsters*, 998 F.2d 1101, 1106 (2d Cir. 1993) (Although consent decrees are judicial orders, they are also agreements between parties that "'should be construed basically as contracts.'" (quoting *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37 (1975)); *see also Crumpton v. Bridgeport Educ. Ass'n*, 993 F.2d 1023, 1028–29 (2d Cir. 1993) ("While a consent decree is a judicial

39

pronouncement, it is principally an agreement between the parties and as such should be construed like a contract.").

"[I]t is the burden of the [party asserting waiver] to plead and prove that the agreement serves the public interest." *Lynch v. City of Alhambra*, 880 F.2d 1122, 1128 (9th Cir. 1989). The critical question is whether, "under the circumstances, the interest in enforcing the waiver is not outweighed by a relevant public policy that would be harmed by enforcement." *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 223 (4th Cir. 2019).

Here, the public policy interests in upholding First Amendment principles strongly outweigh any asserted government interest. As this Court has held, the Constitution protects the free "publication of facts which the community has a right to know" in addition to those which a subject of a consent decree "had and has the right to publish." *Crosby*, 312 F.2d at 485; *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (describing the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"); *Overbey*, 930 F.3d at 224 (same). As a prior restraint, the pre-approval provision is among "the most serious and the least tolerable infringement[s] on our freedoms of speech and press." *Quattrone*, 402 F.3d at 309. This public interest implicates "[t]he right of citizens to inquire, to hear,

40

to speak, and to use information to reach consensus[, which] is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010). Waivers that are contrary to public policy are void and unenforceable. *See Thomas James Assocs., Inc. v. Jameson*, 102 F.3d 60, 66 (2d Cir. 1996) (waiver of certain arbitration rights contrary to public policy and void); *Wessel v. City of Albuquerque*, 299 F.3d 1186, 1198 (10th Cir. 2002) (finding certain provisions "void and unenforceable as against public policy inherent in the First Amendment").

Courts will not enforce unconstitutional prior restraints contained as conditions in settlements—even when entered with consent. *See Overbey*, 930 F.3d at 219 (invalidating waiver of First Amendment rights demanded by city as a condition of police brutality settlement); *United States. v. Richards*, 385 F. App'x 691, 693 (9th Cir. 2010) (invalidating term of plea agreement forbidding defendant from making public comments about county commissioner); *G & V Lounge, Inc.*, 23 F.3d at 1077 (agreement to restrain free expression invalidated as violative of First Amendment); *Davies*, 930 F.2d at 1399 (invalidating the portion of a settlement agreement in which a party waived his right to run for public office); *People v. Smith*, 502 Mich. 624, 644 (2018) (same).

The Fourth Circuit's decision *Overbey* demonstrates precisely why this Court should hold the pre-approval provision here invalid and unenforceable. In *Overbey*,

the Fourth Circuit addressed the city of Baltimore's practice of settling civil-rights lawsuits alleging police misconduct with requirements that settling claimants agree to a "non-disparagement clause," under which they promise not to speak to the media about either their underlying allegations or the settlement process itself. *Overbey*, 930 F.3d at 219. While the court determined the settling party there had waived her First Amendment rights, the court concluded that the "strong public interests rooted in the First Amendment make it unenforceable and void." *Id.* at 222. The court emphasized that "the First Amendment is meant to serve as a bulwark against such exercises of government power," and so "when a settlement agreement contains a waiver of a constitutional right, the government's general interest in using settlement agreements to expedite litigation is not enough to make the waiver enforceable." *Id.* at 224–25. The same is true here.

The SEC's general interest in pursuing settlements is insufficient to counter the constitutional harms at stake because that "interest [] will be present in every dispute over the enforceability of an agreement terminating litigation" and would leave "no point to the *Rumery* balancing test." *Davies*, 930 F.2d at 1398; *see also Loc. 1804-1, Int'l Longshoremen's Ass'n*, 44 F.3d at 1098 n.4 (citing *Davies* favorably); *Fomby-Denson v. Dep't of the Army*, 247 F.3d 1366, 1377–78 (Fed. Cir. 2001); *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 212 (4th Cir. 2007). Moreover, the SEC maintains the protections of the other provisions of the consent

decrees that still: (1) permanently restrain and enjoin Mr. Musk from violating Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5; (2) require that Tesla maintain two independent directors to its board; and (3) require that Tesla maintain a permanent board committee composed of independent directors to oversee the company's controls and procedures governing disclosures and public statements. A50; Final Judgment, *SEC v. Tesla*, ECF 14 at 11, 14.

In sum, the SEC's "interest in [] enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Rumery*, 480 U.S. at 392 (citation omitted). As a result, the pre-approval provision is invalid and unenforceable.

