# 22-1291

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

United States Securities and Exchange Commission,

*Plaintiff-Appellee*,

v.

Elon Musk,

*Defendant-Appellant.*

On appeal from the United States District Court for the
Southern District of New York (Hon. Lewis J. Liman)

## BRIEF FOR THE PLAINTIFF-APPELLEE

DAN BERKOVITZ
General Counsel

MICHAEL A. CONLEY
Solicitor

JEFFREY A. BERGER
Senior Appellate Counsel

JOHN R. RADY
Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-5112 (Berger)
bergerje@sec.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION ........................................................................................... 1

COUNTERSTATEMENT OF JURISDICTION ........................................ 4

COUNTERSTATEMENT OF THE ISSUES ............................................. 4

COUNTERSTATEMENT OF THE CASE ................................................. 5

    I.    The securities laws regulate the disclosure of corporate information ............ 5

    II.    Musk and Tesla entered into consent judgments to resolve enforcement actions related to several of Musk's tweets about taking Tesla private .......... 7

    III.    The Commission moved to hold Musk in contempt, and the parties agreed to resolve the motion by amending the consent judgment .............. 12

    IV.    The district court denied Musk's motion to terminate the consent judgment under Rule 60(b)(5)................................................................ 15

STANDARD OF REVIEW .......................................................................... 18

SUMMARY OF ARGUMENT .................................................................... 19

ARGUMENT ................................................................................................. 21

    I.    The district court acted within its discretion in denying Musk's Rule 60(b)(5) motion ...................................................................... 21

        A.    Musk has not shown any changed circumstances that would justify modifying the judgment ................................... 22

        B.    Musk has not shown that the consent judgment achieved its purpose or that its modification serves the public interest ............... 31

    II.    The district court correctly denied Musk's Rule 60(b)(5) motion because he voluntarily agreed to waive his First Amendment rights........... 33

        A.    Musk consented to the judgment, waiving his rights ......................... 34

        B.    Musk fails to show that his waiver was invalid .................................. 37

III.   Musk's challenges to the enforceability of his waiver are forfeited
        and without merit .................................................................................... 43

        A.   Musk did not previously argue that his waiver would be
             unenforceable .......................................................................... 43

        B.   The public interest in enforcing Musk's waiver is compelling........... 45

        C.   The "unconstitutional conditions" theory is inapplicable
             because an agreement to settle is not a government benefit.............. 50

CONCLUSION ..................................................................................................... 53

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) ....................................................................... 5

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) ...................................................................51, 52

*Alexander v. United States*,
   509 U.S. 544 (1993) ..................................................................... 36

*Andrulonis v. United States*,
   26 F.3d 1224 (2d Cir. 1994) ......................................................18, 30

*Barron v. Burnside*,
   121 U.S. 186 (1887) ..................................................................... 51

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ...................................................................5, 46

*Berger v. Heckler*,
   771 F.2d 1556 (2d Cir. 1985) ......................................................... 49

*Bldg. & Constr. Trades Council v. N.L.R.B.*,
   64 F.3d 880 (3d Cir. 1995) .........................................................28, 32

*Bormann v. AT & T Comms., Inc.*,
   875 F.2d 399 (2d Cir. 1989) ........................................................... 43

*Citizens United v. FEC*,
   558 U.S. 310 (2010) ..................................................................... 48

*Crosby v. Bradstreet Co.*,
   312 F.2d 483 (2d Cir. 1963) ........................................................45, 48

*D.H. Overmyer Co. v. Frick Co.*,
   405 U.S. 174 (1972) ..................................................................... 34

*Daily Mirror, Inc. v. N.Y. News, Inc.*,
   533 F.2d 53 (2d Cir. 1976) (per curiam) ............................................ 4

*Davies v. Grossmont Union High Sch. Dist.,*
930 F.2d 1390 (9th Cir. 1991) ...........................................................40, 45, 51

*Democratic Nat'l Comm. v. Republican Nat'l Comm.,*
673 F.3d 192 (3d Cir. 2012) ........................................................................ 32

*Dolan v. City of Tigard,*
512 U.S. 374 (1994) ..............................................................................51, 52

*Erie Telecomms., Inc. v. City of Erie,*
853 F.2d 1084 (3d Cir. 1988) ................................................................35, 40

*Ernst & Ernst v. Hochfelder,*
425 U.S. 185 (1976) ..................................................................................... 5

*FCC v. League of Women Voters,*
468 U.S. 364 (1984) ................................................................................... 51

*Fomby-Denson v. Dep't of Army,*
247 F.3d 1366 (Fed. Cir. 2001) ................................................................. 45

*Frew ex rel. Frew v. Hawkins,*
540 U.S. 431 (2004) ................................................................................... 33

*FTC v. Pukke,*
53 F.4th 80 (4th Cir. 2022) ........................................................................ 50

*G & V Lounge, Inc. v. Michigan Liquor Control Comm'n,*
23 F.3d 1071 (6th Cir. 1994) ................................................................45, 51

*Ganino v. Citizens Utilities Co.,*
228 F.3d 154 (2d Cir. 2000) ...................................................................... 46

*In re George F. Nord Bldg. Corp.,*
129 F.2d 173 (7th Cir. 1942) ................................................................38, 41

*Golden v. Zwickler,*
394 U.S. 103 (1969) ................................................................................... 43

*Gonzalez v. Crosby,*
545 U.S. 524 (2005) ................................................................................... 21

*Grace v. Bank Leumi Tr. Co.,*
443 F.3d 180 (2d Cir. 2006) ...................................................................... 18

*Hollins v. Methodist Healthcare, Inc.*,
  379 F. Supp. 2d 907 (W.D. Tenn. 2005),
  *aff'd*, 474 F.3d 223 (6th Cir. 2007) .................................................................. 42

*Horne v. Flores*,
  557 U.S. 433 (2009) ......................................................................................22, 31

*INS v. St. Cyr*,
  533 U.S. 289 (2001) ............................................................................................ 34

*Koontz v. St. John's River Water Mgmt. Dist.*,
  570 U.S. 595 (2013) ......................................................................................51, 52

*Lake James Cmty. Volunteer Fire Dep't v. Burke Cnty.*,
  149 F.3d 277 (4th Cir. 1998) ............................................................................. 35

*Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001) ............................................................................................ 51

*Leonard v. Clark*,
  12 F.3d 885 (9th Cir. 1993), *as amended* (Mar. 8, 1994) ...................35, 36, 41

*Lynch v. City of Alhambra*,
  880 F.2d 1122 (9th Cir. 1989) ........................................................................... 45

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .............................................................................................. 46

*Metro. Opera Ass'n v. Local 100, Hotel Empls. & Rest. Empls. Int'l Union*,
  239 F.3d 172 (2d Cir. 2001) ............................................................................... 36

*Miller v. SEC*,
  998 F.2d 62 (2d Cir. 1993) ................................................................................. 49

*Moran v. Burbine*,
  475 U.S. 412 (1986) ......................................................................................39, 42

*Nat'l Org. for Marriage, Inc. v. Walsh*,
  714 F.3d 682 (2d Cir. 2013) ............................................................................... 43

*Nemaizer v. Baker*,
  793 F.2d 58 (2d Cir. 1986) ................................................................................. 21

v

*Nollan v. Cal. Coastal Comm'n*,
    483 U.S. 825 (1987) ..................................................................... 52

*Old Republic Ins. Co. v. Pac. Fin. Servs. of Am., Inc.*,
    301 F.3d 54 (2d Cir. 2002) (per curiam)...................................31, 39, 43

*Overbey v. Mayor of Baltimore*,
    930 F.3d 215 (4th Cir. 2019) ................................................... 44, 48

*Paragould Cablevision, Inc. v. City of Paragould*,
    930 F.2d 1310 (8th Cir. 1991) ......................................................... 35

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*,
    369 F.3d 645 (2d Cir. 2004)...................................................... 29, 41

*Patterson v. Newspaper & Mail Deliverers' Union*,
    13 F.3d 33 (2d Cir. 1993) ................................................................ 33

*Pee Dee Health Care, P.A. v. Sanford*,
    509 F.3d 204 (4th Cir. 2007) ......................................................... 35

*People v. Smith*,
    502 Mich. 624 (2018)........................................................................ 45

*Reynolds v. Roberts*,
    202 F.3d 1303 (11th Cir. 2000) ..................................................... 49

*Rufo v. Inmates of Suffolk County Jail*,
    502 U.S. 367 (1992) ................................................................. *passim*

*SEC v. Citigroup Global Mkts., Inc.*,
    752 F.3d 285 (2d Cir. 2014).................................................... *passim*

*SEC v. Citigroup Global Mkts., Inc.*,
    673 F.3d 158 (2d Cir. 2012) (per curiam) ..................................... 49

*SEC v. Clifton*,
    700 F.2d 744 (D.C. Cir. 1983) (per curiam)............................. 49, 50

*SEC v. Coldicutt*,
    258 F.3d 939 (9th Cir. 2001) ......................................................... 32

*SEC v. Conradt*,
    309 F.R.D. 186 (S.D.N.Y. 2015),
    *aff'd*, 696 Fed. App'x 46 (2d Cir. 2017) (summary order)........................................... 50

*SEC v. Heart Tronics, Inc.*,
    2016 WL 9049642 (C.D. Cal. Mar. 30, 2016),
    *aff'd*, 751 F. App'x 974 (9th Cir. 2018) (unpublished) ................................................ 39

*SEC v. Jerry T. O'Brien, Inc.*,
    467 U.S. 735 (1984) ........................................................................................... 24

*SEC v. Levine*,
    881 F.2d 1165 (2d Cir. 1989) ........................................................................... 49

*SEC v. Mayhew*,
    121 F.3d 44 (2d Cir. 1997) ............................................................................... 46

*SEC v. Novinger*,
    40 F.4th 297 (5th Cir. 2022) ............................................................................ 30

*SEC v. Romeril*,
    15 F.4th 166 (2d Cir. 2021),
    *cert. denied*, 142 S. Ct. 2836 (2022) ........................................................... *passim*

*Snepp v. United States*,
    444 U.S. 507 (1980) (per curiam) ............................................................. 38, 41

*In re Tesla, Inc. Sec. Litig.*,
    2022 WL 1497559 (N.D. Cal. Apr. 1, 2022) ................................................... 9

*Thomas James Assocs., Inc. v. Jameson*,
    102 F.3d 60 (2d Cir. 1996) ............................................................................... 45

*Town of Newton v. Rumery*,
    480 U.S. 386 (1987) .................................................................................. *passim*

*Typhair v. Gouverneur*,
    322 F. App'x 26 (2d Cir. 2009) (summary order) ...................................... 42

*United States v. Armour & Co.*,
    402 U.S. 673 (1971) ......................................................................... 41, 49, 50

*United States v. Bank of New York*,
    14 F.3d 756 (2d Cir. 1994) ............................................................................... 21

*United States v. Brennan*,
  650 F.3d 65 (2d Cir. 2011) ........................................................................ 39

*United States v. Int'l Bhd. of Teamsters*,
  247 F.3d 370 (2d Cir. 2001) .................................................................. 18, 21

*United States v. Int'l Bhd. of Teamsters*,
  931 F.2d 177 (2d Cir. 1991) .................................................................. 35, 40

*United States v. Lynch*,
  92 F.3d 62 (2d Cir. 1996) ........................................................................ 18

*United States v. Quattrone*,
  402 F.3d 304 (2d Cir. 2005) .................................................................... 36

*United States v. Richards*,
  385 F. App'x 691 (9th Cir. 2010) (unpublished) ........................................ 45

*United States v. Sec'y of Hous. & Urb. Dev.*,
  239 F.3d 211 (2d Cir. 2001) .................................................................. 22, 31

*Wessel v. City of Albuquerque*,
  299 F.3d 1186 (10th Cir. 2002) ............................................................... 45

*Williams v. Vukovich*,
  720 F.2d 909 (6th Cir. 1983) ................................................................... 49

*Zieper v. Metzinger*,
  474 F.3d 60 (2d Cir. 2007) ...................................................................... 36

## Statutes and Rules

Securities Exchange Act of 1934, 15 U.S.C. § 78a, et seq.

