# 22-1291

---

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

United States Securities and Exchange Commission,

*Plaintiff-Appellee,*

v.

Elon Musk,

*Defendant-Appellant.*

---

On appeal from the United States District Court for the
Southern District of New York (Hon. Lewis J. Liman)

---

**SUPPLEMENTAL APPENDIX**

---

DAN BERKOVITZ
General Counsel

MICHAEL A. CONLEY
Solicitor

JEFFREY A. BERGER
Senior Appellate Counsel

JOHN R. RADY
Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-5112 (Berger)
bergerje@sec.gov

# TABLE OF CONTENTS

Order, Dkt. No. 9 (Oct. 4, 2018) ....................................................................... SA1

Joint Submission in Support of Approval and Entry of Proposed
     Consent Judgments, Dkt. No. 13 (Oct. 11, 2018) ............................................ SA3

Defendant Elon Musk's Memorandum of Law in Support of His Motion
     to Quash & to Terminate Consent Decree,
     Dkt. No. 71 (Mar. 8, 2022) ............................................................... SA10

Defendant Elon Musk's Reply in Further Support of His Motion
     to Quash & to Terminate Consent Decree,
     Dkt. No. 80 (Mar. 29, 2022) ............................................................ SA43

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  OCT 0 4 2018
```

United States Securities and Exchange
Commission,

                              Plaintiff,

              —v—

Elon Musk,

                              Defendant.

18-cv-8865 (AJN)

ORDER

ALISON J. NATHAN, District Judge:

On September 29, 2018, the Court received a motion from the Securities and Exchange

Commission representing that the parties had reached a settlement and requesting that the Court

approve and enter a proposed consent judgment. Dkt. No. 6. It is this Court's regular practice to

have the parties submit a joint letter explaining why the Court should approve a proposed

consent judgment. *See, e.g., Securities and Exchange Commission v. VIPWallst, Inc. et al.*, No.

1:17-cv-01756 (AJN), Dkt. No. 28; *Securities and Exchange Commission v. LoBue*, No. 1:12-cv-

07944 (AJN), Dkt. No. 3.

The Court has a duty to ensure the proposed consent judgment is "fair and reasonable."

*SEC v. Citigroup Global Markets, Inc.*, 752 F.3d 285, 294 (2d Cir. 2014) ("[T]he proper standard

for reviewing a proposed consent judgment involving an enforcement agency requires that the

district court determine whether the proposed consent decree is fair and reasonable, with the

additional requirement that the public interest would not be disserved." (citation and quotation

marks omitted)); *see also Kozlowski v. Coughlin*, 871 F.2d 241, 244 (2d Cir. 1989) (noting that

"[b]efore entering a consent judgment," the district court must determine, *inter alia*, that the

**SA1**

decree "furthers the objectives of the law upon which the complaint was based" (alteration, quotation marks, and citation omitted)); *Janus Films, Inc. v. Miller*, 801 F.2d 578, 582 (2d Cir. 1986) (noting that a court must make a "minimal determination of whether the agreement is appropriate" before entering a consent order).

No later than October 11, 2018, the parties shall file a joint letter not to exceed ten pages double-spaced, explaining why the Court should approve the proposed consent judgment.

SO ORDERED.

Dated: October ___, 2018
New York, New York

_____
ALISON J. NATHAN
United States District Judge

**SA2**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** | : : : |
| Plaintiff, | : : |
| vs. | : **No. 1:18-cv-8865-AJN-GWG** |
|  | : **[rel. 1:18-cv-8947]** |
| **ELON MUSK** | : : |
| Defendant. | : : |

---

### JOINT SUBMISSION IN SUPPORT OF APPROVAL AND ENTRY OF PROPOSED CONSENT JUDGMENTS

Pursuant to this Court's October 4, 2018 Orders, counsel for Plaintiff United States Securities and Exchange Commission ("SEC") and Defendants Elon Musk and Tesla, Inc. ("Tesla") provide this submission in support of approval and entry of the proposed consent judgments to resolve these civil matters. Because the parties considered the resolution of these two matters together, this submission discusses the appropriateness of both of the two proposed consent judgments.

The parties believe that resolution of these cases consistent with the proposed settlement terms is in the best interest of investors, including Tesla shareholders. We therefore respectfully submit that the Court should accept and enter the proposed consent judgments.

### THE ACTIONS

On September 27 and 29, 2018, the SEC filed complaints against Mr. Musk and Tesla, respectively. *See* Complaint as to Defendant Elon Musk, 1:18-cv-8865-AJN-

**SA3**

GWG, Dkt. No. 1; Complaint as to Defendant Tesla, Inc., 1:18-cv-8947-AJN-GWG, Dkt.

No. 1.

Mr. Musk and Tesla did not respond to the SEC complaints prior to these

settlements being reached.

## THE PROPOSED SETTLEMENT TERMS

Without admitting or denying the SEC's allegations, Mr. Musk and Tesla have

agreed to settle these actions and consent to the entry of the proposed consent judgments.

The terms of the settlements were negotiated by Mr. Musk's and Tesla's experienced

counsel and approved by the SEC.  The proposed consent judgments against Mr. Musk

and Tesla would:

(a)     permanently enjoin Mr. Musk from violating Section 10(b) of the
        Exchange Act and Rule 10b-5 thereunder;

(b)     permanently enjoin Tesla from violating Rule 13a-15 of the Exchange
        Act;

(c)     order Mr. Musk to pay a civil penalty in the amount of $20,000,000;

(d)     order Tesla to pay a civil penalty in the amount of $20,000,000;

(e)     order Mr. Musk to comply with undertakings requiring him to resign as
        Chairman of Tesla's board of directors, certify that he has done so, and
        comply with mandatory procedures to be adopted by Tesla concerning the
        oversight and approval of his Tesla-related public statements; and

(f)     order Tesla to comply with undertakings, including appointment of a new
        Chairman and two additional independent directors to its board of
        directors, establishment of a new board committee responsible for
        disclosures, implementation of mandatory procedures to oversee and pre-
        approve Mr. Musk's Tesla-related written communications that reasonably
        could contain information material to the company or its shareholders, and
        designation or employment of an experienced securities lawyer whose
        duties will include enforcement of those procedures.

**SA4**

*See* Consent and Proposed Final Judgment as to Defendant Elon Musk, 1:18-cv-8865-AJN-GWG, Dkt. Nos. 6-1, 6-2; Consent and Proposed Final Judgment as to Defendant Tesla, Inc., 1:18-cv-8947-AJN-GWG, Dkt. Nos. 3-1, 3-2.

## SCOPE OF REVIEW

The use and entry of consent judgments has long been endorsed by the Supreme Court.  *See, e.g.*, *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971); *Swift & Co. v. United States*, 276 U.S. 311, 324-27 (1928).  The Second Circuit has similarly noted that there is a "strong federal policy favoring the approval and enforcement of consent decrees."  *SEC v. Wang*, 944 F.2d 80, 85 (1991).

As this Court noted in its Orders, in reviewing a consent judgment in an SEC enforcement case, the district court's role is to determine whether the proposed consent judgment is "fair and reasonable."  *SEC v. Citigroup Global Markets, Inc.*, 752 F.3d 285, 294 (2d Cir. 2014).  If the consent decree includes an injunction, as is the case here, the Court must also find that "the public interest would not be disserved" by the proposed injunctive relief.  *Id.* at 298 (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).  As the Second Circuit noted, "[t]he job of determining whether the proposed S.E.C. consent decree best serves the public interest, however, rests squarely with the S.E.C., and its decision merits significant deference."  *Id.* at 296.  As a result, "[a]bsent a substantial basis in the record for concluding that the proposed consent decree does not meet these requirements, the district court is required to enter the order."  *Id.* at 294.

SA5

## THE PROPOSED SETTLEMENTS SHOULD BE APPROVED

**Position of the SEC**

The proposed settlements in this case are fair, reasonable, and will serve the interests of the public and investors.  As a result, the proposed consent judgments meet the standard set forth by the Second Circuit and should be entered.

First, Mr. Musk has consented to the entry of a judgment that would permanently enjoin him from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Tesla has consented to entry of a judgment that would permanently enjoin it from violating Rule 13a-15 of the Exchange Act.  *See* Consent and Proposed Final Judgment as to Defendant Elon Musk, 1:18-cv-8865-AJN-GWG, Dkt. Nos. 6-1, 6-2; Consent and Proposed Final Judgment as to Defendant Tesla, Inc., 1:18-cv-8947-AJN-GWG, Dkt. Nos. 3-1, 3-2.

Section 21(d)(1) of the Exchange Act authorizes the SEC to seek such injunctive relief.  15 U.S.C. § 78u(d)(1).  These injunctions benefit investors "by reminding defendants that they must obey the law in the future," *SEC v. Clifton*, 700 F.2d 744, 748 (D.C. Cir. 1983), and enabling the Court to enforce compliance using its contempt power. *See SEC v. Bilzerian*, 112 F. Supp. 2d 12, 16 (D.D.C. 2000) ("The Court has both an inherent and statutory power to enforce compliance with its orders through the remedy of civil contempt."); *see also SEC v. Blinder, Robinson & Co., Inc.*, 855 F.2d 677, 680 (10th Cir. 1988) (endorsing the district court's finding that "the reason for the injunction was the ability of the enforcement agency to come to court and show a violation and to then have available the quick remedy of contempt").

SA6

Second, the proposed consent judgments order Mr. Musk and Tesla to pay significant civil penalties in the amount of $20,000,000 each.  *See* Consent and Proposed Final Judgment as to Defendant Elon Musk, 1:18-cv-8865-AJN-GWG, Dkt. Nos. 6-1, 6-2; Consent and Proposed Final Judgment as to Defendant Tesla, Inc., 1:18-cv-8947-AJN-GWG, Dkt. Nos. 3-1, 3-2.

Subject to the Court's approval, the SEC intends to distribute these penalties to affected investors.  The SEC is authorized to seek, and this Court is empowered to order, civil penalties pursuant to Section 21(d)(3) of the Exchange Act.  15 U.S.C. § 78u(d)(3).  Generally, civil penalties serve dual purposes of addressing prior alleged violations and also providing future deterrence.  *See, e.g., SEC v. Tourre*, 4 F. Supp. 3d 579, 597 (S.D.N.Y. 2014).

In this case, the SEC considered multiple factors in determining appropriate civil penalties.  These included the seriousness of the alleged violations, the market impact caused by the alleged conduct, and Defendants' financial means, but also countervailing factors such as Defendants' willingness to settle these actions promptly, Defendants' apparent lack of pecuniary gain, and the limited temporal scope of the conduct.

Finally, under the terms of the proposed consent judgments, Mr. Musk and Tesla have agreed to undertake a number of corporate governance measures specifically tailored to prevent future violations of the type alleged by the SEC here.  Pursuant to the Court's equitable powers, it may order such ancillary relief to effectuate the purposes of the federal securities laws.  *See SEC v. Am. Bd. of Trade, Inc.*, 830 F. 2d 431, 438 (2d Cir. 1987); 15 U.S.C. § 78u(d)(5) ("In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek,

**SA7**

and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.").

Specifically, Mr. Musk has agreed to undertakings requiring him to (a) resign from his role as Chairman of the board of directors of Tesla and not seek or accept reappointment as Chairman for a period of three years thereafter; (b) comply with all mandatory procedures implemented by Tesla regarding the (i) oversight of communications relating to the company made in any format, and (ii) pre-approval of written communications that contain, or reasonably could contain, information material to the company or its shareholders; and (c) certify, in writing, compliance with undertaking (a). *See* Consent and Proposed Final Judgment as to Defendant Elon Musk, 1:18-cv-8865-AJN-GWG, Dkt. Nos. 6-1, 6-2.

Relatedly, Tesla has agreed to undertakings requiring it to (a) appoint an independent Chairman of Tesla's board of directors to replace Mr. Musk and not to reappoint Musk to Chairman for a minimum of three years, and only then if such reappointment is approved by a majority vote of shareholders; (b) add two independent directors to Tesla's board of directors; (c) create a permanent committee of Tesla's board of directors, consisting of independent directors only, overseeing (i) implementation of the terms of the consent and final judgment; (ii) the controls and processes governing the company's and its senior executives' disclosures and/or public statements that relate to the company; and (iii) the review and resolution of human resources issues or issues raising conflicts of interest that involve any member of executive management; (d) employ or designate an experienced securities lawyer for so long as Tesla remains a reporting company under the Exchange Act; (e) implement mandatory procedures and