### D. The Court Should Excise The Pre-Approval Provision From The Consent Decree

In light of the constitutional defects in the pre-approval provision, this Court should modify the amended final judgment to excise the provision.

A consent decree contrary to law must be modified. *See Rufo*, 502 U.S. at 388; *see also Alexander v. Bahou*, 512 F. Supp. 3d 363, 375 (N.D.N.Y. 2021) ("If a consent decree's language is so broad as to permit conduct that violates federal law, practicality demands that courts be permitted to modify that language."). Such requirement flows naturally from the fact that "[t]he power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in

43

the Constitution, treaties, federal statutes, and applicable legal precedents." *Hurd v. Hodge*, 334 U.S. 24, 34–35 (1948)*; see also Davies*, 930 F.2d at 1399–400 (deeming settlement agreement "void" to the extent it infringed constitutional rights and vacating finding of contempt for violation of the agreement). That is because, "[e]ven if the consent decree does not expressly order that conduct, it allows for it, and by extension protects it," such that "[t]his Court has an interest and an obligation to ensure that conduct in violation of federal law is not being perpetrated under its authority." *Alexander*, 512 F. Supp. 3d at 375.

Here, the pre-approval provision violates the First Amendment and cannot be enforced. Accordingly, the consent decree should be modified to remove any pre-approval provision.

## II.  ALTERNATIVELY, EQUITABLE CONSIDERATIONS REQUIRE MODIFICATION OF THE CONSENT DECREE

Even if the pre-approval provision were not unenforceable and invalid as a matter of law, the consent decree must be modified to strike the provision. The SEC has treated the consent decree not as a means of seeking further assurance that Mr. Musk is complying with securities laws but as a separate and independent ground for investigating Mr. Musk, aggravating the existing constitutional defect of the decree for which the only remedy is modification. As a result, enforcement of the pre-approval provision is contrary to the public interest. In any event, any legitimate objective served by the pre-approval provision has been achieved.

Modification to eliminate the pre-approval provision thus is separately warranted under Federal Rule of Civil Procedure 60(b)(5). The district court abused its discretion in concluding otherwise based on its assessment that Mr. Musk should have anticipated the SEC would use the consent decree to police his constitutionally protected speech, A275—a conclusion that is "freely reviewable," *Davis*, 278 F.3d at 79, because it concerns the legal effects of the consent decree.

### A. The SEC's Conduct Has Magnified the Constitutional Defects Of The Pre-Approval Provision, Rendering It Unworkable And Contrary To The Public Interest

The SEC's conduct following imposition of the consent decree has exacerbated the constitutional harm of the pre-approval provision, justifying modification.

A district court has inherent authority to terminate or modify a consent decree. Fed. R. Civ. P. 60(b)(5). This power is, "at bottom, guided by equitable considerations." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 101 (2d Cir. 1995). Consent decrees can and "should be sensitively adjusted by courts of equity, exercising their historic powers both to provide remedial relief and, when appropriate, to terminate their authority." *Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*, 13 F.3d 33, 38 (2d Cir. 1993). "Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous. . . .

Modification is also appropriate when a decree proves to be unworkable because of unforeseen obstacles, . . . or when enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384.

"[A]ny showing of a significant change in factual conditions or law would justify a modification of a decree." *Patterson*, 13 F.3d at 37 (applying a "flexible standard"); *see also Sec'y of Hous. & Urban Dev.*, 239 F.3d at 216–17 (documenting the "significant relaxation of the restrictions imposed on District Courts seeking to modify consent decrees"). Once changed circumstances are met, modification is mandatory. *Barcia*, 367 F.3d at 99 ("If the party seeking modification [demonstrates changed circumstances or law], the court then *must* consider whether the modification proposed is 'suitably tailored to the changed circumstance.'" (emphasis added) (quoting *Rufo*, 502 U.S. at 383 and citing *Frew v. Hawkins*, 540 U.S. 431, 442 (2004))); *Still's Pharmacy, Inc. v. Cuomo*, 981 F.2d 632, 637 (2d Cir. 1992) (affirming modification and applying a "flexible test").

Over the course of the past four years, the SEC has doubled down on its prior attempts to control Mr. Musk's speech and used the pre-approval provision to do so. The SEC has taken these actions without any ostensible regard for core First Amendment rights, amidst heavy-handed investigation and overreaching

interpretation of the consent decree that seems destined to chill the exercise of those rights without supervision by the court.[5]

Since the judgment was entered, the SEC has maintained constant investigations into Mr. Musk's speech, employing nebulous interpretations of the consent decree seemingly designed to curb and chill his future speech, all regarding speech entirely unrelated to the 2018 tweet for which the SEC initiated this action.