  Section 10(b), 15 U.S.C. § 78j(b) ............................................................... 6
  Section 13, 15 U.S.C. § 78m ...................................................................... 5
  Section 21, 15 U.S.C. § 78u ............................................................. 4, 24, 39
  Section 27, 15 U.S.C. § 78aa ...................................................................... 4

28 U.S.C. § 1291 ....................................................................................... 4

Federal Rule of Civil Procedure 60(b)(5) .................................................. *passim*

viii

<u>Rules under the Securities Exchange Act of 1934, 17 C.F.R. § 240.0-1, et seq.</u>

    Rule 10b-5, 17 C.F.R. § 240.10b-5 ........................................................ 6

    Rule 13a-15, 17 C.F.R. § 240.13a-15 ................................................... 6

Regulation FD, 17 C.F.R. § 243.100 et seq. ......................................... 6

**Commission Releases**

65 Fed. Reg. 51,716 (Aug. 24, 2000) .............................................. 6, 48

67 Fed. Reg. 57,276 (Sept. 9, 2002) ...................................................... 6

73 Fed. Reg. 45,862 (Aug. 7, 2008) ...................................................... 6

SEC Release No. 34-69279,
    105 SEC Docket 4327, 2013 WL 5138514 (Apr. 2, 2013) ......................... 7

**Other Authorities**

EY, Disclosure Committee Report: Practices and Trends (2021) ................. 48

Tesla Motors, Inc., Form 8-K (Nov. 5, 2013) .................................... 7

W. Brooke Elliott *et al.*, *Negative News and Investor Trust: The Role
of $Firm and #CEO Twitter Use*, 56 J. OF ACCT. RES. 1483 (2018) ........... 48

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

United States Securities and Exchange Commission,

*Plaintiff-Appellee,*

v.

Elon Musk,

*Defendant-Appellant.*

On appeal from the United States District Court for the
Southern District of New York (Hon. Lewis J. Liman)

**BRIEF FOR THE PLAINTIFF-APPELLEE**

**INTRODUCTION**

Securities issuers communicate corporate information through many channels, including company websites and social media outlets like Twitter. The dissemination of such information is critical for investors and for the efficient functioning of the markets. As a result, it is subject to the securities laws. Issuers and their officers can face liability for making materially false and misleading disclosures, and issuers can also face liability if they lack sufficient controls regarding disclosures.

Elon Musk is the CEO of Tesla, a public company, and Tesla designated his personal Twitter account as one of several channels for announcing information about Tesla. In 2018, Musk tweeted that he had "funding secured" to take Tesla

private, which caused a jump in Tesla's share price and a subsequent halt in trading. The Securities and Exchange Commission filed an enforcement action against Musk, alleging that this statement, and several related tweets, violated the antifraud provisions of the securities laws. Separately, the Commission sued Tesla, alleging that it violated the securities laws by failing to have required disclosure controls and procedures.

Both Musk and Tesla chose to settle their enforcement actions rather than litigate. They agreed to separate, but related, consent judgments and then later agreed to amend them. Musk's consent judgment requires him to comply with Tesla's procedures regarding Tesla-related communications, which Tesla agreed to create as part of its consent judgment. Musk's consent also requires him to obtain pre-approval from a Tesla attorney for written communications about Tesla, including tweets that disclose information about a specified list of topics, such as Tesla's financial condition, its production numbers, and disposition of Tesla securities.

That's it. The consent judgment does not prohibit Musk from tweeting accurate information about Tesla. It has no bearing on Musk's tweets about non-Tesla matters. And it does not require pre-approval of tweets by the Commission or a court—a Tesla employee reviews communications about Tesla. The consent judgment thus does nothing more than require Musk to follow his company's policies and have a Tesla attorney review certain communications before he publicizes them, including through a channel designated by Tesla for disclosure of information.

Years after signing this consent judgment, Musk sought to terminate it pursuant to Federal Rule of Civil Procedure 60(b)(5), and the only question presented here is whether the district court acted within its discretion in denying his request. Rule 60(b)(5) is an exception to the principle that final judgments remain final, and it is available only in extraordinary situations, such as when significant changes in circumstances make prospective application inequitable. But Musk has failed to show any changed circumstances—let alone significant legal or factual changes—that would justify releasing him from his agreement. Instead, Musk points to the Commission's continued monitoring of his disclosures and compliance with Tesla's procedures. But the Commission's interest in enforcing the securities laws and ensuring compliance with the consent judgment is not an unanticipated event that justifies abrogating it.

Unable to show any abuse of discretion by the district court, Musk tries to switch the focus from Rule 60(b)(5) to the First Amendment, with new arguments not raised below and exaggerations of how the consent judgment operates. This Court should ignore the distraction because Musk twice waived any First Amendment rights that may have been implicated by his agreement. Musk's voluntary and knowing consent to the terms of the judgment, including pre-approval, is a dispositive waiver of rights under Supreme Court and Second Circuit precedent. Musk suggests that his waiver was somehow invalid, but it strains credulity to believe that the CEO of Tesla did not understand the agreements he negotiated and signed. And to the extent that the Court considers whether to uphold his waiver—even absent any pending motion

3

for contempt or other relief—the interests of Tesla's shareholders and the market in Musk's compliance with Tesla's disclosure controls greatly outweigh Musk's interest in being able to tweet about Tesla without input from Tesla itself.

## COUNTERSTATEMENT OF JURISDICTION

The Commission filed a civil enforcement action against Musk in 2018, and the district court had subject-matter jurisdiction pursuant to Sections 21(d)–(e) and 27 of the Securities Exchange Act of 1934. 15 U.S.C. §§ 78u(d)–(e), 78aa; *see also* A43 (conceding jurisdiction). Musk signed a consent judgment in 2018, A50–54, and agreed to an amended judgment in 2019, A231–32.

Nearly three years after entry of the amended consent judgment, Musk moved for relief pursuant to Federal Rule of Civil Procedure 60(b)(5). A243–46. The district court denied his motion on April 27, 2022. A258–79. Musk filed a timely notice of appeal on June 15, 2022. A284. The district court's order was a final decision as to his Rule 60(b)(5) motion, and this Court has jurisdiction under 28 U.S.C. § 1291. *Daily Mirror, Inc. v. N.Y. News, Inc.*, 533 F.2d 53, 56 (2d Cir. 1976) (per curiam).

## COUNTERSTATEMENT OF THE ISSUES

1. Whether the district court acted within its discretion in finding that Musk did not show any changed circumstances that justified modifying his agreement to comply with Tesla's disclosure policies, including pre-approval by a Tesla attorney.

2. Whether the district court properly determined that Musk waived any First Amendment rights related to his agreement to adhere to those policies.

4

3.     Whether Musk's waiver would be enforceable where the public interest of Tesla shareholders and the market in pre-approval outweighs Musk's interest in making written communications about Tesla without any review by Tesla.

## COUNTERSTATEMENT OF THE CASE

### I.     The securities laws regulate the disclosure of corporate information.

Disclosure is a central pillar of the federal securities laws.  The Securities Act of 1933 "was designed to provide investors with full disclosure of material information concerning public offerings of securities," and the Exchange Act imposed "regular reporting requirements on companies whose stock is listed on national securities exchanges."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976).  Together, these laws underscore Congress's "fundamental purpose" to "substitute a philosophy of full disclosure for the philosophy of caveat emptor," *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) (quotation omitted), as well as its reliance on "the premise that securities markets are affected by information," *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988).

Issuers, such as Tesla, disclose information in a variety of ways.  They must disclose information as required by law, *see* 15 U.S.C. § 78m, including through quarterly, annual, and episodic (Form 8-K) reports filed with the Commission.  Because of the importance of these filings, issuers must "maintain disclosure controls and procedures," which ensure "that information required to be disclosed" is properly "recorded, processed, summarized and reported" in a timely fashion.  17 C.F.R.

§ 240.13a-15(a), (e).  Rule 13a-15 mandates these controls so that "the information that is collected and disclosed in Exchange Act reports is complete and accurate."  67 Fed. Reg. 57,276, 57,283 (Sept. 9, 2002).

Issuers also communicate market information in other ways.  All disclosures are subject to the general antifraud prohibition, which bars "any untrue statement of a material fact" or the omission of "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b); 15 U.S.C. § 78j(b).  Moreover, Regulation FD (Fair Disclosure) avoids the harms of selective disclosure by requiring issuers to make simultaneous public disclosure of material information if it is disclosed to certain individuals.  17 C.F.R. § 243.100.  Consequently, many issuers "have policies and procedures regarding disclosure practices, the dissemination of material information, and the question of which issuer personnel are authorized to speak to analysts, the media, or investors."  65 Fed. Reg. 51,716, 51,726 n.90 (Aug. 24, 2000).

The Commission has addressed how these laws apply to disclosures of information over the internet and social media.  In 2008, the Commission issued guidance on when information posted on a company's website is "public" under Regulation FD, which "depend[s] on the steps that the company has taken to alert the market to its Web site and its disclosure practices."  73 Fed. Reg. 45,862, 45,867 (Aug. 7, 2008).  A few years later, the Commission addressed disclosures through social media.  SEC Release No. 34-69279, 105 SEC Docket 4327, 2013 WL 5138514 (Apr.

6

2, 2013). It stated that "the principles outlined in the 2008 Guidance—and specifically the concept that the investing public should be alerted to the channels of distribution a company will use to disseminate material information—apply with equal force to corporate disclosures made through social media channels." *Id.* at \*5.

## II. Musk and Tesla entered into consent judgments to resolve enforcement actions related to several of Musk's tweets about taking Tesla private.