**SA8**

controls to oversee all of Mr. Musk's communications regarding the company made in any format; and (f) certify, in writing, compliance with the undertakings. *See* Consent and Proposed Final Judgment as to Defendant Tesla, Inc., 1:18-cv-8947-AJN-GWG, Dkt. Nos. 3-1, 3-2.

These comprehensive undertakings are designed to benefit investors by putting additional corporate governance measures in place. Moreover, entry of the proposed consent judgments would ensure that these agreed-upon measures are implemented promptly, rather than at the conclusion of litigation, if at all.

**Position of Tesla and Mr. Musk**

Tesla and Mr. Musk believe that a prompt resolution of these actions through settlement is in the best interests of investors and should be approved.

\*                    \*                    \*

For all the reasons stated, the parties respectfully submit that the Court approve and enter the proposed consent judgments.

Dated: October 10, 2018

Cheryl L. Crumpton
U.S. Securities and Exchange
Commission
100 F Street, N.W.
Washington, D.C. 20549

Steven M. Farina
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

*Counsel for Elon Musk*

Bradley J. Bondi
Cahill Gordon & Reindel LLP
1990 K Street, N.W., Suite 950
Washington, D.C. 20006

*Counsel for Tesla, Inc.*

**SA9**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 1:18-cv-08865-AJN** |
| **ELON MUSK,** | |
| **Defendant.** | |

## DEFENDANT ELON MUSK'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO QUASH & TO TERMINATE CONSENT DECREE

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................... 1

II.     BACKGROUND .................................................................................................... 2

III.    LEGAL STANDARD ............................................................................................ 4

        A.      Motion To Quash. ..................................................................................... 4

        B.      Motion To Terminate Consent Decree. ..................................................... 6

IV.     ARGUMENT .......................................................................................................... 6

        A.      The Challenged Requests Should Be Quashed Because The SEC
                Lacks Authority To Issue A Subpoena Based On The Consent Decree
                Rather Than The Securities Laws. ............................................................. 7

                1.      An Administrative Subpoena Must Be Supported By A
                        Legitimate Investigatory Purpose. ................................................. 8

                2.      The Securities Laws Do Not Supply A Legitimate Basis For
                        The Challenged Requests. ............................................................... 9

                3.      The SEC Cannot Issue Administrative Subpoenas To
                        Investigate Compliance With The Judgments In This Case. ......... 14

        B.      The Challenged Requests Should Be Quashed Because The Subpoena
                Was Issued In Bad Faith. ......................................................................... 16

        C.      The Consent Decree Should Be Terminated Or At Least Modified. ......... 20

                1.      The SEC's Exploitation Of The Consent Decree Has Made
                        Compliance Onerous And Unworkable. ........................................ 20

                2.      The SEC Has Used The Consent Decree To Police First
                        Amendment Speech. ...................................................................... 21

                3.      The Equities Strongly Favor Termination. .................................... 24

V.      CONCLUSION ...................................................................................................... 25

**SA11**

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ayers v. SEC*,
  482 F.Supp. 747 (D. Mont. 1980) ................................................................. 17

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ........................................................................................ 22

*Carson v. Simon*,
  978 F.3d 1051 (8th Cir. 2020) ..................................................................... 21

*Coffey v. Braddy*,
  834 F.3d 1184 (11th Cir. 2016) ..................................................................... 6

*Cohen v. California*,
  403 U.S. 15 (1971) ....................................................................................... 23

*Consumer Health Info. Corp. v. Amylin Pharms., Inc.*,
  54 F. Supp. 3d 1001 (S.D. Ind. 2014) .......................................................... 25

*EEOC v. Federal Home Loan Mtg. Corp.*,
  37 F. Supp. 2d 769 (E.D. Va. 1999) ............................................................. 14

*EEOC v. Hearst Corp.*,
  103 F.3d 462 (5th Cir. 1997) ........................................................................ 14

*EEOC v. Tire Kingdom, Inc.*,
  80 F.3d 449 (11th Cir. 1996) .......................................................................... 5

*EEOC. v. Loc. 40, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Joint Apprenticeship Comm., Iron Workers Locs. 40 & 361 & Allied Bldg. Metal Indus.*,
  76 F.3d 76 (2d Cir. 1996) ............................................................................. 24

*FDIC v. Garner*,
  126 F.3d 1138 (9th Cir. 1997) ........................................................................ 5

*Frew ex rel. Frew v. Hawkins*,
  540 U.S. 431 (2004) ...................................................................................... 16

*Grenda v. SEC*, 2017 WL 4053821 (W.D.N.Y. Sept. 14, 2017) .............................. 17

*Hampton v. Steen*,
  No. 2:12-cv-00470-SU, 2014 WL 2949302 (D. Or. June 27, 2014) ............... 5

*In re Anonymous Online Speakers*,
  661 F.3d 1168 (9th Cir. 2011) .................................................................. 21

*In re Proquest Sec. Litig.*,
  527 F. Supp. 2d 728 (E.D. Mich. 2007) .................................................... 10

*In the Matter of Altaba Inc., f/d/b/a Yahoo! Inc.*,
  Release No. 3937 (S.E.C., Apr. 24, 2018) ........................................... 10, 12

*In the Matter of China-Biotics, Inc.*,
  Release No. 70800 (S.E.C., Nov. 4, 2013) ................................................ 10

*In the Matter of First Am. Fin. Corp.*,
  Release No. 92176 (S.E.C., June 14, 2021) ............................................... 12

*In the Matter of Talon Real Est. Holding Corp.*,
  Release No. 87614 (S.E.C., Nov. 25, 2019) .............................................. 10

*Int'l Waste Controls, Inc. v. SEC*,
  362 F. Supp. 117 (S.D.N.Y. 1973) ............................................................ 19

*Kaufman and Broad–South Bay v. Unisys Corp.*,
  822 F.Supp. 1468 (N.D. Cal. 1993) ........................................................... 25

*Lorain NAACP v. Lorain Bd. of Educ.*,
  979 F.2d 1141 (6th Cir. 1992) ................................................................... 24

*Mallory v. Eyrich*,
  922 F.2d 1273 (6th Cir. 1991) ................................................................... 24

*Nehmer v. U.S. Dep't of Veterans Affs.*,
  494 F.3d 846 (9th Cir. 2007) ..................................................................... 16

*Oklahoma Press Pub. Co. v. Walling*,
  327 U.S. 186 (1946) ..................................................................................... 8

*Packingham v. North Carolina*,
  137 S. Ct. 1730 (2017) ............................................................................... 21

*Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*,
  13 F.3d 33 (2d Cir. 1993) ............................................................................ 6

*Philippine Export v. Chuidian*,
  218 Cal.App.3d 1058 (1990) ...................................................................... 25

*Resol. Tr. Corp. v. Walde*,
  18 F.3d 943 (D.C. Cir. 1994) ....................................................................... 8

*Rich & Whillock, Inc. v. Ashton Dev., Inc.*,
  157 Cal.App.3d 1154 (1984) ...................................................................... 25

*RNR Enters., Inc. v. SEC*,
  122 F.3d 93 (2d Cir. 1997) ........................................................................... 5

SA13

*RTC v. Thornton*,
41 F.3d 1539 (D.C. Cir. 1994) ....................................................................... 15

*Rufo v. Inmates of the Suffolk Cty Jail*,
502 U.S. 367 (1992) ........................................................................ 6, 20, 21, 22

*SEC v. ESM Gov't Sec., Inc.*,
645 F.2d 310 (5th Cir. 1981) .............................................................................. 5

*SEC v. Brigadoon Scotch Distrib.*,
480 F.2d 1047 (2d Cir. 1973) ................................................................... 5, 8, 17

*SEC v. Facebook, Inc.*,
3:19-cv-04241 (N.D. Cal. Aug. 22, 2019) ........................................................ 12

*SEC v. Jerry T. O'Brien, Inc.*,
467 U.S. 735 (1984) ........................................................................................ 4, 7

*SEC v. Musk*,
1:18-cv-8865 (S.D.N.Y.) ............................................................................. 3, 17

*SEC v. Sears*,
No. 05-728-JE, 2005 WL 5885548 (D. Or. July 28, 2005) ............................... 5

*SEC v. Tesla*,
1:18-cv-8947 (S.D.N.Y.) ................................................................. 2, 3, 17, 18

*SEC v. Waymack*,
358 F. Supp. 3d 56 (D.D.C. 2019) ..................................................................... 5

*SEC v. Wheeling-Pittsburgh Steel Corp.*,
648 F.2d 118 (3d Cir. 1981) ....................................................................... 13, 17

*U.S. for Use and Benefit of Reed v. Callahan*,
884 F.2d 1180 (9th Cir. 1989) ......................................................................... 25

*United States v. Constr. Prod. Rsch., Inc.*,
73 F.3d 464 (2d Cir. 1996) .............................................................................. 16

*United States v. Eastman Kodak Co.*,
63 F.3d 95 (2d Cir. 1995) ................................................................................ 20

*United States v. Fensterwald*,
553 F.2d 231 (D.C. Cir. 1977) ......................................................................... 19

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) ........................................................................................... 8

*United States v. Powell*,
379 U.S. 48 (1964) ..................................................................................... 4, 5, 7

*United States v. Quattrone*,
402 F.3d 304 (2d Cir. 2005) ............................................................................ 22

**SA14**

*United States v. Sec'y of Hous. & Urban Dev.*,
239 F.3d 211 (2d Cir. 2001)................................................................................6

*Waste Mgmt. of Ohio, Inc. v. City of Dayton*,
132 F.3d 1142 (6th Cir. 1997)...........................................................................24


**STATUTES**

15 U.S.C. § 78a.....................................................................................................10

15 U.S.C. §§ 78u(a), (b).........................................................................................8


**RULES**

17 C.F.R. § 240.13a-15(e)..................................................................................9, 10

Fed. R. Civ. P. 60(b)..........................................................................................6, 20

The Commission's Guidance on the Use of Company Web Sites,
73 Fed. Reg. 45862-01 (Aug. 1, 2008) ...............................................................11


**OTHER AUTHORITIES**

Dave Michaels, *SEC Probes Trading by Elon Musk and Brother in Wake of Tesla CEO's Sales*,
Wall St. J. (Feb. 24, 2022 2:22 pm ET), https://www.wsj.com/articles/sec-probes-trading-by-elon-musk-and-brother-in-wake-of-tesla-ceos-sales-11645730528 ..............19

Elon Musk (@elonmusk), Twitter (Feb. 26, 2019, 4:25 am PT),
https://twitter.com/elonmusk/status/1100371207491248128 .......................................23

Elon Musk (@elonmusk), Twitter (July 2, 2020, 11:50 am PT),
https://twitter.com/elonmusk/status/1278762916326649863 .......................................23

Elon Musk (@elonmusk), Twitter (July 2, 2020, 11:57 am PT),
https://twitter.com/elonmusk/status/1278764736876773383 .......................................23

Elon Musk (@elonmusk), Twitter (Oct. 4, 2018, 1:16 pm PT),
https://twitter.com/elonmusk/status/1047943670350020608 .......................................23

Molly Ball, Jeffrey Kluger & Alejandro De La Garza, *2021 Person of the Year: Elon Musk*,