To begin with, just months after entering into the consent decree, the SEC moved the court to find Mr. Musk in contempt for a truthful tweet that had no impact on Tesla's position in the market. SEC Contempt Mot., ECF 18. It made this "serious charge," A215, without engaging in any serious effort to meet, confer, or work with Mr. Musk and his counsel, demanding an immediate response over the weekend and filing its motion for contempt despite Mr. Musk's counsel's request for one day to provide a full response. *Id.*; A77–78. The SEC sought to have Mr. Musk held in contempt and used that leverage to force him—unrepresented throughout negotiations—to agree to amend the consent decree so that it had yet further control over the pre-approval process. The district court rejected the SEC's

---

[5] The district court did not reach this question and instead assumed the issue was waived. A274–75. Mr. Musk contests that he waived his right to challenge the SEC's infringement of his First Amendment rights or that such waiver would be enforceable, *see supra* at 30–43, but in any event, whether Mr. Musk has demonstrated that modification of the decree is necessary now is a separate and distinct question as a matter of law from whether the decree is void.

contempt motion and, ever since, the SEC has pursued unilateral action against Mr. Musk, with no concern for the court's supervisory role.

The ensuing three years have been replete with SEC investigations that never lead anywhere. At all times following the commencement of the 2018 investigation through the present, the SEC has kept at least one investigation open regarding Tesla and Mr. Musk. But not a single tweet about which the SEC has inquired has concerned the topic of the 2018 tweet—taking Tesla private.

Consider the November 2021 tweets polling whether Mr. Musk's Twitter followers thought he should sell Tesla stock. Such tweets are unrelated to taking Tesla private and could not possibly have been statements or omissions of material facts, as Rule 10b-5 requires, because they were not facts. In the past ten months, the SEC has issued numerous subpoenas to Mr. Musk and individuals and entities with which he is associated. Compliance with this litany of subpoenas has been burdensome and no end appears in sight.

While the district court was of the view that the tweets rightly elicited "questions" from the SEC, A276, the SEC should not be permitted to investigate constitutionally protected speech as a violation of a consent decree. That is, apart from any investigation into whether the challenged statements violate the securities laws, the SEC has asserted an independent right to investigate whether Mr. Musk obtained pre-approval. The SEC's subpoena to Tesla also twice asks for documents

related to compliance with "the final judgment or amended final judgment" in both *SEC v. Musk* and *SEC v. Tesla*. CA25.

The First Amendment also does not tolerate agency action that chills speech by targeting an individual with ceaseless threats of prosecution because "[p]ermitting government officials unbridled discretion in determining whether to allow protected speech presents an unacceptable risk of both indefinitely suppressing and chilling protected speech." *11126 Baltimore Boulevard, Inc. v. Prince George's Cty., Md.*, 58 F.3d 988, 994 (4th Cir. 1995). Here, the SEC's reliance on the pre-approval provision to investigate Mr. Musk chills his speech by burdening Mr. Musk with investigative requests that may dissuade him from speaking at all. And every time the SEC enquires into the pre-approval of one of Mr. Musk's tweets, it raises the specter that it may punish him for his speech, making him less likely to speak freely in the future. *See Metro. Opera Ass'n, Inc.*, 239 F.3d at 172–79 (vacating injunction that "risks contempt sanctions for speech that may ultimately, after full appellate review, be found constitutionally protected").

Such fear would be justified in light of the SEC's history of enforcing the consent decree. When Mr. Musk tweeted in 2019 about vehicle production volumes, he determined the tweet was immaterial and did not require pre-approval, in accordance with the consent decree. He nevertheless found himself facing the

possibility of being held in contempt of court because that day the SEC read the requirements of the consent decree differently than he did.  A223 at ¶ 9.

The SEC's inquiries have been particularly troubling in light of the SEC's citation to Mr. Musk's criticism of the SEC in seeking to investigate compliance with the pre-approval provision.  *See, e.g.*, SEC Contempt Mot., ECF 18 at 14–15; A212–13.  Such references create the impression that the SEC is targeting Mr. Musk *because of* his constitutionally protected speech.  But "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

The SEC's failure to uphold its side of the bargain alone provides sufficient basis to terminate or modify the decree.  *Rufo*, 502 U.S. at 383 n.7.  When a consent-decree party's conduct falls short of its commitments and obligations, modification of a consent decree is warranted.  This is no less true when the government is that party.  *See, e.g.*, *Thompson v. U.S. Dep't Of Hous. & Urb. Dev.*, 404 F.3d 821, 824 (4th Cir. 2005) (Department of Housing and Urban Development's actions or failure to act constitute a "factual" change warranting modification of consent decree); *Sec'y of Hous. & Urb. Dev.*, 239 F.3d at 218 (consent decree "prove[d] to be unworkable because of unforeseen obstacles," specifically continued failure of city to take action anticipated by the consent decree).