Elon Musk is the CEO of Tesla, and the former Chairman of its Board of Directors. A19 (¶ 10); A53. Tesla is a publicly traded issuer that manufactures electric vehicles and energy generation and storage systems. Musk also serves as an officer or director for several other companies, including SpaceX and Twitter.

On November 5, 2013, Tesla announced that Musk's personal Twitter account would serve as a channel for disclosure of information about the company, along with Tesla's corporate account. In a Commission filing, Tesla informed the market that it would announce "material information to the public" through "a variety of means," including "blogs and social media," and it encouraged investors to "follow Elon Musk's and Tesla's Twitter accounts." Form 8-K (Nov. 5, 2013)[1]; *see also* A19 (¶¶ 12–13). In August 2018, Musk had over 22 million Twitter followers, A16 (¶ 2), and he currently has over 122 million.

---

[1] *Available at* https://www.sec.gov/Archives/edgar/data//1318605/000119312513427630/d622890d8k.htm.

The events leading to the settlement at issue here began with a tweet about Tesla's status as a publicly traded company. On August 7, 2018, Musk tweeted: "Am considering taking Tesla private at $420. Funding secured." A25 (¶ 33). The trading volume and price of Tesla shares immediately spiked, and Nasdaq halted trading in Tesla for over 90 minutes. A35 (¶ 75). Over the next three hours, Musk made several confirmatory tweets, stating:

> My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla. Already do this with Fidelity's SpaceX investment.

> Shareholders could either to sell at 420 or hold shares & go private.

> Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote.

A16–17, 26–27 (¶¶ 2, 37, 41, 45). From Musk's first tweet to the end of August 7, Tesla's share price jumped 6.42%. A35 (¶ 75).

The Commission commenced an enforcement action against Musk less than two months later, alleging that these statements were materially false and misleading and violated Exchange Act Section 10(b) and Rule 10b-5. A16, citing 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. The Commission alleged that there was no "secured" or "confirmed" funding, and that Musk never discussed a price of $420 per share with potential investors. A31 (¶ 62). It was not accurate that contingency on a shareholder vote was the "[o]nly reason" a transaction was "not certain"—Tesla's board or a specially appointed committee needed to approve the transaction, and no terms had

8

been agreed to, let alone presented for consideration. A32 (¶ 63). Finally, Musk had not determined whether it was possible for individual shareholders to remain invested in Tesla if it went private. A32–33 (¶¶ 64–67).[2]

In a separate complaint, the Commission alleged that Tesla violated Rule 13a-15. *SEC v. Tesla, Inc.*, 18-cv-8947, Dkt. No. 1 (S.D.N.Y. Sept. 29, 2018). Despite Tesla's designation of Musk's Twitter account as a channel for disclosure, *id.* ¶¶ 11–12, Tesla had no policies addressing Musk's use of Twitter, *id.* ¶ 33, and it failed to maintain controls regarding Musk's disclosure of information through Twitter, *id.* ¶¶ 36–37.

Shortly after the complaints were filed, Musk and Tesla chose to settle, rather than litigate, and they entered into separate consent judgments. In advocating for approval, Tesla and Musk told the court "that a prompt resolution of these actions through settlement is in the best interests of investors and should be approved." SA9. The Commission filed a consent motion for entry of final judgment in each action on September 29, 2018. A39; Dkt. No. 6, *SEC v. Tesla.*

---

[2] In a pending securities-fraud class action based on similar allegations, a district court found that the "funding secured" and "investor support is confirmed" tweets were false and misleading. *In re Tesla, Inc. Sec. Litig.*, 2022 WL 1497559, at *15–18 (N.D. Cal. Apr. 1, 2022). Several other shareholder actions against Musk relating to these tweets are also pending. *See* Dkt. No. 18, *In re Tesla, Inc. Shareholder Derivative Litig.*, 18-cv-1669 (D. Del. Aug. 19, 2021).

The consents and consent judgments are interlocking. In his consent, Musk stated that the parties "reached a good faith settlement," declared that he "enters into this Consent voluntarily," and represented "that no threats, offers, promises, or inducements of any kind have been made by the Commission" or any of its officers "to induce Defendant to enter into this Consent." A46, 48 (¶¶ 8, 14). He waived "the entry of findings of fact and conclusions of law," as well as "the right, if any, to * * * appeal from the entry of the Final Judgment." A45 (¶¶ 6–7). He agreed that the consent "shall be incorporated into the Final Judgment," over which the court would retain jurisdiction. A46, 48 (¶¶ 9, 16).[3] Musk was represented by experienced counsel, who signed the consent indicating approval as to its form. A48.

The final consent judgment, which the court entered on October 16, 2018, enjoined Musk from violating Section 10(b) and Rule 10b-5, ordered him to pay a civil penalty of $20 million, and required him to resign as Chairman of Tesla's Board. A50–53. Critically, at paragraph IV(b), Musk agreed to:

> comply with all mandatory procedures implemented by [Tesla] regarding (i) the oversight of communications relating to the Company made in any format, including, but not limited to, posts on social media (*e.g.*, Twitter), the Company's website (*e.g.*, the Company's blog), press releases, and investor calls, and (ii) the pre-approval of any such written communications that contain, or reasonably could contain, information material to the Company or its shareholders[.]

---

[3] Musk agreed not to publicly deny the allegations and that, if he did, the Commission could ask the court to vacate the judgment. A47 (¶ 13). Musk cites, but has never challenged this provision, which is not a "gag rule." Br. 6, 29, 37; *see SEC v. Romeril*, 15 F.4th 166 (2d Cir. 2021) (holding that a defendant waived his constitutional rights in agreeing to an identical provision), *cert. denied*, 142 S. Ct. 2836 (2022).

A53–54.

This provision did not prohibit Musk from tweeting about Tesla. It did not place the court or the Commission in a position of reviewing or approving Musk's tweets before publication. Rather, it required him to adhere to Tesla's policies regarding oversight of material Tesla-related communications. It had no bearing on tweets or other communications unrelated to Tesla.

The same day, the district court entered a final consent judgment against Tesla. *SEC v. Tesla*, Dkt. No. 14. Tesla's consent contained nearly identical waivers and representations, and it required Tesla to create a board committee that would oversee "controls and processes governing the Company's and its senior executives' disclosures and/or public statements that relate to the Company." *Id.* ¶ IV(b). The judgment ordered Tesla to employ an experienced securities lawyer who would "review communications made through Twitter and other social media by the Company's senior officers in a manner that is consistent with the Company's disclosure policy and procedures." *Id.* ¶ IV(c). And the judgment mandated that Tesla "implement mandatory procedures and controls to oversee all of Elon Musk's communications regarding the Company made in any format," including tweets, and "to pre-approve any such written communications that contain, or reasonably could contain, information material to the Company or its shareholders." *Id.* ¶ IV(d).

Tesla adopted the required procedures in December 2018. They stated that "Authorized Executives," including Musk, could not publish written communications that "contain, or reasonably could contain, information material to Tesla" without obtaining "pre-approval" by a Tesla attorney. A55. The policy further stated that information regarding "projections, forecasts, or estimates" may, "depending on its significance, be material to Tesla or its stockholders." A55.

## III. The Commission moved to hold Musk in contempt, and the parties agreed to resolve the motion by amending the consent judgment.

Two months after Tesla implemented its policy, a Musk tweet about Tesla's vehicle production led to a negotiated amendment of the consent judgment, which is the agreement that binds the parties today. On February 19, 2019, Musk tweeted, "Tesla made 0 cars in 2011, but will make around 500k in 2019." A91. The Commission moved for contempt, arguing that this tweet contained materially misleading information and that Musk did not obtain pre-approval, as required by Tesla's policies. Dkt. Nos. 18, 30 ("Dkt. No." refers to entries in the district court docket). The Commission explained that this tweet differed from Tesla's prior disclosure that it was "targeting *annualized* Model 3 output in excess of 500,000 units sometime between Q4 of 2019 and Q2 of 2020." A69 (emphasis added). Indeed, later on February 19, Musk tweeted: "Meant to say annualized production rate at end of 2019 probably around 500k, ie 10k cars/week. Deliveries for year still estimated to be about 400k." A92.

12

The district court held a hearing to determine whether Musk, who appeared with counsel, should be held in contempt. A146–47. The hearing focused on the meaning of materiality in the consent judgment, whether the February 19 tweets were material, and Tesla's process for assessing materiality as a trigger for pre-approval. A148–215. During the hearing, the court expressed its "concerns that no matter what I decide here, this issue will not be finally resolved." A215. The court ordered the parties to "make a good faith effort to resolve this matter, both for the immediate contempt motion, and to ensure absolute clarity moving forward so we are not back here again." A216; *see* A145.

Over the next three weeks, the parties negotiated. A218–20. The Commission and Musk jointly informed the court that "counsel for the SEC, Mr. Musk, and counsel for Tesla met and conferred" regarding a "potential resolution." A218. Musk did not seek extra time to retain separate counsel for himself or suggest that he needed his own attorney in order to negotiate a resolution.

The parties eventually agreed to amend the original consent judgments. For the Musk consent judgment, the parties agreed to make two changes to paragraph IV(b)—the provision concerning pre-approval. A229. First, for purposes of determining which communications were subject to pre-approval, the parties shifted from a materiality standard to a list of categories, which included: Tesla's "financial condition, statements, or results"; "potential or proposed mergers"; "production numbers or sales or delivery numbers"; "new or proposed business lines";

13

"projection, forecast, or estimate numbers"; "events regarding [Tesla's] securities," including Musk's disposition of Tesla's securities; "nonpublic legal or regulatory findings or decisions"; and "any event requiring the filing of" an episodic report (Form 8-K) with the Commission. A229–30. Second, amended paragraph IV(b) specified that covered communications had to be pre-approved by an "experienced securities lawyer" employed by Tesla. A229.

Consistent with the court's instruction, the revisions "provide additional clarity regarding the written communications for which [Musk] is required to obtain pre-approval pursuant to the Final Judgment." A222. This "enhanced clarity" would "reduce the likelihood of future disputes regarding compliance with this provision of the Final Judgment." A223. Like the original, the amended judgment does not place the court or the Commission in the role of reviewing or approving Musk's tweets, it does not preclude Musk from publishing accurate tweets about Tesla, and it has no bearing on communications about non-Tesla matters.

This second consent contains similar representations that Musk entered "into this Consent voluntarily" and that "no threats, offers, promises, or inducements" were made by the Commission to induce him "to enter into this Consent." A226 (¶ 3). He further agreed that "all other provisions of the September 2018 Consent and the Final Judgment shall remain in effect." A226 (¶ 6). The district court entered the amended consent judgment on April 30. A231–32.

14

The Commission and Tesla agreed to make corresponding changes to their consent judgment. The amended Tesla consent judgment replaced paragraph IV(d) with language mirroring the new paragraph in Musk's consent judgment. *SEC v. Tesla*, Dkt. No. 17. The amended judgment contained the same list of topics for pre-approval as appears in the Musk judgment, including "Musk's acquisition or disposition of the Company's securities." *Id.* at 2.