Time (Dec. 13, 2021), https://time.com/person-of-the-year-2021-elon-musk/...............22

SEC Div. of Enforcement,
Enforcement Manual 3.1.3.....................................................................................15

**SA15**

# I.   INTRODUCTION

On February 24, 2022, this Court invited Defendants to move to quash the Securities and Exchange Commission's ("SEC" or "Commission") subpoena.  *See* Dkt. No. 65.[1]  Mr. Musk now respectfully does so.

Through its subpoena dated November 29, 2021, the SEC demands Mr. Musk produce documents pertaining to (1) the review or pre-approval of statements he posted on Twitter and (2) his sale of Tesla stock or options.  *See* Exhibit A (Elon Musk Subpoena, *In the Matter of Tesla, Inc.* (SF-4496)).  Mr. Musk respectfully moves this Court to quash the subpoena with respect to the first category of requests pertaining to the review or pre-approval of his tweets (the "Challenged Requests").  These demands have no basis in the securities laws and, insofar as they seek information pertaining to the consent judgment issued by Your Honor, the SEC has no authority to act absent this Court's authorization.  Moreover, the SEC issued the Challenged Requests in bad faith as part of a concerted campaign to target and silence Mr. Musk's speech on matters of public concern.  Accordingly, Mr. Musk respectfully requests that this Court quash the Challenged Requests.

Mr. Musk further moves to terminate the consent decree entered in this case.  Dkt. No. 14.  The equities strongly favor terminating the consent decree, which the SEC has used to trample on Mr. Musk's First Amendment rights and to impose prior restraints on his speech. Contrary to the SEC's conception, the consent decree is not a charter for subjecting Mr. Musk to unwarranted scrutiny for exercising his constitutional right to speak his mind in public.  The SEC is using its near limitless resources to further chill Mr. Musk's First Amendment rights via

---

[1]   Unless otherwise indicated, docket references refer to the docket in this case, *SEC v. Musk.*

**SA16**

endless investigations outside the bounds of law. It follows that the consent decree should be terminated, or, at a minimum, modified to remove the prior restraint on Mr. Musk's free speech.

## II. BACKGROUND

Over the past four years, the SEC has subjected Tesla, Inc. ("Tesla") and Mr. Musk to unrelenting investigation into Mr. Musk's First Amendment expression. In 2018, the SEC brought actions for securities fraud against Mr. Musk and Tesla regarding statements Mr. Musk made on his Twitter account. Dkt. No. 1; *SEC v. Tesla*, 1:18-cv-8947 (S.D.N.Y.), Dkt. No. 1. Mr. Musk felt "forced to sign the consent decree in 2018 [when] Tesla was a less mature company and the SEC's action stood to jeopardize the company's financing. Defending against the SEC's action through protracted litigation was not in the interests of the company and its shareholders." Declaration of Elon Musk, filed concurrently herewith, at ¶ 4.

On October 16, 2018, this Court issued a final judgment requiring Mr. Musk to obtain pre-approval of any written communications that contain, or reasonably could contain, information material to Tesla or its shareholders. Dkt. No. 14. Tesla, for its part, agreed to implement mandatory procedures and controls to provide oversight of Mr. Musk's communications about the company and require pre-approval by Mr. Musk, of communications that contain or reasonable could contain, information material to Tesla or its shareholders. *Tesla*, Dkt. Nos. 3, 14. On April 30, 2019, pursuant to a consent motion from both parties, this Court issued an amended judgment delineating specific topics for which Mr. Musk is required to obtain preapproval before issuing a written communication. Dkt. No. 47. The Amended Judgment further provided "that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of the Final Judgment, as amended by this Order." *Id.* at 2; *Tesla*, Dkt. No. 17 at 2.

**SA17**

On November 6, 2021 at 12:17 pm PT, in direct response to well-publicized proposals for revising the federal tax code and criticism directed at him, Mr. Musk tweeted a question: "Much is made lately of unrealized gains being a means of tax avoidance, so I propose selling 10% of my Tesla stock.  Do you support this?"  Elon Musk (@elonmusk), Twitter (Nov. 6, 2021, 12:17 pm PT), https://twitter.com/elonmusk/status/1457064697782489088 [hereinafter "12:17 pm Tweet"].  At 12:23 pm PT, he tweeted, "I will abide by the results of this poll, whichever way it goes."  Elon Musk (@elonmusk), Twitter (Nov. 6, 2021, 12:23 pm PT), https://twitter.com/elonmusk/status/1457066048944066565 [hereinafter "12:23 pm Tweet"].  Ultimately, 57.9% of the votes (3,519,252 in total) voted "yes."  *See supra*, 12:17 pm Tweet.

On November 16, 2021, the SEC served Tesla with a subpoena.  Exhibit B (Tesla Subpoena, *In the Matter of Tesla, Inc.* (SF-4496)).  In part, the Tesla Subpoena seeks information relating to whether Mr. Musk sought and obtained approval from Tesla before he posted the November 6, 2021 tweets, and if and how Tesla has complied with the judgment and amended judgment in this case.  For example, Demand 7 of the Tesla Subpoena requires:

> From April 30, 2019 to the present, all Documents and Communications Concerning Elon Musk's compliance or non-compliance with Tesla's disclosure controls and procedures, executive communications policy, external communications policy, other policies or procedures relating to public statements or communications by Tesla executives, or the final judgment or amended final judgment in *SEC v. Musk*, 1:18-cv-8865-AJN (S.D.N.Y.).

Ex. B at 5.  Demand 10 similarly requires "From April 30, 2019 to the present, all Documents and Communications Concerning Tesla's compliance or non-compliance with the final judgment or amended final judgment in *SEC v. Tesla*, 1:18-cv-8947-AJN (S.D.N.Y.)."  *Id.*

On November 29, 2021, the SEC issued a similar subpoena to Mr. Musk.  Ex. A. Demand 3 of the Musk Subpoena directs Mr. Musk to produce "All Documents and Communications Concerning" the 12:17 and 12:23 tweets.  Ex. A. at 4.  Demand 4 requests

**SA18**

"Documents related in any way to submission of the 12:17 tweet and/or the 12:23 tweet to Tesla's General Counsel or Securities Counsel, or any counsel acting in either capacity, for pre-approval or review before they were published." *Id.*

The next day, through counsel, Mr. Musk and Tesla produced to the SEC a privilege log addressing these requests. Exhibit C (Privilege Log sent from A. Spiro to R. Andrews Nov. 30, 2021). Nevertheless, over the following months the SEC has continued to demand the production of further documents, even as Tesla has produced approximately 1,000 documents in response to the SEC's investigation. Mr. Musk has not produced any documents personally.

This subpoena is but one in a winding parade of investigations into Mr. Musk and companies in which he holds leadership roles or financial stakes, conducted seriatim and without factual basis by the SEC. *See infra* at 17–18. The SEC's previous attempts to obtain information from Tesla and Mr. Musk have not yielded a shred of evidence that either violated the securities laws. The SEC has nevertheless repeatedly attempted to tarnish Tesla's and Mr. Musk's records with repeated, unfounded investigations. As the SEC returns again and again to seek the same information relating to compliance with the consent decree entered by this Court, it has become all too clear that it is trying to end-run the Court's supervision.

## III. LEGAL STANDARD

### A. Motion To Quash.

In a proceeding to quash an administrative subpoena, the district court's role is limited. *See SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 741 (1984).[2] However, because "[i]t is the court's process which is invoked to enforce the administrative summons[,] a court may not permit its process to be abused." *United States v. Powell*, 379 U.S. 48, 58 (1964). Accordingly,

---

[2] Unless otherwise indicated, this brief omits from quotations and citations all internal quotation marks, footnotes, and citations.

the court must satisfy itself "(1) that the investigation will be conducted pursuant to a legitimate purpose, (2) that the inquiry may be relevant to the purpose, (3) that the information sought is not already within the Commissioner's possession, and (4) that the administrative steps required . . . have been followed." *RNR Enters., Inc. v. SEC*, 122 F.3d 93, 96–97 (2d Cir. 1997) (quoting *Powell*, 379 U.S. at 57–58); *see also EEOC v. Tire Kingdom, Inc.*, 80 F.3d 449, 450 (11th Cir. 1996) (requiring that the administrative agency's investigation is within the agency's authority); *FDIC v. Garner*, 126 F.3d 1138, 1142 (9th Cir. 1997) (same).

Moreover, a court may quash or refuse to enforce an administrative subpoena if the target demonstrates that the agency has issued the subpoena for an improper purpose or in bad faith, such as to harass the individual from whom information was sought, to pressure the party to settle a collateral dispute, or "for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58; *see also SEC v. Brigadoon Scotch Distrib.*, 480 F.2d 1047, 1056 (2d Cir. 1973) ("[W]hile the SEC is entitled to great freedom in conducting its investigations, it is not at liberty to act unreasonably, and in appropriate circumstances the court may inquire into the reasons for an investigation and into its effects."); *SEC v. ESM Gov't Sec., Inc.*, 645 F.2d 310, 315 (5th Cir. 1981) (rejecting the view that agency "abuse of process" should be "rigidly defined" and denying improper enforcement of SEC subpoena); *SEC v. Waymack*, 358 F. Supp. 3d 56, 65 (D.D.C. 2019) (finding it "unreasonable to require production of all documents with [overbroad] terms even for a limited time period"); *SEC v. Sears*, No. 05-728-JE, 2005 WL 5885548, at *1 (D. Or. July 28, 2005) ("harassment or to pressure [a] person to settle a collateral dispute" are improper purposes); *cf. Hampton v. Steen*, No. 2:12-cv-00470-SU, 2014 WL 2949302, at *5–10 (D. Or. June 27, 2014) (subpoena under Federal Rule of Civil

Procedure 45 may be quashed when "served for the purpose of annoying and harassment and not really for the purpose of getting information").

### B. Motion To Terminate Consent Decree.

A district court has inherent authority to terminate or modify a consent decree. *See Rufo v. Inmates of the Suffolk Cty Jail*, 502 U.S. 367, 381, 381 n. 6 (1992). "[A] district court may modify or terminate a consent decree, subject to abuse-of-discretion review, if changed circumstances have caused compliance with the decree to become substantially more onerous, have rendered the decree impracticable, or have caused its continued enforcement to be inimical to the public interest." *Coffey v. Braddy*, 834 F.3d 1184, 1193 (11th Cir. 2016); *see also Rufo*, 502 U.S. at 381. "[A]ny showing of a significant change in factual conditions or law would justify a modification of a decree." *Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*, 13 F.3d 33, 37 (2d Cir. 1993) (applying a "flexible standard"). "[A] court of equity [is entitled] to focus on the dominant objective of the decree and to terminate the entire decree once that objective has been reached." *Id.* at 39; *see also* Fed. R. Civ. P. 60(b) (a "court may relieve a party or its legal representative from a final judgment . . . [if] the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable"); *United States v. Sec'y of Hous. & Urban Dev.*, 239 F.3d 211, 216–17 (2d Cir. 2001) (documenting the "significant relaxation of the restrictions imposed on District Courts seeking to modify consent decrees").

## IV. ARGUMENT

The SEC has spent the past five months devoting its formidable resources to investigating Mr. Musk and Tesla, much as it has spent the past four years doing the same under varying auspices. The November 29, 2021 subpoena's requests for Mr. Musk to produce information

SA21

solely regarding the judgments overseen by this Court cross the line. The Challenged Requests seek information not pursuant to any legitimate enforcement of the securities laws, but rather information solely under the purview of this Court. Worse yet, the SEC's unrelenting stream of investigations into Mr. Musk and companies in which Mr. Musk holds leadership roles or financial stakes demonstrates that the SEC has been proceeding in bad faith. The Challenged Requests should be quashed.

What is more, the consent decree should be terminated because compliance with it has become impossible under the SEC's skewed conception of its authority. Nothing less than First Amendment freedoms are imperiled. The more the SEC monitors Mr. Musk's Twitter activity, and forces others to do the same, the more Mr. Musk's freedom of expression is infringed. Especially considering that Mr. Musk had no choice but to sign the consent as he did in 2018, the equities now compel termination of the consent decree.