The SEC's approach thus has rendered the consent decree unworkable.

Separately, the public interest also demands modification. "[A] court should surely keep the public interest in mind in ruling on a request to modify based on a change in conditions." *Rufo*, 502 U.S. at 392. Thus modification or vacatur of an injunction is warranted when continued enforcement "would be detrimental to the public interest." *Id.* at 384–85 (citing *Duran v. Elrod,* 760 F.2d 756, 759–61 (7th Cir. 1985)). "*Rufo*'s flexibility is designed to permit details in complicated decrees, much as this one, to be adapted to changing conditions so that the public interest can be preserved." *Juan F. By & Through Lynch v. Weicker*, 37 F.3d 874, 879 (2d Cir. 1994).

The vindication of constitutional rights is always in the public interest. *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[S]ecuring First Amendment rights is in the public interest."). And, as discussed above, public policy strongly favors eliminating the pre-approval provision. *See supra* at 39–43. Whether in the context of unenforceable contractual waivers of constitutional rights or modification of a consent decree, the public interest always weighs heavily in favor of First Amendment freedoms.

Mr. Musk entered into the consent decree with the understanding that it would permit Tesla and Mr. Musk to agree on reasonable communications policies. The consent decree simply does not permit the type of micromanaging of Mr. Musk's

protected speech in which the SEC has engaged since its entry. These circumstances thus provide a separate basis to modify the consent decree by striking the pre-approval provision and restoring to Mr. Musk his ability to speak lawfully and consistent with his First Amendment rights, without the SEC's interference.

**B.     Modification Is Further Warranted Because The Objective Of The Pre-Approval Provision Has Been Achieved**

The pre-approval provision likewise should be removed because any goal it served has been accomplished and modification would allow for the free debate protected by the First Amendment.

"The federal court *must* exercise its equitable powers to ensure that when the objects of the decree have been attained," the decree is modified to no longer subject the party to judicial oversight. *Frew*, 540 U.S. at 442. As this Court has held, a "flexible standard" applies when determining whether to modify a consent decree in light of the "substantial attainment of the decree's objective." *Patterson*, 13 F.3d at 38 ("For defendants . . . it is the prospect of modification as circumstances change or objectives are substantially reached that provides the incentive to settle on reasonable terms, rather than adamantly resist in protracted litigation.").

This Court should grant modification of the consent decree for the separate reason that the objective of the decree has been achieved. Tesla has implemented procedures that govern the oversight of executive communications. These procedures apply to Mr. Musk. No objective would be served by subjecting

Mr. Musk's constitutionally protected future speech to continuing SEC and judicial oversight.

Even the SEC, while citing the consent decree within its subpoena requests, CA25, simultaneously has claimed authority to issue such subpoenas apart from claimed violations of the pre-approval provision. Resp. in Opp. to Mot. to Quash & to Terminate Consent Decree, ECF 78 at 9 n.2, 10–11. Thus, the SEC itself recognizes that it does not need the pre-approval provision to police any perceived violations of the securities laws.

Insofar as the SEC perceives a violation of the securities laws in the future, it maintains all investigatory authority it has with respect to every other individual. It can issue subpoenas, it can conduct testimony, it can bring charges. It can also rely on the injunction entered prohibiting Mr. Musk from violating Section 10(b). A50–51 at ¶ I. But any objective served by the pre-approval provision has been served. Thus, this Court should modify the consent decree to eliminate it.

## CONCLUSION

This Court should vacate the district court's order, hold that the pre-approval provision contained in the amended judgment is an impermissible and unenforceable violation of the First Amendment, and remand with instructions to strike the pre-approval provision from the judgment and amended judgment.

DATED:  September 27, 2022         Respectfully submitted,

                                   QUINN EMANUEL URQUHART &
                                   SULLIVAN LLP


                                   By _/s/ Alex Spiro_____
William A. Burck                      Alex Spiro
Rachel G. Frank                      Ellyde R. Thompson
QUINN EMANUEL URQUHART &             QUINN EMANUEL
SULLIVAN, LLP                        URQUHART & SULLIVAN, LLP
1300 I Street NW, 9th Floor          51 Madison Avenue, 22nd Floor
Washington, D.C. 20005               New York, NY 10010
(202) 538-8000                       Telephone: (212) 849-7000

                                     *Counsel for Elon Musk*

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rules of Appellate Procedure 32(g)(1) and Local Rule 32.1(4), I certify that the foregoing brief is proportionately spaced using 14-point Times New Roman font and contains 12,763 words, excluding the parts exempted from length limits by Federal Rule 32(f).


*/s/ Alex Spiro*
Alex Spiro

## CERTIFICATE OF SERVICE

I hereby certify that, on September 27, 2022, I electronically filed the foregoing response with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Alex Spiro*
Alex Spiro