## IV. The district court denied Musk's motion to terminate the consent judgment under Rule 60(b)(5).

In the ensuing years, Musk continued to tweet about Tesla, as well as tweeting numerous times about non-Tesla matters. On November 6, 2021, he tweeted that he was considering "selling 10% of [his] Tesla stock," asked his followers whether they supported such a sale, and stated that he would "abide by the results of this poll." SA18 (Supplemental Appendix). The Commission issued subpoenas to Musk and Tesla in November 2021 as part of an investigation into that tweet, seeking the production of documents concerning his compliance with Tesla's disclosure policies. CA12 (Confidential Appendix). Musk submitted letters to the court in February 2022 about these developments. A233–40. The court wrote that his "precise application to the Court is unclear" and denied any request for relief. A241–42.

A few weeks later—and nearly three years after entry of the amended consent judgment—Musk (but not Tesla) moved for relief under Federal Rule of Civil Procedure 60(b)(5). A243–45. At the same time, Musk (but not Tesla) moved to

quash portions of the November 2021 Musk subpoena. The district court denied his motion to quash, and Musk has not appealed that part of its decision. A263–72.

Musk presented three arguments for why the amended consent judgment should be terminated, or at least modified. He argued that because the Commission issued subpoenas and document requests, it failed "to uphold its side of the bargain." SA35–36, 55–56. He contended that his agreement to comply with Tesla's procedures and obtain pre-approval from Telsa violated his First Amendment rights. SA36–39, 53–55. And he claimed that he was under economic duress when he agreed to settle in September 2018. SA39–40, 55.

The district court denied Musk's motion. Applying *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), the court explained that the "'party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree,'" namely "a significant change either in factual conditions or the law.'" A272, quoting *Rufo*, 502 U.S. at 383–84. Under this framework, the court wrote, "[n]one of [Musk's] arguments hold water." A274. First, the district court stated that the First Amendment does "not permit [Musk] to engage in speech" that is fraudulent. A274. And "to the extent" the pre-approval requirement imposed "an additional restriction" on speech—a question the court did not reach—Musk's First Amendment argument was foreclosed by *SEC v. Romeril*, 15 F.4th 166 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2836 (2022), which held that "parties can waive their First Amendment rights in consent decrees

and other settlements of judicial proceedings." *Id.* at 172, cited at A274. Because Musk agreed to the terms of the consent judgment, "[h]e cannot now complain that this provision violates his First Amendment rights." A275.

Next, the district court addressed Musk's argument that the Commission has used the consent judgment to "harass him and to launch investigations of his speech." A275. Rejecting Musk's complaints about the "sheer number of demands," the court explained that the Commission made only "limited requests": "inquiries related to the original enforcement actions that led to the consent decree here; inquiries related to the investigation that led to the amended final judgments; and the inquiries at issue in the investigation here, which arose after Musk tweeted about selling ten percent of his shares." A276. The court held that given the Commission's mission to "protect investors, maintain fair, orderly and efficient markets, and facilitate capital formation," the Commission "cannot be faulted for the limited requests it has issued." A275–76.

Finally, the district court addressed Musk's duress argument, concluding that even if Musk—"one of the wealthiest individuals in the world * * * as well as the CEO of Tesla, which was already a Fortune 500 company"—legitimately worried about the effect of litigation on Tesla and believed that settling was in Tesla's best interest, those beliefs did "not establish a basis for him to get out of the judgment he voluntarily signed." A277. The fact that a settlement may avoid potential negative consequences "does not mean it is coercive," but rather "may simply mean that the executive is acting in the best interests of those for whom he is a fiduciary." A277–

17

78.  Instead, the court wrote, economic duress requires a "wrongful act," and Musk's "conclusory assertion" that the Commission "took advantage of the position in which it put Mr. Musk" was "insufficient to sustain a finding of economic duress."  A278. The court concluded, based on the record, that Musk was "not forced to enter" into the consent judgment, but rather strategically chose to do so, and he could not "seek to retract the agreement he knowingly and willingly entered" into simply because he wishes now that he had not made that choice then.  A278–79.

## STANDARD OF REVIEW

A court reviews the denial of relief under Rule 60(b) for an abuse of discretion. *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001); *Andrulonis v. United States*, 26 F.3d 1224, 1235 (2d Cir. 1994).  It is well-established that Rule 60(b) "decisions by district courts are accorded deference."  *Grace v. Bank Leumi Tr. Co.*, 443 F.3d 180, 187 (2d Cir. 2006).  With respect to Musk's waiver, "[w]hile a district court's conclusion regarding a defendant's waiver of his constitutional rights is subject to *de novo* review," this Court will "review the district court's underlying factual findings for clear error" and will affirm a "district court's conclusion that a defendant knowingly and voluntarily waived his constitutional rights * * * if 'any reasonable view of the evidence supports it.'"  *United States v. Lynch*, 92 F.3d 62, 65 (2d Cir. 1996), quoting *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993) (per curiam).

## SUMMARY OF ARGUMENT

The Court should affirm the district court's denial of Musk's Rule 60(b)(5) motion. The district court reasonably determined that Musk did not satisfy his burden of demonstrating a significant change in circumstances that justified modifying the consent judgment. Musk focuses on the Commission's monitoring of his compliance with the securities laws, but the Commission's continued performance of its statutory mission was not an unanticipated event. Moreover, Musk's accusation of supposedly endless investigations is a significant exaggeration: he sought Rule 60(b) relief in the wake of a single subpoena that the Commission issued after the entry of the amended consent judgment. Musk may no longer wish to comply with the pre-approval process, and he may find it inconvenient at times, but he agreed to its terms and has not demonstrated any change in circumstances that makes it substantially more onerous or unworkable. Nor has he demonstrated why Tesla shareholders, and investors more generally, should not continue to benefit from Tesla's review of its CEO's communications about Tesla-related matters before he publishes them.

Unable to demonstrate *any* change in circumstances, Musk tries to shove a First Amendment argument into the Rule 60(b)(5) box. But Musk knowingly and voluntarily waived any First Amendment rights implicated by the pre-approval process for Tesla-related communications. As this Court held in *SEC v. Romeril*, 15 F.4th 166, 172 (2d Cir. 2021), parties can waive constitutional rights in settlements, and "[t]he First Amendment is no exception." Here, Musk waived his rights twice; he

agreed to a judgment and then agreed to amendments that he negotiated, both times representing that he was not forced to settle. Nothing indicates that Musk—an experienced businessman—failed to understand the agreements or that his consents reflected anything but free and deliberate choices.

While Musk claims that his waiver cannot be enforced, this argument is forfeited because he did not raise it below, and it is premature because the Commission is not currently asking the court to decide that Musk violated the consent judgment. Even if this Court were to evaluate his waiver in the absence of a concrete attempt to enforce it, the interests in upholding the consent judgment are strong. Musk's agreement protects investors by ensuring that the information the public uses to make decisions about Tesla securities is accurate and consistent with what Tesla reports. Tesla shareholders in particular have an interest in ensuring that Musk follows Tesla's disclosure policies, including on his Twitter account, which Tesla designated as a channel for disclosure. These interests outweigh Musk's desire to communicate about Tesla without any input from Tesla itself. While Musk drenches his brief in hyperbole about a "government-mandated monitor" and purported chilling of speech, nothing in Musk's agreement precludes him from tweeting truthful information about Tesla—let alone non-Tesla matters, which are not covered at all— and the "monitor" of Musk's Tesla-related communications is not the court or the Commission, but another Tesla employee.

20

**ARGUMENT**

The district court reasonably denied Musk's Rule 60(b)(5) motion because no changed circumstances justified modifying the consent judgment. Unable to identify any relevant factual developments that would indicate an abuse of discretion, Musk stages a First Amendment sideshow that teems with rhetoric but lacks substance. His constitutional claims fail because he knowingly and voluntary waived any First Amendment rights arguably implicated by the consent judgments when he agreed to them—twice. Maintaining the judgment, and continuing to require Musk to obtain approval from Tesla for disclosures about Tesla, furthers the interests of Tesla shareholders and the market in receiving accurate corporate information.

## I. The district court acted within its discretion in denying Musk's Rule 60(b)(5) motion.

Musk fails to show any "exceptional circumstances" justifying relief from the consent judgment. *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001). Rule 60(b) provides an "exception to finality," *Gonzalez v. Crosby*, 545 U.S. 524, 529 (2005), striking a balance "between serving the ends of justice and preserving the finality of judgments," *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986). A Rule 60(b) motion is "generally not favored," *Int'l Bhd. of Teamsters*, 247 F.3d at 391, and "may be granted only in extraordinary circumstances," *United States v. Bank of New York*, 14 F.3d 756, 759 (2d Cir. 1994) (quotation omitted).

Rule 60(b)(5)—the lone subsection of Rule 60(b) at issue—authorizes relief from a judgment if, among other things, "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). It "provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009), quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992). "Changes in consent decrees are not trivial matters," and modification will not "'be warranted in all circumstances.'" *United States v. Sec'y of Hous. & Urb. Dev.*, 239 F.3d 211, 217 (2d Cir. 2001), quoting *Rufo*, 502 U.S. at 383. Under *Rufo*, Musk "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." 502 U.S. at 383. But Musk has failed to identify any significant change in circumstances or to provide any other justification for relief that would indicate an abuse of discretion by the district court.

### A.   Musk has not shown any changed circumstances that would justify modifying the judgment.

The district court reasonably denied Musk's motion. Musk has never identified any significant change in "statutory or decisional law." *Id.* at 388. Instead, he rests his argument on three supposed factual developments: (1) the Commission has monitored his compliance with the consent judgment and the securities laws; (2) the Commission has not "upheld" its part of the bargain; and (3) the amended judgment

is supposedly not workable. None constitutes a significant changed circumstance, let alone indicates that the district court abused its discretion.

1. Musk alludes to purported "constant investigations" as a basis for relief, Br. 47, but the Commission's ongoing concern about compliance with the securities laws is not a changed circumstance. Modification is "ordinarily" not justified under Rule 60(b)(5) "where a party relies upon events that actually were anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 385. And if "a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree," the party bears a "heavy burden to convince a court" that modification is proper. *Id.*

The possibility that the Commission would continue to evaluate Musk's disclosures—and his compliance with Tesla's controls—was hardly unanticipated when the parties settled. The Commission's mission is to "achieve a high standard of business ethics in the securities industry, * * * and to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation." A275 (quotation omitted). As such, "Musk could hardly have thought that at the time he entered the decree he would have been immune from non-public SEC investigations." *Id.* Settlements are not a get-out-of-future-inquiries card.