### A. The Challenged Requests Should Be Quashed Because The SEC Lacks Authority To Issue A Subpoena Based On The Consent Decree Rather Than The Securities Laws.

To defeat a motion to quash an administrative subpoena, the SEC "must show that the investigation will be conducted pursuant to a legitimate purpose." *Powell*, 379 U.S. at 57–58. It cannot do so here. It is black-letter law that the SEC "has statutory authority to conduct nonpublic investigations into possible violations of the securities laws and, in the course thereof, to issue subpoenas to obtain relevant information." *Jerry T. O'Brien*, 467 U.S. at 737. What the SEC may not do is use its status as a powerful regulatory body to harass individuals. Nor may the agency expand its investigatory authority by invoking the orders issued by this Court, even as it simultaneously evades this Court's jurisdiction to enforce those orders. The SEC's interpretation of its authority under the securities laws would give it license to evade court supervision of every consent decree it enters—a reading that is untenable.

**SA22**

1.   **An Administrative Subpoena Must Be Supported By A Legitimate Investigatory Purpose.**

"[A] governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).  And "while the SEC is entitled to great freedom in conducting its investigations, it is not at liberty to act unreasonably, and in appropriate circumstances the court may inquire into the reasons for an investigation and into its effects." *Brigadoon Scotch Distrib. Co.*, 480 F.2d at 1056.  As the Supreme Court has made clear, "[p]ersons from whom [an agency] seeks relevant information are not required to submit to [the agency's] demand, if in any respect it is unreasonable or overreaches the authority Congress has given." *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 217 (1946).  The D.C. Circuit has recognized that this principle applies with even greater force when an agency issues a subpoena to an individual, rather than a corporation. *See Resol. Tr. Corp. v. Walde*, 18 F.3d 943, 949 (D.C. Cir. 1994) (recognizing that cases that have permitted "agencies the greatest latitude in seeking the information they deem relevant to their duties . . . involve corporations rather than individuals," and noting that "[t]he Supreme Court reminds us that 'corporations can claim no equality with individuals in the enjoyment of a right to privacy'") (quoting *Morton Salt*, 338 U.S. at 652).

The Exchange Act empowers the SEC only to "make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this chapter [or] the rules or regulations thereunder" and only to demand to see any papers "the Commission deems relevant or material to the inquiry."  15 U.S.C. §§ 78u(a), (b). To compel a person or entity to provide documentary or testimonial evidence in an investigation, the Commission must first authorize its staff to issue subpoenas by entering a formal order of

**SA23**

investigation.  A formal order of investigation outlines the scope of the investigation that the Commission has authorized and identifies the relevant statutes and rules that might have been violated.  As such, any legitimate investigatory purpose must be identified in a formal order.

> **2.    The Securities Laws Do Not Supply A Legitimate Basis For The Challenged Requests.**

The formal order of investigation in this case provides no basis for the Challenged Requests.  The formal order identifies that the judgments in this case enjoined Tesla from violating Rule 13a-15 of the Exchange Act.  Exhibit D at 1 (Formal Order of Investigation, SF-4496) (citing Dkt. Nos. 14, 17).  It then lists three possible securities laws violations, only one of which, Rule 13a-15, the SEC asserts relates to review or pre-approval of Mr. Musk's Twitter activity.  *Id.* at 1–2.  In our communications with SEC staff, they have insisted that Rule 13a-15 provides a basis for their investigation into Mr. Musk's tweets.  But Rule 13a-15 does not provide a general license to the SEC to investigate communications beyond those related to reports filed or submitted under the Exchange Act.  Nor does the rule allow the SEC to monitor compliance with the consent decree absent court supervision.

> **a)    Rule 13a-15 Applies To Disclosures In Securities Act Reports, Not Any And All Public Communications.**

Rule 13a-15 concerns "disclosure controls and procedures" specifically relating to reports filed or submitted under the Exchange Act.  17 C.F.R. § 240.13a-15(e).  It has nothing to do with review or pre-approval of executive communications.  While both the judgments in this matter and Rule 13a-15(e) use the phrase "disclosure controls and procedures," the securities laws limit the Rule 13a-15 requirement to companies' policies and procedures specifically ensuring accuracy of the reports a company submits under the Exchange Act.  Rule 13a-15(e) states:

> For purposes of this section, the term *disclosure controls and procedures* means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer *in the reports that*

9

**SA24**

> *it files or submits under the Act* is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms.

*Id.* (first emphasis in original) (citing 15 U.S.C. 78a *et seq.*).

Courts have applied this definition uniformly. *See, e.g.*, *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 742 n.8 (E.D. Mich. 2007) (citing SEC Rule 13a–15(e)) ("The Sarbanes-Oxley Act provides the following definition of disclosure controls and procedures: Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer *in the reports that it files or submits under the Act* is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosures.") (emphasis added); *In the Matter of China-Biotics, Inc.*, Release No. 70800, at *10 n.40 (S.E.C., Nov. 4, 2013) ("Exchange Act Rule 13a-15(e), 17 C.F.R. § 240.13a-15(e), defines 'disclosure controls and procedures' as controls and procedures 'designed to ensure that information required *to be disclosed by an issuer in [its Exchange Act] reports* . . . is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms.'") (emphasis added); *In the Matter of Altaba Inc., f/d/b/a Yahoo! Inc.*, Release No. 3937, at *8 (S.E.C., Apr. 24, 2018): (similar); *In the Matter of Talon Real Est. Holding Corp.*, Release No. 87614, at *6 n.30 (S.E.C., Nov. 25, 2019) (similar).

Rule 13a-15 does not bestow a roving license for the SEC to investigate any and all "disclosure controls and procedures" it identifies. As the SEC has repeatedly recognized in its own proceedings, *see supra*, Rule 13a-15 concerns "disclosure controls and procedures" specifically relating to reports filed or submitted under the Exchange Act—quite different from all the countless instances in which information may be disclosed, via Twitter or otherwise.

10

**SA25**

Indeed, the 12:17 and 12:23 tweets did not include any information that Tesla would be required to disclose under the securities laws.  In the 12:17 tweet, Mr. Musk commented on a hot-button political issue, then posed a question.  12:17 pm Tweet ("Much is made lately of unrealized gains being a means of tax avoidance, so I propose selling 10% of my Tesla stock. Do you support this?").  In the 12:23 tweet, Mr. Musk simply confirmed "I will abide by the results of this poll, whichever way it goes."  12:23 pm Tweet.  A public poll is a way to gather information; it is not a disclosure of information, much less information a company would have to report in SEC filings.  To the extent that the ultimate sale of the shares required that Mr. Musk file a Form 4, that obligation fell on Mr. Musk personally, not on Tesla.  In sum, Rule 13a-15 has no conceivable application to the tweets in question.

Lest there be any doubt, SEC guidance expressly provides that disclosure controls and procedures requirements do *not* apply to online disclosures of information that are not disclosures pursuant to the Exchange Act.  That is, the Commission itself recognizes that disclosure controls and procedures are required only for Exchange Act reporting.  The Commission's Guidance on the Use of Company Web Sites, 73 Fed. Reg. 45862-01, 45873 at *17 (Aug. 1, 2008), explains that companies may post Exchange Act disclosure information on their websites instead of supplying it directly to the SEC.  If they do so, disclosure controls and procedures apply to that information, because "it is information required to be disclosed by the company in Exchange Act reports."  *Id.*  But "disclosure controls and procedures do not apply to other disclosures of information on a company's Web site.  This means that the principal executive officer and principal financial officer will not be disclosing their conclusions regarding the effectiveness of any controls that a company may have in place regarding its Web site

11

**SA26**

disclosure of information, other than those controls with respect to information that is posted as an alternative to being provided in an Exchange Act report." *Id.* at 45874.

The SEC's history of enforcement under Rule 13a-15 confirms that the Rule applies solely to weaknesses in controls or procedures that are tied directly to public SEC filings and/or a dearth of company policies to guard against the risk of misrepresentations or omissions in those filings. *See, e.g., In the Matter of Altaba Inc., f/d/b/a Yahoo! Inc.*, at *8 (Yahoo violated Rule 13a-15 when it learned of a data breach and did not disclose the breach in its public filings for nearly two years); *SEC v. Facebook, Inc.*, 3:19-cv-04241, Dkt. No. 11 (N.D. Cal. Aug. 22, 2019) (SEC alleged Facebook violated Rule 13a-15 with a misleading characterization of the risk of misuse of users' data in its 10-K and 10-Q filings following Facebook's work with Cambridge Analytica); *In the Matter of First Am. Fin. Corp.*, Release No. 92176, at *6 (S.E.C., June 14, 2021) (First American violated Rule 13a-15 when it learned about a cybersecurity vulnerability in its title and escrow document management software, but did not remedy the vulnerability before a major data leak and failed to disclose the leak in its Form 8-K). The rule simply does not apply to disclosures outside of public Exchange Act filings.

> **b)** **The Commission's Attempt To Recast Rule 13a-15 As A Tool To Avoid Court Supervision Of The Consent Decree Is Unpersuasive.**

In an attempt to justify its continued investigation of Mr. Musk's constitutionally protected speech without coming to this Court, the Commission turns to the argument that it may investigate compliance with the consent decree under auspices of investigating Tesla's statements in SEC filings to the effect that Tesla is complying with the consent decree. That is, the Commission believes it may invoke the securities laws to subpoena information from Mr. Musk simply because Tesla has made statements about the consent decree in its 10-Qs and 10-Ks. Yet all Tesla has ever said in its filing is that it will "continue to comply with the terms

**SA27**

and requirements of the settlement." *See, e.g.*, Tesla, Annual Report (Form 10-K) (Feb. 4, 2022) at 26; Tesla, Quarterly Report (Form 10-Q) (Oct. 25, 2021) at 56; Tesla, Quarterly Report (Form 10-Q) (Jul. 27, 2021) at 56; Tesla, Quarterly Report (Form 10-Q) (Apr. 27, 2021) at 52; Tesla, Annual Report (Form 10-K) (Feb. 8, 2021) at 25; Tesla, Annual Report (Form 10-K) (Feb. 13, 2020) at 31. That statement does not give rise to the SEC's claimed authority to therefore investigate any and all facts concerning Mr. Musk's compliance with the decree.

First, whether or not *Tesla* preapproved Mr. Musk's tweet has nothing to do with Tesla's compliance with the consent decree in its matter, *Tesla*, Dkt. Nos. 3, 14. Indeed, the judgment and amended judgment Tesla agreed to merely require the company to undertake certain tasks— all of which were done years ago—including *implement* mandatory procedures and controls to oversee Mr. Musk's communications and require preapproval. *Id.* at 4. If *Mr. Musk* fails to seek preapproval of a tweet, Tesla's compliance is not impugned.

Second, this amounts to a telling admission that the SEC believes it can make an end-run around this Court and unilaterally investigate compliance specifically with this decree whenever it feels the urge to do so, without ever checking with the Court. Indeed, the SEC's theory of its authority threatens to render meaningless the Court's essential role in superintending its decree. *See Roberson v. Giuliani*, 346 F.3d 75, 80 (2d Cir. 2003) ("[C]ourts have inherent power to enforce the terms of such a decree because they constitute court orders."); *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 (3d Cir. 1981) (observing that while "courts must not interfere unduly in the administrative process . . . our primary concern is with the integrity of the judicial process"). Because companies in Tesla's position must regularly update investors on their compliance efforts, the SEC is arrogating to itself unilateral, unchecked license to investigate the particulars of consent-decree compliance however it pleases by the simple

**SA28**

expedient of claiming to be investigating such compliance *as set forth in one or another SEC filing*.