Musk undercuts his argument by conceding that the Commission "may take action" if it "perceives a violation of the law" and may enforce the law "in the ordinary course." Br. 27, 29, 53. The "ordinary course" includes investigations and

the issuance of subpoenas. 15 U.S.C. § 78u(a)–(b); *see SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 741 (1984) ("Congress has vested the SEC with broad authority to conduct investigations into possible violations of the federal securities laws and to demand production of evidence relevant to such investigations."). Musk's acknowledgement of the Commission's law-enforcement remit—"[i]t can issue subpoenas, it can conduct testimony, it can bring charges," Br. 53— cannot be reconciled with his view that the Commission is somehow harassing him by inquiring about disclosures and Tesla's procedures regarding disclosures.

Moreover, Musk's insinuation of "constant investigations" and "ceaseless threats of prosecution" is fictional. Br. 46, 49. As the district court found, based on Musk's representations, the Commission has issued "limited requests" to Musk pertaining to three sets of tweets. A276. First, the Commission issued a subpoena to Tesla and two subpoenas to Musk shortly after his 2018 tweets about taking Tesla private—the tweets that prompted the Commission's enforcement action. SA32. Second, the Commission requested information about Musk's February 2019 tweets regarding Tesla's production numbers, which led to the contempt motion. SA32–33; *see* A76–88. Third, the Commission subpoenaed Tesla and Musk after Musk's November 2021 tweets where he proposed selling 10% of his Tesla stock. CA2–25; *see also* SA33 (indicating that the Commission issued requests to Tesla, but not Musk, in May 2020). Far from "heavy-handed" investigations designed to "chill" Musk's

24

speech, Br. 46–47, there have been only measured inquiries regarding Musk's compliance with the securities laws.

Notably, only one of the "limited requests," A276, that Musk cited in his district court briefing occurred after the April 2019 amendment to the consent judgment. SA33. From that vantage, the Commission issued just one inquiry to Musk between the amended judgment and his Rule 60(b)(5) motion, belying his rhetoric about "SEC investigations that never lead anywhere" and the supposed issuance of "numerous subpoenas to Mr. Musk." Br. 48; CA2–13. While it is not uncommon for the Commission (and other agencies) to issue numerous subpoenas in an investigation, the Commission has not "issued dozens of administrative subpoenas" to Musk since 2019. Br. 12.

The November 2021 subpoena—which the district court declined to quash in a part of the order that Musk has not appealed—pertains to an investigation into, *inter alia,* Tesla's compliance with Rule 13a-15. CA27–29; Dkt. No. 78, at 7–9. As the district court observed, whether Tesla has adhered to disclosure controls relates to the accuracy of Tesla's representations about those controls in Commission filings. A272. Plus, since Musk had "not produced any documents" in response to that subpoena at the time he filed his motion, SA19, it is unclear how the subpoena could have constituted a changed circumstance that would have justified Rule 60(b) relief. *See Rufo,* 502 U.S. at 384 (modification warranted when "changed factual conditions make

25

compliance with the decree substantially more onerous" or "when a decree proves to be unworkable because of unforeseen obstacles").

This Court should resist Musk's exaggerations about the extent of the Commission's investigation. The Commission has not "surveilled" Musk—it has asked questions about Tesla-related tweets that Musk published. Br. 17. And it has not "attempted to curb" speech that "does not touch upon the federal securities laws"—it has not tried to "curb" Musk's truthful speech about Tesla at all, let alone interfere with his speech about non-Tesla matters. Br. 18. Rather, consistent with its mission, the Commission has monitored compliance with the securities laws and the parties' agreement, which is designed to ensure adequate corporate control over the disclosure of information about Tesla, particularly through channels designated by Tesla as conduits for disseminating information to the market.

2. There is also no merit to Musk's contention that the Commission has somehow "fail[ed] to uphold its side of the bargain." Br. 50. Musk does not point to any term of the consent judgment with which the Commission has not complied. The consent judgment did not immunize Musk from future inquiries or contain a promise that the Commission would not seek enforcement of the consent judgment. Indeed, the parties consented to judicial oversight, including the possibility of contempt, as part of their bargain: they agreed that the court "shall retain jurisdiction over this matter for the purpose of enforcing the terms of the Final Judgment." A48 (¶ 16). Thus, Musk's claim that the Commission has used the consent judgment to

"chill" his speech "without supervision by the court," Br. 47, is doubly specious because any attempted enforcement of the consent judgment, including by a contempt motion, is subject to judicial supervision and there is no evidence that the Commission has somehow used the consent judgment to harass Musk.

It is Musk who appears to misunderstand the "side[s] of the bargain." Br. 50. He portrays the "pre-approval provision" as imposition of a "government-mandated monitor," but ignores that the "monitor" is a Tesla employee. Br. 1, 20, 37. True, an Article III court issued the judgment requiring Musk, per the parties' agreement, to have a Tesla attorney review his Tesla-related communications. But that bears little resemblance to the government-censor scenario Musk invokes; the Commission does not decide whether Musk's tweets should be published and it is not "micromanaging" Musk's tweets. Br. 51–52.

The Commission has no interest in halting the dissemination of accurate information about Tesla—facilitating disclosure lies at the core of the securities laws. The consent judgment does not bar Musk from speaking about Tesla. It has zero impact on Musk's speech about non-Tesla matters, and there is no indication that it has stopped Musk from tweeting about a wide variety of topics. The Commission and the public do, however, have a vital interest in ensuring that Musk complies with Tesla's procedures regarding disclosure of important information about the company.

Musk anachronistically points to the 2019 contempt motion as a changed circumstance. But the contempt motion preceded—and led to—the amendments

27

currently at issue. It is not a subsequent event that would justify relief under Rule 60(b)(5). Moreover, Musk does not cite any caselaw supporting the odd notion that a motion to enforce a judgment could constitute a changed circumstance that would permit modification of the judgment under Rule 60(b)(5). If that were true, every motion seeking to hold a party to its bargain would be self-defeating.

It is unclear why Musk seeks to relitigate this motion now, particularly because it undermines his assertion that the consent judgment is somehow beyond judicial supervision. Br. 47–48. After the Commission moved for contempt, the court received briefing, held a hearing, and ordered the parties to negotiate. A145; *see Bldg. & Constr. Trades Council v. N.L.R.B.*, 64 F.3d 880, 891 (3d Cir. 1995) (stating that a contempt motion would entitle "those subject to the order to judicial overview," allowing a court "to distinguish between intentional violations of the decrees and unjustified harassment"). The court did not "rejec[t] the SEC's contempt motion," Br. 47–48; it never ruled on it because the parties agreed to amend the consent judgment. A223. And those amendments did not give the Commission "further control over the pre-approval process," Br. 47, but instead altered the terms under which *Tesla* would review his communications. A231–32. If the Commission were to move for contempt again, the district court would again decide whether there was clear evidence that Musk breached his agreement.

In any event, Musk distorts several aspects of the Commission's motion. Br. 49–50. Musk decided that the 2019 tweet about production numbers "did not require

28

pre-approval," Br. 49, but the Commission disagreed, and the court never resolved this dispute.  Moreover, the Commission cited a Musk interview not because Musk criticized the Commission, but rather because the interview raised questions about whether he had "diligently attempted to comply [with the judgment] in a reasonable manner."  *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quotation omitted); *see* Dkt. No. 18, at 11–12 (when asked how Tesla would know which tweets would move the market if there were no review, Musk answered: "[W]e might make mistakes.  Who knows? * * * Nobody's perfect.").

Musk's rehashing of the contempt motion exposes the inconsistency of his argument.  He takes issue with the Commission asking the court to supervise the consent judgment.  And he takes issue with the Commission using its statutorily authorized subpoena power to investigate possible wrongdoing because, in his view, such investigation evades the court's supervision.  Musk, in effect, does not want the Commission to make any inquiries, but the Commission has the authority—and the obligation—to ensure compliance with the deal it struck and the securities laws.

3.      Finally, Musk has not shown any changed conditions that "make compliance with the decree substantially more onerous" or shown that the "decree [has proven] to be unworkable."  *Rufo*, 502 U.S. at 384.  Rule 60(b)(5) does not authorize relief simply because "it is no longer convenient to live with the terms of a [judgment]."  *Id.* at 383.  If a "party makes a deliberate, strategic choice to settle, she

29

cannot be relieved of such a choice merely because her assessment of the consequences was incorrect." *Andrulonis v. United States*, 26 F.3d 1224, 1235 (2d Cir. 1994) (quotation omitted). And as one court held in a Rule 60(b)(5) case involving a Commission consent judgment, "[a]lthough the defendants argue that the terms incorporated into the judgments produce harmful effects, those are the terms to which they agreed." *SEC v. Novinger*, 40 F.4th 297, 307–08 (5th Cir. 2022). Even if Musk misjudged the consequences of his agreement and now finds pre-approval to be inconvenient, it would not justify relief under Rule 60(b)(5).

But Musk does not even support such an argument. He has not explained why it is suddenly difficult, three years after he agreed to the amended consent judgment, for him to seek pre-approval from a Tesla attorney before tweeting or issuing other communications about a set of Tesla-related topics. He refers in the abstract to "First Amendment freedoms," Br. 51, but he has not shown that the pre-approval process has proven unworkable, particularly since it does not bar him from speaking about Tesla. *See Rufo*, 502 U.S. at 384 (modification appropriate when decree proves to be "unworkable because of unforeseen obstacles"). Musk's argument about unworkability has a certain irony: the parties amended the original agreement to make compliance easier by replacing a standard based on materiality, A54, with a defined universe of topics. A231–32; *see* A215, 223. And while Musk complains about Commission inquiries, Br. 46–51, any investigatory burdens do not make his compliance with the pre-approval process or Tesla's disclosure controls unworkable.

**B.     Musk has not shown that the consent judgment achieved its purpose or that its modification serves the public interest.**

Musk argues that modification of the consent judgment is also warranted because its continued enforcement is detrimental to the public interest, Br. 51–52, and because its purpose has been achieved, Br. 52–53. Musk has forfeited both arguments by failing to raise them to the district court. *Old Republic Ins. Co. v. Pac. Fin. Servs. of Am., Inc.*, 301 F.3d 54, 59 (2d Cir. 2002) (per curiam); *see* SA10–58; Br. 52 ("*This Court* should grant modification of the consent decree for the *separate* reason that the objective of the decree has been achieved.") (emphases added).

Even if the Court were to consider it now, Musk's public-interest argument fails because the existence of a changed circumstance remains a predicate for granting a Rule 60(b)(5) motion on public interest grounds, and Musk has not identified any actual change that would make continued enforcement detrimental to the public interest. *See Horne*, 557 U.S. at 447; *United States v. Sec'y of Hous. & Urb. Dev.*, 239 F.3d 211, 217 (2d Cir. 2001) ("[U]nder *Rufo*, a modification due to changed factual conditions * * * is appropriate when * * * enforcement of the decree without modification would be detrimental to the public interest.") (quotation omitted). Moreover, and as explained more below, *infra* Section III.B, Musk's compliance with Tesla's disclosure controls, including pre-approval by a Tesla attorney, serves the interest of Tesla shareholders and the market more generally. It does not preclude

Musk from using Twitter (or other channels) to disseminate information about Tesla, but it does ensure a process exists to protect investors against inaccurate disclosures.