In sum, Mr. Musk's tweets at issue here are not Exchange Act financial reports—they were a public poll, indeed, a question—and the SEC cannot properly invoke Rule 13a-15 to monitor Mr. Musk's Twitter activity based on the mere fact the consent decree is referenced in SEC filings.

### 3. The SEC Cannot Issue Administrative Subpoenas To Investigate Compliance With The Judgments In This Case.

Nor can the Commission invoke the consent decree itself as imbuing it with authority to issue its own administrative subpoenas to investigate compliance. Your Honor's previous orders "retain jurisdiction of this matter for the purposes of enforcing the terms of the Final Judgment." ECF 47; *see also* ECF 14 ("[T]his Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment."). By specifically referring to the judgments in this case in its subpoena to Tesla and seeking documents from Mr. Musk pertaining to review or pre-approval of his tweets, the SEC seeks to circumvent the jurisdiction of this Court as it unilaterally grasps for documents pertaining specially to the consent decree.

The Commission may not use an administrative subpoena to investigate matters that relate only to the consent decree and do not concern the securities laws. Were the Commission able to bypass the limitations, discussed above, of Section 13(a) of the Exchange Act under the mistaken assumption that every violation of a consent decree is a violation of the securities laws themselves, it would render the concept of a court-supervised settlement a nullity.

Moreover, agencies are not authorized to use their investigative power in aid of litigation that has already commenced. *See EEOC v. Hearst Corp.*, 103 F.3d 462 (5th Cir. 1997); *EEOC v. Federal Home Loan Mtg. Corp.*, 37 F. Supp. 2d 769, 772–74 (E.D. Va. 1999). In *RTC v.*

**SA29**

*Thornton*, the D.C. Circuit stated clearly: "We must emphasize that a subpoena is a tool of investigation." 41 F.3d 1539, 1546 (D.C. Cir. 1994). Absent clear authorization from Congress that an agency may use a tool in ongoing litigation, such authority would "bestow a power that conflicts with two long-standing principles limiting the use of legal process to investigate, and discover." *Id.* Analogizing to the grand jury, the D.C. Circuit reasoned that the authority to issue a subpoena in connection with litigation "conflicts with the general principle that an investigation terminates once suit has been filed" and explained that "the [] far-reaching power asserted by the RTC here—a power that effectively would allow the RTC to use subpoenas in aid of ongoing litigation—is utterly foreign to the law defining the traditional scope of investigative authority." *Id.* at 1546–47 (collecting cases). *See also* SEC Div. of Enforcement, Enforcement Manual 3.1.3, at 33 ("[S]taff should not use investigative subpoenas solely to conduct discovery with respect to claims alleged in the pending complaint. A court might conclude that the use of investigative subpoenas solely to conduct discovery is a misuse of the SEC's investigative powers and circumvents the court's authority and the limits on discovery in the Federal Rules of Civil Procedure.").

The Commission itself recognized that this Court, not the agency, wields ongoing authority to monitor compliance with the consent decree when, in 2019, the Commission submitted briefing to this Court under the heading "Authority to Enforce [The Consent] Order Is Vested with the Court, Not the SEC." ECF 30 at 13. The Commission continued, "[e]nforcement of the provisions of the Court's order does not depend on the SEC's statutory authority to bring injunctive action or on any authority of the SEC at all. Rather, this Court has broad equitable powers to enforce the terms of its order . . . ." *Id.* (collecting sources). Nothing has changed between 2019, when the SEC relied on this Court's authority to enforce the consent

15

**SA30**

decree rather than its statutory authority, and now, when it seeks to enforce the decree without so much as apprising the Court.

The Supreme Court has made clear that "[f]ederal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004). In 2007, the Ninth Circuit properly rebuffed an attempt by the Veterans' Affairs agency to enforce terms of a consent decree by regulation because it divested the district court of jurisdiction. *Nehmer v. U.S. Dep't of Veterans Affs.*, 494 F.3d 846, 860 (9th Cir. 2007). Explaining that a district court has "inherent authority" over a consent decree it has issued, such jurisdiction "presupposes that it, and not a party before it, is the principal and proper arbiter with the responsibility to interpret the decree and oversee the litigation. Although a party may *ask* the district court to issue an order clarifying, enforcing, or modifying a decree and *suggest* a favored interpretation, a party—whether a private or public entity—cannot dictate the meaning of the decree to the court or relieve itself of its obligations under the decree without the district court's approval." *Id.* (collecting cases).

To the extent Mr. Musk remains bound by the terms of the consent decree, so should the SEC. If the SEC seeks information about Mr. Musk's compliance, it must come before Your Honor rather than pursue an end-run around the jurisdiction of this Court through improper administrative subpoenas. Because it has not done so, and because it may not "conduct any investigation it may conjure up," *United States v. Constr. Prod. Rsch., Inc.*, 73 F.3d 464, 471 (2d Cir. 1996), the Challenged Requests should be quashed.

### B. The Challenged Requests Should Be Quashed Because The Subpoena Was Issued In Bad Faith.

The motion to quash should further be granted because the subpoena was issued in bad faith by the SEC. This bad faith is evidenced by the long string of investigations into

**SA31**

Mr. Musk's online speech. "[W]hile the SEC is entitled to great freedom in conducting its investigations, it is not at liberty to act unreasonably, and in appropriate circumstances the court may inquire into the reasons for an investigation and into its effects. For example, if a subpoena were not issued in good faith but to harass or pressure the subject of an investigation, or for any other improper purpose, then the court would be bound not to enforce the subpoena as issued." *Brigadoon Scotch Distrib. Co.*, 480 F.2d at 1056; *see also Wheeling-Pittsburgh Steel Corp.*, 648 F.2d at 125 ("[T]he presence of SEC bad faith is only one of several possible reasons for the ultimate conclusion; a determination that the court's process would be abused if the subpoena were to be enforced is the ultimate conclusion."); *Ayers v. SEC*, 482 F.Supp. 747, 751 (D. Mont. 1980) ("While recognizing that the SEC has great latitude and freedom from undue judicial interference in conducting agency investigations, the agency discretion is not unfettered."). Indeed, "[a] court may quash an administrative subpoena if the target demonstrates that the subpoena was issued in bad faith—to harass, to pressure the person subject to investigation, or for some other 'improper purposes.'" *Grenda v. SEC*, 2017 WL 4053821, at *2 (W.D.N.Y. Sept. 14, 2017) (quoting *Brigadoon Scotch Distrib.*, 480 F.2d at 1056).

Improper purposes are evident here and the SEC's pursuit of Mr. Musk has crossed the line into harassment, which is quintessential bad faith. Over the past four years, the SEC has engaged in successive investigations of Mr. Musk and his tweets without cease. Below is a brief summary of the SEC's hovering attention to Mr. Musk's online speech:

- August 7, 2018: Subpoena to Tesla regarding August 7, 2018 Take Private tweet (SF-4082)
- August 9 and 15, 2018: Subpoena to Musk and other individuals regarding the August 7, 2018 Take Private tweet (SF-4082)
- September 27, 2018: Complaint filed in *SEC v. Musk*, 1-18-cv-8865-AJN
- September 29, 2018: Complaint filed in *SEC v. Tesla*, 1-18-cv-8947-AJN

17

**SA32**

* October 16, 2018: Final Judgment on Consent Decree in *Musk* and *Tesla*, settling Take Private Investigation (SF-4082)

- February 26, 2018: SEC correspondence to Tesla expressing concerns with compliance with the Final Judgment

  * April 30, 2019: Amended Final Judgment on Consent Decree in *Musk* and *Tesla* (SF-4082)

- December 4, 2019: Take Private Investigation terminated (SF-4082)

- May 1, 2020: Voluntary subpoena to Tesla regarding *SEC v. Tesla*, 1-18-cv-8947-AJN

- May 14, 2020: Document retention request to Tesla regarding tweets and the Disclosure Controls Committee

- November 16, 2021: Investigation opened regarding November 6, 2021 Stock Sale Poll Tweet (SF-4496)

- November 16, 2021: Subpoena to Tesla regarding Stock Sale Poll (SF-4496)

- November 29, 2021: Subpoena to Elon Musk and others regarding Stock Sale Poll (SF-4496)

The sheer number of these demands raises an inference that the SEC is targeting Mr. Musk and acting in bad faith. And the pattern of demands is similarly telling, reflecting the Commission's bottomless appetite for pursuing Mr. Musk while lacking any evidence that Mr. Musk violated the securities laws.[3] The SEC was not satisfied when Mr. Musk agreed to settle the investigation that led to the first judgment in this case, or when Mr. Musk agreed to settle the investigation that led to the amended judgment in this case. Instead, the SEC has used its subpoena power to continue investigating matters that were subject to settlements, and then serially to start new investigations with no end in sight. As discussed *supra* at 14–15, the former

---

[3] *See* Exhibit E (Letter from A. Spiro to S. Buchholz (May 22, 2020)) ("In the end, the current dispute appears to be nothing more than yet another attempt to harass Tesla and silence Mr. Musk. Over the course of many years, SEC investigations have overlapped endlessly with one another such that there has been no reprieve from the SEC's intense, and meritless, focus on Mr. Musk and his businesses. The serial nature of these investigations leaves us gravely concerned that the SEC is targeting Mr. Musk for an improper purpose.").

SA33

is impermissible; the SEC may not use an administrative subpoenas to investigate a matter once litigation has been brought. And the latter is still amounts to bad faith prohibited by law.[4]

The SEC has offered no indication that it will subside from its campaign against Mr. Musk absent judicial intervention. It falls to courts to check such governmental abuses, as they have in the past. *See generally United States v. Fensterwald*, 553 F.2d 231, 232 (D.C. Cir. 1977) (authorizing limited discovery in light of allegations of agency bad faith); *Int'l Waste Controls, Inc. v. SEC*, 362 F. Supp. 117, 120 (S.D.N.Y. 1973) (finding jurisdiction to enjoin SEC investigations predicated on allegations that the SEC "has plainly exceeded its statutory authority or threatens irreparable injury in clear violation of an individual's rights").

As detailed above, whether and how Mr. Musk's tweets were pre-screened does not bear on his or Tesla's compliance with securities laws. The SEC is heedlessly intruding on Mr. Musk's privacy and into the companies' affairs, a pattern of behavior that shows no sign of

---

[4] The SEC's bad faith toward Mr. Musk and Tesla is further evidenced by the Commission's leak to the media of information regarding its investigation. As explained in counsel's February 21, 2022 letter to this Court, after counsel filed the February 17, 2022 letter to this Court regarding the Commission's conduct, at least one member of the SEC staff responded by leaking to the press certain information regarding its investigation. In the wake of that, Mr. Musk and Tesla sought "on-the-record assurance that the Commission has not leaked investigative details in violation of its own rules and policies, and is otherwise acting in accordance with the law." Dkt. No. 64 at 2–3.

In the week since, the SEC has provided no such assurance, nor has the Commission made any attempt to deny it leaked information about its investigation. By letter dated February 19, 2022, we respectfully requested that specific SEC staff members preserve their records and devices. We also reported the matter to the SEC Office of Inspector General. Still, we have received no denial of the leak.

On February 24, 2022, this Court denied Mr. Musk and Tesla's request for intervention. One hour later, the Wall Street Journal ran an article titled, "SEC Probes Trading by Elon Musk and Brother in Wake of Tesla CEO's Sales," based on the leaked information. *See* Dave Michaels, *SEC Probes Trading by Elon Musk and Brother in Wake of Tesla CEO's Sales*, Wall St. J. (Feb. 24, 2022 2:22 pm ET), https://www.wsj.com/articles/sec-probes-trading-by-elon-musk-and-brother-in-wake-of-tesla-ceos-sales-11645730528.

Retaliation of this nature is impermissible and further evidence of bad faith.

**SA34**

abatement. The SEC's vendetta against Mr. Musk should be put to a stop, and Mr. Musk respectfully requests that this Court quash the Challenged Requests.