Contrary to Musk's views, the purposes of the consent judgment have not been achieved such that modification is required. "[T]he mere passage of time and temporary compliance" do not "constitute the type of changed circumstances that warrant lifting of an injunction." *Bldg. & Constr. Trades Council*, 64 F.3d at 889; *see SEC v. Coldicutt*, 258 F.3d 939, 943 (9th Cir. 2001) ("[O]bedience to a mandate provides no justification for dissolving the injunction. Compliance is just what the law expects.") (quotation omitted); *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 220 (3d Cir. 2012) (compliance "alone is not necessarily sufficient to justify vacating the Decree because compliance is the purpose of the Decree"). Musk assumes Tesla's implementation of disclosure controls fulfilled the purpose of his consent judgment. Br. 52–53. But an objective of his consent is to require him to follow those procedures, rather than relying on Tesla to enforce them against its CEO and a significant shareholder. Maintenance of the judgment is especially important because Tesla designated Musk's Twitter account as a channel of corporate communication, and the consent judgment stems from Musk's use of that channel to make statements that the Commission alleged were materially false. While the Commission can bring a new enforcement action *ex post* if it believes that Musk again makes materially false statements, a key purpose of the consent judgment is to have an *ex ante* process for the review of potentially market-moving information before it moves the market.

The two cases cited by Musk (Br. 52) do not support his argument that the purposes of the consent judgment have been achieved. The decision in *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004), addressed the "intersection of the principles governing consent decrees and the Eleventh Amendment," which implicated federalism issues at play when federal courts enforce consent decrees against state officials. *Id.* at 437, 441–42. No such federalism principles are implicated here. And in *Patterson v. Newspaper & Mail Deliverers' Union*, 13 F.3d 33 (2d Cir. 1993), this Court affirmed the termination of a program regarding minority employment because a numerical goal established by a consent decree was reached. *Id.* at 36, 38–39. Unlike in *Patterson*, however, the consent judgment here does not involve a numerical target; it implements a procedure intended to advance ongoing interests in protecting Tesla shareholders and the market by ensuring the accuracy of communications about Tesla that its CEO makes.

## II. The district court correctly denied Musk's Rule 60(b)(5) motion because he voluntarily agreed to waive his First Amendment rights.

Musk tries to paper over the absence of significant changed circumstances with a misdirected First Amendment argument that fails to show the consent judgment is "impermissible under federal law." *Rufo*, 502 U.S. at 388. Even assuming that pre-approval by a Tesla attorney could be viewed as a restriction on his ability to speak, Musk agreed to this provision. He tries to brush aside his consent, relying heavily on litigated cases, Br. 20–29, but this tactic ignores the crucial difference between Musk's

voluntary agreement to comply with Tesla's disclosure policies and a restraint imposed against his will. The prior-restraint jurisprudence he invokes is inapposite here because (1) Musk waived any First Amendment rights implicated by the consent judgment and (2) he has failed to demonstrate that his waiver was somehow invalid.

### A. Musk consented to the judgment, waiving his rights.

The Supreme Court and this Court have made clear that parties can waive their constitutional rights when settling government enforcement actions. This Court recently explained, in a case involving a Commission consent judgment, that "[i]n the course of resolving legal proceedings, parties can, of course, waive their rights, including such basic rights as the right to trial and the right to confront witnesses." *SEC v. Romeril*, 15 F.4th 166, 172 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2836 (2022). Waivers of rights in civil settlements parallel the criminal sphere, where "it is well settled that plea bargaining does not violate the Constitution even though a guilty plea waives important constitutional rights." *Town of Newton v. Rumery*, 480 U.S. 386, 393 (1987); *see D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 184–87 (1972); *INS v. St. Cyr*, 533 U.S. 289, 321–22 (2001) ("In exchange for some perceived benefit, defendants waive several of their constitutional rights (including the right to a trial) * * * ."). In *Rumery*, the Court enforced an agreement in which a municipality dropped criminal charges in exchange for a defendant's waiver of his right to file a civil rights lawsuit. 480 U.S. at 391–92. As part of its ruling, the Court held that there is no "per se rule of invalidity" for waivers of constitutional rights. *Id.* at 394–95; *accord Pee Dee Health*

*Care, P.A. v. Sanford*, 509 F.3d 204, 212 (4th Cir. 2007) (stating that nothing in federal law prohibits constitutional waivers); *Lake James Cmty. Volunteer Fire Dep't v. Burke Cnty.*, 149 F.3d 277, 280 (4th Cir. 1998) ("[S]imply because a contract includes the waiver of a constitutional right does not render the contract *per se* unenforceable.").

Adhering to *Rumery*, this Court has held that "the First Amendment is no exception." *Romeril*, 15 F.4th at 172. "[P]arties can waive their First Amendment rights in consent decrees and other settlements of judicial proceedings." *Id.* *Romeril* tracks earlier decisions, like *United States v. Int'l Bhd. of Teamsters*, 931 F.2d 177, 187–88 (2d Cir. 1991), which held that when a union entered into a consent decree governing publication of election materials, it waived its First Amendment rights. The Second Circuit is not unique; courts routinely recognize and uphold waivers of First Amendment rights in government settlements. *Lake James*, 149 F.3d at 280 (listing examples); *Leonard v. Clark*, 12 F.3d 885, 889–90 (9th Cir. 1993), *as amended* (Mar. 8, 1994); *Paragould Cablevision, Inc. v. City of Paragould*, 930 F.2d 1310, 1315 (8th Cir. 1991); *Erie Telecomms., Inc. v. City of Erie*, 853 F.2d 1084, 1096 (3d Cir. 1988).

Musk's focus on litigated, prior restraint cases that do not involve consent, Br. 20–29, misconstrues the issue before this Court. There is no legitimate comparison between Musk's consent and a preliminary injunction barring a union from defaming an employer, *Metro. Opera Ass'n v. Local 100, Hotel Empls. & Rest. Empls. Int'l Union*, 239 F.3d 172 (2d Cir. 2001), or a judicial order forbidding media outlets from publishing information about a trial, *Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976);

*United States v. Quattrone*, 402 F.3d 304 (2d Cir. 2005). And there is no legitimate comparison between Musk's agreement to pre-approval by a Tesla employee and situations where officials play a role in approving speech. *Alexander v. United States*, 509 U.S. 544, 550–51 (1993); *Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007).

In this instance, Musk voluntarily and knowingly agreed—twice—to pre-approval. *See Leonard*, 12 F.3d at 889 ("First Amendment rights may be waived upon clear and convincing evidence that the waiver is knowing, voluntary and intelligent."). When he signed the original consent judgment, Musk represented that he "enters into this Consent voluntarily" and "that no threats" or "inducements of any kind" were made to force him "to enter into this Consent." A46 (¶ 8). He further stated that the parties "reached a good faith settlement," A48 (¶ 14), and informed the court that the settlement was "in the best interests of investors and should be approved," SA9. Musk was represented by counsel, who also signed the consent, approving it as to form. A48.

The 2019 amendment featured similar indicia of waiver. Musk again represented that his consent was voluntary. A226 (¶ 3). He was present and had counsel at the contempt hearing. A146–47. After the district court ordered the parties to confer, Musk negotiated over several weeks, signing joint submissions to the court about the parties' progress and ultimately inking the amended consent. A216–20. The period of negotiation was even longer than the period in *Rumery*, where a

defendant, facing criminal charges, "considered the agreement for three days before signing." 480 U.S. at 394. As in *Rumery*, Musk made a knowing and voluntary waiver.

**B.    Musk fails to show that his waiver was invalid.**

While Musk makes a number of arguments for disregarding his waiver, several are raised for the first time on appeal, and thus are forfeited, and all lack merit. At the outset, the district court correctly held that "Musk was not forced to enter into the consent decree." A278. Similar to the defendant in *Rumery*, Musk is "a sophisticated businessman" who made a "highly rational judgment" after receiving ample time to read, review, and negotiate the amendments. 480 U.S. at 394. It strains credulity to believe that such an experienced corporate executive like Musk could not grasp the implications of the document he was signing.

Nonetheless, Musk argues that his waiver was invalid. He contends that *Romeril* does not control because his settlement implicates a broader "scope of speech," which goes beyond his initial tweet "giving rise to the underlying action." Br. 31–33. But *Romeril*, like *Rumery*, turned on the principle that a defendant can waive constitutional rights as part of a settlement, not the "breadth" of the waiver, Br. 1. In *Romeril*, the defendant, as part of a Commission consent judgment, agreed not to deny the allegations in the complaint. When Romeril moved to set aside his consent judgment sixteen years later on constitutional grounds, this Court held that "[t]he Judgment does not violate the First Amendment because Romeril waived his right to publicly deny the allegations of the complaint." 15 F.4th at 172; *id.* at 173 ("To the

extent Romeril had the right to publicly deny the SEC's allegations against him, he waived that right by agreeing to the no-deny provision as part of a consent decree.").

Nothing in *Romeril*, the cases cited in *Romeril*, or the cases cited by Musk (Br. 31–33), suggest that a knowing and voluntary waiver is invalid unless it is "strictly tailored to specific and existing concerns," as Musk suggests, Br. 32. Rather, one "who has been a party to [a consent decree] is in no position to claim that such decree restricts his freedom of speech" because he "has waived his right and given his consent to its limitations within the scope of that decree." *In re George F. Nord Bldg. Corp.*, 129 F.2d 173, 176 (7th Cir. 1942); *see also Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) (per curiam) (rejecting claim that requirement in employment agreement was unenforceable as a prior restraint when employee "voluntarily signed the agreement"). In any event, the waiver *is* tied to the tweets that prompted Commission action—the consent requires Musk to adhere to Tesla's process for disclosures precisely because he allegedly made a false statement about taking Tesla private in the absence of such a process. The purpose of that process, and the pre-approval requirement, is to ensure that Tesla monitors its executives' communications.

Musk believes that the only permissible scope of relief would be to prevent him from making statements about taking Tesla private. Br. 2, 31, 36–38. But courts can fashion conduct-based relief, including injunctions, which extend beyond the exact wrongdoing that triggered the action. *See* 15 U.S.C. § 78u(d)(5) (providing that courts "may grant[] *any* equitable relief that may be appropriate or necessary for the benefit

of investors") (emphasis added). Even in litigated cases, courts may impose such broader relief, such as barring defendants from serving as officers or directors of all public companies, not just the companies for which they worked when the violation occurred. *E.g.*, *SEC v. Heart Tronics, Inc.*, 2016 WL 9049642 (C.D. Cal. Mar. 30, 2016), *aff'd*, 751 F. App'x 974 (9th Cir. 2018) (unpublished).