### C.   The Consent Decree Should Be Terminated Or At Least Modified.

Even assuming arguendo that the judgments in this case could conceivably support the Challenged Requests, the consent decree should be terminated. The equities strongly favor terminating the consent decree, which intrudes on Mr. Musk's First Amendment right to be free of prior restraints and has been misused to launch endless, boundless investigation of his speech. At a minimum, the consent decree should be modified to remove the prior restraint on Mr. Musk's speech.

"*Rufo* teaches that the power of a court to modify or terminate a consent decree is, at bottom, guided by equitable considerations." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 101 (2d Cir. 1995). That is, a party may seek to modify or terminate a consent decree by demonstrating "a significant change in circumstances." *Id.* (citing *Rufo*, 502 U.S. at 383 n.7; F.R.C.P. 60(b)(5)). *Rufo* further provides "a number of situations that may constitute a showing of changed circumstances, including: where changed factual conditions make compliance with the decree 'substantially more onerous'; where the decree proves unworkable because of unforeseen obstacles; or where enforcement of the decree would be detrimental to the public interest." *Eastman Kodak*, 64 F.3d at 101 n.3 (citing *Rufo*, 502 U.S. at 383 n.7).

### 1.   The SEC's Exploitation Of The Consent Decree Has Made Compliance Onerous And Unworkable.

The SEC's conduct under the auspices of the consent decree threatens to invite more and more governmental abuse moving forward. As the SEC has understood the consent decree and its ability to issue administrative subpoenas thereunder, it has assumed powers it would not otherwise have and used those powers to conduct never-ending investigations. As detailed

**SA35**

above, Mr. Musk and companies in which he holds leadership roles or financial stakes have been subject to one investigation after another, accompanied by round after round of demands for voluminous, costly document productions, with no signs of abatement. This pattern continues despite extensive prior cooperation by Mr. Musk, and despite the absence of any evidence of any securities law violation. Compliance with improper document requests and now this subpoena has become substantially more onerous—and indeed utterly impractical—than the settlement to which the parties consented. The SEC's failure to uphold its side of the bargain alone provides sufficient basis to terminate or modify the decree. *Rufo*, 502 U.S. at 383 n.7. Mr. Musk entered into the consent decree on the understanding it would establish peace and keep the Commission within reasonable, principled bounds. Certainly there was no expectation that this Court's oversight would disappear even while the Court's orders and judgments were specially leveraged by the SEC, or that the SEC would be resolved to harass Mr. Musk without check.

**2.     The SEC Has Used The Consent Decree To Police First Amendment Speech.**

Enforcement of the decree in the present circumstances also poses a grave threat to Mr. Musk's First Amendment rights. Courts are especially attentive "when a party seeks modification of a . . . consent decree that arguably relates to vindication of a constitutional right," *Rufo*, 502 U.S. at 383 n. 7, and "it is always in the public interest to protect constitutional rights," *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020) (citation omitted).

Mr. Musk's tweets are, of course, protected speech. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) ("[S]ocial media users employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought."); *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) ("Although the Internet is the latest platform for anonymous speech, online speech stands on the same footing as other

**SA36**

speech—there is 'no basis for qualifying the level of First Amendment scrutiny that should be applied' to online speech."[5]

When Mr. Musk and the SEC entered into the consent decree, important constitutional questions about the imposition of prior restraints and the chilling effect of government-mandated preauthorization were placed to one side. We are aware of no other consent decree that calls for the imposition of a government-sanctioned monitor who can dictate precisely what Mr. Musk does or does not say. *See, e.g.*, *United States v. Quattrone*, 402 F.3d 304, 310 (2d Cir. 2005) (Sotomayor, J.) ("Any imposition of a prior restraint . . . bears 'a heavy presumption against its constitutional validity.'") (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)); *see also* Dkt. No. 27 at 20–25. In this sense, the peculiar contours and concerns of the consent decree make it especially problematic and susceptible to abuse.

Over the course of the past four years, the Commission has doubled down on its prior attempts to control Mr. Musk's speech. It has done so without any ostensible regard for core First Amendment rights, amidst heavy-handed investigation that seems destined, and perhaps calculated, to chill exercise of those rights. Unlike other consent decrees, the SEC interprets the agreement in this case to permit it to micro-manage Mr. Musk's Twitter activity. Indeed, the SEC believes it may police speech that falls outside the bounds of Section 10(b) of the Securities Exchange Act of 1934, which prohibits fraud in the purchase or sale of securities and statements or omissions of material fact, 15 U.S.C. § 78j(b). But any attempt to censor speech that is not

---

[5]   Mr. Musk has more than 75-million followers on Twitter. Indeed, a recent article by Time Magazine referenced Mr. Musk's tweets half a dozen times and quoted a source's observation that, "He's probably the most viral social influencer ever." Molly Ball, Jeffrey Kluger & Alejandro De La Garza, *2021 Person of the Year: Elon Musk*, Time (Dec. 13, 2021), https://time.com/person-of-the-year-2021-elon-musk/. Government attempts to shut down individuals' speech are always wrong, but attempts to limit the speech of public figures such as Mr. Musk are also undoubtedly detrimental to the public interest. *Rufo*, 502 U.S. at 383 n.7.

SA37

and cannot be considered fraudulent or otherwise violative of the securities laws impermissibly infringes on First Amendment rights.

The 12:17 and 12:23 tweets illustrate this point. Mr. Musk's poll is not a statement or omission of material fact or a scheme to defraud. If anything, it is behavior the SEC should encourage: a CEO's transparency with the public and shareholders about a proposed stock sale.

Of course, Mr. Musk is an outspoken and much-followed critic of the government generally, and the SEC specifically; it should not be lost on anyone that the SEC has shown a preoccupation with investigating Mr. Musk for what he tweets at the SEC's expense.[6]

To the extent that the SEC is exploiting the consent decree to punish protected expression that rubs it wrong, such retaliation is patently unconstitutional. "The constitutional right of free expression is . . . designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us"—not into the hands of the Securities and Exchange Commission. *Cohen v. California*, 403 U.S. 15, 24 (1971).

The consent decree should be terminated, or, at a minimum, the Court should modify the consent decree to remove the prior restraint on Mr. Musk's speech. If the SEC wants this Court to maintain authority over Mr. Musk's conduct, it can do so through the injunction it entered

---

[6]     *See, e.g.*, Elon Musk (@elonmusk), Twitter (Oct. 4, 2018, 1:16 pm PT), https://twitter.com/elonmusk/status/1047943670350020608 ("Just want to [note] that the Shortseller Enrichment Commission is doing incredible work. And the name change is so on point!"); Elon Musk (@elonmusk), Twitter (Feb. 26, 2019, 4:25 am PT), https://twitter.com/elonmusk/status/1100371207491248128 ("Something is broken with SEC oversight."); Elon Musk (@elonmusk), Twitter (July 2, 2020, 11:50 am PT), https://twitter.com/elonmusk/status/1278762916326649863 ("Will send some to the Shortseller Enrichment Commission to comfort them through these difficult times"); Elon Musk (@elonmusk), Twitter (July 2, 2020, 11:57 am PT), https://twitter.com/elonmusk/status/1278764736876773383 ("SEC, three letter acronym, middle word is Elon's").

prohibiting Mr. Musk from violating Section 10(b). Mr. Musk is willing (and the federal securities laws otherwise require him) to abide by the Court's injunction.

### 3. The Equities Strongly Favor Termination.

The circumstances under which Mr. Musk was forced to sign the consent decree only compound the inequitable nature of the present arrangement. A consent decree has attributes of both a contract and a judicial act and is essentially "'a settlement agreement subject to continued judicial policing.'" *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1148 (6th Cir. 1992), *cert. denied*, 509 U.S. 905 (1993); *see also EEOC. v. Loc. 40, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Joint Apprenticeship Comm., Iron Workers Locs. 40 & 361 & Allied Bldg. Metal Indus.*, 76 F.3d 76, 79 (2d Cir. 1996) ("Consent decrees are interpreted according to principles of contract law."). Because consent decrees are also contracts negotiated by the parties, state law claims such as "mutual mistake, fraud, misrepresentation, etc." may also serve as a basis for modification. *See Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 132 F.3d 1142, 1146 n.4 (6th Cir. 1997); *see also Mallory v. Eyrich*, 922 F.2d 1273, 1280 (6th Cir. 1991) (mutual mistake of fact may warrant relief from consent decree).

At the time Mr. Musk signed the consent in this case, Tesla was in no position to weather a fight with the SEC. Mr. Musk felt "forced to sign the consent decree in 2018. Tesla was a less mature company and the SEC's action stood to jeopardize the company's financing. Defending against the SEC's action through protracted litigation was not in the interests of the company and its shareholders." Declaration of Elon Musk at ¶ 4. Mr. Musk "wanted to settle to help Tesla, but [he] did not wish to cause harm to the other companies," which would have been inevitable absent a settlement because the SEC's allegation risked the companies' "future ability to raise money through Regulation D offerings." *Id.* at ¶¶ 5–6. In that posture, Mr. Musk "entered into the consent decree for the immediate survival of Tesla." *Id.* at ¶ 8.

24

"Under California law, economic duress can serve as a basis for invalidating a release or waiver." *U.S. for Use and Benefit of Reed v. Callahan*, 884 F.2d 1180, 1184 (9th Cir. 1989) (applying California law); *see also Kaufman and Broad-South Bay v. Unisys Corp.*, 822 F.Supp. 1468, 1475 (N.D. Cal. 1993). Economic duress is an equitable doctrine which "come[s] into play upon the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal.App.3d 1154, 1158 (1984); *accord Philippine Export v. Chuidian*, 218 Cal.App.3d 1058 (1990). For Mr. Musk, "the only other alternative [was] financial ruin" for Tesla and other companies in which Mr. Musk holds leadership roles or financial stakes, and that was simply not a consequence he could force on the shareholders. *Consumer Health Info. Corp. v. Amylin Pharms., Inc.*, 54 F. Supp. 3d 1001, 1006 (S.D. Ind. 2014), *aff'd*, 819 F.3d 992 (7th Cir. 2016).

In 2018, the SEC took advantage of the position in which it put Mr. Musk. Ever since, the SEC has used the consent decree to repeatedly target Mr. Musk's First Amendment activity for governmental investigation and to thereby chill his expression. Therefore, Mr. Musk respectfully requests that this Court terminate the consent decree, or at the least modify the decree consistent with the First Amendment rights and principles at stake, and monitor the SEC's further enforcement efforts under it.

## V.  CONCLUSION

For the foregoing reasons, Elon Musk, by and through his undersigned attorney, respectfully requests that this Court grant his motion quash the Challenged Requests and to terminate the consent decree.

**SA40**

Dated: New York, New York
       March 8, 2022

Respectfully submitted,

/s/ Alex Spiro
Alex Spiro
QUINN EMANUEL
  URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com

*Attorney for Elon Musk*

**SA41**

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Motion to be filed with the Court's CM/ECF

system this 8th day of March, 2022, thereby causing it to be served on all counsel of record.


Dated: New York, New York                    Respectfully submitted,
      March 8, 2022

                                        /s/ Alex Spiro
                                        Alex Spiro
                                        QUINN EMANUEL
                                          URQUHART & SULLIVAN, LLP
                                        51 Madison Avenue, 22nd Floor
                                        New York, NY 10010
                                        Telephone: (212) 849-7000
                                        Facsimile: (212) 849-7100
                                        alexspiro@quinnemanuel.com

                                        *Attorney for Elon Musk*

SA42

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