Next, Musk argues that he "could not possibly have known the circumstances and consequences of the pre-approval provision." Br. 31. This is a new argument; he did not previously claim that he failed to understand the consent. A255–56. Rather, he contended only that he was under economic duress when he signed the consent in September 2018—a claim that the court rejected and that Musk does not repeat on appeal. SA39–40; *see also* SA55; *cf. Rumery*, 480 U.S. at 393 (recognizing that criminal defendants may be "required to make difficult choices that effectively waive constitutional rights," but that this "possibility does not justify invalidating *all* such agreements"). Because Musk has not raised the only argument he made to the district court, and did not previously make the arguments he offers now, he has forfeited the issue of whether his waiver was knowing and voluntary. *Old Republic*, 301 F.3d at 59 (2d Cir. 2002); *United States v. Brennan*, 650 F.3d 65, 137 (2d Cir. 2011).

But even if the Court were to reach the issue, the record shows that Musk entered into the agreement "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Musk has not pointed to any term of the pre-approval

39

provision that he claims he did not understand. The judgment on its face specifies what Musk must do—comply with Tesla's disclosure policies that govern his communications about Tesla with respect to a list of topics that he negotiated. A231–32; *see Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1395 (9th Cir. 1991) ("It is possible to knowingly waive a general right without contemplating the specific circumstances under which that waiver will be enforced."); *Erie Telecomms., Inc.*, 853 F.2d at 1097–98 (finding language of agreement was broad enough to encompass unknown claims).

This number of topics is not "potentially infinite," as Musk exaggerates. Br. 32. The consent contains a list of subjects that any high-ranking corporate executive should understand, such as "financial condition," "production numbers," "projections," and "mergers." Musk negotiated this list to replace the materiality standard in the original consent, provide "enhanced clarity," and "reduce the likelihood of future disputes regarding compliance." A223. Indeed, Musk's argument is at war with itself: he describes the agreed-upon topics as "unknowable," Br. 19, yet criticizes the deal precisely because it covers "specific topics," Br. 23.

Musk also argues that his waiver was not knowing because it applies to "future speech about circumstances no one could anticipate in advance." Br. 31, 33–34. But the fact that this consent judgment implicates future events is not unusual—*Romeril* applied to possible future speech, as did all of the agreements in the cases *Romeril* cited. *See Romeril*, 15 F.4th at 170; *Int'l Bhd. of Teamsters*, 931 F.2d at 187; *Leonard*, 12

F.3d at 886; *In re George F. Nord*, 129 F.2d at 175; *Snepp*, 444 U.S. at 508. And the "circumstances" are not hard to anticipate; they concern topics that would generally be important to Tesla shareholders and the market. Musk claims to be surprised that the consent judgment would apply to disclosures "unrelated to the 2018 tweet" about going private, Br. 47, but the four corners of the settlement he signed goes beyond just tweets about going private. *See United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971) ("Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms" and "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it."). The consent judgment ensures that Tesla controls the disclosure of information across specified categories so as to minimize the risk that there is a repeat of the disruption that occurred in 2018.

Any future attempts to enforce the consent—and any disagreements about what it covers—would be patrolled by the district court. *See Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (a finding of contempt requires that the violation of an order be clear and unambiguous). Musk cites a decision (Br. 34) in which a court held that a hospital's agreement to a non-discrimination policy did not constitute a waiver of the hospital's right to choose its own ministers because the non-discrimination policy said nothing about waiving the ministerial exception under the First Amendment. *Hollins v. Methodist Healthcare, Inc.*, 379 F. Supp. 2d 907, 912–13 (W.D. Tenn. 2005), *aff'd*, 474

F.3d 223 (6th Cir. 2007). Unlike *Hollins*, which involved an unanticipated consequence of the agreement not covered by the plain text, Musk's consent judgment provides the relevant list of topics and any lack of clarity can be addressed by the court if necessary.

Musk's decision to negotiate the amended judgment without individual counsel does not cast "further doubt" on his waiver. Br. 33. Musk was present at the hearing on the Commission's contempt motion, where he was represented by counsel. A146–47. He negotiated with the Commission for three weeks, where counsel for Tesla was also present. A218–21. At no point did he raise the lack of individual representation as an issue or request more time so he could retain his own counsel. Moreover, the fact that he opted to negotiate the amendment personally, including the topics for pre-approval, only reinforces the knowing and voluntary nature of his waiver.

When the parties presented the amended judgment to the court in 2019, and when Musk filed his Rule 60(b)(5) motion in 2022, he did not contend that the lack of individual representation affected his ability to understand the agreement, nor did he argue that he was under any coercion. In fact, he represented that the opposite was true. A226 (¶ 3). Nothing about his apparent decision to rely on Tesla's lawyers to represent his interests implies that he did not understand the amended consent or that his agreement was not the product of a "free and deliberate" choice. *Moran*, 475 U.S. at 421; *see Bormann v. AT & T Comms., Inc.*, 875 F.2d 399, 403–04 (2d Cir. 1989); *Typhair v. Gouverneur*, 322 F. App'x 26, 27 (2d Cir. 2009) (summary order).

42

## III. Musk's challenges to the enforceability of his waiver are forfeited and without merit.

### A. Musk did not previously argue that his waiver would be unenforceable.

Musk argues that any waiver of his First Amendment rights is unenforceable for two reasons: (1) under the *Rumery* balancing test, the interests in enforcing his waiver are outweighed by public interests harmed by enforcing it, Br. 39–43; and (2) his agreement to the pre-approval provision is an "unconstitutional condition," Br. 35–38. Musk has forfeited both arguments because he failed to raise them below. *Old Republic*, 301 F.3d at 59. While Musk cited prior restraint cases in the district court, SA36–39, 53–55, he neither addressed the balancing framework in *Rumery* nor mentioned "unconstitutional conditions."

Musk's failure to raise these arguments in his Rule 60(b)(5) motion may have been a function of the fact that the Commission was not seeking to enforce his waiver at the time by requesting relief from the district court. If the Commission were to move for contempt again, or seek some other relief, enforceability issues would be germane. Musk effectively seeks a ruling based on hypothetical events, but federal courts do not render "advisory opinions"; they require "concrete legal issues, presented in actual cases, not abstractions." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (quotation omitted); *see Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) ("A claim is not ripe if it depends upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (quotation omitted).

43

The *Overbey* case that Musk cites stands in contrast. Br. 41–42. In that case, the defendant enforced a non-disparagement clause against a settling plaintiff in a police brutality case, remitting only half the settlement funds owed to the plaintiff because of comments the plaintiff made, which prompted the plaintiff to bring a second action, alleging a First Amendment violation. *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 220–21 (4th Cir. 2019). In deciding whether to enforce the waiver after the city raised it as a defense, the court described it as "well-settled that a person may choose to waive certain constitutional rights pursuant to a contract with the government" and it held that Overbey had "waived the First Amendment protections that would have otherwise shielded her speech from government sanction." *Id.* at 223. But the panel majority (over a dissent) declined to enforce the waiver after balancing the various interests under the circumstances, emphasizing the terms of the waiver and the police misconduct context. *Id.* at 223–25. The remaining cases cited by Musk mostly

involve concrete attempts at enforcement featuring materially different facts than

those presented here,[4] or concern terms to which the parties did not consent.[5]

## B.     The public interest in enforcing Musk's waiver is compelling.

Even if this court were to engage in *Rumery*'s balancing test now, the public

interest in enforcing the waiver outweighs Musk's interest in disregarding it.  *See* 480

U.S. at 392, 394 (balancing whether the interest in enforcing a waiver "is outweighed

in the circumstances by a public policy harmed by enforcement of the agreement").

Until recently, there was no disagreement that this consent judgment benefited

---

[4] *See Lynch v. City of Alhambra*, 880 F.2d 1122, 1123–24, 1127 (9th Cir. 1989) ("The *per se* rule offered by [plaintiff] is clearly inconsistent with the *Rumery* Court's emphasis on a case-by-case analysis."); *Thomas James Assocs., Inc. v. Jameson*, 102 F.3d 60, 63, 66–67 (2d Cir. 1996) (holding that waiver of arbitration was void after employee requested arbitration); *Wessel v. City of Albuquerque*, 299 F.3d 1186, 1197–99 (10th Cir. 2002) (invalidating term in agreement between city and union during dispute over compulsory deduction of union fees from wages); *Davies*, 930 F.2d at 1392–93, 1396–99 (holding that a provision barring defendant from holding office was unenforceable after defendant ran for office and opposing party sought to enforce the agreement); *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1073–74, 1077–78 (6th Cir. 1994) (striking a term in a liquor license after licensee indicated it intended to breach the term and city indicated it would enforce the term); *People v. Smith*, 502 Mich. 624, 628–31, 633–45 (2018) (affirming decision to strike a term of plea agreement barring a legislator from holding office after legislator again ran for office); *Fomby-Denson v. Dep't of Army*, 247 F.3d 1366 (Fed. Cir. 2001) (rejecting proposed interpretation of settlement agreement after petition for enforcement of agreement).

[5] Musk cites *United States v. Richards*, 385 F. App'x 691, 692–93 (9th Cir. 2010) (unpublished), but that is not a consent case—the court imposed a probation term on a criminal defendant that restricted him from commenting about a public official. Musk also cites *Crosby v. Bradstreet Co.*, 312 F.2d 483 (2d Cir. 1963), but as explained in *Romeril*, the order at issue in *Crosby* applied to individuals who were not parties and did not consent, as Musk acknowledges.  15 F.4th at 173–74; *see* Br. 37 n.4.

45

investors. The Commission alleged that Musk made materially false and misleading statements in his "going private" tweets, which affected Tesla's share price and disrupted the markets. Musk did not admit these allegations, but when the parties submitted the consent judgments for entry, they all agreed "that resolution of these cases consistent with the proposed settlement terms is in the best interest of investors, including Tesla shareholders." SA3, 9.

Like the original, the amended judgment ensures that Musk complies with a process for disclosure that lessens the risk of false or misleading disclosures that could "significantly alter[] the total mix of information made available" to investors. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quotation omitted); *see Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 164 (2d Cir. 2000) (materiality of earning reports); *SEC v. Mayhew*, 121 F.3d 44, 51–52 (2d Cir. 1997) (materiality of information about mergers). The requirement that Musk follow Tesla's procedures, including pre-approval, protects investors by increasing the likelihood that the information they use to price Tesla securities is accurate. *See Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988) ("[E]mpirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.").