    **Plaintiff,**

 v.

**ELON MUSK,**

    **Defendant.**

Civil Action No. 1:18-cv-08865-AJN

## <u>DEFENDANT ELON MUSK'S REPLY IN FURTHER SUPPORT OF HIS MOTION TO QUASH & TO TERMINATE CONSENT DECREE</u>

## TABLE OF CONTENTS

I.      **INTRODUCTION** ................................................................................................. 1

II.     **THE CHALLENGED REQUESTS SHOULD BE QUASHED.** ............................. 1

       A.     **This Court Has Jurisdiction Over The Challenged Requests.** ....................... 1

       B.     **The Challenged Requests Have No Legitimate Investigatory Purpose.** .......... 3

             1.     **The Formal Order Is Not Carte Blanche For Investigation Of Compliance With The Consent Decree.** ................................................. 3

             2.     **Rule 13a-15 Does Not Give The SEC Unbridled License To Investigate Any And All Executive Communications.** ........................ 4

       C.     **The Subpoena Was Issued In Bad Faith.** .......................................................... 6

III.    **THE CONSENT DECREE SHOULD BE VACATED.** ............................................ 7

       A.     **The Consent Decree Violates The First Amendment.** ..................................... 7

       B.     **The SEC's Wrongful Prosecution Cannot Be Recast As Mr. Musk's Regret.** .............................................................................................................. 9

       C.     **The SEC Has Made Compliance Unworkable With Its Unrelenting Investigations And Demands For Privileged Documents.** ............................... 9

       D.     **The SEC Confuses What Is Required By The Consent Decree And What The Securities Laws Mandate.** ............................................................. 10

IV.    **CONCLUSION** ................................................................................................... 10

**SA44**

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>CASES</u>

*Blum v. Yaretsky*,
   457 U.S. 991 (1982) ................................................................................. 7

*Citadel Broad. Co.*,
   Mem. Op. and Order, 17 F.C.C. Rcd 483 (2002) ................................... 9

*Crosby v. Bradstreet*,
   312 F.2d 483 (2d. Cir. 1963) ............................................................... 1, 8

*Exxon Mobil Corp. v. Schneiderman*,
   316 F. Supp. 3d 679 (S.D.N.Y. 2018) ................................................... 3

*Grenda v. S.E.C.*,
   2017 WL 4053821 (W.D.N.Y. Sept. 14, 2017) ................................... 2, 6

*Hampton v. S.E.C.*,
   2018 WL 4853902 (D.D.C. Oct. 5, 2018) ............................................. 2

*In re Consol. Pretrial Proc. in Air W. Sec. Litig.*,
   436 F. Supp. 1281 (N.D. Cal. 1977) ..................................................... 9

*In re Marriage of Baltins*,
   212 Cal. App. 3d 66 (Ct. App. 1989) .................................................... 9

*In re Zarnel*,
   619 F.3d 156 (2d Cir. 2010) ................................................................. 8

*In the Matter of Nikola Corp.*,
   Release No. 93838 (Dec. 21, 2021) ...................................................... 5

*Krantz v. BT Visual Images, L.L.C.*,
   89 Cal. App. 4th 164 (2001) ................................................................. 9

*Lerman v. S.E.C.*,
   928 F. Supp. 2d 798 (S.D.N.Y. 2013) ................................................... 2

*Lugar v. Edmondson Oil Co., Inc.*,
   457 U.S. 922 (1982) ............................................................................. 7

*Rich & Whillock, Inc. v. Ashton Dev., Inc.*,
   157 Cal. App. 3d 1154 (Ct. App. 1984) ................................................ 9

*RNR Enters., Inc. v. S.E.C.*,
   122 F.3d 93 (2d Cir. 1997) ................................................................... 3

**SA45**

*S.E.C. v. Romeril*,
    15 F.4th 166 (2d Cir. 2021) ............................................................................. 7, 8

*United States v. Constr. Prod. Rsch., Inc.*,
    73 F.3d 464 (2d Cir. 1996) ................................................................................. 3

## RULES

Guidance on the Use of Company Web Sites,
    73 Fed. Reg. 45862-01, 45873 (Aug. 1, 2008) ................................................... 5

SEC Release No. 33-8124, Certification of Disclosure in Companies' Quarterly and
    Annual Reports (2002) ........................................................................................ 4

## OTHER AUTHORITIES

Eminem, "Without Me" (2002) ..................................................................................... 8

**SA46**

## I. INTRODUCTION

The SEC argues that it has unfettered authority to subpoena whatever it wants, whenever it wants, so long as it obtains a formal order. But the SEC's investigatory power has limits, especially once, as here, it is leveraging a binding order specially entered and superintended by this Court. The SEC seeks to justify its misconduct by relying on Rule 13a-15—a circumscribed rule that does not govern the conduct it is investigating: Mr. Musk's tweets. And the Second Circuit's binding precedent in *Crosby v. Bradstreet Co.*, 312 F.2d 483 (2d Cir. 1963), requires that the Court either terminate the consent decree or, at minimum, strike the constitutionally overbroad prior restraint on Mr. Musk's speech.

## II. THE CHALLENGED REQUESTS SHOULD BE QUASHED.

### A. This Court Has Jurisdiction Over The Challenged Requests.

This Court plainly has jurisdiction over its judgments; the SEC's arguments to the contrary only seek to circumvent this Court's authority and directly police Mr. Musk's speech without answering to the one tribunal uniquely positioned to adjudicate disputes between these parties, over these issues. Dkt. No. 71 ("Mot.") at 1–2; *see also* Dkt. No. 65 (providing Mr. Musk may make a motion to quash). As this Court knows, the SEC entered into a bilateral, ongoing consent decree that this Court approved and continues to superintend between the parties. Thereafter, the SEC ran to this Court seeking relief when it believed that Mr. Musk did not comply with Tesla's disclosure controls, alleging a violation of the consent decree. *See* Dkt. No. 18. Now, the SEC is telling the Court that it lacks jurisdiction over the same claim. The SEC's actions are nothing more than improper forum shopping.

In its response, the SEC glaringly omits that its subpoenas specifically cite "the final judgment or amended final judgment in *S.E.C v. Musk*, 1:18-cv-8865-AJN (S.D.N.Y.)" and "the final judgment or amended final judgment in *S.E.C v. Tesla*, 1:18-cv-8947-AJN (S.D.N.Y.)."

**SA47**

*See* Mot. at 3; *see also infra* at 3–4 (SEC's misrepresentations of its subpoenas). Notably, Mr. Musk has *not* asked this Court to quash the portions of the subpoena unrelated to the consent decree. He merely seeks relief that this Court is specially situated to provide: supervision over a party to a consent decree issued by this Court. The SEC should no more be able to dodge such supervision than Mr. Musk can.

Further, the SEC provides no support for the jurisdictional bar it seeks to impose on pre-enforcement challenges to SEC subpoenas. The cases cited by the Commission pertaining to sovereign immunity are legally and factually inapposite. None involved the enforcement of a court-ordered consent decree; rather, all involved complaints alleging affirmative claims for abuse of process by the SEC and demanding declaratory and injunctive relief, as well as monetary damages. Dkt. No. 78 ("Resp.") at 5–6. Mr. Musk has not filed a complaint against the SEC nor sought monetary damages, and there is no question of sovereign immunity because the SEC voluntarily selected this Court as the forum for its suit when it could have filed an administrative proceeding. The SEC also filed the joint request for this Court to retain jurisdiction. Dkt. No. 13. Even outside the consent decree context, courts have considered motions to quash pre-enforcement administrative subpoenas on the merits, particularly when third-party rights are concerned, as here.[1] *See, e.g., Grenda v. S.E.C.*, 2017 WL 4053821, at *2 (W.D.N.Y. Sept. 14, 2017); *Hampton v. S.E.C.*, 2018 WL 4853902, at *6 (D.D.C. Oct. 5, 2018); *Lerman v. S.E.C.*, 928 F. Supp. 2d 798, 805 (S.D.N.Y. 2013).[2]

Prudential concerns further support this Court's exercise of jurisdiction. It makes little sense to require that Mr. Musk "wait-and-see" if the SEC initiates a Section 78u(c) proceeding in

---

[1] Mr. Musk is a party to the consent decree, but he is a third-party subpoena recipient.

[2] Unless otherwise indicated, this brief omits from quotations and citations all internal quotation marks, footnotes, and citations.

**SA48**

in this Court or in another,[3] and potentially litigate a venue transfer motion, all for this issue to be re-briefed and decided in a posture substantively identical to the current one. *See Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d 679, 696 (S.D.N.Y. 2018) (declining to exercise prudential ripeness doctrine and ruling on motion to quash pre-enforcement subpoena where party had been producing documents in connection with prior subpoenas).

### B. The Challenged Requests Have No Legitimate Investigatory Purpose.

The Commission offers roving references to its broad authority under the Formal Order, Rule 13a-15, and the judgment and amended judgment in this case to justify the Challenged Requests. But those authorities are each specific and bounded, and none—together or apart—supply the Commission the legitimate investigatory purpose required under law.

### 1. The Formal Order Is Not Carte Blanche For Investigation Of Compliance With The Consent Decree.

The Commission relies heavily on the Formal Order as legal basis for the Challenged Requests. *See, e.g.*, Resp. at 7; *see also id.* at 4–6, 9–10, 16. But the Formal Order is not itself evidence of the legitimacy of the subpoena, no matter how many times the Commission notes its existence. *See* Mot. at 8–9; *United States v. Constr. Prod. Rsch., Inc.*, 73 F.3d 464, 471 (2d Cir. 1996) (rejecting idea that "an agency may conduct any investigation it may conjure up"); *RNR Enters., Inc. v. S.E.C.*, 122 F.3d 93, 97 (2d Cir. 1997) (inquiring whether the formal order reflects a legitimate investigatory purpose). The Formal Order is not an open invitation for any fishing expedition the Commission may wish to pursue, and the Commission errs in assuming that a court may not look behind its veil.

To that end, the SEC twice denies that "its subpoenas are issued under the consent decree," instead stating unequivocally "the subpoenas were issued under the authority granted by

---

[3] When asked, the SEC would not commit to bring such an action before Your Honor.

**SA49**

the Formal Order of Investigation." Resp. at 5 n.2; *see also id.* at 16. To support that claim, the

SEC points out that the Musk and Tesla subpoenas "refer to" the Formal Order, and "do not bear

the caption for *S.E.C v. Musk* or *S.E.C v. Tesla*." Resp. at 4. While it may be strictly true that

this case caption is not at the *top* of the Tesla subpoena, that subpoena *twice* asks for documents

related to compliance with "the final judgment or amended final judgment in *SEC v. Musk*, 1:18-

cv-8865-AJN (S.D.N.Y.)." Mot. at 3. It should suffice to note that the SEC is expressly trading

off consent-decree provisions that are presided over by the very same Court that the SEC is

claiming unfettered prerogatives to circumvent. Any such theory of this Court's authority—by

which the SEC can leverage it without answering to it—is untenable.

### 2. Rule 13a-15 Does Not Give The SEC Unbridled License To Investigate Any And All Executive Communications.

The SEC pairs recitations to the Formal Order with similarly unsupported reliance on

Rule 13a-15. The SEC has no authority for its naked assertion that a securities rule that governs

after-the-fact disclosures in SEC filings *also* requires *pre-approval of tweets*.

First, the SEC argues a point of first-impression, that to comply with the disclosure

controls and procedure requirements of Rule 13a-15, a company must pre-approve its

executives' tweets. The SEC does not cite the Rule itself for this proposition; nor could it.

There is no support in law for the Commission's propositions that (1) the rule requires pre-

approvals of any kind, as opposed to after-the-fact disclosures of material information, or (2) a

tweet constitutes a disclosure similar to an 8-K, 10-K, or 10-Q filing. Mot. at 9–13.[4] Even the

SEC's guidance makes clear that only a narrow set of executive communications fall under the

---

[4]    *See also* SEC Release No. 33-8124, Certification of Disclosure in Companies' Quarterly and Annual Reports (2002), *available at* https://www.sec.gov/rules/final/33-8124.htm (Rule 13a-15 was "intended to address the issuer's controls and procedures for recording, processing[,] summarizing and reporting the information that is required to be disclosed in Exchange Act reports.").