The terms of the amended consent judgment are not the shackles that Musk portrays them to be. The pre-approval procedures create a pause—within Tesla— before Musk publishes information about the company, but it does not preclude or

46

bar him from disclosing information about Tesla. And while no one disagrees that speech is involved, *see* Br. 21, the speech at issue is not just Musk's speech. Because Tesla designated Musk's personal Twitter account as one conduit for information about the company, his tweets may be perceived as the speech of a company owned by its shareholders, who have a stake in ensuring that its officers release accurate information in a coordinated manner. Shareholders' concerns about disclosure through social media are reflected in the large number of shareholder suits concerning the content of Musk's tweets and Tesla's supervision of those tweets.[6]

In response, Musk offers only general sentiments about "the public policy interests in upholding First Amendment principles." Br. 40. But Musk's agreement to be bound by Tesla's communication policies is unlike any of the restrictions at issue in the cases that Musk cites. The amended consent does not preclude Musk from tweeting truthful information about Tesla—it requires Musk to follow Tesla's process for how such tweets may be published. While Musk repeatedly refers to a "government-mandated monitor," Br. 1, 20, 37, the "monitor" is not the government—it is a Tesla employee. It remains unclear why there is such a sharp

---

[6] *See In re Tesla, Inc. Sec. Litig.*, 18-cv-4865 (N.D. Cal.) (nine consolidated class actions); *In re Tesla, Inc. Shareholder Derivative Litig.*, 18-cv-1669 (D. Del.) (two consolidated derivative actions); *Elton v. Musk*, C.A. No. 2018-0749 (Del. Ch.); *Siedman v. Musk*, C.A. No. 2018-0775 (Del. Ch.); *Krol v. Musk*, C.A. No. 2018-0802 (Del. Ch.); *Dixon v. Musk*, C.A. No. 2018-0806 (Del. Ch.); *Doris Shenwick Tr. v. Musk*, C.A. No. 2018-0823 (Del. Ch.); *Laborers' Dist. Coun. & Contractors' Pension Fund of Ohio v. Musk*, C.A. No. 2019-0187 (Del. Ch.); *Gharrity v. Musk*, C.A. No. 2021-0199 (Del. Ch.); *Wagner v. Musk*, C.A. No. 2022-0953 (Del. Ch.).

objection to a requirement that Tesla have procedures for executives authorized to communicate on its behalf. Such requirements are relatively common—many companies have social media policies and maintain disclosure committees. *See* W. Brooke Elliott *et al.*, *Negative News and Investor Trust: The Role of $Firm and #CEO Twitter Use*, 56 J. OF ACCT. RES. 1483, 1490 (2018) (77% of surveyed firms had a social media policy); EY, Disclosure Committee Report: Practices and Trends 5 (2021) (94% of companies had a formal disclosure committee)[7]; 65 Fed. Reg. 51,716, 51,726 n.90 (Aug. 24, 2000) (noting the Commission's awareness that many issuers have policies "regarding disclosure practices, the dissemination of material information, and the question of which issuer personnel are authorized to speak to analysts, the media, or investors"). Musk's consent judgment does nothing to prevent the "publication of facts which the community has a right to know," *Crosby*, 312 F.2d at 485, undermine "[t]he right of citizens to inquire, to hear, to speak, and to use information to reach consensus," *Citizens United v. FEC*, 558 U.S. 310, 339 (2010), or harm "'uninhibited, robust, and wide-open' debate on 'public issues,'" *Overbey*, 930 F.3d at 224, quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Moreover, Musk ignores that the balancing of interests in the *Rumery* test occurs against the backdrop of a presumption that once a consent judgment is entered, "the court is by and large required to honor the terms agreed to." *SEC v.*

---

[7] *Available at* https://assets.ey.com/content/dam/ey-sites/ey-com/en_us/news/ 2021/ey-2021-disclosure-committee-report-practices-and-trends.pdf.

*Levine*, 881 F.2d 1165, 1181 (2d Cir. 1989). "Long standing precedent evinces a strong public policy against judicial rewriting of consent decrees," *Reynolds v. Roberts*, 202 F.3d 1303, 1312 (11th Cir. 2000), and they are "strictly construed to preserve the bargained for position of the parties," *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983).

The Commission decided that the "optimal allocation of its limited resources" involved settling with Musk on specific terms, including a pre-approval process. *SEC v. Citigroup Global Mkts., Inc.*, 673 F.3d 158, 165 (2d Cir. 2012) (per curiam). Courts have been reluctant to dissolve "consent decrees years after" entry because "significant governmental interests would be impaired." *SEC v. Clifton*, 700 F.2d 744, 748 (D.C. Cir. 1983) (per curiam). A defendant who has obtained the advantages of settling—not "the least of which is the termination of the litigation—cannot then be permitted to ignore such affirmative obligations as were imposed by the decree." *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985). "If sanctioned parties easily are able to reopen consent decrees years later, the SEC would have little incentive to enter into such agreements." *Miller v. SEC*, 998 F.2d 62, 65 (2d Cir. 1993).

Here, both sides waived "their right to litigate the issues," and both sides gave "up something they might have won had they proceeded with the litigation." *Armour & Co.*, 402 U.S. at 681; *SEC v. Citigroup Global Mkts., Inc. (Citigroup II)*, 752 F.3d 285, 295–96 (2d Cir. 2014); *see also FTC v. Pukke*, 53 F.4th 80, 103 (4th Cir. 2022) ("When a defendant willingly enters a stipulated judgment, he is given the benefit of certainty—over the uncertainty of trial—in exchange for not challenging the agreement in the

future.").  The Commission gave "up a number of advantages," *Clifton*, 700 F.2d at

748, in exchange for obtaining remedies in the public interest more quickly than it

could have at trial.  *See* SA9.  Musk avoided the risk of an adverse outcome at trial,

which could have affected the private actions against him and resulted in him being

barred from serving as an officer or director for any issuer.  He also saved himself

"the time, expense, and inevitable risk of litigation," and he yielded something he

"might have won had [he] proceeded with the litigation," including favorable findings

of fact.  *Armour*, 402 U.S. at 681; *Citigroup II*, 752 F.3d at 295.

Ultimately, Musk has shown no reason why this negotiated agreement designed

to ensure the accuracy of information that could move the market is contrary to the

public interest.  Nor has he justified undoing the settlement years after the parties'

agreement.  "When it comes to civil settlements, a deal is a deal, absent far more

compelling circumstances than are here presented."  *SEC v. Conradt*, 309 F.R.D. 186,

187 (S.D.N.Y. 2015), *aff'd*, 696 Fed. App'x 46 (2d Cir. 2017) (summary order)

(affirming district court's decision to deny vacatur of a civil consent judgment after

defendant's guilty plea in a parallel criminal matter was vacated).

### C. The "unconstitutional conditions" theory is inapplicable because an agreement to settle is not a government benefit.

Even if this Court were to address Musk's forfeited argument that his waiver

cannot be enforced because it is an "unconstitutional condition," Br. 35–38, the

concept of unconstitutional conditions has no relevance here.  Courts sometimes

employ an unconstitutional-conditions analysis when a government benefit is involved, but there is no binding precedent holding that "the settlement of a pending securities fraud action" (Br. 17) is a "benefit" under this theory. Instead, Musk cites cases about: federal funding, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013), *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001), *FCC v. League of Women Voters*, 468 U.S. 364 (1984); land-use permits, *Koontz v. St. John's River Water Mgmt. Dist.*, 570 U.S. 595 (2013), *Dolan v. City of Tigard*, 512 U.S. 374 (1994); state licensing, *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994), *Barron v. Burnside*, 121 U.S. 186 (1887); and one case that does not apply an unconstitutional conditions framework at all, *Davies*, 930 F.2d at 1399.

The unconstitutional conditions framework does not apply to government settlements for good reason—a settlement of a Commission enforcement action is not a "benefit" that can be analogized to a funding program, permit, or license. Musk appears to believe that the primary purpose of the consent judgment was to benefit *him*, but the Commission did not settle this action to benefit Musk—it settled to benefit the *public* while minimizing risk and allocating finite resources. *Citigroup II*, 752 F.3d at 295–96. To the extent that a settlement may be described as conferring some advantage by comparison to the alternative of trial, that does not transform settlements into conveyances of government benefits. If every settlement were a benefit, and every waiver of rights an "unconstitutional condition," it would effectively end government settlements, which always contain waivers.

51

Even within the waters of unconstitutional conditions, Musk's argument runs aground. He proposes applying the "nexus" and "rough proportionality" factors that developed under Takings Clause cases involving property. Br. 35, 38, citing *Koontz*, 570 U.S. at 612; *Dolan*, 512 U.S. at 385, 387; *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987). Application of that rubric makes little sense in the context of a consent judgment and would be at odds with decisions like *Rumery* and *Romeril*, which confirm that "parties can waive their First Amendment rights in consent decrees," *Romeril*, 15 F.4th at 172, but do not apply a legal framework designed to assess when the government can "condition approval of a permit on the dedication of property to the public," *Koontz*, 570 U.S. at 605.[8]

Musk's attempt to apply the unconstitutional conditions framework similarly ignores that courts possess the tools to weed out judgments obtained by "gimmickry" or "extortion." Br. 38. A consent judgment should be approved if it is "fair and reasonable, with the additional requirement that the public interest would not be disserved." *Citigroup II*, 752 F.3d at 294 (quotation omitted). This standard requires district courts to assess "the basic legality of the decree," whether its terms are clear,

---

[8] In any event, there is a "close nexus" (Br. 35) between Musk's waiver and the public interest. As argued previously, *supra* Section III.B, Musk's agreement to be bound by Tesla's policies protects investors and the market, and it is "specifically tailored to prevent future violations of the type alleged by the SEC." SA7; *see Agency for Int'l Dev.*, 570 U.S. at 214–15 (distinguishing between permissible limits on spending programs and impermissible attempts to "leverage funding to regulate speech outside the contours of the program itself").

whether it "reflects a resolution of the actual claims in the complaint," and whether it is tainted by collusion or corruption. *Id.* at 294–95. The district court here took its role seriously; it ordered the parties to explain why the original consent judgment should be approved, SA1–2, and then, satisfied with the answer, approved it. A year later, it approved the amended consent judgment. The Commission's settlement with Musk was no gimmick; it reflected a considered decision by both parties to resolve a serious antifraud enforcement action involving a false and misleading tweet through a consent judgment in which Musk agreed to have a Tesla attorney review future tweets about Tesla matters before publication. There is no justification for altering the deal now under a misplaced "unconstitutional conditions" theory or any other grounds.

## CONCLUSION

The order denying Musk's Rule 60(b)(5) motion should be affirmed.

Respectfully submitted,

DAN BERKOVITZ  
General Counsel

  /s/ Jeffrey A. Berger  
JEFFREY A. BERGER  
Senior Appellate Counsel

MICHAEL A. CONLEY  
Solicitor

JOHN R. RADY  
Appellate Counsel

Securities and Exchange Commission  
100 F Street, N.E.  
Washington, D.C. 20549  
December 22, 2022  (202) 551-5112 (Berger)

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,677 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface—Garamond, 14 point—using Microsoft Word.

/s/  Jeffrey A. Berger