**SA50**

purview of a company's Rule 13a-15 disclosure controls—namely, those that are required in an Exchange Act report. *See* Commission's Guidance on the Use of Company Web Sites, 73 Fed. Reg. 45862-01, 45873-74 (Aug. 7, 2008) (listing examples of communications that may require an Exchange Act report, such as company's waiver of its code of ethics or board policy on director attendance at the annual meeting).

The SEC instead cites the Amended Judgment in this case, which requires pre-approval of certain types of executive communications. Indeed, that is only further evidence that the SEC seeks to investigate compliance with the *consent decree*, not Rule 13a-15. To the extent that the Commission seeks to rely on the Complaint in *S.E.C v. Tesla* and *In the Matter of Nikola Corp.*, Release No. 93838 (Dec. 21, 2021), those were settled matters that carry no precedential legal value; the SEC's theory that Rule 13a-15 covers tweets has never actually been resolved. In any event, the misconduct alleged in those cases—material misrepresentations—differs categorically from the communication at issue here, a Twitter poll. *See generally* Mot. at 11, 13–14.

Second, the SEC argues that Tesla's representations in its 10-Ks and 10-Qs provide basis for investigation. The SEC overstates Tesla's representations, *see* Mot. at 12–13, and again attempts to blur the distinction between Rule 13a-15 and the consent decree. Rule 13a-15 requires that Tesla make certain disclosures in Commission filings. Distinctly, the consent decree concerns pre-clearance of certain executive communications, including Mr. Musk's tweets, by Tesla's securities counsel. After a tweet is published (pre-approved or not), the SEC's only germane concern under Rule 13a-15 should be whether obligatory information is disclosed.[5] But nowhere in its brief does the SEC cite a single example of a communication (*e.g.*, a tweet)

---

[5]    Under Rule 13a-15, the touchstone inquiry for whether a filing is necessary is materiality. In contrast, the Amended Judgment does not contain a materiality requirement and encompasses a broader category of information than what is covered under the Rule.

**SA51**

by Mr. Musk that contained information that Tesla was required to separately disclose in a filing with the Commission and did not—the crux of a Rule 13a-15 analysis.[6]  And the SEC does not actually allege that the tweets it complains about independently violate securities laws.  Instead, the SEC has based its investigation on whether or not tweets were pre-approved—a question that distinctly concerns the consent decree and not Rule 13a-15.

To the extent the SEC cites *Grenda v. S.E.C.* to suggest that it has the power to issue subpoenas and investigate whether a party is complying with a settlement—without any independent violation of the securities laws—that case is inapposite because it concerned a settlement in an SEC administrative proceeding and therefore did not implicate the ongoing supervisory authority of a federal court.  Resp. at 10, 2017 WL 4053821, at *1.  As discussed at length in the principal brief, the SEC may not make an end-run around this Court's supervision.  Mot. at 12–16.

Nor has the SEC actually cited any support for its contention that the consent decree "require[s] Tesla to . . . ensure that Musk actually *complies with*—the company's new mandatory controls and procedures."  Resp. at 9.  Tesla is in fact complying with its obligations to institute disclosure controls.  *See* Mot. at 13.  That the Commission prefers to substitute its judgment for that of the independent directors whom the SEC *approved* to monitor disclosure controls says nothing about what the consent decree itself mandates.[7]

### C. The Subpoena Was Issued In Bad Faith.

The SEC reverts to claims of its purported broad authority in response to Mr. Musk's well-grounded claims of harassment.  What the Commission calls "new instances of conduct . . .

---

[6]  *See Tesla*, Dkt. 3-1 ¶ 6(c) (requiring Tesla securities counsel to make appropriate SEC filings following communications).

[7]  *See Tesla*, Dkt. 3-1 ¶ 6(b) (requiring committee oversight of the judgment, "the charter and composition of [which] is subject to review and approval by the staff of the Commission").

**SA52**

that could implicate the federal securities laws," Resp. at 11, are nothing more than Mr. Musk's tweets of a truthful fact, an aspiration, an opinion, and a question—not material misrepresentations or fraud. Nor does the Commission address its leak of non-public information about this investigation, which alone speaks volumes about the SEC's bad faith conduct toward Mr. Musk. *See* Mot. at 19 n.4.

## III. THE CONSENT DECREE SHOULD BE VACATED.

Mr. Musk's arguments for vacatur of the consent decree are only further vindicated by the Commission's response to his motion. The SEC has advanced its investigations without regard for Mr. Musk's constitutional rights, the limits of its authority under Rule 13a-15, or the circumstances under which Mr. Musk signed the decree.

### A. The Consent Decree Violates The First Amendment.

The Commission first attempts to evade scrutiny for its unconstitutional restraint on Mr. Musk's speech by arguing that an SEC-designed, court-enforced agreement involves no state action merely because the Commission has deputized a Tesla securities lawyer to pre-approve Mr. Musk's tweets. But it is irrelevant *whom* the SEC has tasked with this duty; Mr. Musk's speech is restrained as a result of the SEC's prosecution just the same. *See Blum v. Yaretsky*, 457 U.S. 991, 1004–05 (1982) (state action can be found where the state exercises coercive power on the private actor, provides "significant encouragement", or transfers into private hands traditionally state powers); *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982) ("[T]he conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the State.").

Next, the SEC again oversteps by claiming that, just because Mr. Musk agreed to the judgment and amended judgment in this case,[8] that he waived any right to challenge the SEC's

---

[8]    In fact, Mr. Musk was not represented by counsel at the time of the amended judgment.

**SA53**

subsequent abuse of the settlement. The Commission misplaces reliance on *S.E.C v. Romeril*, 15 F.4th 166 (2d Cir. 2021), which created a deep intra-circuit split and is the subject of a currently pending petition for certiorari. But *Crosby v. Bradstreet Co.*, 312 F.2d 483, in which the Second Circuit vacated a consent decree on First Amendment grounds, remains the controlling law in this Circuit. *See In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010) (law of the circuit rule). In *Crosby,* the Second Circuit held:

> with the power of a court of the United States to enjoin publication of information about a person, without regard to truth, falsity, or defamatory character of that information. Such an injunction, enforceable through the contempt power, constitutes a prior restraint by the United States against the publication of facts which the community has a right to know and which [plaintiff] had and has the right to publish. The court was without power to make such an order; *that the parties may have agreed to it is immaterial.*

*Id.* at 485 (emphasis added).

Notwithstanding, Mr. Romeril has asked the Supreme Court to resolve this split, correctly explaining that there is little more offensive to the First Amendment than a content-based lifetime ban on wholly truthful speech.[9] *Romeril*, 15 F.4th 166, *petition for cert. filed*, (U.S. Mar. 23, 2022) (No. 21-1284) (collecting cases holding courts lack power to enforce prior restraints and content and viewpoint-based speech restrictions as settlement conditions, even when entered with consent). Further, the broad swath of speech subject to pre-approval, and the SEC's continuing and harassing investigation of Mr. Musk's compliance with its prior restraint, raise additional concerns beyond the no-admit-no-deny gag order at issue in *Romeril*.

The First Amendment requires that agencies proceed with caution when constitutional rights are at stake, not seek to pursue any and all novel theories that broaden their authority at the

---

[9]     *See generally* Ex. E to Mot. The intermittent nature of the SEC's harassment underscores the judgment's chilling effect because it is impossible to know *ex ante* what tweets will raise the Commission's ire. Even the SEC seems unsure of what tweets require preclearance, leaving only two conclusions: the consent decree is unduly vague or the agency is pursuing its investigation in bad faith.

**SA54**

cost of individual freedom. *Compare* Eminem, "Without Me" (2002) ("The [SEC] won't let me be or let me be me so let me see / They tried to shut me down . . .") *with Citadel Broad. Co.*, Mem. Op. and Order, 17 F.C.C. Rcd 483 (2002) (rescinding penalty against radio station for playing Eminem song and noting "the First Amendment is a critical constitutional limitation that demands we proceed cautiously and with appropriate restraint").

### B. The SEC's Wrongful Prosecution Cannot Be Recast As Mr. Musk's Regret.

The SEC attempts to recast its own coercive prosecution of Mr. Musk, but the Commission concedes that a wrongful act may create economic duress. Resp. at 14. *See Krantz v. BT Visual Images, L.L.C.*, 89 Cal. App. 4th 164, 176 (2001), *as modified* May 22, 2001 ("Impermissible threats include bad faith threatened use of civil process."). And the Commission does not even seek to defend its initial prosecution of Mr. Musk for his truthful tweets regarding taking Tesla private. *See generally* Mot. at 24–25.

"[F]ear of financial ruin is uniformly recognized as a valid reason for submitting to another party's economic coercion." *In re Consol. Pretrial Proc. in Air W. Sec. Litig.*, 436 F. Supp. 1281, 1290 (N.D. Cal. 1977). While settlements undoubtedly offer consideration to both parties, like all contracts, that is no answer to a claim of coercion. "[A] reasonably prudent person subject to [a wrongful] act may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin." *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154, 1159 (Ct. App. 1984). And that the consent included a clause regarding its voluntary nature does not absolve the SEC of any wrongful conduct. *See In re Marriage of Baltins*, 212 Cal. App. 3d 66, 83 (Ct. App. 1989).

### C. The SEC Has Made Compliance Unworkable With Its Unrelenting Investigations And Demands For Privileged Documents.

The SEC again relies on vague citations to the Formal Order and its broad investigatory power to justify another investigation that is patently seeking evidence of compliance with the

**SA55**

consent decree.  Resp. at 16; *supra* at 3–4.  But the general investigative authority of the SEC does nothing to inform the Court about whether the consent decree is workable.

For example, the SEC has repeatedly demanded access to documents that are attorney-client communications or attorney work product.  *See, e.g.*, Musk Subpoena (demanding production of "Documents related in any way to submission of the 12:17 tweet and/or the 12:23 tweet to Tesla's General Counsel or Securities Counsel, or any counsel acting in either capacity . . . .").  While Tesla and Mr. Musk have properly rebuked such efforts, the SEC has not relented and has repeatedly taken the position that communications and work product reflecting attorney advice regarding pre-approval are not privileged.  Accordingly, as structured, compliance with the consent decree cannot be confirmed without testing the outer bounds of attorney-client privilege and the attendant constitutional concerns.  *See also generally* Mot. at 16–20.

### D. The SEC Confuses What Is Required By The Consent Decree And What The Securities Laws Mandate.

The SEC takes the position that it may investigate any of Mr. Musk's tweets so long as he tweets about Tesla, regardless of whether the consent decree is vacated.  Resp. at 17.  As described above, the SEC misapprehends what disclosure controls and procedures Rule 13a-15 requires.  *See supra* at 4–6.  Moreover, if the SEC is correct that Rule 13a-15 requires procedures identical to the amended judgment, it is difficult to understand why the amended judgment should remain in force.

## IV.  CONCLUSION

Mr. Musk respectfully requests the Court quash the Challenged Requests and terminate the consent decree.

**SA56**

Dated: New York, New York
      March 29, 2022

Respectfully submitted,

/s/ Alex Spiro
_____

Alex Spiro
QUINN EMANUEL
  URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com

*Attorney for Elon Musk*

**SA57**

### CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Motion to be filed with the Court's CM/ECF system this 29th day of March, 2022, thereby causing it to be served on all counsel of record.

Dated: New York, New York
March 29, 2022

Respectfully submitted,

/s/ Alex Spiro
Alex Spiro
QUINN EMANUEL
    URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com

*Attorney for Elon Musk*

**SA58**